LARA SHALOV MEHRABAN
ACTING REGIONAL DIRECTOR
Sheldon L. Pollock
Richard G. Primoff
Lindsay S. Moilanen
Theresa H. Gue
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, 20-100
New York, NY 10004-2616
(212) 336-0148 (Primoff)
Email: primoffr@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **COMPLAINT** |
| **Plaintiff,** | **22 Civ. 4736 (      )** |
| -against- | |
| **KAREN ROSENBERGER and JOANNA LANNI,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint against Defendants Karen Rosenberger ("Rosenberger") and Joanna Lanni ("Lanni"), alleges as follows:

## SUMMARY

1.      This action involves misconduct by two certified public accountants—Rosenberger, the Chief Financial Officer ("CFO") and Lanni, the Controller—in connection with improper accounting at Synchronoss Technologies, Inc. ("Synchronoss" or the "Company"), a public company in the business of providing software products and services in the

telecommunications industry. As a result of this misconduct, Synchronoss materially overstated its financial performances in multiple quarterly and annual filings from November 2015 to February 2017. Rosenberger signed and certified the accuracy of each of these filings.

2.     On June 13, 2017, the Company filed a Form 8-K with the Commission, disclosing that its financial statements filed for fiscal years ("FY") 2015 and 2016 should no longer be relied upon, as it had improperly recognized revenue in those filings, and had "identified a material weakness in internal control over financial reporting relating to its revenue recognition process."

3.     On July 2, 2018, Synchronoss filed a Form 10-K with the Commission that restated financial statements for FY 2015 and 2016 and other selected financial data for those periods, as well as selected financial data for FY 2013 and 2014. Synchronoss acknowledged that in the restated period, it had improperly accounted for numerous transactions amounting to approximately $190 million in cumulative revenue, and had "pervasive material weaknesses" in its internal accounting controls.

4.     This action involves conduct from September 2015 to June 2017 (the "Relevant Period") with respect to five of these transactions, for which the Company improperly recorded revenue, cumulatively, of approximately $26 million, in violation of generally accepted accounting principles ("GAAP").

5.     Rosenberger aided and abetted the Company's public filing of materially false financial statements with respect to these transactions and engaged in fraud with respect to three of them—two transactions with one of the Company's largest customers ("Customer A"), and one transaction in which the Company acquired another business.

6.      Rosenberger sought to cover up her and the Company's misconduct by lying to Synchronoss's auditor in connection with those transactions, falsifying the Company's books and records, and by failing to implement or maintain, and circumventing, the Company's system of accounting controls.

7.      Lanni, as Controller, aided and abetted the Company's improper revenue recognition, and circumvented the Company's system of accounting controls in connection with one of these five transactions, by providing a materially misleading memorandum to the auditor regarding the transaction.

## VIOLATIONS

8.      By virtue of the foregoing conduct and as alleged further herein, Defendant Rosenberger violated Sections 10(b), 13(a) and 13(b)(5) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j(b), 15 U.S.C. § 78m(a) and 78m(b)(5)] and Rules 10b-5, 13a-14, 13b2-1, and 13b2-2 promulgated thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, and 240.13b2-2]; violated Section 304 of the Sarbanes-Oxley Act of 2002 ("SOX"); and aided and abetted Synchronoss's violations of Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].[1]

9.      By virtue of the foregoing conduct and as alleged further herein, Defendant Lanni violated Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1]; and aided and abetted Synchronoss's violations of Sections

---

[1]      Rosenberger entered into multiple tolling agreements with the Commission covering the period January 15, 2020 to September 18, 2021.

13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) & 78m(b)(2)(A)] and Rules

12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11,

and 240.13a-13].[2]

10.     Unless Defendants are restrained and enjoined, they will engage in the acts,

practices, transactions, and courses of business set forth in this Complaint or in acts, practices,

transactions, and courses of business of similar type and object.

**NATURE OF THE PROCEEDING AND RELIEF SOUGHT**

11.     The Commission brings this action pursuant to the authority conferred upon it by

Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

12.     The Commission seeks a final judgment: (a) permanently enjoining Defendants

from violating the federal securities laws and rules this Complaint alleges they have violated;

(b) ordering Defendants to pay civil money penalties pursuant to Exchange Act Section 21(d)(3)

[15 U.S.C. § 78u(d)(3)]; (c) permanently prohibiting Defendant Rosenberger from serving as an

officer or director of any company that has a class of securities registered under Exchange Act

Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d)

[15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

(d) ordering Defendant Rosenberger to reimburse the Company for all incentive-based

compensation, equity-based compensation, stock-based compensation, and stock profits pursuant

to Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243(a)]; and (e) ordering any

other and further relief the Court may deem just and proper.

---

[2]     Lanni entered into multiple tolling agreements with the Commission covering the period
May 7, 2020 to December 7, 2021.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Section 27 of the

Exchange Act [15 U.S.C. § 78aa].

14.     Defendants, directly and indirectly, have made use of the means or

instrumentalities of interstate commerce or of the mails in connection with the transactions, acts,

practices, and courses of business alleged herein.

15.     Venue lies in this District under Section 27 of the Exchange Act [15 U.S.C.

§ 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this

Complaint occurred within the Southern District of New York and were effected, directly or

indirectly, by making use of means or instrumentalities of transportation or communication in

interstate commerce, or the mails, or the facilities of a national securities exchange. During the

relevant period, the Company's stock was traded in the Southern District of New York on the

Nasdaq Stock Market ("Nasdaq"), and certain investors who purchased the Company's stock

during the Relevant Period resided in the Southern District of New York. The false and

misleading statements identified in this Complaint were directed into, among other places, the

Southern District of New York.

## DEFENDANTS

16.     **Rosenberger**, age 56, resides in Las Cruces, New Mexico. From 2008 until 2017,

Rosenberger was licensed by the State of New Jersey as a certified public accountant ("CPA").

Rosenberger joined Synchronoss in 2000, and from 2015 until her resignation on April 1, 2017,

Rosenberger served as the Company's CFO. As CFO, Rosenberger was in charge of and

supervised Synchronoss's accounting team and signed and certified the accuracy of each of the

Forms 10-K and Forms 10-Q that the Company filed during the Relevant Period. Rosenberger

also signed the management representation letters the Company sent to its auditor for each annual audit and quarterly review during the Relevant Period.

17.     **Lanni**, age 52, resides in Franklin Park, New Jersey. Lanni has been licensed as a CPA since 2003. Lanni joined Synchronoss in 2014, and from 2015 to mid-2017, served as its Controller. Lanni is currently employed as an accountant at a public company.

## OTHER RELEVANT ENTITY

18.     **Synchronoss** is a software and services company based in New Jersey. Its customers are generally telecommunications companies, and its products and services during the Relevant Period included software-based activation, messaging, and analytics, as well as cloud services. The Company's securities are registered pursuant to Section 12(b) of the Exchange Act, and are currently listed on Nasdaq. From May 2018 to October 2018, the Company was delisted by Nasdaq because it had become delinquent in its required filings. During the Relevant Period, numerous people purchased the Company's securities, including multiple individuals residing in the Southern District of New York.

## FACTS

**I.     ROSENBERGER DIRECTED SYNCHRONOSS TO FALSELY REPORT MORE THAN $7 MILLION IN REVENUE FROM PURPORTED SALES TO CUSTOMER A IN 2015**

19.     In the third ("Q3") and fourth quarters ("Q4") of 2015, Synchronoss's sales team failed to close the sale of two software licenses to Customer A, one of its largest telecommunications customers. At Rosenberger's direction, Synchronoss nonetheless improperly recognized over $7 million in revenue from these purported sales in these quarters.

20.     As Rosenberger knew or recklessly disregarded, Customer A did not commit to purchase the first of these licenses, and by July 2016 at the latest, Rosenberger also knew or

recklessly disregarded that Customer A had informed the Company that it had decided not to purchase the license.

21.     For the second license, the Company created a purported agreement that Rosenberger knew or recklessly disregarded was backdated to December 31, 2015, even though Rosenberger knew the sale had not actually closed by that date.

22.     Synchronoss, at the direction of Rosenberger, carried both of these purported sales on its books as "unbilled receivables" throughout 2016.

23.     Rosenberger misled the Company's auditor with regard to the status of these transactions to avoid having to write off these unbilled receivables or restate its financial statements for Q3 and Q4 2015.

**A.      GAAP Principles Relevant to the Customer A Transactions**

24.     As a public company, Synchronoss was required during the Relevant Period to file quarterly and annual reports with the Commission that presented its financial results in conformity with GAAP.

25.     Revenue recognition for the sale of software under GAAP during the Relevant Period was governed by the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 985-605. Paragraph 985-605-25-3 provided that companies such as Synchronoss could properly recognize revenue from the sale of software that did not "require significant production, modification, or customization," only when each of the following conditions were met:

a.     Persuasive evidence of an arrangement exists;
b.     Delivery of the product has occurred;
c.     The vendor's fee is fixed or determinable; and
d.     Collectibility is probable.

26.     According to ASC 985-605-25-6, GAAP during the Relevant Period required that where a software license is sold to a customer together with other products and services, the transaction must be evaluated as a single arrangement with multiple elements (a "multiple element arrangement" or "MEA"), and the "fee shall be allocated to the various elements based on vendor-specific objective evidence of fair value, regardless of any separate prices stated in the contract for each element."

27.     According to GAAP, if contracts are negotiated or executed within a short time frame of each other, it is an indication that the contracts should be accounted for as an MEA.

28.     In such MEAs, GAAP during the Relevant Period required that if a company does not have vendor specific objective evidence ("VSOE") of fair value for all undelivered elements, revenue recognition for the entire arrangement, even for delivered elements, must be deferred until either VSOE exists for the undelivered elements, all elements are performed or delivered, or as the services are expected to be performed (ASC 985-605-25-9 and 10).

**B.      Synchronoss Failed to Close a Sale for the
         Access Service Request "ASR" Software in Q3 2015**

29.     In March 2015, Synchronoss's sales team began efforts to sell its ASR Software to Customer A.[3]

30.     By August 2015, still with no agreement reached on the ASR Software transaction, Synchronoss and Customer A began work instead on a "proof of concept" ("POC") trial to test the ASR Software, by having one of Customer A's customers use the software on a trial basis.

---

[3]      The ASR Software was a software product intended to assist Synchronoss's telecommunications customers in responding to access service requests (*i.e.*, orders to originate or terminate connections to a telephone network) by or to other phone carriers.

31.     That POC trial continued to February 2016, at which time Customer A terminated it.

32.     During negotiations in September 2015 with Customer A to finalize the financial terms of the POC trial, Customer A made clear to a Synchronoss salesperson ("Sales Rep. A") that it was not committing to purchase the ASR Software on a production basis (*i.e.*, for use with actual customers), as the terms were still being negotiated. Terms of finalized agreements between Synchronoss and Customer A were typically contained in a Statement of Work ("SOW"). Sales Rep. A emailed in response that he agreed.

33.     In negotiating the SOW for the POC trial, Customer A refused to agree to Synchronoss's request that upon a successful conclusion of the trial, Customer A would immediately purchase the ASR Software license. Instead, Customer A insisted on an explicit provision in the SOW for the POC—executed on October 29, 2015—that provided that even after a successful conclusion of the POC trial, "[a] decision to move to production will be determined post-launch solely by [Customer A]."

34.     On September 25, 2015, Sales Rep. A emailed price terms for an "Enterprise Edition" of the ASR Software license of $4.5 million to three employees of Customer A and told them that for Synchronoss to be able to deliver workable licenses that month to be used not only by the POC test subject but "beyond," the Company required both (1) their approval and the emailed approval of one or both of two more senior employees of Customer A to those terms, and (2) an emailed response that said, "We are agreeing to move forward with Corporate or Enterprise [ASR] Software from Synchronoss."

35.     One of the Customer A employees, after receiving an email from one of the more senior employees at Customer A that stated only that Synchronoss was "[a]pproved to begin the

SOW," replied by email to Synchronoss that it "ha[d] approval to start the SOW on good faith." Sales Rep. A told his supervisor (the "Sales EVP") that the language from Customer A "doesn't help" and that he was trying to get it changed. The Sales EVP then forwarded all of these email exchanges to Rosenberger and others at Synchronoss and agreed that "what we have so far [is] not what we need," meaning the response was insufficient for purposes of recognizing revenue in Q3.

36.     Sales Rep A then tried again. He sent another email to Customer A on September 28, 2015 that, as he had initially, advised that Synchronoss still required the approval of one or both of the same senior Customer A employees as before, and a response that said: "We are agreeing to move forward with Corporate or Enterprise Edition (please pick one) of the ASR Software."

37.     Later that day, Sales Rep. A received the requested one-sentence response from one of the employees of Customer A by email, but Customer A never sent the required email approvals of either of the two senior Customer A employees (neither of whom were included on Sales Rep. A's email). Sales Rep. A then forwarded that entire email chain to the Sales EVP, who then forwarded it to Rosenberger and others.

38.     After others (including the CEO) responded to the Sales EVP with relief and approval in emails on which Rosenberger was included, Rosenberger responded, "Great news!!!!!"

39.     As Rosenberger knew or recklessly disregarded, however, there was not persuasive evidence of an arrangement for the sale of the ASR Software license, or probability of collection, as required for revenue recognition under GAAP, because Synchronoss (1) had not received the required email approvals from either of the senior employees of Customer A that

Sales Rep. A had told Customer A were required, (2) the POC trial was still in process, and

(3) Customer A had not agreed to anything other than to start the process of negotiating an SOW.

### C.   Synchronoss Failed to Close a Sale of its Local Number Portability ("LNP") Software in the Fourth Quarter of 2015

40.     Synchronoss also sought to sell its LNP Software to Customer A in 2015.[4]

41.     By late 2015, Customer A had informed Synchronoss's sales team that it would

not be purchasing the Company's LNP Software by the close of the fourth quarter.

42.     Rosenberger knew or recklessly disregarded that Synchronoss was not going to

close the sale by the end of the year. On December 24, 2015, for example, in an email that was

forwarded to Rosenberger that same day, Sales Rep. A emailed the Sales EVP and others at

Synchronoss that funding at Customer A had not been approved for the purchase, and that he

thought Customer A would "get this done in Jan[uary] following [Customer A's] regular

process."

43.     Furthermore, as Rosenberger knew or recklessly disregarded, during the first

week of January 2016, Synchronoss was still negotiating material terms of the sale with

Customer A.

44.     By email dated January 5, 2016 to Rosenberger and others, for example, Sales

Rep. A advised that the license fee for the LNP Software had been revised to $3 million—in

other words, that the price term of the agreement was not finalized.

45.     From emails Rosenberger received on January 5 and 6, 2016, Rosenberger also

knew or recklessly disregarded that the LNP Software transaction was intended by the Company

---

[4]     The LNP Software was a software product intended to allow a retail customer of
Customer A to keep his or her personal mobile number when switching carriers.

and Customer A to be an MEA agreement (*see* ¶¶ 26-28, *supra*). In addition to the sale of the license, the Company was to provide, among other things, hosting services to Customer A.

46.     Based on those emails, Rosenberger knew or recklessly disregarded that the Company and Customer A were continuing to negotiate the terms of such services simultaneously with the license, and that there was no VSOE of the fair value of those hosting services.

47.     On January 6, 2016, after receiving an email update on the status of negotiations that were still ongoing, the Company's Chief Operating Officer ("COO") asked Rosenberger, "How does this translate to Q4?" Rosenberger responded, "Unclear yet. They need to get the license piece approved tonight."

48.     As Rosenberger knew or recklessly disregarded, even had Synchronoss and Customer A reached agreement on the terms of a sale of the "license piece" on January 6, it would have been improper under GAAP for Synchronoss to report the revenue as having been earned in 2015, because there would still have been no evidence of an agreement as of December 31, 2015, and because there was no VSOE for the undelivered elements of this MEA, such as hosting.

49.     But Synchronoss, as Rosenberger also knew or recklessly disregarded, did not reach agreement with Customer A on January 6.

50.     In an email dated January 6, Sales Rep. A told Rosenberger that another Company employee wanted him to have Customer A "physically sign and backdate the license agreement," and warned he might get some "pushback on that since [the] only entity authorized to physically sign documents is procurement." Rosenberger acknowledged in response that she was aware of that request.

51.     In the afternoon of January 8, 2016, Sales Rep. A emailed Rosenberger a one-page document with an illegible signature (and no printed name) that, just as he had previously suggested to Rosenberger two days earlier, was misleadingly backdated to December 31, 2015 (the "Backdated Letter"). Shortly thereafter that same afternoon, Rosenberger forwarded the Backdated Letter by email to others, noting that "[t]his is consistent with the conversation [the Company employee] . . . and I had the other evening."

52.     The Backdated Letter purported to reflect summary terms for a license agreement for the LNP Software, with a purported license fee of $3 million. It was backdated, as Rosenberger knew or recklessly disregarded, to provide the false and misleading appearance that it had been signed before the end of the fourth quarter of 2015.

53.     There was also no indication on the Backdated Letter that it was signed by a member of Customer A's procurement department, who, as Sales Rep. A had notified Rosenberger just two days earlier, were the only employees of Customer A authorized to sign agreements.

54.     In fact, notwithstanding the Backdated Letter, Customer A had not agreed to purchase a license of the LNP Software in January 2016 at all.

55.     As Rosenberger knew or recklessly disregarded, Synchronoss and Customer A were still negotiating the terms of a license for the LNP Software as late as September 2016, as well as the other, undelivered, elements of this MEA.

56.     By email dated September 1, 2016, for example, the Sales EVP forwarded to Rosenberger and others a summary of outstanding material issues in the negotiations for the LNP Software license transaction.

57.     The Sales EVP noted in the email that "I have little confidence in this thing getting resolved and contracted in a way that we need by end of quarter. It will ultimately require an escalation to resolve IMO and I have believed that for some time. Otherwise, it's going to continue to swirl."

58.     As Rosenberger knew or recklessly disregarded, negotiations continued over the next few months, and Synchronoss did not enter into an agreement to sell the LNP Software to Customer A until December 2016, for a price of $2.5 million—half a million dollars lower than the $3 million improperly recognized as revenue in 2015.

### D.     Negotiations for ASR and LNP Software Continued into 2016 <br> As the Auditor Began to Question the Receivables

59.     Synchronoss continued to carry the purported Customer A receivables for the ASR and LNP transactions as "unbilled receivables" on its books throughout 2016, even as Customer A repeatedly communicated to Synchronoss management that it had never agreed to purchase the ASR Software and would not purchase it, and as negotiations over the LNP Software license sale continued throughout the year.

60.     On January 14, 2016, Customer A requested by email a quote from Synchronoss for the sale of the ASR Software license—again notifying Synchronoss that it had not previously agreed to purchase the ASR Software license Synchronoss had already falsely recorded as sold.

61.     Sales Rep. A replied by email on January 20, 2016 that he would not submit that quote until January 22, because, among other things, he needed to negotiate its terms with Rosenberger.

62.     By email dated January 28, 2016, Rosenberger learned that the Company's auditor had requested a telephone call the following week to discuss the status of the SOWs for the ASR and LNP Software licenses.

63.     Rosenberger was further notified by email on February 3, 2016 that the auditor wanted to send written confirmation requests to Customer A to verify that Customer A owed Synchronoss payment on the ASR and LNP Software licenses the Company had booked as revenue the prior year.

64.     In an email that same day, Rosenberger explained to the COO that the auditor was looking at these sales because "[w]e didn't bill it – sitting in unbilled – no SOW. Sitting in unbilled in Q3 and Q4."

65.     Rosenberger understood that the auditor would focus on the LNP and ASR Software receivables because they were unusually old. When the COO complained in response that the auditor was "fishing," Rosenberger lamented that "we aren't coming from a position of strength from the other items booked in the quarter and prior quarter DSO's [Days Sales Outstanding]," and "[n]ow they are going through everything."[5]

66.     From February 2016 to mid-July 2016, Customer A repeatedly notified Synchronoss's sales team and senior management, first, that Customer A did not consider the September 28, 2015 email to reflect a commitment to purchase the ASR Software, and, then, by late June 2016, that Customer A had decided not to purchase the ASR Software license at all.

67.     On February 18, 2016, for example, Customer A emailed a letter to the COO and members of the sales team, complaining that "members of the Synchronoss' sales organization" had improperly been attempting to "secure commitments via email directly from [Customer A] business personnel outside of our companies' prescribed business practices," and, referencing the

---

[5]     "Days Sales Outstanding" is a measure of the average number of days that it takes a company to collect payment for a sale.

ASR Software transaction, noted that this behavior had led the Synchronoss sales team to assert that Customer A had committed to purchase that product, when in fact it had not.

68.     Customer A's letter also advised that "[a]ny action that Synchronoss may choose to take based on communications with [Customer A] business organizations in advance of a written agreement signed by GSC [Global Supply Chain] puts your company at risk."

69.     The following day, the COO sent a responsive letter to Customer A that did not dispute Customer A's assertions.

70.     On February 23, 2016, Customer A reiterated by letter to the COO and others at Synchronoss that there was no legally binding contract for the sale of the ASR Software.

71.      Rosenberger knew or recklessly disregarded that Customer A's position regarding the ASR Software transaction had a material effect on Synchronoss's prior recognition of revenue for 2015.

72.     On June 23, 2016, Customer A emailed certain sales personnel at Synchronoss, that Synchronoss's ASR Software "was not selected as a finalist" against products offered by its competitors. The email was forwarded later that day to a number of executives at Synchronoss, all of whom sat near Rosenberger in a small area restricted to the most senior company executives.

73.     On July 12, 2016, Rosenberger met with the COO, the GC, and other Synchronoss executives and sales personnel to review the Company's position on ASR Software, and, as one participant of the meeting described in an internal email, collectively decided to "kick the can further down the line with no escalation anywhere" until Q3 or Q4 of 2016 or later, and instead to focus on obtaining a signed agreement for the LNP Software sale that the Company previously reported had already occurred.

E.     **Rosenberger Materially Misled Synchronoss's**
       **Auditor With Respect to the Customer A Transactions**

74.     To evade scrutiny from the Company's auditor, Rosenberger, as discussed below

in detail, misled the auditor when it questioned Synchronoss on the status of these receivables,

through materially false and misleading statements and omissions of fact.

75.     Rosenberger reviewed and approved materially false and misleading revenue

recognition memoranda that she knew or recklessly disregarded would be provided, and were

provided, to Synchronoss's auditor in connection with its review of the Company's financial

statements.

76.     The revenue recognition memorandum for the ASR Software license represented

that there was "persuasive evidence of an arrangement" and "[c]ollectability is probable," but as

Rosenberger knew or recklessly disregarded, these statements were materially false and

misleading.

77.     The memorandum omitted that (1) Synchronoss never received the email

approvals from the senior employees that Synchronoss told Customer A were required; and

(2) the POC trial was still on-going, and the signed agreement on the POC trial expressly

provided that Customer A was reserving decision on whether to purchase a production version of

the license. The omission of these material facts, as Rosenberger knew or recklessly disregarded,

made the statements in the revenue recognition memorandum materially false and misleading.

78.     The revenue recognition memorandum that Rosenberger reviewed and approved

for the purported LNP Software license falsely and misleadingly represented that there was

"persuasive evidence" of a sale of the license as of December 31, 2015, because "Synchronoss

received a letter from [Customer A] confirming that the [LNP Software] had been delivered as of

December 31, 2015," and "[w]e also note that the letter confirms the pricing for the licenses and maintenance support and does not grant [Customer A] any rights of return or price protection."

79.     As Rosenberger knew or recklessly disregarded, the memorandum omitted entirely any mention of the material fact that the purported agreement for the sale of the LNP license had not been reached in December 2015, that the Backdated Letter on which it relied as "persuasive" evidence of an agreement supposedly reached on December 31, 2015 was not signed until January 8, 2016, that the Backdated Letter was not signed by an authorized employee of Customer A—and that, with Rosenberger's knowledge and approval, the Company had backdated the document for the sole purpose of obscuring this material fact from the auditor, so that the Company could get away with inflating its financial statements.

80.     The memorandum, as Rosenberger knew or recklessly disregarded, also omitted any mention of the material fact that the LNP license was negotiated as an MEA together with an agreement for the Company to provide hosting services in connection with that software. This fact was material because the Company lacked VSOE of the fair value of those services, which were to be provided in 2016 and beyond (*i.e.*, they were undelivered elements). Accordingly, no revenue from the license could be recognized for the year ended December 31, 2015, and recognition of revenue for the sale of the license was improper under GAAP, even if the Company had persuasive evidence that an agreement for the sale had been reached in 2015.

81.     Rosenberger also misled the Company's auditor with respect to these transactions in management representation letters she signed and sent to the auditor on November 5, 2015, February 26, 2016, May 10, 2016, August 4, 2016, and November 8, 2016 in connection with the Company's public financial filings. In those letters, Rosenberger represented that the financial

statements were "prepared and presented in conformity with US [GAAP]," and, specifically with respect to the receivables included in the financial statements, represented the following:

> We have disclosed to you all sales terms (both expressed and implied), including all rights of return or price adjustments and warranty provisions. We have made available to you all significant contracts, communications (either written or oral), and other relevant information pertaining to arrangements with our customers, including distributors and resellers.

82.     As Rosenberger knew or recklessly disregarded, the foregoing representations, in light of the foregoing facts that were not provided to Synchronoss's auditor, were materially false and misleading.

83.     Rosenberger also met and communicated with Synchronoss's auditor at least quarterly during 2016 to discuss the unbilled receivables from Customer A, as they were becoming increasingly aged.

84.     At each of these meetings, Rosenberger continued to misrepresent that the receivables were collectible, and attributed the delay in invoicing Customer A for the purported ASR and LNP Software sales to vague management issues. At no time in any of these meetings with the auditor did Rosenberger disclose that Customer A had told Synchronoss in February 2016 that there was no valid sales contract for the ASR Software and that Synchronoss should not have recognized revenue on it or, after June 23, 2016, that Customer A had also chosen not to purchase the ASR Software license at all.

85.     Rosenberger also did not disclose at any of these meetings that, as she knew or recklessly disregarded, the Company's management had chosen not to attempt to dispute Customer A's position with respect to the ASR Software transaction until, at the earliest, late in Q3 or Q4 of 2016.

86.     Rosenberger also failed to disclose at any of these meetings that the Backdated Letter was actually signed in January 2016, and was purposely backdated to obscure that point, despite previously representing to the auditor that it was "persuasive evidence" that the Company had sold the LNP Software on December 31, 2015.

87.     Nor did Rosenberger disclose to the auditor at any of these meetings that negotiations over material terms of the LNP Software sale were still ongoing throughout 2016, and that, at least as of July 2016, as Rosenberger was told, Synchronoss was still trying to get a signed agreement for the transaction.

88.     In one such meeting with the auditor, on or around July 22, 2016, Rosenberger told the auditor that the ASR Software receivable was collectible, that collection was delayed because Synchronoss had not invoiced it, and that Synchronoss had not invoiced the receivable because of turnover in Customer A's executive staff, purportedly a process Synchronoss did not want to interrupt.

89.     Rosenberger did not disclose at this meeting that Customer A had told Synchronoss in writing in February 2016 that there was no valid and binding sale of the license, and that in June 2016, Customer A had emailed the Company that it rejected the ASR Software product, omissions that made her statements materially false and misleading.

90.     In another such meeting, on October 21, 2016, Rosenberger and other senior Synchronoss finance personnel again met with Synchronoss's auditor, at which a chief topic for discussion were the ASR and LNP Software unbilled receivables. At the meeting, Rosenberger continued to conceal from the auditor the material facts discussed above regarding these transactions.

91.     Rosenberger also made misrepresentations to, and omitted material information from, the auditor at meetings of Synchronoss's audit committee.

92.     On July 27, 2016, Rosenberger and two of the auditor's accountants attended a meeting of Synchronoss's audit committee, shortly before the Company was to file its Form 10-Q for Q2 2016. At the meeting, Rosenberger again explained that Synchronoss was having issues with certain unbilled receivables due to "management changes" at Customer A.

93.     At this meeting, Rosenberger did not disclose that Customer A had informed Synchronoss that it had never entered into a binding commitment to purchase the ASR Software or that it had decided not to buy the ASR Software.

94.     Rosenberger also did not disclose that, as she knew or recklessly disregarded, the unbilled LNP Software receivable was premised on the Backdated Letter, which was not signed in December 2015, but rather in January 2016.

95.     Nor did she disclose that negotiations over material terms of that sale were still ongoing, and that, as she and others had discussed on July 12, 2016, Synchronoss was still trying to get a signed agreement for on the LNP Software sale that Rosenberger had falsely assured the auditor had already been obtained the prior year.

96.      Rosenberger knew or recklessly disregarded that her statements to the auditor and the audit committee at this meeting were materially false and misleading in light of these omissions. In addition, as she knew or recklessly disregarded, the minutes of the meeting memorializing these misleading comments would be and were provided to the auditor in connection with its quarterly review. In her August 4, 2016 management representation letter to the auditor, Rosenberger expressly noted that the minutes of that meeting had been made available to the auditor in connection with its review of the Company's financial statements.

97.     On October 26, 2016, Rosenberger attended a meeting of the Company's audit committee, which the auditor also attended. Rosenberger explained at the meeting that the Company's cash position was "down due in part to . . . extended timing of turning unbilled balances into billed trade receivables." Rosenberger emphasized that "there were no product or service issue[s] . . . indicating collectability issues."

98.     She did not disclose that Customer A had already told the Company four months earlier that it would not purchase the ASR Software.

99.     Rosenberger also did not disclose that, as she knew or recklessly disregarded, negotiations over the sale of the LNP Software license it had improperly booked were in fact still ongoing with Customer A.

100.    Rosenberger knew or recklessly disregarded that her statements to the auditor and the audit committee at this meeting were materially false and misleading in light of these omissions. In addition, as she knew or recklessly disregarded, the minutes of the meeting memorializing these comments would be and were provided to the auditor in connection with its quarterly review, and in her November 8, 2016 management representation letter to the auditor, Rosenberger expressly noted that the minutes of that meeting had been made available to the auditor in connection with its review of the Company's financial statements.

### F.    Rosenberger Directed Synchronoss to Falsely Report Revenue from its Purported 2015 Transactions With Customer A in its Required Public Filings

101.    Companies like Synchronoss that issue securities under Section 12 of the Exchange Act are required to make quarterly, annual, and periodic filings (Forms 10-Q, 10-K, and 8-K respectively). These filings are required to accurately present certain information about the issuer, including certain financial information.

102.     As CFO, Rosenberger signed Synchronoss's public filings during the Relevant Period, including the filings detailed below.

103.     Rosenberger also knowingly or recklessly falsely certified in each of the Forms 10-Q and the Form 10-K detailed below, among other things, that the Company complied with Section 13(a) of the Exchange Act, and "fairly present[ed], in all material respects, the financial condition and results of operations of the Company."

104.     At Rosenberger's direction, Synchronoss improperly included $4.35 million in revenue from the ASR Software transaction in its Form 8-K announcing its financial results for Q3 2015 and its Form 10-Q for Q3 2015, filed on October 28, 2015 and November 5, 2015, respectively; and in its Form 8-K announcing its financial results for FY 2015 and its Form 10-K for FY 2015, filed on February 4, 2016, and February 26, 2016, respectively.

105.     As Rosenberger knew or recklessly disregarded, recognizing revenue for the purported ASR Software sale was improper under GAAP because there was not persuasive evidence of an arrangement or probability of collection, as GAAP required (*see* ¶ 25, *supra*), and as a result, the Company materially overstated its pre-tax income for the third quarter by more than 26%, and for FY 2015, by approximately 6%.

106.     At Rosenberger's direction, Synchronoss improperly included revenue of $3 million for the LNP Software transaction in its Form 8-K announcing its financial results for Q4 2015 and FY 2015, and in its Form 10-K for Q4 2015 and FY 2015, filed on February 4, 2016 and February 26, 2016, respectively.

107.     As Rosenberger knew or recklessly disregarded, recognizing revenue for the purported LNP Software sale was improper under GAAP because there was not persuasive evidence of an arrangement or probability of collection, nor VSOE of the undelivered elements

of that MEA, as GAAP required (*see* ¶¶ 25-28, *supra*), and as a result, the Company materially overstated its pre-tax income for the fourth quarter by more than 23%, and for the year, by approximately 4%.

108.    In addition, by improperly including this $3 million in revenue in its financial statements for the fourth quarter of 2015, Synchronoss exceeded consensus analysts' expectations for the Company's revenue, while properly excluding it would have resulted in the Company's revenue falling below expectations. The consensus revenue estimate was approximately $155.3 million for the quarter, and Synchronoss reported $157.8 million. Without the improperly recorded LNP revenue, Synchronoss would have reported $154.8 million.[6]

109.    Synchronoss, at Rosenberger's direction, also improperly reflected the receivables from the ASR Software and LNP Software transactions in subsequent filings. Specifically, Synchronoss issued Forms 8-K announcing its financial results for Q1, Q2, and Q3 2016, which were filed on May 5, 2016, August 3, 2016 and November 7, 2016, respectively. Synchronoss also filed its Forms 10-Q for Q1, Q2, and Q3 2016 on May 10, 2016, August 4, 2016, and November 8, 2016, respectively.

110.    As Rosenberger knew or recklessly disregarded, these 2016 filings were materially misleading because they materially overstated the Company's receivables and stockholders' equity balances on its balance sheets and omitted to disclose restated financial

---

[6]    The estimated and reported revenue figures in this paragraph and in ¶¶ 147 and 201, *infra*, reflect a disclosed adjustment to GAAP revenue associated with deferred revenue write-downs from acquisitions. This non-GAAP metric was presented in addition to GAAP revenue and used by Synchronoss and analysts in measuring and analyzing its performance.

statements for Q3 and Q4 2015 to reflect that the Customer A "sales" should not have been recorded.

## II.     ROSENBERGER DIRECTED SYNCHRONOSS TO FALSELY RECOGNIZE AND REPORT REVENUE OF $10 MILLION IN Q1 2016 IN CONNECTION WITH AN ACQUISITION

111.    In March 2016, Synchronoss entered into an agreement to acquire the Acquisition Target from the private equity firm that owned it (the "Parent"), for approximately $120 million. On the same day, Synchronoss entered into a transaction to sell a license to the Acquisition Target, and another entity owned by the Parent it was not acquiring ("Surviving Company"), nominally for $10 million, purportedly to settle patent infringement claims Synchronoss had asserted against the Acquisition Target only after acquisition negotiations began.

112.    As Rosenberger knew or recklessly disregarded, Synchronoss management intended and understood throughout its negotiations with the Parent that the license agreement and the acquisition agreement were one business transaction: the agreements were negotiated together, and Synchronoss expressly made the acquisition contingent on the license agreement.

113.    The license agreement's primary purpose, as Rosenberger knew or recklessly disregarded, was to afford Synchronoss the opportunity to create the false appearance that it had generated $10 million in reportable revenue, when in reality its intended effect was to lower the cost of its acquisition.

114.    In order to evade scrutiny of the foregoing by the Company's auditor, Rosenberger made material misrepresentations and omitted to provide material information to the Company's auditor regarding this transaction.

### A.      **GAAP Principles Relevant to the Acquisition**

115.     According to GAAP, per ASC 805-10-25-20, if a company enters into a transaction during the negotiations for an acquisition—such as the license agreement Synchronoss negotiated with the Acquisition Target—it should be accounted for in accordance with the GAAP guidance for that type of transaction, only if it is indeed a separate transaction and not a part of the business combination. If the nominally separate transaction is part of the business combination, the consideration transferred for it should be accounted for as an adjustment (higher or lower) to the acquisition cost.

116.     In determining whether a transaction is a separate transaction rather than part of a business combination, ASC 805-10-55-18 requires a company to consider certain factors, including the reasons for the transaction, who initiated the transaction, and the timing of the transaction.

### B.      **Synchronoss Insisted That the Acquisition Target Settle the Infringement Claims by Paying a License Fee of $10 Million as a Condition of the Acquisition Agreement**

117.     Synchronoss began efforts to negotiate the acquisition of Acquisition Target in the third quarter of 2015.

118.     By email dated January 8, 2016, Rosenberger learned that the CEO and the COO had concluded that an acquisition price of $130 million was acceptable, but had set as a goal "to try and get something lower—*e.g.*, $100m to $110M."

119.     In a January 20, 2016 email to Rosenberger and others, an executive at the Company noted that that it was "key" to threaten that Synchronoss would "enforce our IP [intellectual property] . . . regardless of this transaction," *i.e.*, the acquisition, but that a settlement of the purported infringement claims represented a "great opportunity for both sides to

26

bridge the valuation gap," and that as a sign of good faith, Synchronoss was willing to increase its "net purchase price."

120.    Synchronoss then sent a revised term sheet to the Parent to acquire the Acquisition Target on January 23, 2016. On January 25, 2016, Rosenberger received a copy of the Acquisition Target's counterproposal and a summary from a Synchronoss vice president (the "EVP") by email.

121.    Rosenberger also was copied on a responsive email circulated internally among the Company's negotiating team, in which it was reiterated that "we need to let them know it's a net 110 deal … If they don't think ip is worth 10 then my understanding is they don't get 120," meaning that the $120 million acquisition price was contingent on the Acquisition Target's agreement to pay $10 million to settle Synchronoss's purported patent infringement claim.

122.    On January 26, 2016, in that same email chain with Rosenberger and others, the EVP circulated a proposed email response to the Parent that noted that Synchronoss had internally accepted an acquisition cost of $110 million, but formally structured the deal as "120 [million] accounting for the IP," *i.e.*, Synchronoss contemplated a net price for the acquisition price of $110 million, with Synchronoss paying the Parent $120 million, and the Acquisition Target paying a "license fee" of $10 million to supposedly settle the infringement claims. The EVP added with respect to the "IP" that the "two independent agreements will be executed simultaneously."

123.    As the foregoing emails reflected, and as Rosenberger knew or recklessly disregarded, the two agreements were not "independent" or separate, but were part of the proposed business combination.

124.    As Rosenberger knew or recklessly disregarded, the business combination with Acquisition Target was structured in this manner solely to afford Synchronoss the opportunity to falsely portray the license agreement as separate from the acquisition, and thus to improperly record the $10 million fee as revenue.

125.    On January 26, 2016, Rosenberger also received an email sent to the EVP, in which the EVP was instructed to respond to the Parent "that if they challenge anything regarding our IP [*i.e.*, the infringement claims] then the deal's off or your GC will go strong after."

126.    As negotiations proceeded over the next two days, Synchronoss executives reiterated to one another, and to the Parent, that the Acquisition Target's agreement to the license agreement was critical to the completion of the acquisition, and that both agreements were part of the same transaction.

127.    For example, on January 27, 2016, the EVP reported back by email to Rosenberger and others that he had spoken with the Parent, and had the impression the Parent was trying to "get some movement above 110 (+10)," and that there was no "discussion on the IP." The EVP further stated he had discussed the license agreement with the Parent, "and he [the Parent] said he got it (10M IP or we don't do)," and that he [the EVP] had alerted the Parent that both agreements would be signed simultaneously.

128.    As Rosenberger knew or recklessly disregarded, Synchronoss continued to treat the acquisition as a "net" $110 million deal, contingent on execution of the $10 million license agreement, as the parties proceeded to complete due diligence before the deal closed.

129.    In an email dated February 4, 2016 from the EVP to Rosenberger, for example, the EVP reported that Synchronoss had been clear to the Parent in its last email that the "IP Settlement [*i.e.*, the license agreement] was required for the PA/LOI [purchase agreement /letter

of intent] to be valid," and that "[w]e have been consistent here (and I made clear without 10M IP Settlement, the 122M PA wasn't happening)."

130.    Throughout the course of negotiations in January and February, the Parent repeatedly requested that Synchronoss provide the Parent with Synchronoss's patent infringement "claims charts." Synchronoss did not create the charts until January 2016, well after negotiations between Synchronoss and the Parent had commenced, and refused to provide them to the Parent.

131.    Shortly before the two agreements were signed, Synchronoss revised the license agreement to add the Surviving Company as a licensee.

132.    There was no business or economic justification for doing so. As Rosenberger knew or recklessly disregarded from internal emails, the Surviving Company was added for no additional consideration, the Parent had not sought for it to be added, and the Surviving Company had not been infringing on Synchronoss's patents.

133.    Rather, the sole justification for adding the Surviving Company as a licensee was related to revenue recognition. On or about February 11, 2016, Rosenberger and the auditor discussed by email that if the license agreement covered only the Acquisition Target and not a surviving entity that would otherwise be infringing in the future, it could adversely affect Synchronoss's ability to recognize the $10 million fee as upfront revenue.

134.    On the same day, Rosenberger and the GC also discussed over email eliminating the Surviving Company from the license agreement, and whether that would assist in the effort to recognize revenue from it.

135.    Based on these February emails, Rosenberger knew or recklessly disregarded that the Company's decision about including the Surviving Company in the license agreement was

driven solely by the goal of revenue recognition, and no other business justification, and that the license agreement was created as a stand-alone document to be executed separately solely for purposes of creating the false appearance that recognition of the fee as revenue was appropriate.

**C.      Rosenberger Materially Misrepresented
The Transaction with Acquisition Target to the Company's Auditor**

136.      To provide purported justification for Synchronoss's improper recognition of this $10 million from the license agreement as revenue, Rosenberger approved and signed a revenue recognition memorandum with respect to the license agreement that she knew would be, and was, provided to the Company's auditor in connection with its review of the Company's Form 10-Q for Q1 2016 and its Form 10-K for FY 2016.

137.      The revenue recognition memorandum stated as follows:

We believe $10.0M should be recognized as revenue for past infringement from OWM on our messaging management patents and should not be reflected as consideration transferred in the business combination. This settlement was not a negotiating factor in the business combination agreement. None of the two transactional amounts were negotiated together and the acquisition was not contingent on entering into the license agreement. The purchase consideration for acquiring the business was at a similar markup to other transactions in the market that have occurred, and therefore unrelated to the license agreement settlement.

138.      Rosenberger also approved and signed a separate accounting memorandum (to which the revenue recognition memorandum explicitly referred) with respect to Synchronoss's acquisition of the Acquisition Target that made substantially the same representations. Rosenberger knew or recklessly disregarded that this memorandum would be, and was, provided to the Company's auditor in connection with its review of the Company's Form 10-Q for Q1 2016 and its Form 10-K for FY 2016.

139.      The foregoing statements, as Rosenberger knew or recklessly disregarded, were false and misleading, because, as described above, the "IP Settlement" was an important factor in

the negotiation of the business combination agreement, and Synchronoss had repeatedly conveyed to the Parent that the IP Settlement was a condition to Synchronoss's willingness to acquire the Acquisition Target at the stated price.

140. As Rosenberger also knew or recklessly disregarded, these misstatements were material, because whether the license agreement was a negotiating factor in the acquisition, and whether the acquisition was contingent on the Acquisition Target entering into the License Agreement, were material factors in determining under GAAP whether the license agreement should have been considered part of the acquisition—and consequently whether the license fee should have been recognized as revenue, or instead as a reduction in the acquisition cost.

141. Rosenberger also materially misled the auditor regarding these transactions in management representation letters that she signed and sent to the auditor on or about May 10, 2016 and February 27, 2017. In each of these letters, Rosenberger misrepresented that Synchronoss had provided the auditor with "[a]ccess to all information, of which we are aware, that is relevant to the preparation and fair presentation of the . . . financial statements." Rosenberger knew or recklessly disregarded that this statement was materially false, as Synchronoss had concealed from, and misrepresented to, the auditor the foregoing material facts regarding the license agreement it had obtained from the Acquisition Target.

142. Rosenberger never disclosed to the auditor the material facts that the license agreement was negotiated as an integral part of the acquisition of the Acquisition Target or that Synchronoss had insisted on the execution of the license agreement as a condition of its agreement to acquire the Acquisition Target at the price stated in the purchase agreement.

**D.  Rosenberger Directed Synchronoss to Falsely Report Revenue From its Transaction With Acquisition Target in its Required Public Filings**

143.    As CFO, Rosenberger signed Synchronoss's public filings during the Relevant Period, including the filings detailed below.

144.    Rosenberger knowingly or recklessly falsely certified in the Form 10-Q and Form 10-K detailed below, among other things, that the Company complied with Section 13(a) of the Exchange Act and "fairly present[ed], in all material respects, the financial condition and results of operations of the Company."

145.    At Rosenberger's direction, Synchronoss improperly included the $10 million license fee from the Acquisition Target as revenue in its Form 8-K announcing its financial results for Q1 2016 and its Form 10-Q for the Q1 2016, filed on May 5 and May 10, 2016, respectively; and in its Form 8-K announcing its financial results for FY 2016 and its Form 10-K for FY 2016, filed on February 8 and 27, 2016, respectively.

146.    As Rosenberger knew or recklessly disregarded, the inclusion of this purported license fee as revenue was improper under GAAP because the purported license agreement was part of the acquisition and not a separate agreement, and the fee should have been reported as an adjustment to the acquisition cost (*see* ¶¶ 115-116, *supra*). The inclusion of the license fee as revenue materially understated Synchronoss's reported pre-tax loss for the quarter by approximately 60% and its pre-tax loss from continuing operations for the year by more than 11%.

147.    By improperly including this $10 million figure as revenue, as Rosenberger knew or recklessly disregarded, Synchronoss also created the false appearance that it had exceeded analysts' expectations of Synchronoss's performance for the quarter. Without the $10 million Synchronoss improperly included in its financial statements, it would have failed to meet those

expectations. Analysts' consensus revenue estimate was $144.3 million, and Synchronoss reported approximately $145.6 million for the quarter ended March 31, 2016. Without the improperly recorded revenue, Synchronoss would have reported $135.6 million.

**III.   SYNCHRONOSS OVERSTATED REVENUE BY OVER $5 MILLION
        IN Q2 2016 IN CONNECTION WITH A TRANSACTION WITH CUSTOMER B**

148.    In Q2 2016, the Company reported revenue of approximately $5.3 million, by repackaging an existing multi-year "software-as-a-service" ("SaaS") arrangement with one of its customers ("Customer B").

149.    Before the Relevant Period, Synchronoss's software business was premised largely on a SaaS model, in which Synchronoss permitted customers to use software it owned, and provided customers with ancillary support services, such as maintenance and hosting services. In those arrangements, customers were billed, and Synchronoss recognized revenue, ratably over the term of the agreement as the services were performed.

150.    Synchronoss persuaded Customer B to split its existing SaaS agreement into a perpetual license agreement ("PLA"), with an upfront fee for the license and other ancillary support. Around the same date, the Company signed another agreement with Customer B for "audit services" that it negotiated simultaneously with the PLA.

151.    In addition, the Company continued to provide "hosting" services that it had previously provided under the SaaS arrangement, but delayed the signing of the hosting agreement to allow for revenue recognition on the PLA in Q2 2016.

152.    The foregoing agreements comprised an MEA with Customer B, and the requirements for revenue recognition under GAAP described above with respect to the ASR and LNP Software transactions (*see* ¶¶ 26-28, *supra*) also governed the recognition of revenue with respect to this MEA with Customer B.

153.    As Rosenberger and Lanni knew or recklessly disregarded, recognizing $5.3

million as revenue in the second quarter of 2016 falsely and materially inflated the Company's

income because GAAP required that the entire MEA be considered together—the PLA, the audit

services, and the hosting agreements—and thus precluded recognition of revenue in Q2 2016.

**A.      Synchronoss Persuaded Customer B to
Convert Its Existing SaaS Arrangement Into
Separate License and Service Agreements**

154.    Prior to Q2 2016, Synchronoss had a SaaS arrangement with Customer B through

a subsidiary it had acquired in Q3 2015, and which the subsidiary had previously maintained

since 2007.  In Q2 2016, Synchronoss convinced Customer B to break the SaaS arrangement into

its component parts and sold to Customer B a PLA to certain software separately from the other

elements (*e.g.*, hosting, maintenance) of the previous SaaS agreement. Synchronoss then

assigned a fee of approximately $5.3 million to the PLA, and recognized that fee upfront as

revenue, rather than having to wait to recognize revenue ratably over the term of the agreement

as required by GAAP.

155.    Under the SaaS arrangement with Customer B, Synchronoss had provided

Customer B with the use of payment processing software together with related services such as

hosting and maintenance.[7]

156.    Under that same SaaS arrangement, Synchronoss had also provided "audit

services" to Customer B. The "audit services" consisted of the review of Customer B's invoices

by Synchronoss, performed by the Company's subcontractor ("Subcontractor A"), to determine

---

[7]     These products processed invoices, automated payments, and sought to improve margins
by optimizing cost and revenue.

if Customer B had been overcharged by various vendors. Customer B would authorize Synchronoss and Subcontractor A to seek reimbursement from the vendors on its behalf and, if successful in obtaining reimbursement for such overcharges, Customer B would pay Synchronoss a percentage of the reimbursed payments as audit services fees. Synchronoss would then pay Subcontractor A a percentage of the amount Customer B paid Synchronoss.

157.    In early April 2016, Synchronoss negotiated with Customer B to replace the SaaS arrangement with a PLA for software licenses, together with separate agreements for related hosting and support services for that software.

158.    In addition, Synchronoss and Customer B negotiated at the same time an "audit services" agreement under which Customer B would prepay a fixed upfront fee in return for Synchronoss seeking reimbursements for a set amount of identified apparent overcharges, instead of the fee being contingent on reimbursements Synchronoss would later obtain from Customer B's vendors. To induce the purchase of the PLA, Synchronoss offered this upfront fee at a significant discount to what they estimated Customer B would pay in contingency fees under the old audit services agreement. Synchronoss referred to the upfront fee as the "Settlement" fee for the referenced identified overcharges.

159.    After discussions and various proposals with Customer B that continued late into June, on June 29, 2016, Synchronoss proposed an agreement in the aggregate for all of these components that consisted of a fee of $750,000 for the PLA; $127,500 and $144,000 per year for the maintenance and hosting agreements, respectively; and more than $6.3 million for the audit services agreement.

160.    Rosenberger and Lanni each knew or recklessly disregarded that Synchronoss was negotiating the PLA with Customer B at the same time it was negotiating the audit services

agreement and the other ancillary agreements, including hosting, that up until then, it had already been providing in the SaaS arrangement.

161.    On or about June 14, 2016, for example, Lanni met with members of the sales team to discuss the structure of the deal and the revenue recognition implications of that structure. Specifically, the discussion made clear that the deal would involve the PLA, audit services, hosting, maintenance, and other service components.

162.    At or about that time, the sales team discussed the proposed PLA and audit services agreement (and their simultaneous negotiation) with Rosenberger. Rosenberger advised the sales team that the fee then contemplated for the audit services agreement could not be capitalized by Customer B, but rather would have to be expensed, and that if Customer B wanted to capitalize that amount of money, the fee would have to be assigned to the PLA.[8]

163.    On June 17, 2016, Rosenberger was also forwarded an internal company email that summarized Synchronoss's draft proposals to Customer B for both the PLA and audit services agreements.

164.    Consistent with advice from Rosenberger, Synchronoss sent revised draft agreements to Customer B on June 29, 2016, with one day left before the close of the quarter, that abruptly changed the dollar figures assigned to the PLA and the audit services agreement.

165.    In contrast to the proposal from earlier that same day, which had assigned a value of $750,000 to the PLA and more than $6 million to the audit services agreement, Synchronoss now assigned $4.3 million to one license and approximately $1.875 million to a second license

---

[8]    To "capitalize" an expenditure means the company is considered as having acquired an asset. To "expense" it, on the other hand, means the expenditure is recorded as an expense that reduces the earnings of the company when incurred. If capitalized as an asset, the cost is recognized as an expense over a period of time, typically several years.

(for a product that had not been a subject of negotiations), for a total PLA amount of more than $6.1 million. The audit services agreement figure was now reduced a corresponding approximate amount, to only $600,000.

166.    Earlier that day, Lanni received a draft of the PLA, redlined to show changes from a prior draft. The attached draft reflected a total price of more than $6 million for the licenses. Lanni was further advised in the cover email that this was the "latest version" of the Customer B agreement.

167.    The draft agreement Lanni received explicitly referenced the audit services and hosting agreements that had been in place prior to the new PLA.

168.    Lanni was also emailed further revised, redlined versions of the PLA and audit services agreement the evening of June 29, 2016 that also reflected a price of more than $6 million for the PLA. The redlined audit services agreement revealed that the audit services agreement fee had been reduced dramatically: from more than $6 million to $600,000. The audit services agreement also made it plain that that Synchronoss was required to perform substantial future work pursuant to the agreement.

169.    Rosenberger also received, by email on June 30, 2016, a redlined version of the current draft of the audit services agreement, also reflecting the change in price from more than $6 million to $600,000, and also making it plain that Synchronoss would be required to perform substantial future work pursuant to the agreement.

170.    In or around July 2017, before Synchronoss filed its Form 10-Q for Q2 2016, Rosenberger also reviewed an agreement to pay Subcontractor A approximately $4 million for the audit services it was to provide Synchronoss, for Synchronoss to perform its audit services for Customer B. The $4 million figure was almost seven times the $600,000 falsely attributed to

those services in Synchronoss's agreement with Customer B, but was consistent with the approximate $6 million amount originally contemplated for those services, because Subcontractor A was entitled to approximately two thirds of Synchronoss's fee.

171.    As Rosenberger and Lanni knew or recklessly disregarded, Synchronoss had arbitrarily switched the values assigned to the components of the deal at the eleventh hour in order to be able to falsely record revenue in the second quarter of 2016.

172.    The amounts Synchronoss was now attributing to these agreements were without any rational connection to the fair value of the PLA and audit services components of the deal. As Rosenberger and Lanni knew or recklessly disregarded, there was no VSOE for the audit services agreement, and those services still had to be performed.

173.    The Synchronoss sales team discussed that they did not want Customer B to sign the audit services agreement until July 1, 2016, the first day of the third quarter.

174.    Accordingly, when Synchronoss sent the final agreements to Customer B on June 29, 2016, it directed Customer B to sign the PLA and accept delivery of the software on June 30 and to sign the audit services agreement a day later, on July 1.

175.    Customer B signed the PLA on June 30, 2016. As directed by Synchronoss, one day later, on July 1, 2016, Customer B signed the audit services agreement.

176.    The one-day separation in signing these two agreements in different reporting periods decreased the likelihood that the auditor would examine the audit services agreement in its review of Synchronoss's second quarter financial statements and recognize what Synchronoss was attempting to obscure: that the two agreements were part of an MEA, and the acceleration of revenue recognition from the PLA was inconsistent with GAAP.

177.    Rosenberger and Lanni knew or recklessly disregarded that the audit services agreement and PLA, as well as the ancillary hosting and maintenance agreements, were negotiated simultaneously as one overall MEA.

178.    In addition, Synchronoss and Customer B also agreed to the terms of the hosting arrangement but did not execute a separate hosting agreement at the end of Q2 2016. The PLA did not reference hosting or amending terms of the Hosted Solutions Services Agreement that concerned what entity would host the software.

179.    Customer B did not sign the agreement for hosting and professional services related to support and use of the software until January 2017. The hosting agreement was made retroactively effective as of July 1, 2016, while the professional services agreement was made effective as of July 6, 2016.

180.    Despite the fact that the agreements were executed five months later than the PLA, Synchronoss continued to provide hosting and professional services to Customer B throughout the entire period with no interruption, just as it had when it had its SaaS arrangement with Customer B.

181.    Rosenberger and Lanni knew that the Company had previously been providing hosting services to Customer B under the prior SaaS arrangement, and knew or recklessly disregarded that the Company was continuing to provide those services without interruption between the executions of the PLA and the hosting agreement.

   C.    **Rosenberger and Lanni Falsified Synchronoss's Books And Records by Improperly Recognizing Revenue and <u>Misrepresented the Customer B Transaction to the Company's Auditor</u>**

182.    Rosenberger and Lanni each reviewed, approved, and signed a revenue recognition memorandum related to the Q2 2016 PLA transaction with Customer B that

purported to justify the Company's inclusion of approximately $5.3 million in revenue from the PLA in its financial statements for Q2 2016.

183.    Rosenberger and Lanni each knew or recklessly disregarded that this memorandum would be and was provided to the auditor in connection with its review of the Form 10-Q for Q2 2016 and the Form 10-K for FY 2016.

184.    As Rosenberger and Lanni knew or recklessly disregarded, the PLA and the audit services agreement were negotiated together as part of an MEA, and GAAP required that revenue be allocated based on the respective VSOE of fair value of the PLA and the audit services agreement.

185.    Rosenberger and Lanni further knew or recklessly disregarded that there was no VSOE for the audit services agreement and that services under that agreement were undelivered as of June 30, 2016. Accordingly, any and all revenue from the MEA needed to be deferred as of June 30, 2016, even if the PLA element had been delivered.

186.    Rosenberger and Lanni also knew or recklessly disregarded that Customer B negotiated agreements for hosting and professional services concurrently with the PLA and audit services agreement, as they were repackaging services that had previously been provided under a SaaS arrangement.

187.    Synchronoss in fact continued to perform those hosting and professional services without interruption until the hosting agreement was signed in 2017, a fact that Lanni and Rosenberger knew or recklessly disregarded at all relevant times.

188.    Under GAAP, the fact that the Company was providing hosting services in connection with the PLA further demonstrated that this was a MEA arrangement and that, in the

absence of VSOE of fair value for hosting and the other elements that had yet to be delivered, revenue recognition for the PLA was improper.

189.    As Rosenberger and Lanni knew or recklessly disregarded, the revenue recognition memorandum discussed only the PLA. It omitted the material facts that the PLA was negotiated simultaneously with the audit services agreement, and that hosting and professional services were to be provided under the MEA. Under GAAP, these omitted facts precluded recognition of revenue for the PLA in Q2 2016.

190.    Even after Rosenberger and Lanni were expressly advised that the Company was providing hosting services (a fact that they previously knew or recklessly disregarded), they did not adjust their accounting treatment of the transaction, nor did they disclose to the auditor the material fact that the Company was providing these hosting services and had been doing so without interruption throughout 2016.

191.    As Rosenberger also knew or recklessly disregarded, the revenue recognition memorandum also failed to disclose that Synchronoss and Subcontractor A had reached an agreement in July 2016 for Subcontractor A to perform the required audit services work, according to which Synchronoss was required to pay Subcontractor A a fee of $4 million.

192.    Rosenberger knew or recklessly disregarded that the fee to Subcontractor A was inconsistent with the $600,000 fee Synchronoss assigned to the audit services agreement—but was consistent with the earlier contemplated figure of more than $6 million. The revenue recognition memorandum omitted any discussion of that fact, or that the PLA fee had been substantially increased while the audit services fee was simultaneously and substantially decreased, just before signing.

193.    This omitted information was material because it would have revealed that the PLA was sold as part of an MEA and that the Company had not attributed fair value to the several components of this MEA, but rather had arbitrarily increased the PLA fee to improperly accelerate the recognition of revenue for Q2 2016.

194.    Rosenberger participated in meetings with the Company's auditor, on at least a quarterly basis, to discuss the Company's financial statements. In none of these meetings did Rosenberger disclose the material fact that the Company had negotiated the audit services agreement with Customer B simultaneously with the PLA.

**D.    Synchronoss Materially Overstated Revenue from
Its Transaction With Customer B in its Required Public Filings**

195.    As CFO, Rosenberger signed Synchronoss's public filings during the Relevant Period, including the filings detailed below.

196.    Rosenberger knowingly or recklessly falsely certified in the Form 10-Q and Form 10-K detailed below, among other things, that the Company complied with Section 13(a) of the Exchange Act, and "fairly present[ed], in all material respects, the financial condition and results of operations of the Company."

197.    At Rosenberger's direction, Synchronoss improperly included approximately $5.3 million in revenue from the Customer B transaction in its Form 8-K announcing its financial results for Q2 2016 and its Form 10-Q for Q2 2016, filed on August 3, 2016 and August 4, 2016, respectively; its Form 8-K announcing its financial results for FY 2016; and its Form 10-K for FY 2016, filed on February 8, 2017, and  February 27, 2017, respectively.[9]

---

[9]    The $5.3 million in revenue represents the $6 million from the PLA purportedly sold to Customer B as described above, after allocating approximately $900,000 to maintenance. When the Company restated its financial statements for FY 2016, it reversed out approximately $4.66 million of this revenue.

198.    Synchronoss's Forms 8-K, 10-Q, and 10-K, with Rosenberger's knowing and substantial assistance, materially overstated Synchronoss's financial performance for the quarter and year and, by improperly recording this $5.3 million in purported revenue in Q2 2016, materially understated Synchronoss's pre-tax loss by approximately 57% for the quarter and its pre-tax loss from continuing operations by approximately 6%.

199.    As Rosenberger knew or recklessly disregarded, the recognition of revenue from this PLA was improper under GAAP because the PLA and the ancillary hosting and audit services agreements comprised a MEA, and Synchronoss had no VSOE for the fair value of hosting or audit services. According to GAAP, the fees from these agreements should therefore have been recognized ratably over the term of the agreement

200.    Through her conduct discussed above (*see* ¶¶ 154-190, *supra*), Lanni knowingly or recklessly provided substantial assistance to Synchronoss's material overstatement of its financial performance for Q2 2016.

201.    In addition, by improperly including this $5.3 million in revenue in its financial statements, Synchronoss reported $161.49 million in revenue, and thus was able to exceed analysts' estimates for approximately $156.9 million for the second quarter of 2016. Had Synchronoss reported its financial performance in a manner consistent with GAAP by excluding this $5.3 million, the resulting revenue of $156.2 million would have failed to meet analysts' estimates.

IV.     **SYNCHRONOSS MATERIALLY OVERSTATED REVENUE OF $3.6 MILLION IN Q4 2016 FROM A PURPORTED SALE TO SUBCONTRACTOR A**

202.    In late 2016, Synchronoss's sales team was informed by Customer B that it would not be purchasing a PLA for several software products by the end of the fourth quarter worth an estimated $4 million, contrary to the Company's prior internal forecast.

203.    In response, Synchronoss's sales team persuaded Subcontractor A to acquire the PLA intended for Customer B before the close of Q4 2016 for a fee of $3.6 million, with the understanding that Subcontractor A would resell the PLA to Customer B in 2017, thus allowing the Company to recognize revenue from the sale in Q4 2016.

204.    As Rosenberger knew or recklessly disregarded, Subcontractor A had acted only as a subcontractor for the Company, had no prior billing or credit history with Synchronoss, had not previously acted as a reseller of software, and had repeatedly sought assurances from Synchronoss that it would not suffer a loss on the transaction and would be held harmless should the resale not occur.

205.    Rosenberger therefore knew or recklessly disregarded that under GAAP, the "fee" under the PLA was not fixed or determinable, that there was no probability of collection on it, and that recognition of this fee as revenue was therefore improper. Rosenberger nonetheless reviewed and approved a revenue recognition memorandum that falsely represented the fee was fixed and determinable and that collectibility was probable.  As a result, Synchronoss materially overstated its revenue by $3.6 million in its Forms 8-K and 10-K for Q4 2016 and FY 2016, respectively.

A.      **GAAP Principles Relevant to the Customer A Transactions**

206.    In addition to the GAAP requirements discussed above regarding the necessity of determining that collectibility is probable for purposes of revenue recognition, *see* ¶ 25, *supra*,

44

GAAP also required during the relevant period (per ASC 985-605-25-36) that when evaluating whether a fee is fixed or determinable with respect to a reseller agreement, a company should consider the following factors:

    a.    Business practices, the reseller's operating history, competitive pressures, informal communications, or other factors indicate that payment is substantially contingent on the reseller's success in distributing individual units of the product. Contractual arrangements under which the reseller is obligated to pay only as and if sales are made to users shall be accounted for as consignments.

    b.    Resellers are new, undercapitalized, or in financial difficulty and may not demonstrate an ability to honor a commitment to make fixed or determinable payments until they collect cash from their customers . . . .

**B.**    **Synchronoss Purportedly Sold a License to Subcontractor A Under a Reseller Agreement That Subcontractor A Could Not Afford**

207.    On or about November 11, 2016, sales and finance personnel at Synchronoss had forecast to Rosenberger and others at Synchronoss that Synchronoss would close on the sale of a PLA for several types of software to Customer B for an estimated $4 million in revenue in Q4 2016.

208.    On December 26, 2016, however, sales personnel at Synchronoss learned from Customer B that a "year-end deal is just not possible."

209.    On or about December 28, 2016, Rosenberger was advised about this fact via email: "[Customer B] was unable to sign for [Q]4 but indicated they still intend to buy in Q1."

210.    In response, Synchronoss sales personnel sought to persuade Subcontractor A (for which Synchronoss was a substantial source of revenue) to enter into a "reseller agreement" with Synchronoss. The goal of the arrangement was that Subcontractor A would purchase the software PLA Synchronoss had intended to sell to Customer B for $3.6 million, and then resell it to Customer B in 2017 (the "Reseller Agreement").

45

211.     Rosenberger was made aware of this resale plan via email on December 28, 2016 when she was told Subcontractor A was to "buy a license as a resale/distributor and buy from us to sell to customers such as [Customer B]."

212.     Rosenberger received additional email communications about the structure of and need for the deal. In an email chain in which an employee questioned why Subcontractor A was getting generous terms on the deal, a Synchronoss executive replied that "[w]e need this deal first off," and also "they are only gonna sell it to [Customer B] but the wording need to be more general so mcfly proof and not focused on just [Customer B.]"

213.     As Rosenberger knew, "Mcfly" was a dismissive reference to Synchronoss's auditor. By "mcfly proof," the executive was conveying to Rosenberger and others that Synchronoss needed the deal documents to be sufficiently obscure as to the real purpose of the Subcontractor A transaction—to accelerate revenue recognition in December 2016 on a sale that would not actually close until 2017—so as to evade scrutiny by the auditor.

214.     Subcontractor A's annual revenues for 2016 were only approximately $7 million, ninety percent of which came from Synchronoss. It was therefore highly improbable that Subcontractor A was financially capable of independently capable of paying for the license.

215.     Subcontractor A told Synchronoss sales personnel it was reluctant to agree to the resale plan, because, among other reasons, it had no use for the software, and was fearful of risking being obligated to pay the Company $3.6 million and/or taking a loss on a subsequent resale to Customer B.

216.     Rosenberger was aware that Subcontractor A insisted on avoiding any economic risk on the proposed transaction. She received a proposal in which a member of the sales team explained a contemplated "February executed amendment" to Subcontractor A's consulting

agreement, under which the Company would prepay funds to Subcontractor A under that agreement in advance of Subcontractor A's March 2017 payment obligation to the Company in the proposed Reseller Agreement. In addition, this contemplated agreement would increase fees that Synchronoss would pay to Subcontractor A if it did not realize the profit Synchronoss promised on the resale of the software. Rosenberger received this proposal despite the fact that she and the Assistant Controller had already told the member of the sales team that there could be no extension of payment terms or contingencies related to the agreement. She reiterated those conditions after receiving the proposal.

217.     In addition, on or about December 30, 2016, Rosenberger participated in a telephone call with Subcontractor A's CEO and several Synchronoss employees, in which the Synchronoss sales team sought to persuade Subcontractor A to sign the Reseller Agreement. During the call, Subcontractor A's CEO requested a "hold harmless" provision in the event that the resale did not go through, and was told by Synchronoss that it could not put that language in the Reseller Agreement.

218.     On the afternoon of December 31, 2016, Synchronoss and Subcontractor A signed the Reseller Agreement, which ostensibly provided that Subcontractor A would pay Synchronoss $3.6 million for a PLA for three types of Synchronoss software that it could then resell to other companies. The Reseller Agreement on its face did not contain any contingencies, and purported to require Subcontractor A to pay for the software PLA by March 31, 2017, which was when or after sales personnel told Rosenberger the projected resale to the ultimate customer would occur.

219.     In fact, the Synchronoss sales team had assured Subcontractor A in writing in a side letter that Subcontractor A would not need to pay the Company under the Reseller Agreement until it had resold the software to Customer B, and, further, that it would make

Subcontractor A whole if it sustained any losses on the resale. The sales team also sent Subcontractor A the agreement discussed above (¶ 216, *supra*), under which the Company would prepay fees to Subcontractor A in an amount sufficient for Subcontractor A to pay the Company under the Reseller Agreement.

220.    In order to assess whether collectibility from Subcontractor A was probable, as required under GAAP for revenue recognition, Synchronoss's policies required new customers go through an initial credit review process to evaluate the customer's ability to pay by reviewing the entity's financial information and payment history.

221.    Rosenberger did not conduct the required credit review process for Subcontractor A, nor did she direct anyone in Synchronoss's accounting department to do so.

222.    In addition to failing to perform the standard procedures to establish that the receivable would be collectible, as required by GAAP, Rosenberger also knew or recklessly disregarded facts that demonstrated that collection of the receivable was "substantially contingent" on Subcontractor A's resale of the software, including that: (i) the business purpose of the agreement with Subcontractor A was to allow Synchronoss to recognize revenue the fourth quarter of 2016 when sales personnel told Rosenberger that the intended purchaser, Customer B, would not be purchasing it until the first quarter of 2017; (ii) Subcontractor A had no history as a reseller, (iii) payment terms did not require payments until when or after Synchronoss projected a sale to Customer B would occur; (iv) Subcontractor A expressed a need to be held harmless if it could not resell the software; (v) the sales team knew this hold harmless provision was very important to Subcontractor A as evidenced by its continuing to propose the provision even after being told the provision could not be in the agreement; and (vi) generous business terms were

being proposed, not for business purposes, but to make the agreement "Mcfly proof," *i.e.*, to avoid auditor scrutiny.

223.    Recognition of the purported $3.6 million in revenue from this Reseller Agreement, as Rosenberger knew or recklessly disregarded, was improper under GAAP, as the fee was neither fixed nor determinable, or its collection probable.

### C.    Rosenberger Materially Misrepresented the Reseller Agreement and Collectibility with Subcontractor A to the Company's Auditor

224.    At Rosenberger's direction, and with her review and approval, Synchronoss's accounting team prepared a revenue recognition memorandum to justify its inclusion of $3.6 million in revenue from the Reseller Agreement in its financial statements. As Rosenberger knew or recklessly disregarded, the memorandum would be, and was, provided to Synchronoss's auditor.

225.    The memorandum stated that "[c]ollectability is probable," a conclusion required for revenue recognition under GAAP, because the subsidiary acquired by Synchronoss in 2015 "has been engaged in business with [Subcontractor A] since 2010 and has not had any billing issues. As such, we find that collectability of the fees is probable."

226.    However, as Rosenberger knew or recklessly disregarded, collection from Subcontractor A under the Reseller Agreement was not probable. In addition, as Rosenberger knew or recklessly disregarded, the representation that there had been no "billing issues" with Subcontractor A based on its prior history with the Company was false and misleading, because that history was as a subcontractor and not as a customer, and thus Subcontractor A had no relevant credit history with Synchronoss or any history of Subcontractor A paying Synchronoss on invoices.

227.    Furthermore, as Rosenberger knew or recklessly disregarded, Subcontractor A had never previously resold a product, and the business purpose of the transaction was not due to Subcontractor A's decision to become a software reseller. Rather, as Rosenberger knew or recklessly disregarded, Synchronoss's sales team had inserted Subcontractor A as an intermediary in its intended sale to Customer B. The sale to Subcontractor A was simply a mechanism Synchronoss used to allow Synchronoss the ability to create the misleading appearance that it had closed a sale in December 2016, and thus allow it to recognize revenue in 2016, rather than the following year. None of these material facts were disclosed in the revenue recognition memorandum, nor did Rosenberger otherwise disclose them to the auditor.

228.    As described above, Rosenberger knew or recklessly disregarded that Subcontractor A itself was concerned about its ability to meet a formal commitment to pay $3.6 million to Synchronoss, that it had sought a hold harmless provision, and that the Company's sales team had persistently presented Rosenberger with proposals to indemnify Subcontractor A and provide covert financing to facilitate payment. None of these material facts were disclosed in the revenue recognition memorandum, nor did Rosenberger otherwise disclose them to the auditor.

229.    On February 10, 2017, Synchronoss's auditor emailed Synchronoss's accounting team a number of questions regarding Subcontractor A, including its history with Synchronoss and Synchronoss's comfort with Subcontractor A's financial condition. The auditor also asked for any collectibility analyses Synchronoss had done. Synchronoss provided no response.

230.    On February 14, 2017, Rosenberger attended a meeting with the auditor, at which one item on the agenda were the open questions the auditor had sent by email. At that meeting,

Rosenberger did not disclose any of the foregoing material facts about Synchronoss's relationship with Subcontractor A.

231.    In fact, as of February 17, 2017, the only information Synchronoss provided the auditor on collectibility was the similarly false and misleading material representation that the Company had "a good business relationship with [Subcontractor A] that goes back years with [subsidiary], so we don't see delinquency being an issue with the company."

232.    On February 27, 2017, Rosenberger signed and sent to the auditor a management representation letter in connection with Synchronoss's year-end financial statements. Rosenberger represented in the letter, among other things, the following:

> We have disclosed to you all sales terms (both expressed and implied), including all rights of return or price adjustments and warranty provisions. We have made available to you all significant contracts, communications (either written or oral), and other relevant information pertaining to arrangements with our customers, including distributors and resellers.

233.    In light of the foregoing material facts Rosenberger knew or recklessly disregarded regarding the Reseller Agreement and Subcontractor A, Rosenberger's representations, as she knew or recklessly disregarded, were materially false and misleading.

### D.    Synchronoss Improperly Reported Revenue from its Purported Transaction With Subcontractor A in its Required Public Filings

234.    As CFO, Rosenberger signed Synchronoss's public filings during the Relevant Period, including the filings detailed below.

235.    Rosenberger knowingly or recklessly falsely certified in the Form 10-Q and Form 10-K detailed below, among other things, that the Company complied with Section 13(a) of the Exchange Act, and "fairly present[ed], in all material respects, the financial condition and results of operations of the Company."

236.    At Rosenberger's direction, Synchronoss improperly included $3.6 million in revenue from the Reseller Agreement in its Form 8-K announcing its financial results for Q4 2016 and FY 2016, and its Form 10-K for Q4 2016 and FY 2016, filed on February 8, 2017 and February 27, 2017, respectively.

237.    By improperly including the revenue from the Reseller Agreement, Synchronoss falsely understated its pre-tax loss from continuing operations for the quarter by more than 10%, and for the year by more than 4%. It also allowed Synchronoss to meet guidance the Company had publicly issued in December 2016 that it otherwise would not have met.

238.    Synchronoss's inclusion of this purported revenue in its financial statements, with Rosenberger's knowing and substantial assistance, was improper under GAAP, because, among other reasons, the license fee in the Reseller Agreement was not "fixed or determinable" and collectibility was not "probable."

## V.    SYNCHRONOSS RESTATED ITS FINANCIALS AND ACKNOWLEDGED THE PERVASIVE MATERIAL WEAKNESSES OF ITS INTERNAL ACCOUNTING CONTROLS DURING THE RESTATED PERIOD

239.    In July 2018, Synchronoss announced a restatement of its audited financial statements for the fiscal years ended December 31, 2016 and 2015 and restated selected financial data for the fiscal years ended 2014 and 2013, periods in which Rosenberger was CFO, totaling approximately $190 million in cumulative revenues.

240.    As part of this announcement, Synchronoss restated revenues related to certain transactions for which Synchronoss had recognized revenue improperly and in a manner inconsistent with GAAP.

241.    The restatement was required not only by the unlawful conduct described above, but also as a result, as Synchronoss acknowledged in its restatement, of "pervasive material

weaknesses" in Synchronoss's internal control over financial reporting for the restatement period.

These weaknesses included:

- failure to ensure that the elements of revenue recognition were always met prior to revenue recognition and all elements within MEAs identified and accounted for appropriately;

- failure to maintain adequate oversight to guide individuals in applying internal control over financial reporting in preventing or detecting material accounting errors, or omissions, due to inadequate information and, in certain instances, compliance with Synchronoss's revenue recognition policies;

- failure to design and maintain adequate review and approval controls, including the use of appropriate technical accounting expertise, when recording complex or non-routine transactions such as those involving revenue recognition, acquisitions and divestitures, including ensuring transactions are appropriately accounted for from a substance over form perspective;

- failure to maintain sufficient personnel with an appropriate level of accounting knowledge, experience, and training in the application of GAAP commensurate with the size of the entity and nature and complexity of financial reporting requirements; and

- failure to consistently maintain a corporate culture that prevented the occurrence of certain deviations from its policy.

242.    As CFO, Rosenberger had primary responsibility for directing the adoption and implementation of the Company's internal control over financial reporting.

243.    Rosenberger knowingly and substantially assisted Synchronoss's failure to devise and maintain a system of internal controls sufficient to prevent the improper recording and reporting of revenue, including with respect to the transactions described above. *See* ¶¶ 29-238, *supra*.

244.    For every transaction entered into by Synchronoss in excess of $500,000, Synchronoss's accounting team prepared a revenue recognition memorandum setting out the accounting guidelines under GAAP relevant to the recognition of revenue and providing the purported factual bases for any such recognition.

245.     As required under Synchronoss's policies and procedures during the Relevant Period, Rosenberger reviewed and approved all such revenue recognition memoranda during the Relevant Period.

246.     However, as described above, Rosenberger failed to ensure that revenue recognition memoranda properly incorporated all relevant information in determining the appropriate accounting under GAAP.

## VI.     ROSENBERGER FAILED TO REIMBURSE SYNCHRONOSS UNDER SOX 304

247.     Sarbanes-Oxley Section 304 requires the CEO and CFO of any issuer required to prepare an accounting restatement due to material noncompliance with the securities laws as a result of misconduct to reimburse the issuer for (i) any bonus or incentive-based or equity-based compensation received by that person from the issuer during the 12-month period following the false filings, and (ii) any profits realized from the sale of securities of the issuer during those 12-month periods.

248.     During the Relevant Period, Rosenberger received bonuses, incentive-based compensation, equity-based compensation, and realized profits from her sales of Synchronoss stock.

249.     Rosenberger received at least $690,000 of incentive-based compensation based on Synchronoss's reported, but materially false, 2015 and 2016 performance, including more than $430,000 in cash bonuses and more than 7,300 shares of common stock valued at approximately $260,000. She also received other cash bonuses and equity-based compensation, including additional common shares based on time with the Company, and options to purchase more than 32,000 shares of common stock. She also made multiple profitable stock sales during the Relevant Period.

250.     To date, Rosenberger has not reimbursed Synchronoss for any bonuses, incentive-based compensation, equity-based compensation, or realized profits from her sales of Synchronoss stock received during the period of required repayment under SOX 304.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Rosenberger)

251.     The Commission re-alleges and incorporates by reference here the allegations in ¶¶ 1-147.

252.     Defendant Rosenberger, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

253.     By reason of the foregoing, Defendant Rosenberger, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Rule 13b2-2
### (Rosenberger)

254.     The Commission re-alleges and incorporates by reference here the allegations in ¶¶ 1-246.

255.     From no later than 2015 through February 2017, Defendant Rosenberger, directly or indirectly, made or caused to be made materially false or misleading statements to an accountant in connection with audits, reviews, or examinations of Synchronoss's financial statements or in the preparation or filing of Synchronoss's documents or reports required to be filed with the SEC; or omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statement were made, not misleading, to an accountant in connection with audits, reviews, or examinations of financial statements or in the preparation or filing of Synchronoss's documents or reports required to be filed with the SEC.

256.     By reason of the foregoing, Defendant Rosenberger violated and, unless enjoined, will again violate Exchange Act Section 13(b) [15 U.S.C. § 78m(b)] and Rule 13b2-2 [17 C.F.R. § 240.13b2-2] thereunder.

### THIRD CLAIM FOR RELIEF
**Violations of Exchange Act Section 13(a) and Rule 13a-14 Thereunder
(Rosenberger)**

257.     The Commission re-alleges and incorporates by reference here the allegations in ¶¶ 1-246.

258.     Defendant Rosenberger, as the principal executive officer and principal financial officer of an issuer with a class of securities registered pursuant to Exchange Act Section 12 [15 U.S.C. § 78l], certified to the best of her knowledge that one or more of the issuer's periodic reports filed with the Commission contained no untrue statements of material fact or omissions of material fact when Rosenberger knew or recklessly disregarded that the report or reports contained untrue statements of material fact or omissions of material fact.

259. By reason of the foregoing, Defendant Rosenberger violated and, unless enjoined, will again violate Rule 13a-14 [17 C.F.R. § 240.13a-14] promulgated under Exchange Act § 13(a) [15 U.S.C. § 78m(a)].

## FOURTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 13(b)(5)
### (Rosenberger and Lanni)

260. The Commission re-alleges and incorporates by reference here the allegations in ¶¶ 1-246 as to Rosenberger, and ¶¶ 1-7, 9-18, 24-28, 148-201 as to Lanni.

261. By engaging in the conduct described above, Defendants Rosenberger and Lanni each knowingly circumvented Synchronoss's system of internal accounting controls and each knowingly falsified, or caused to be falsified, Synchronoss's books and records.

262. By reason of the foregoing, Defendants Rosenberger and Lanni violated and, unless enjoined, will again violate Exchange Act Section 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## FIFTH CLAIM FOR RELIEF
### Violations of Exchange Act Rule 13b2-1
### (Rosenberger and Lanni)

263. The Commission re-alleges and incorporates by reference here the allegations in ¶¶ 1-246 as to Rosenberger, and ¶¶ 1-7, 9-18, 24-28, 148-201 as to Lanni.

264. By reason of the conduct alleged above, Defendants Rosenberger and Lanni, directly or indirectly, falsified or caused to be falsified, books, records, or accounts described in Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 13(b)(2)(A)].

265. By reason of the foregoing, Defendants Rosenberger and Lanni violated, and unless restrained and enjoined, will continue violating Rule 13b2-1 promulgated under the Exchange Act [17 C.F.R § 240.13b2-1].

## SIXTH CLAIM FOR RELIEF
### Aiding and Abetting Synchronoss's Violations of Exchange Act Section 10(b) and
### Rules 10b-5(a) and (c) Thereunder
### (Rosenberger)

266.    The Commission re-alleges and incorporates by reference here the allegations in ¶¶ 1-147.

267.    By engaging in the conduct described above, Synchronoss directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

268.    By reason of the foregoing, Synchronoss violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

269.    Defendant Rosenberger knowingly or recklessly provided substantial assistance to Synchronoss with respect to its violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

270.    By reason of the foregoing, Defendant Rosenberger is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Synchronoss's violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)], and, unless enjoined, Rosenberger will again aid and abet these violations.

## SEVENTH CLAIM FOR RELIEF
## Aiding and Abetting Synchronoss's Violations of Exchange Act Section 13(b)(2)(B)
### (Rosenberger)

271.    The Commission re-alleges and incorporates by reference here the allegations in ¶¶ 1-246.

272.    By engaging in the conduct described above, Synchronoss failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that Synchronoss's corporate transactions were executed in accordance with management's authorization and in a manner to permit the preparation of financial statements in conformity with GAAP in violation of Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)].

273.    By reason of the foregoing, Synchronoss violated Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)].

274.    Rosenberger, as the Company's CFO, had primary responsibility for directing the adoption and implementation of the company's internal accounting controls.

275.    Rosenberger failed to ensure that the Company's revenue recognition memoranda properly incorporated all relevant information in determining the appropriate accounting for the transaction. For example, Rosenberger knew the revenue recognition memorandum regarding the license agreement with the Acquisition Target, a transaction the Company later restated, falsely stated that the acquisition was not contingent on the license agreement.

276.    In addition, for example, Rosenberger failed to ensure that on the Customer B transaction, the accounting team inquired about who would be hosting the software that was the subject of the PLA after conversion from a SaaS arrangement, when she knew that the Company had previously been providing that service under the SaaS arrangement.

277.    With respect to the Subcontractor A transaction, Rosenberger approved a revenue recognition memorandum that noted the required factors to be considered when determining whether collectibility is probable with respect to a new reseller, but she failed to ensure that any of those factors were actually considered, nor did she even ensure that standard credit checks were performed.

278.    Rosenberger also approved a revenue recognition memorandum with respect to the LNP Software transaction, later restated by the Company, that she knew relied on a backdated document as "persuasive evidence" of an arrangement.

279.    By reason of the foregoing, Defendant Rosenberger knowingly or recklessly provided substantial assistance to Synchronoss with respect to its violations of Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)].

280.    By reason of the foregoing, Defendant Rosenberger is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Synchronoss's violations of Exchange Act Section 13(b)(2)(B) [15 U.S.C. § 78m(b)(2)(B)], and, unless enjoined, Rosenberger will again aid and abet these violations.

**EIGHTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Exchange Act Sections 13(a) and 13(b)(2)(A)**
**and Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder**
**(Defendants Rosenberger and Lanni)**

281.    The Commission re-alleges and incorporates by reference here the allegations in ¶¶ 1-246 as to Rosenberger, and ¶¶ 1-7, 9-18, 24-28, 148-201 as to Lanni.

282.    By reason of the foregoing, from 2015 through 2017, Synchronoss, was an issuer of securities registered pursuant to Section 12 of the Exchange Act, and it filed materially false and misleading current reports, materially false and misleading quarterly reports, and materially false and misleading annual reports with the Commission that made untrue statements of

material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected Synchronoss's transactions and dispositions of its assets.

283.     Defendants Rosenberger and Lanni knowingly or recklessly provided substantial assistance to Synchronoss with respect to its violations of Exchange Act Sections 13(a) and 13(b)(2)(A) [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11, and 240.13a-13].

284.     By reason of the foregoing, Defendants Rosenberger and Lanni are liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting Synchronoss's violations of Exchange Act Section 13(a) and 13(b)(2)(A) [15 U.S.C. §§ 78m(a) and 78m(b)(2)(A)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-11, and 240.13a-13], and, unless enjoined, Rosenberger and Lanni will again aid and abet these violations.

### NINTH CLAIM FOR RELIEF
### Violations of Sarbanes-Oxley Act Section 304
### (Rosenberger)

285.     The Commission re-alleges and incorporates by reference here the allegations in ¶¶ 1-250.

286.     Section 304 of the Sarbanes-Oxley Act [15 U.S.C. § 7243] requires the CFO of any issuer required to prepare an accounting restatement due to material noncompliance with the securities laws as a result of misconduct to reimburse the issuer for (i) any bonus or incentive-based or equity-based compensation received by that person from the issuer during the

12-month period following the false filings, and (ii) any profits realized from the sale of securities of the issuer during those 12-month periods.

287.    Synchronoss was required to restate its financial statements filed during the Relevant Period due to material noncompliance with the securities laws as a result of misconduct.

288.    Rosenberger received incentive-based compensation during the 12-month periods following filings required to be restated, in an amount not less than $690,000, and to date has not reimbursed the Company for any portion of thereof, nor has the Commission exempted such incentive compensation, pursuant to Section 304(b) of the Sarbanes-Oxley Act [15 U.S.C. § 7243(b)], from the application of Section 304(a) of the Sarbanes-Oxley Act [15 U.S.C. § 7243(a)].

289.    By reason of the foregoing, Rosenberger violated Section 304 of the Sarbanes-Oxley Act [15 U.S.C. § 7243].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

## I.

Permanently enjoining Defendant Rosenberger and her agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them, from violating, directly or indirectly, Exchange Act Sections 10(b), 13(a) and 13(b)(5) [15 U.S.C. §§ 78j(b), 15 U.S.C. § 78m(a) and 78m(b)(5)] and Rules 10b-5, 13a-14, 13b2-1, and 13b2-2 promulgated thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, and 240.13b2-2] and from aiding and abetting any violations of Exchange Act Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B)

[15 U.S.C. §§ 78j(b), 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 10b-5(a), 10b-5(c), 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.10b-5(a), 240.10b-5(c), 240.12b-20, 240.13a-1, 240.13a-11, & 240.13a-13].

## II.

Permanently enjoining Defendant Lanni and her agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them, from violating, directly or indirectly, Exchange Act Sections 13(b)(5) [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1] and from aiding and abetting any violations of Exchange Act Sections 13(a) and 13(b)(2)(A) [15 U.S.C. §§ 78m(a) & 78m(b)(2)(A)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, & 240.13a-13].

## III.

Ordering all Defendants to pay civil monetary penalties under Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

## IV.

Permanently prohibiting Defendant Rosenberger from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

## V.

Ordering Defendant Rosenberger to reimburse the Company for all bonuses, incentive-based compensation, equity-based compensation, and any profits realized from the sale of securities, pursuant to Section 304 of the Sarbanes-Oxley Act [15 U.S.C. § 7243(a)]; and

**VI.**

Granting such other and further relief as this Court deems appropriate and necessary for the benefit of investors.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury as to all issues so triable.

Dated: New York, New York
    June 7, 2022

SECURITIES AND EXCHANGE COMMISSION

By:    S/Lara Shalov Mehraban
    LARA SHALOV MEHRABAN
    ACTING REGIONAL DIRECTOR
    Sheldon L. Pollock
    Richard G. Primoff
    Lindsay S. Moilanen
    Theresa H. Gue
    *Attorneys for Plaintiff*
    SECURITIES AND EXCHANGE COMMISSION
    New York Regional Office
    100 Pearl Street, Suite 20-100
    New York, New York 10004
    (212) 336-0148 (Primoff)
    Email: primoffr@sec.gov