**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

SECURITIES AND EXCHANGE COMMISSION,

               Plaintiff,

      v.

KAREN ROSENBERGER and JOANNA LANNI,

               Defendants.

---

Case No. 22-cv-4736 (DLC)

**MEMORANDUM OF LAW IN SUPPORT OF
KAREN ROSENBERGER'S MOTION FOR SUMMARY JUDGMENT**

**ALSTON & BIRD LLP**
Jenny Kramer
Rachel Finkel
90 Park Avenue
New York, New York 10016
Phone: (212) 210-9420
Jenny.Kramer@alston.com
Rachel.Finkel@alston.com

Andrew Hatchett (admitted pro hac vice)
1201 West Peachtree Street, NE
Atlanta, GA 30309-3424
Phone: (404) 881-7000
Andrew.Hatchett@alston.com
*Counsel for Karen Rosenberger*

## TABLE OF CONTENTS

<b>Page</b>

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 2

I.     Synchronoss and Ms. Rosenberger's Tenure at the Company ............................ 2

     A.     Synchronoss's Business ............................................................................. 2

     B.     Ms. Rosenberger's Tenure at Synchronoss and Role as CFO ................. 3

     C.     EY's Role as Synchronoss's External Auditor ....................................... 4

     D.     Certifications of Annual and Current Reports ........................................ 5

II.     2017–2018 Investigation and Ultimate Restatement of Revenue ...................... 5

III.     The Five Challenged Transactions ...................................................................... 7

     A.     ASR & LNP ............................................................................................. 7

               1.     ASR revenue was properly booked in Q3 2015, with EY's approval, following an email confirmation of the sale and confirmation that AT&T downloaded the software.................................. 8

               2.     AT&T disputed the ASR deal in 2016, but there is no evidence anyone told Ms. Rosenberger; instead, the evidence shows that she understood management turnover at AT&T was causing delays. ........... 10

               3.     LNP revenue was booked in Q4 2015 following a letter memorializing a December 31, 2015 agreement and acceptance of software by AT&T. ............................................................................ 13

               4.     The Investigative Team and EY found no "integrity issues" with respect to Ms. Rosenberger's conduct as to ASR and LNP..................... 16

     B.     Openwave ............................................................................................... 17

     C.     Windstream ............................................................................................ 20

     D.     Sage ....................................................................................................... 22

LEGAL STANDARD ..................................................................................................... 24

ARGUMENT .................................................................................................................. 25

I.      The SEC's Section 10(b) Claim (Claim 1) fails because the SEC cannot show that
        Ms. Rosenberger acted with scienter. ............................................................... 25

        A.      The SEC cannot establish scienter as to the ASR transaction. ............................ 29

                1.      There is no evidence of fraudulent intent as to the original revenue
                        recognition decision for ASR. ................................................................. 30

                2.      There is no evidence that Ms. Rosenberger knew in 2016 that
                        AT&T was contesting the ASR transaction. .............................................. 32

        B.      The SEC cannot show scienter as to the LNP transaction given evidence
                that Ms. Rosenberger had a reasoned basis for her accounting judgment. ........... 33

        C.      The SEC cannot establish that Ms. Rosenberger acted with scienter when
                approving the accounting treatment for Openwave—a highly complex,
                "close call" decision that was consistent with previous transactions and
                that objective, reasonable accountants agree was supportable. ........................... 37

II.     The SEC's claims under Section 13(a) and Rule 13a-14 (Claim 3) and Section
        13(b)(5) (Claim 4) fail for the same reasons as the Section 10(b) and Rule 10b-5
        claims—there is no evidence Ms. Rosenberger "knew" her certifications were
        incorrect. ............................................................................................................ 40

III.    The SEC's Rule 13b2-2 Claim (Claim 2) fails because the SEC cannot show Ms.
        Rosenberger acted unreasonably or made materially false statements to EY. ............. 42

IV.     The SEC's Rule 13b2-1 Claim (Claim 5) fails because it cannot show that
        unreasonable conduct by Ms. Rosenberger caused the alleged accounting errors. ......... 46

V.      The SEC's aiding and abetting claims (Claims 6, 7, and 8) fail for many of the
        same reasons as the primary violations. ............................................................... 47

VI.     Ms. Rosenberger is entitled to judgment on the SOX 304 claim (Claim 9). .................. 49

VII.    The SEC cannot show that it is entitled to disgorgement or injunctive relief. ................ 49

CONCLUSION ............................................................................................................... 50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).........................................................................................24, 25

*Brown v. Eli Lilly & Co.*,
   654 F.3d 347 (2d Cir. 2011)...................................................................................24

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...............................................................................................25

*Chill v. Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996)...................................................................................36

*ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009).......................................................................26, 28, 36

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976)...............................................................................................26

*Freedman v. Value Health, Inc.*,
   135 F. Supp. 2d 317 (D. Conn. 2001).....................................................................25

*Gillis v. QRX Pharma Ltd.*,
   197 F. Supp. 3d 557 (S.D.N.Y. 2016).....................................................................35

*Gonnella v. SEC*,
   954 F.3d 536 (2d Cir. 2020)...................................................................................47

*Horror Inc. v. Miller*,
   15 F.4th 232 (2d Cir. 2021) ..............................................................................24, 25

*In re N. Telecom Ltd. Sec. Litig.*,
   116 F. Supp. 2d 446 (S.D.N.Y. 2000).....................................................................25

*Kerzer v. Kingly Mfg.*,
   156 F.3d 396 (2d Cir. 1998)...................................................................................25

*Liu v. SEC*,
   140 S. Ct. 1936 (2020)...........................................................................................50

*McLaughlin v. Langrock Sperry & Wool, LLP*,
   2020 U.S. Dist. LEXIS 103404 (D. Vt. June 12, 2020).........................................29

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)..............................................................31, 36

*REMEC Inc. Sec. Litig.*,
702 F. Supp. 2d 1202 (S.D. Cal. 2010)............................................32, 40

*SEC v. Bankosky*,
716 F.3d 45 (2d Cir. 2013)...........................................................................49

*SEC v. Cedric Kushner Promotions, Inc.*,
417 F. Supp. 2d 326 (S.D.N.Y. 2006).........................................................25

*SEC v. Gallison*,
2023 WL 3004882 (S.D.N.Y. Feb. 4, 2023)...............................................50

*SEC v. Goldstone*,
2016 WL 3135651 (D.N.M. May 10, 2016)...............................................29

*SEC v. ITT Educ. Servs., Inc.*,
303 F. Supp. 3d 746 (S.D. Ind. 2018).........................................................49

*SEC v. Jasper*,
678 F.3d 1116 (9th Cir. 2012) .....................................................................50

*SEC v. Jensen*,
835 F.3d 1100 (9th Cir. 2016) .....................................................................49

*SEC. v. Kelly*,
765 F. Supp. 2d 301 (S.D.N.Y. 2011).....................................................42, 46

*SEC v. Life Partners Holdings, Inc.*,
71 F. Supp. 3d 615 (W.D. Tex. 2014).........................................................49

*SEC v. Monarch Fund*,
608 F.2d 938 (2d Cir. 1979)...........................................................................50

*SEC v. Obus*,
693 F.3d 276 (2d Cir. 2012)...........................................................................26

*SEC v. Orr*,
2006 WL 542986 (E.D. Mich. Mar. 6, 2006) ...........................................45

*SEC v. Patel*,
61 F.3d 137 (2d Cir. 1995).............................................................................50

*SEC v. Price Waterhouse*,
797 F. Supp. 1217 (S.D.N.Y. 1992).........................................................38, 50

*SEC v. Sourlis,*
  851 F.3d 139 (2d Cir. 2016)................................................................................25, 27

*SEC v. Stanard,*
  2009 U.S. Dist. LEXIS 6068 (S.D.N.Y. Jan. 27, 2009).........................................41

*SEC v. Yorkville Advisors, LLC,*
  305 F. Supp. 3d 486 (S.D. N.Y. 2018).........................................................26, 27, 48

*Shenk v. Karmazin,*
  868 F. Supp. 2d 299 (S.D.N.Y. 2012)....................................................................25, 26

*Stevelman v. Alias Research, Inc.,*
  174 F.3d 79 (2d Cir. 1999)..........................................................................................26

*United States v. Reyes,*
  577 F.3d 1069 (9th Cir. 2009) ...................................................................................42

*Woolgar v. Kingstone Cos.,*
  477 F. Supp. 3d 193 (S.D.N.Y. 2020)....................................................................29, 32

*Wyche v. Advanced Drainage Sys., Inc.,*
  2017 WL 971805 (S.D.N.Y. Mar. 10, 2017) ..........................................................28, 36

**STATUTES**

15 U.S.C. § 78j(b) ............................................................................................................25

15 U.S.C. § 78m................................................................................................................5

15 U.S.C. § 78m(a) ...........................................................................................................40

15 U.S.C. § 78m(b)(5) ......................................................................................................41

15 U.S.C. § 7241(a) ..........................................................................................................40

15 U.S.C. § 7243(a) ..........................................................................................................49

**OTHER AUTHORITIES**

17 C.F.R. § 240.10b-5(a)–(c)...........................................................................................25

17 C.F.R. § 240.13a-14 .....................................................................................................40

17 C.F.R. § 240.13b2-1......................................................................................................46

17 C.F.R. § 240.13b2-2......................................................................................................42

**INTRODUCTION**

The Securities and Exchange Commission (SEC) places high priority on holding corporate executives accountable for corporate failures. That policy serves a valid purpose—*if* the executive engaged in intentional or reckless misconduct. This, however, is not one of those cases.

In 2018, Synchronoss Technologies, Inc. restated approximately $190 million in revenue arising from 21 transactions entered into between 2013 and 2016. Looking for someone to hold accountable for the fact of the restatement, the SEC brought this enforcement action against Karen Rosenberger, who served as Synchronoss's Chief Financial Officer (CFO) for part (but not all) of the period covered by the restatement. The SEC asserts claims against Ms. Rosenberger based on five (of the 21) transactions, which represent just 14 percent of the restated revenue. For three of those transactions (ASR, LNP, and Openwave), the SEC asserts claims for fraud. It also asserts various books-and-records violations for those and two other transactions (Windstream and Sage).

But after six years of investigation and litigation, the SEC has not produced a single piece of evidence that Ms. Rosenberger engaged in any intentional misconduct. That failure is not surprising: Before the SEC became involved, Synchronoss initiated (and spent more than $30 million on) multiple independent, objective, and competent investigations—none of which found that Ms. Rosenberger engaged in wrongdoing. Those investigations found misconduct by *other* employees—including instances where information was intentionally *concealed from Ms. Rosenberger*. But as to Ms. Rosenberger, investigators found "no integrity issues" whatsoever.

Discovery in this case has confirmed those findings. U.S. securities laws don't demand perfection, and the mere fact of an accounting error is not proof that the CFO engaged in fraud (or was even unreasonable). Each transaction challenged by the SEC required significant professional judgment. The undisputed evidence shows that Ms. Rosenberger—acting in collaboration with the Company's external auditors at Ernst & Young (EY) and relying on the information provided by

her subordinates and colleagues—believed in good faith that her accounting judgments complied with governing accounting rules and were consistent with the Company's historical practices.

The SEC's theories seek to create and impose a liability standard that would put even the most conscientious CFOs at risk. The SEC claims that Ms. Rosenberger, a newly minted CFO without public auditing experience, should have disclosed facts of which she was not aware, identified minor technical issues that (if they were even issues to begin with) were also overlooked by EY auditors with access to the same information, and uncovered intentional misconduct by sales personnel who disobeyed her express directives and took deliberate steps to conceal their behavior from her. If the SEC succeeds in its crusade, every CFO who makes a minor mistake or fails to expose hidden misconduct by others may be accused and found liable for fraud.

But that's not how the law works. Claims for securities fraud require *evidence* that the defendant acted with an *intent* to defraud. The SEC has none. There is no evidence to create a triable question as to whether Ms. Rosenberger acted unreasonably, let alone with a fraudulent intent, for any transaction. The Court should grant summary judgment in Ms. Rosenberger's favor.

## BACKGROUND[1]

### I.     Synchronoss and Ms. Rosenberger's Tenure at the Company

#### A.     Synchronoss's Business

Synchronoss is a publicly traded global software company headquartered in New Jersey. SUF ¶ 1. Stephen Waldis, a former AT&T executive, founded the Company in 2000 and served as Synchronoss's CEO from 2000 to 2017. *Id.* ¶ 2. In 2015 and 2016,[2] Synchronoss's largest customers were AT&T and Verizon. *Id.* ¶ 3.

---

[1] Citations to Ms. Rosenberger's Rule 56.1 Statement of Undisputed Facts (filed herewith) are styled as "SUF ¶ __," and exhibits to the Declaration of Jenny Kramer (filed herewith) as "Ex. __."

[2] The SEC defines the "Relevant Period" in this action as September 2015 through June 2017 (ECF 1 ("Compl.") ¶ 4) even though Ms. Rosenberger resigned in February 2017 (SUF ¶ 28).

**B.     Ms. Rosenberger's Tenure at Synchronoss and Role as CFO**

Karen Rosenberger joined Synchronoss in 2000, shortly after the Company was founded. *Id.* ¶ 5. She effectively grew up within the Company, obtaining most of her professional accounting experience during her time at Synchronoss and even earning her CPA license while employed there. *Id.* ¶¶ 6–8. For 14 years (from 2000 to 2014), she held accounting positions under Synchronoss's former CFO, Larry Irving. *Id.* ¶ 6. Ms. Rosenberger was appointed to succeed Irving as CFO in April 2014 and served in that role until February 2017. *Id.* ¶¶ 4, 28, 31.

During her short tenure as CFO, Ms. Rosenberger oversaw the Company's finance department. *Id.* ¶ 9. The finance team was comprised of approximately 14 people, including, among other positions, a Corporate Controller (Joanna Lanni), an Assistant Controller (Joshua Shaver), and a Revenue Recognition & Billing Manager (Melissa Chen). *Id.* On average, four to six employees in the finance group were CPAs, and five or six (including Lanni, Shaver, and Chen) had previously worked for EY, Synchronoss's longtime external audit firm. *Id.* ¶ 10.

Synchronoss's accounting department had an established system of internal controls when Ms. Rosenberger assumed the position as CFO, and Ms. Rosenberger did not modify those controls or change any revenue recognition policy when she was promoted. *Id.* ¶ 12. One of those controls was the practice of creating memos (called "revenue recognition memos") to document Synchronoss's accounting treatment of transactions exceeding $500,000. *Id.* ¶¶ 13, 20. Ms. Rosenberger relied on her team—primarily Chen and Dana Moronese (Synchronoss's Manager of Technical Accounting)—to conduct the fact gathering for, and drafting of, revenue recognition memos. *Id.* ¶¶ 14–17. Revenue recognition decisions were then reviewed and approved by the Assistant Controller (Shaver), the Controller (Lanni), and eventually Ms. Rosenberger. *Id.* ¶¶ 18–19. As the final reviewer, Ms. Rosenberger was responsible for performing a "high-level" review of revenue recognition memos; she was not responsible for reviewing or analyzing the source

documents or independently confirming facts (such as whether the appropriate individual from a counterparty had approved a contract). *Id.* ¶ 19.

In December 2016, Synchronoss acquired Intralinks Holdings, Inc. *Id.* ¶¶ 26–27. After the acquisition, Intralinks's CEO (Ron Hovsepian) assumed the role as CEO of the combined company, with Waldis staying on as Executive Chairman of the Board. *Id.* ¶ 27. With Hovsepian in charge, the Board appointed John Frederick to replace Ms. Rosenberger as CFO. *Id.* ¶ 31. Ms. Rosenberger was offered an option to stay on in the "number two finance role" under Frederick, but she declined the offer. *Id.* ¶ 25. The Company confirmed in its Form 8-K that "Ms. Rosenberger's resignation d[id] not result from any disagreement with the Company on any matter relating to the Company's accounting policies or practices." *Id.* ¶ 28. Frederick served as CFO for only a couple months and was then replaced by Larry Irving (who was also Ms. Rosenberger's predecessor). *Id.* ¶ 32.

### C.     EY's Role as Synchronoss's External Auditor

Since 2006, Synchronoss has engaged EY—a premiere auditing institution—to conduct yearly audits of Synchronoss's financial statements and internal controls over financial reporting, as well as to conduct quarterly reviews of the Company's interim financial information. *Id.* ¶¶ 35–36. EY's audit team included multiple experienced and technically proficient auditors. *Id.* ¶¶ 37–41. Alison Yablonowitz, an EY partner with more than 19 years of experience by 2015, was the Coordinating Partner for the 2011 through 2015 audits. *Id.* ¶¶ 38–39. In 2016, Yablonowitz was replaced by Shawn Rogers, another seasoned EY partner with more than 23 years of public-accounting experience. *Id.* ¶¶ 38, 40.

Rogers testified that Synchronoss and EY had a "collaborative" relationship. *Id.* ¶ 49. During the audits, Synchronoss provided EY with designated office space near Synchronoss's finance team. *Id.* ¶ 44. EY worked closely with Synchronoss's finance team (including Ms.

Rosenberger, Lanni, Shaver, and Chen), as well as individuals outside the finance function (including Synchronoss's General Counsel, Ronald Prague). *Id.*¶¶ 43–48. Synchronoss's finance team also regularly sought EY's guidance throughout the year as transactions were being negotiated; for example, EY sometimes reviewed draft deal documents before they were executed and made recommendations on how to structure transactions to comply with relevant accounting guidance. *Id.* ¶¶ 45, 201. EY also provided formal training to Synchronoss's finance team concerning accounting guidance, such as revenue recognition rules. *Id.* ¶ 50.

In 2015 and 2016, EY offered audit opinions that "the financial statements . . . present fairly, in all material respects, the consolidated financial position of Synchronoss . . . in conformity with [GAAP]." *Id.* ¶ 65. For both years, EY also audited Synchronoss's "internal control over financial reporting" and issued the opinions that Synchronoss "maintained, in all material respect, effective internal control over financial reporting." *Id.* ¶ 66.

### D.       Certifications of Annual and Current Reports

As a public company, Synchronoss must file annual reports (Forms 10-K) and quarterly reports (Forms 10-Q) with the SEC. *See* 15 U.S.C. § 78m. Waldis, as CEO, signed both the 2015 and 2016 Forms 10-K. SUF ¶ 67. Both Waldis and Ms. Rosenberger, as CFO, signed certification of the Forms 10-K as required under Section 302 of the Sarbanes-Oxley Act (SOX), stating that, "based on [their] knowledge," the report "does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made . . . not misleading" and that it "fairly present[s] in all material respects the financial condition, results, of operations and cash flows" of the Company. *Id.* ¶ 68.

## II.     2017–2018 Investigation and Ultimate Restatement of Revenue

In April 2017, Synchronoss's new CFO, John Frederick, asked EY questions about historical accounting decisions that he identified as "judgmental in nature." *Id.* ¶ 70. Rogers (EY's

Coordinating Partner at the time) met with Frederick and defended the historical accounting decisions. *Id.* ¶¶ 71–73. In May 2017, Synchronoss's Audit Committee engaged outside counsel, Torys LLP, to further investigate the historical financials. *Id.* ¶ 74. Torys retained an international accounting firm, BDO USA, LLP (together with Torys, the "Investigative Team") to lead the accounting investigation. *Id.* ¶ 75.

As part of its investigation, the Investigative Team assessed the conduct of senior executives. The team found that Waldis "was responsible for setting an overall tone of a potentially aggressive revenue agenda" and that Chief Operating Officer Bob Garcia likewise "pushed a potentially aggressive revenue agenda." *Id.* ¶ 77. The Investigative Team did not reach similar conclusions about Ms. Rosenberger. *Id.* Although it questioned her competency, the Investigative Team "concluded there were no integrity issues" related to her conduct. *Id.* ¶ 76.

A team of EY accountants, led by EY's Fraud Investigation & Dispute Services practice, also performed a "shadow investigation" that, among other things, evaluated the sufficiency of the Investigative Team's review. *Id.* ¶ 78. EY's shadow investigation was extremely thorough, earning EY $23.2 million in 2017 (more than 7x the revenue EY had made from the 2016 audit). *Id.* ¶ 80. EY assessed the "professional qualifications, skill and knowledge" of the Investigative Team and concluded that the Investigative Team (1) "possess[ed] the appropriate competence and objectivity" to conduct its investigation; and (2) "identified the appropriate evidence to assess these matters." *Id.* ¶ 79. EY ultimately concluded that "the Audit Committee Investigation and the review by new management . . . were sufficient to evaluate the allegations and ensure the 2015 and 2016 financial statements and the 2017 financial statements are free of material misstatement." *Id.* ¶ 81. Rogers, who also oversaw EY's shadow investigation, testified that EY, like the Investigative Team, never found that Ms. Rosenberger engaged in fraud. *Id.* ¶¶ 78, 82. If EY had

believed that Ms. Rosenberger engaged in fraud, it would have been obligated to report that belief to Synchronoss's Audit Committee. *Id.* ¶ 62. EY did not do so because, after its exhaustive review, it did not conclude that Ms. Rosenberger engaged in any intentional misconduct. *Id.* ¶¶ 63–64, 82.

In July 2018, Synchronoss announced its decision to restate its audited financials for fiscal years 2015 and 2016 and selected financial data for fiscal years 2013 through 2016, totaling approximately $190 million in restated revenue. *Id.* ¶ 84; *see also* Compl. ¶ 3. Synchronoss restated revenues related to at least 21 transactions, most of which are not at issue in this case. SUF ¶ 90. The transactions at issue in this case represent less than 14 percent of the total amount of revenue restated by the Company. *Id.* ¶¶ 100, 140, 176, 222, 268; *see also* Compl. ¶ 4.

## III.   The Five Challenged Transactions

The SEC asserts claims against Ms. Rosenberger arising out of five transactions entered in either 2015 or 2016. The SEC advances Section 10(b) securities fraud claims against Ms. Rosenberger based on three of those transactions (ASR, LNP, and Openwave), and various Section 13 books-and-records violations for those three and two others (Windstream and Sage).

### A.   ASR & LNP

The first two transactions involve software sales to AT&T recorded in Q3 2015 (ASR) and Q4 2015 (LNP). The relevant accounting principles governing those two transactions are the same. Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) 985-605 provides that revenue from software sales may be recognized when four criteria are met: (1) persuasive evidence of an arrangement exists, (2) delivery of the product has occurred, (3) the vendor's fee is fixed or determinable, and (4) collectibility is probable. SUF ¶ 92; *see also* Compl. ¶ 25. The SEC's claims concerning ASR and LNP primarily concern the first requirement—whether persuasive evidence of an arrangement existed to support the decision to recognize revenue in the period. *See, e.g.*, Compl. ¶¶ 39, 76, 78, 79, 86.

7

The SEC's own official guidance—SEC Staff Accounting Bulletin (SAB) No. 104—confirms that a company may use documentation other than "written contracts" to provide "persuasive evidence of an arrangement." SUF ¶ 93. SAB 104 provides that if a written contract was "not required as part of a company's customary business practice, persuasive evidence of an arrangement can be written, electronic or even oral in limited circumstances." *Id.*

During the Relevant Period, Synchronoss's policies and practices did not require written contracts to evidence arrangements; instead, Synchronoss sometimes relied on "email correspondence" to evidence arrangements with customers. *Id.* ¶ 94. Synchronoss's practice of using email confirmations as evidence of an arrangement pre-dated Ms. Rosenberger's tenure as CFO and was established with EY's knowledge and approval. *Id.* ¶¶ 95–99. Indeed, both Yablonowitz and Rogers testified that Synchronoss regularly recognized revenue based on email confirmations even when the Company planned to prepare a subsequent statement of work (SOW) to formalize the contract terms. *Id.* ¶ 98. Rogers testified that he understood that, while AT&T (Synchronoss's largest and oldest customer) moved at a somewhat "glacial pace" when it came to paying bills, it was reliable with respect to collectibility, and therefore, EY was comfortable recognizing revenue from AT&T even without a signed SOW. *Id.* ¶ 99.

> **1.     ASR revenue was properly booked in Q3 2015, with EY's approval, following an email confirmation of the sale and confirmation that AT&T downloaded the software.**

In Q3 2015, Synchronoss recognized $4.35 million in revenue for the sale of an ASR software license to AT&T, relying on an email confirmation received from AT&T as persuasive evidence of the arrangement. *Id.* ¶¶ 100–01. Specifically, on September 25, 2015, a Synchronoss salesperson (Charlie Verma) emailed AT&T regarding two ASR license options (a "Corporate Edition" priced at $2,300,000, and an "Enterprise Edition" priced at $4,500,000), as well as the terms for the sale of the software, delivery method, and billing and payment terms. *Id.* ¶ 102.

Verma's email (which did not copy Ms. Rosenberger or anyone from finance) said: "I require your approval and then Candy's/Steve's on the email confirming the terms are agreed upon and the tier (corporate or Enterprise) of license being approved. . . . Response Language needed is 'We are agreeing to move forward with Corporate or Enterprise Edition of Gateway Software from Synchronoss[.]'" *Id.* On September 28, 2015, Candy Conway, whose email signature block indicates that she was an AT&T Vice President, replied: "Approved to begin the SOW." *Id.* ¶ 103. Ms. Conway's response did not specify which edition of the software (Corporate or Enterprise) was being purchased, leading the sales team to express concern that the response was insufficient. *Id.* ¶ 104. Later that day, Verma resent his email asking, once again, for specific response language stated in his original email. *Id.* ¶ 105. This time, Mike Shah at AT&T responded with the exact language requested: "We agree to move forward with Enterprise Edition of the Gateway Software from Synchronoss." *Id.* Conway was not copied on the second email confirmation. *Id.* ¶ 106.

Shah's email confirmation was circulated internally, including to Garcia and Andrew Wilmott (a salesperson who Ms. Rosenberger said was the "lead on the AT&T overall account"), various executives, and members of the finance team. *Id.* ¶ 107. In one email, Wilmott wrote "Excellent news," and in another he wrote, "Tremendous work and result to this Team. Great job all!" *Id.* Garcia wrote, "Putnam the man." *Id.* Ms. Rosenberger likewise replied, "Great news!!!" *Id.* Within the finance department, Melissa Chen wrote to Joshua Shaver "$2.3M ta da," and Shaver corrected her: "$4.5m! They elected the higher option. So its 2.3M + the 2.2M." *Id.* There is no evidence that anyone in Synchronoss's finance department doubted that the email confirmation represented an agreement by AT&T to purchase the software. And Ron Prague (Synchronoss's GC) testified that he always believed that the email was a legally binding contract. *Id.* ¶ 109.

On September 29, 2015, Synchronoss delivered the ASR software to AT&T, and AT&T confirmed that it had downloaded the software. *Id.* ¶ 114. In early October 2015, before Synchronoss booked the revenue from ASR, Ms. Rosenberger contacted Yablonowitz to confirm whether the "email confirmation would be sufficient . . . to recognize revenue" and informed her that it could take months to finalize the SOW for the deal. *Id.* ¶ 115. Yablonowitz did not take issue with Synchronoss's decision to rely on the email confirmation for revenue recognition. *Id.*

Melissa Chen prepared the revenue recognition memo regarding the ASR deal, which also required the approval of Shaver and Lanni. *Id.* ¶ 116. Chen sent the draft memo to EY (specifically, to Lisa Phillips, then a Senior Manager on the Synchronoss engagement) at the same time the memo was sent to Ms. Rosenberger. *Id.* ¶ 117. The draft memo explained that the email confirmation served as persuasive evidence of an arrangement and attached the source email (the same one the SEC claims was facially defective) for EY's review. *Id.* ¶¶ 117–19. EY, again, raised no concerns. *Id.* ¶ 119. EY formed its view independent of Ms. Rosenberger; indeed, there is no evidence that EY ever received a copy of the revenue memo for the ASR transaction that was signed by Ms. Rosenberger. *Id.* ¶¶ 56, 117. The SEC chose not to depose Chen or Shaver (or any other non-defendant employee from the finance department) to assess their understanding of the transaction or Ms. Rosenberger's limited role in reviewing the transaction. Rogers (who oversaw EY's restatement investigation) testified that, even now after reviewing all the information in hindsight, he is not aware of any information that Ms. Rosenberger had in 2015 that would "call into question" Synchronoss's decision to recognize revenue for ASR in Q3 2015. *Id.* ¶ 121.

### 2. AT&T disputed the ASR deal in 2016, but there is no evidence anyone told Ms. Rosenberger; instead, the evidence shows that she understood management turnover at AT&T was causing delays.

Consistent with historical practice, until the SOW was finalized, the ASR revenue was booked to an "unbilled receivables account" (an account created long before Ms. Rosenberger

became CFO, for precisely this purpose). *Id.* ¶¶ 159–60. EY knew that ASR was booked as an unbilled receivable and was given full access to review that account each quarter. *Id.* ¶¶ 161–63.

At some point in 2016, Ms. Rosenberger was told by the sales team that management turnover within AT&T was "prolonging the process" of obtaining an executed SOW for the ASR deal. *Id.* ¶ 155. The sales team told EY that same information directly when EY inquired about the unbilled receivables. *Id.* ¶ 164. For example, on January 28, 2016, Lanni scheduled a call between Putnam and Yablonowitz to "discuss the status of the SOWs for the [ASR and LNP] licenses and the approximate timing of when they are going to be executed." *Id*. Phillips testified that Putnam told EY that "a change in executives at AT&T" was causing the delay in billing AT&T. *Id*. Ms. Rosenberger did not participate in or interfere with EY's discussions with the sales team about the transaction, nor is there any evidence that she instructed the sales team about what they could or could not say to EY. *Id.* ¶ 165. Indeed, both Yablonowitz and Rogers testified that EY could have contacted AT&T directly, and that Ms. Rosenberger never discouraged EY from doing so. *Id*. Lanni similarly testified that she understood that Ms. Rosenberger expected her to provide EY with all facts relevant to the AT&T transactions. *Id*.

In February and June 2016, AT&T sent letters to Garcia and Putnam in which AT&T disputed that it agreed to purchase the ASR software. *Id.* ¶¶ 143–47, 149. None of those communications was shared with Ms. Rosenberger or the finance team. *Id.* ¶¶ 143–51. Nor is there a single email among the thousands produced where members of the sales organization discussed the dispute with Ms. Rosenberger. *See, e.g.*, *id.* ¶ 150. On the contrary, when AT&T's letters were shared with Prague, he instructed John Murdock: "Do not forward/share" with anyone else. *Id*. ¶ 149. The SEC, perhaps concerned about what the sworn testimony might be, chose not to depose Garcia, Putnam, Verma, Murdock, or anyone else who communicated with AT&T about the

dispute. And more importantly, the SEC failed to identify anyone who recalls discussing the AT&T dispute with Ms. Rosenberger. *Id.* ¶¶ 150, 153.

The only evidence the SEC has cited concerning Ms. Rosenberger's purported knowledge of issues with AT&T is a July 13, 2016 email (which Ms. Rosenberger is not even copied on) in which Andrew Wilmott tells Joel Silverman that he (Wilmott) attended a meeting with Garcia, Prague, and Ms. Rosenberger where the group decided to "kick the can further down the line" instead of escalating the issue with AT&T. *Id.* ¶ 152. But that email (which is inadmissible hearsay in any event) does not say that anyone told Ms. Rosenberger that AT&T was disputing the deal. *Id*. The SEC chose not to depose Wilmott but produced a declaration from him after the close of fact discovery in which Wilmott conceded that has no memory of the meeting. *Id.* ¶ 153. Prague also testified that he has no memory of the meeting. *Id*. For her part, Ms. Rosenberger testified that no one told her that AT&T disputed the existence of a contract; indeed, she testified that she did not learn that AT&T disputed the deal until after the left the Company. *Id.* ¶ 157. Ms. Rosenberger's testimony is unrebutted, and the email (which is quite literally the SEC's only "evidence") is perfectly consistent with Ms. Rosenberger's testimony that she understood that management turnover at AT&T was prolonging the SOW process.[3]

In July 2016, Ms. Rosenberger attended an Audit Committee meeting where she explained that "management changes at AT&T" had led to issues with "certain unbilled receivables" with EY personnel. *Id.* ¶ 166. That is exactly what Ms. Rosenberger believed to be the case.

---

[3] According to an internal memo created in 2018, Synchronoss ultimately did not "pursue escalating this issue within AT&T" because "the Company's relationship with AT&T [wa]s worth hundreds of millions of dollars" and "the Company determined that it was not worth potentially harming that important customer relationship by seeking to enforce the September 2015 agreement, given that it constituted a very small percentage of annual revenues related to AT&T." *Id*. ¶ 158. The memo specifically states that the decision not to escalate the issue was "*not* because the Company lacked confidence in its position that a binding agreement had been struck with AT&T." *Id*. (emphasis added).

### 3. LNP revenue was booked in Q4 2015 following a letter memorializing a December 31, 2015 agreement and acceptance of software by AT&T.

The LNP transaction involved the sale of a perpetual software license and maintenance support services to AT&T in December 2015. *Id.* ¶ 140. Synchronoss recognized $3 million as license revenue in December 2015 and $600,000 in support services over 12 months. *Id.*

The first communication with finance about this deal appears to have been on December 18, 2015, when Murdock sent Shaver and Lanni draft terms of the sale of two LNP licenses, one of which had a $3 million license fee, and stated that the license would be "accepted and invoiced on delivery of the Standard Software." *Id.* ¶ 124. Verma (without copying anyone else) appears to have sent those terms to AT&T on December 21, 2015. *Id.* ¶ 125.

On December 24, 2015, Ms. Rosenberger received an email from Murdock about the "[s]tatus on the potential of LNP revenue." *Id.* ¶ 128. The first email in the chain, from Charlie Verma, said that AT&T "Legal" would not "allow SNCR to deploy the [LNP] licenses" until AT&T had approved the "funding" for the licenses. *Id.* Verma's email expressed skepticism about whether the LNP deal could be closed in Q4 2015, and Putnam replied, "We are not done here until 11:59pm on New Year's [E]ve. We certainly aren't quitting on Christmas [E]ve." *Id.* According to Yablonowitz and Rogers, there was nothing unusual or suspect about the fact that Synchronoss's sales team wanted to close the deal before the end of the year. *Id.* ¶ 129.

Ms. Rosenberger forwarded Putnam's December 24, 2015 email to Waldis and wrote, "I like Putnam's response." *Id.* ¶ 130. Waldis replied by asking Ms. Rosenberger whether there could be any "relief . . . on timing" to reach a formal agreement due to the Christmas/New Year's holidays, if Synchronoss and AT&T could reach an agreement on the terms "in principal" before the close of the quarter. *Id.* Ms. Rosenberger replied, "I don't think so – the delivery would have had to occur by 12/31." *Id.* Waldis then followed up again, asking Ms. Rosenberger, "What if they

accept software in Dec, and send an email saying due to holidays, we will get formal OK after Monday AM fist [sic] day back." *Id*. Ms. Rosenberger replied, "I would say we could work that one. I will give [Putnam] a call." *Id*.

On December 31, 2015, Ms. Rosenberger received confirmation that Synchronoss had delivered the LNP software to AT&T and that AT&T had downloaded and accepted the software. *Id*. ¶¶ 132–33.

On January 5 and 6, 2016, Ms. Rosenberger was copied on an email chain describing negotiations with AT&T about a bucket of products and services, including "hosting" services for the LNP license. *Id*. ¶ 134. The LNP license was included on the list of products and services being discussed with AT&T, but it was identified as a "Q4 2015" item. *Id*. The emails described discussions about other products and services, but none described ongoing negotiations over the $3 million price for the LNP license. *Id*. At one point, Garcia asked Ms. Rosenberger how the negotiations "translate to Q4." *Id*. Ms. Rosenberger responded, "[U]nclear yet. They need to get the license piece approved tonight." *Id*. Asked what she meant by that, Ms. Rosenberger testified that she understood there was a final deal for the LNP license because "the software [had] been delivered" and "funding had . . . been approved" but that she "wanted to make sure . . . there was no changes in anything that were discussed" in Q4 relative to the license. *Id*.

On January 8, 2016, Verma sent Ms. Rosenberger and others a signed letter, dated December 31, 2015, containing the terms of the LNP deal. *Id*. ¶ 136. The letter stated that it "summarize[d] the agreed pricing and related terms pertaining to Synchronoss license for its Standard Software for LNP Gateway which was delivered to AT&T and acknowledged on December 31, 2015." *Id*. It stated that the LNP license fee was $3 million, and that the license "is accepted and invoiced on December 31, 2015 delivery date." *Id*. Ms. Rosenberger knew the letter

was signed in January 2016 but testified that she relied on the representation in the letter that the agreement was reached, and the software delivered, on December 31, 2015. *Id.* ¶ 137. Ms. Rosenberger explained that her view was informed, in part, by earlier emails indicating that AT&T would not accept delivery of the software until it had approved funding for the license. *Id.*

In early January 2016, AT&T held "kick off meetings" with its customers to introduce a platform that would use the LNP software. *Id.* ¶ 139. The Company devoted resources to participating in those meetings, which, according to a 2018 internal memo drafted after Ms. Rosenberger left the Company, it would not have done if the "Company did not believe that an agreement had been reached for AT&T to pay for the software and services it provided." *Id.*

Chen prepared a revenue recognition memo for the transaction. Regarding persuasive evidence of an arrangement, the memo states: "Synchronoss received a letter from AT&T confirming that the above-listed software had been delivered *as of* December 31, 2015. . . . [T]he letter confirms the pricing for the licenses and maintenance support and does not grant AT&T any rights of return or price protection." *Id.* ¶¶ 140–41 (emphasis added). The memo does not specify when the AT&T letter was received, but Yablonowitz (EY's then Coordinating Partner) agreed that a fair reading of the memo suggests that the letter was received *after* December 31, 2015, since it references (in the past tense) to software that "*had been* delivered *as of* December 31, 2015." *Id.* ¶ 141. When asked (by the SEC) whether it mattered that the letter agreement was signed after December 31, 2015, Yablonowitz responded that it might have been a "relevant fact, but I don't – *I'm not sure it would change a revenue recognition conclusion*." *Id.* ¶ 138 (emphasis added).

The LNP revenue was booked to the same unbilled receivables account as the ASR revenue and was subjected to the same quarterly review by EY. *Id.* ¶¶ 159, 161–65. Like ASR, there were

also delays in converting the LNP revenue from "unbilled" to "billed"—delays that Ms. Rosenberger understood were the result of management turnover at AT&T. *Id.* ¶¶ 155, 159.

AT&T executed the SOW for the LNP agreement in Q4 2016. *Id.* ¶ 156. The SOW included a license fee of $2.5 million. *Id.* According to an internal memorandum written in 2018, the Company viewed AT&T's agreement to pay a $3 million fee as "legally enforceable," but "given that the Company's relationship with AT&T [wa]s worth hundreds of millions of dollars" and that the LNP deal "constituted a very small percentage of annual revenues related to AT&T," the Company decided "it was not worth potentially harming that important customer relationship by seeking to enforce the December 2015 agreement." *Id.*

### 4. The Investigative Team and EY found no "integrity issues" with respect to Ms. Rosenberger's conduct as to ASR and LNP.

With the benefit of hindsight, the Company ultimately decided to restate the ASR and LNP revenues. *Id.* ¶ 168. But Synchronoss's restatement memoranda make clear that the Company still believed that the original "accounting treatment of [the ASR and LNP] transaction[s] was consistent with its business policy and business practice at the time, which was based on the SAB 104 guidance that if a written contract is not required as part of a company's customary business practiced, persuasive evidence of an arrangement can be written, electronic, or even oral in circumstances." *Id.* ¶ 169. As to ASR, the memo "note[d] that the determination whether persuasive evidence of an arrangement exists involves the exercise of judgment" and stated that, "under the [less prescriptive] revenue recognition guidance now applicable to that issue, there is little doubt that the facts respecting this transaction would constitute persuasive evidence of an arrangement upon the Company's delivery of the software to AT&T on September 29, 2015." *Id.* ¶ 170. Similarly, with respect to LNP, the Company "believe[d] that it is highly likely that the revenue recognition determinations that it made, during the financial periods addressed by the

memorandum . . . , would be consistent with the letter and spirit of the new and improved FASB standard now applicable to similar transaction[s] effected after December 15, 2017." *Id.* ¶ 171.

The Investigative Team—which, as noted above, EY assessed to be objective and competent—did not "call into question [Ms. Rosenberger's] integrity or conclude that she was involved in any intentional wrongdoing" with respect to the ASR or LNP transactions. *Id.* ¶¶ 172–73. Rogers testified that EY likewise never reached any conclusion that Ms. Rosenberger engaged in intentional wrongdoing related to either transaction. *Id.*

### B.   Openwave

The third charged transaction relates to Synchronoss's Q1 2016 acquisition and license settlement with Openwave Messaging, Inc. On March 1, 2016, Synchronoss reached an agreement to acquire Openwave from private equity firm Marlin Equity Partners for $124.5 million. *Id.* ¶ 182. On the same day, Synchronoss entered into a $10 million licensing agreement with Openwave to settle patent infringement claims. *Id.*

Whether a settlement agreement executed contemporaneously with an acquisition should be accounted for separately or as part of the business combination is a question that requires significant professional judgment. *Id.* ¶¶ 175, 218. The relevant accounting guidance (found in ASC 805) calls for the consideration of various factors, including the reasons for the transaction, the timing of the transaction, and who initiated the transaction. *Id.* ¶ 175. After considering the guidance set forth in ASC 805, Synchronoss concluded it was appropriate to recognize the $10 million from the license agreement as revenue separate from the business combination. *Id.* ¶ 176.

In support of the decision to account for the settlement separately, Synchronoss's finance team and EY considered the fact that Synchronoss had a strategy of aggressively protecting its patents through IP litigation. *Id.* ¶ 178; *see also id.* ¶¶ 177–81. Prague (Synchronoss's GC) told finance that the Company had prepared "claim charts" mapping its "infringed patents" to

17

Openwave's products and concluded that Openwave infringed. *Id.* ¶¶ 186–89. Prague also confirmed to Ms. Rosenberger (and separately to EY) that Synchronoss would enforce its patent rights against Openwave even if the acquisition failed. *Id.* ¶¶ 196–97, 203. EY emphasized that point in its internal summary memo, noting that "if the Company didn't acquire Openwave Messaging it would have filed a patent infringement lawsuit against it." *Id.* ¶ 203.

Synchronoss consulted with EY about how to account for the IP license during the acquisition negotiations. In early February 2016, Lanni emailed Rogers to ask his views on the revenue decision; in response, Rogers stated that he had talked to Phillips about the fact that Synchronoss had executed "similar arrangements in the past." *Id.* ¶ 201. Rogers was referring to the fact that Synchronoss had settled infringement claims with an acquisition target on least two earlier occasions, one of which occurred before Ms. Rosenberger became CFO. *Id.* ¶ 179. In both cases, Synchronoss accounted for license settlement separate from the business transaction. *Id*. For Openwave, Rogers advised that Synchronoss should "consider how these have been done in the past." *Id.* ¶ 201. He then reviewed draft contracts and provided guidance about structural changes to the license settlement agreement, including adding a second surviving entity (Openwave Mobility) to further align the deal terms with those earlier transactions. *Id*.

As part of the restatement, Synchronoss amended its accounting treatment of the Openwave license agreement, as well as the accounting for at least four similar transactions (that are not part of this case) where IP license agreements were executed around the time of business combinations. *Id.* ¶ 217. Synchronoss's ultimate decision to restate the Openwave license revenue (to treat it as part of the business combination) was driven largely by comments that Synchronoss negotiators made in internal emails and correspondence with Marlin in January and early February 2016 suggesting a link between the license and the acquisition. *Id.* ¶ 216. For example, in several emails

Synchronoss negotiators discussed the acquisition price and the settlement amount in "net" terms. *See, e.g.*, *id.* ¶¶ 193–94. In one email, a Synchronoss negotiator indicated that Synchronoss would close the acquisition only if Openwave agreed to the IP settlement. *Id.* ¶ 193.

Ms. Rosenberger was copied on the cc line of some of those emails. *Id.* ¶ 191. But there is no dispute that she did not participate in the negotiations (*id.* ¶¶ 183, 196), that none of the emails was specifically directed to her or sought accounting guidance (*id.* ¶¶ 191–94), and that Ms. Rosenberger did not respond to or comment on to any email describing the negotiations. *Id.* ¶ 195. Indeed, Ms. Rosenberger only engagement was one instance where she forwarded a chain to her finance team with an instruction to "Please forward to EY and KPMG." *Id.* ¶¶ 198–200. The SEC's own accounting expert admits that he does not review every group email that he is copied on if he determines it is not pertinent to the task at hand, and he conceded that there is no evidence that Ms. Rosenberger was actually reading (let alone internalizing) the emails at the time. *Id.* ¶ 191.

Roughly six months later, Ms. Rosenberger approved two accounting memos that included a statement that the IP settlement agreement "was not a negotiating factor" in the business combination agreement. *Id.* ¶ 204. As we sit here today, Ms. Rosenberger would acknowledge that statement is inconsistent with earlier emails by Synchronoss negotiators. But, as discussed below, approving a memo with an errant statement is not alone sufficient to prove intentional fraud.

But more importantly, even if the memo had described the negotiations in explicit detail, reasonable accountants can, did, and still do disagree about whether the emails discussing those negotiations require different accounting treatment. The Investigative Team—including accountants from BDO that EY found to be competent and objective—considered the same emails that the SEC relies on and nonetheless concluded that "the original accounting determination was supportable." *Id.* ¶ 213. The Investigative Team acknowledged the existence of "internal

communications . . . that considered the license settlement and the purchase issues together," but concluded that "the fundamental guidance to record the license as revenue was met, regardless of the discussions from [those] emails." *Id.* ¶¶ 214–15. "The Investigative Team stated their view that there was a fine line between structuring a transaction in a certain way for accounting purposes and a transaction that did not have any merit." *Id.* ¶ 215. While the Investigative Team found it to be a "close call," it concluded that there "was legitimate work done to analyze the potential infringement and conduct an economic valuation consistent with historical transactions." *Id.*

Synchronoss's new management nonetheless opted for a more conservative approach—restating the IP license fee as an adjustment to the acquisition price. *Id.* ¶ 217. But EY's documents confirm that was not a black-and-white decision; instead, it was a decision that reflected "differences in judgments or interpretations of the applicable guidance." *Id.* ¶ 218. Indeed, Rogers and Phillips both testified that Openwave was a complex transaction for which reasonable accountants with access to all the relevant information could reach different conclusions as to the proper accounting treatment. *Id.*

### C.     Windstream

The fourth transaction—for which the SEC asserts only Section 13 violations and not a claim for fraud—involves amendments to existing agreements with Windstream Communications LLC. Compl. ¶ 5. Windstream was historically a customer of Razorsight Corporation, a software company that Synchronoss had acquired a few months earlier. SUF ¶ 220.

The SEC advanced two theories regarding the Windstream transaction in its Complaint but abandoned one of those theories after fact discovery. The first (now abandoned) theory is that, when Synchronoss entered into a Q2 2016 agreement (referred to as "Amendment 9") to convert an existing Software as a Service (SaaS) arrangement with Windstream (where license revenue is recognized as services are provided) into a perpetual license agreement (where the license revenue

is recognized up front), Synchronoss concealed that it was hosting the license—a fact which would have required Synchronoss to spread the revenue over the duration of the hosting period. *See* Compl. ¶¶ 154–55, 157, 178–183, 186–90, 199. But discovery did not reveal any evidence that Ms. Rosenberger even knew that Synchronoss was hosting the license. SUF ¶ 238. And so it is not surprising that the SEC's expert conceded that he had no opinion about whether Ms. Rosenberger did anything wrong when she approved a revenue recognition memo that did not reference hosting. *Id.* ¶ 239.

The SEC's second theory is that Amendment 9 (a Q2 2016 transaction) should have been treated as a multiple element arrangement (MEA) with an audit services agreement ("Amendment 10") that was executed with Windstream days later at the beginning of Q3 2016. Compl. ¶¶ 156, 158–160. Ms. Rosenberger was not involved in negotiating either Amendment 9 or Amendment 10. SUF ¶¶ 223, 229. And there is not a single admissible document in the discovery record showing that Ms. Rosenberger even knew that Amendment 10 was ever executed. *Id.* ¶¶ 231, 235, 236. Ms. Rosenberger is not listed as an approver for the revenue recognition memo related to Amendment 10, and there is no evidence that she ever saw (let alone approved) that memo during the Relevant Period. *Id.* ¶ 235. And even if Ms. Rosenberger had known that Amendment 10 was executed around the same time as Amendment 9, the two agreements related to entirely different services and did not indicate on their face that they were related. *Id.* ¶ 227. The SEC can point to no admissible evidence demonstrating that Ms. Rosenberger believed the two agreements (the first relating to a software license, and the second relating to "audit services") were related. Notably, issues with Amendment 10 were not identified during the Company's nearly $30 million restatement investigation, meaning the SEC is the first to conclude that Amendments 9 and 10 should have been accounted for as an MEA. *Id.* ¶ 242.

### D.   Sage

The final transaction—another for which the SEC asserts only Section 13 violations (*see* Compl. ¶ 5)—is a resale transaction with Sage Management Inc. executed in Q4 2016.

In December 2016, Charlie Thomas and Marc Bandini (both former Razorsight executives who joined Synchronoss in 2015) negotiated a deal with Sage whereby Sage would act as a reseller for certain Synchronoss software. SUF ¶¶ 220, 244, 245. The deal came together late in December, after Synchronoss was unable to close a deal with Windstream to purchase the software in the period. *Id*. ¶ 248. Thomas testified that he had identified Sage as a "great candidate" to serve as a reseller of certain Synchronoss software because Sage "knew the software sell" and had relationships with end customers. *Id*. ¶ 246. Ms. Rosenberger was not involved in the negotiations of the transaction, and only learned about them days before it was set to close. *Id*. ¶¶ 245, 248.

In the days before the execution of the agreement, Thomas and Bandini proposed to Sage's CEO (Scott Johnson) various contractual provisions that would protect Sage from paying for the software if it could not resell it. *Id*. ¶¶ 249–51. When those proposed provisions were shared with Synchronoss's finance team, Ms. Rosenberger and Joshua Shaver, on two separate occasions, informed Thomas and Bandini that the resale agreement could not contain any contingencies, such as a contingency that Sage would only be responsible for payment if it was able to resell the software. *Id*. ¶¶ 253–54, 257. Thomas responded: "Understood. Working non-stop last 72 hours with emphasis on revenue recognition requirements needed in order for deal to work." *Id*. ¶ 255. Both Thomas and Johnson testified that they clearly understood that Ms. Rosenberger would not approve any deal with contingent payment terms. *Id*. ¶ 256. And Rogers testified that, based on Thomas's reply, it would be reasonable for the finance team to assume that Thomas would follow their guidance. *Id*. ¶ 255.

The final agreement executed on December 31, 2016 (the only agreement with Sage that Ms. Rosenberger ever saw) did not contain any contingencies, guarantees, or make whole provisions. *Id.* ¶¶ 266, 278. The software that was the subject of the reseller agreement was successfully delivered to Sage on December 31, 2016, and Sage confirmed that it had downloaded the software. *Id.* ¶ 267. As a result, Synchronoss recognized approximately $3.6 million in revenue from the Sage reseller agreement in the fourth quarter of 2016. *Id.* ¶ 268.

However, unbeknownst to Ms. Rosenberger, Thomas and Bandini executed a separate side agreement with Sage that purported to modify the terms of the resale agreement, including by adding the very contingencies that Ms. Rosenberger and Shaver had explicitly told Thomas and Bandini could not exist in any agreement with Sage. *Id.* ¶¶ 277–78. No one testified that Ms. Rosenberger approved that decision. On the contrary, there is no evidence that Ms. Rosenberger ever learned of the side agreement before she left the Company. *Id.* ¶ 278. In 2017, during the course of the restatement investigation, the side agreement was discovered, and Thomas, Bandini, and Ives were terminated for their deception. *Id.* ¶ 277. In 2018, the Investigative Team relied on the existence of the undisclosed side letter as the basis for restating the revenue for the transaction. *Id.* ¶¶ 279–81.

The SEC also alleges that the finance team did not adequately assess collectibility as to the reseller agreement. *See* Compl. ¶¶ 220–21, 226–28. The Sage revenue recognition memo (which was not authored, signed, or approved by Ms. Rosenberger) states: "Razorsight Corporation, which was acquired by Synchronoss in 2015, has been engaged in business with Sage since 2010 and has not had any billing issues." SUF ¶¶ 269–70. The SEC contends that statement (which, again, was not a statement by Ms. Rosenberger) is misleading because Sage was never a customer of Razorsight. Compl. ¶ 226. But there is no evidence that Ms. Rosenberger understood the nature of

the relationship between Sage and Razorsight and, in any event, no evidence that she played any role in drafting, reviewing, or approving that statement. *See* SUF ¶¶ 269–70.

Regardless, the undisputed evidence confirms that Ms. Rosenberger conducted a collectability analysis. The Investigative Team interviewed Ms. Rosenberger, Lanni, and Prauge, who explained that they specifically considered Synchronoss's legal right to offset payables owed to Sage to cover any unpaid receivable. The Investigative Team found that the "explanations provided by these individuals reasonable" and concluded that the Company had "made an *appropriate judgment*" with respect to its collectability. *Id.* ¶ 280. The Investigative Team also concluded that "they did not have concerns about Karen Rosenberger's integrity related to the Sage transactions." *Id.* ¶ 281. Rogers testified that EY has never expressed concerns about Ms. Rosenberger's integrity as to the Sage transaction, nor has EY concluded that there is anything Ms. Rosenberger should have done to identify the side letter executed by Thomas. *Id.*

## LEGAL STANDARD

Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To present a 'genuine' issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "[C]onclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 330–31 (S.D.N.Y. 2006) (quoting *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir.

1998)). "If the nonmoving party submits evidence that is 'merely colorable,' or is not 'significantly probative,' then summary judgment may be granted." *Horror Inc. v*, 15 F.4th at 240–41 (quoting *Anderson*, 477 U.S. at 249–50).

## **ARGUMENT**

## I.    **The SEC's Section 10(b) Claim (Claim 1) fails because the SEC cannot show that Ms. Rosenberger acted with scienter.**

Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder prohibit fraudulent conduct in connection with the purchase or sale of a security. *See* ECF 85 ("MTD Op.") at 11; 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a)–(c). To prove a primary violation of Section 10(b) and Rule 10b-5, the SEC must show that Ms. Rosenberger "(1) made a material misrepresentation or a material omission as to which [s]he had a duty to speak, or used a fraudulent device; (2) with scienter; and (3) in connection with the purpose or sale of securities." MTD Op. at 12 (quoting *SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016)). "A failure of proof on any one of these . . . essential elements of [the SEC's] claims . . . requires summary judgment in [Ms. Rosenberger's] favor." *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 455 (S.D.N.Y. 2000) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Summary judgment should be granted on the SEC's 10(b) claims because, despite a multi-year investigation and a complete discovery record, the SEC cannot "produce[] evidence from which a reasonable jury could infer that [Ms. Rosenberger] acted with the requisite scienter." *Shenk v. Karmazin*, 868 F. Supp. 2d 299, 307 (S.D.N.Y. 2012); *see also Freedman v. Value Health, Inc.*, 135 F. Supp. 2d 317, 341–42 (D. Conn. 2001) (granting summary judgment on Section 10(b) and Rule 10b-5 claims where plaintiff failed to provide sufficient proof of scienter), *aff'd*, 34 F. App'x 408 (2d Cir. 2002).

Scienter is a mental state embracing an "'intent to deceive manipulate or defraud' or 'knowing or intentional misconduct.'" MTD Op. at 14 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12, 197 (1976)). To establish scienter "[a]t the summary judgment stage, the SEC must produce evidence (1) showing that the defendant[] had motive an opportunity to commit fraud, or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 511 (S.D. N.Y. 2018) (quoting *Shenk*, 868 F. Supp. 2d at 305). The SEC does not advance a "motive and opportunity" theory.[4] Accordingly, to survive summary judgment, the SEC must proffer "*strong* circumstantial evidence" of conscious misbehavior or recklessness. *Id.* at 511 (emphasis added).

As this Court previously explained, "[m]ere negligence . . . is insufficient" to meet the heightened scienter requirement. MTD Op. at 14 (quoting *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012)). Nor can the SEC argue that Ms. Rosenberger, as CFO, "ought to have known" about accounting errors (*Yorkville Advisors*, 305 F. Supp. 3d at 512 ("Mere allegations that a defendant knew or should have known of fraudulent conduct based solely on his or her corporate title or position are insufficient [to prove scienter].")), or that accounting errors are themselves evidence of a fraudulent intent. *See ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 200 (2d Cir. 2009) ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim" absent plausible "evidence of corresponding fraudulent intent."); *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir. 1999) (holding that "disregarding of GAAP and industry standards" is not strong circumstantial evidence of conscious misbehavior or recklessness). Instead, the SEC must present

---

[4] Nor could it; courts in this Circuit uniformly hold that an executive's desire to make her company "appear profitable or desire to keep stock prices high to increase officer compensation" is insufficient. *Yorkshire Advisors*, 305 F. Supp. 3d at 512 (citations omitted).

evidence of a "reckless disregard for the truth, that is, conduct which is *highly unreasonable **and*** which represents *an extreme departure* from the standards of ordinary care." MTD Op. at 14 (quoting *Sourlis*, 851 F.3d at 144) (emphasis added).

The SEC comes nowhere close to satisfying that standard. There is no evidence, for example, that Ms. Rosenberger instructed anyone to withhold information from EY. SUF ¶¶ 288–95. Instead, the undisputed evidence shows that the finance team understood her expectation was to provide complete and accurate information to EY. *Id.* ¶ 292. Similarly, Yablonowitz and Rogers both testified that Ms. Rosenberger never refused to provide information or interfered with EY's audit process. *Id.* ¶¶ 294–95; *compare Yorkville Advisors*, 305 F. Supp. 3d at 513–14 (granting summary judgment where "[t]here [wa]s no evidence that Defendants. . . . instructed anyone to withhold material information" from an external reviewer). And while the Investigative Team found that other executives (like Waldis and Garcia) "actively pushed a potentially aggressive revenue agenda," it did not reach similar conclusions for Ms. Rosenberger. *Id.* ¶ 77. Instead, it found "no integrity issues" or intentional wrongdoing. *Id.* ¶¶ 76, 172–73; *compare Yorkville Advisors*, 305 F. Supp. 3d at 513 (finding insufficient evidence of scienter where "internal and external reviews" of the valuations at issue "never showed any evidence of fraud or deceit").

Nonetheless, the SEC continues to press its 10(b) claims, hoping that this Court will find something that no one else can see. But discovery has failed to support the SEC's theories. In the end, the evidence shows only that Ms. Rosenberger (in collaboration with her team and EY) approved the recognition of revenue on sophisticated, complex, and highly judgmental transactions that she believed was supportable under the relevant accounting guidance. The fact that the SEC, with the benefit of perfect hindsight, has concluded that those decisions were wrong is not proof of fraud. *See, e.g.*, *Wyche v. Advanced Drainage Sys., Inc.*, 2017 WL 971805, at *17 (S.D.N.Y.

Mar. 10, 2017) ("Plaintiff's allegations comprise a classic 'fraud in hindsight' claim: Because the Company's accounting eventually was found to be inadequate, and violative of GAAP, Plaintiff contends that Defendants must have known, or were reckless not to know, that the Company's accounting was inadequate *at the time* of their public statements. But such claims are not cognizable."), *aff'd*, 710 F. App'x 471 (2d Cir. 2017); *ECA*, 553 F.3d at 200 (holding that the plaintiff failed to allege fraud "[e]ven if there was a GAAP violation").

But it's not just the absence of evidence that defeats the SEC's claims; the SEC's own expert confirms that the SEC cannot establish scienter. The SEC retained Scott Taub (a former SEC accountant and now private consultant) to analyze the historical accounting treatment for the charged transactions and Ms. Rosenberger's conduct in connection with her original accounting analysis. Ex. 11 at 1. For each transaction, Taub opines that the Company's original accounting was incorrect. *See id*. at 58–59. He then concludes, for each transaction, that Ms. Rosenberger "was in possession of information" that should have led her to question the accounting treatment. *Id*. at 59–60. Taub ultimately concludes that Ms. Rosenberger's failure to properly consider all the information "in her possession" renders her accounting judgments "unreasonable." *Id*.

Taub's opinions are critically flawed. For instance, in assessing the reasonableness of Ms. Rosenberger's judgment, Taub ignored evidence that information was withheld from Ms. Rosenberger that may have impacted her analysis (Ex. 9 at 208:10–21, 406:19–407:3) and conceded that he did not consider the Company's internal control framework or the expected scope of Ms. Rosenberger's review. *Id*. at 142:12–143:20. While he conceded that there are certain (in his view, "very rare") circumstances in which an accountant could make a mistake and still be acting reasonably, he refused to explain what those circumstances are or to articulate any objective standard of care. *Id*. at 106:22–25 ("[I]t would be very rare for me to reach a conclusion that the

accounting was improper but that, nonetheless, the judgment was reasonable."). In other words, while Taub's standard is unclear, it seems that only the perfect can pass his unforgiving review.

And yet, even if we accept Taub's perfectionist standard, it is significant that his opinions stop at "unreasonable." In other words, he has opined *only* that Ms. Rosenberger was negligent. But this Court has made clear that "[m]ere negligence" is not enough to prove fraud. MTD Op. at 14; *see also Woolgar v. Kingstone Cos.,* 477 F. Supp. 3d 193, 240–41 (S.D.N.Y. 2020) (noting that it is "well established that mismanagement is not actionable under the securities laws"). Instead, Section 10(b) requires proof of conduct that is "highly unreasonable *and* which represents an extreme departure from the standards of ordinary care." MTD Op. at 14. Taub concedes that he has not identified any "extreme departure from acceptable norms."[5] Ex. 9 at 124:14–125:25. And if Taub can't do it, the SEC cannot prove its case because no juror can determine what constitutes an "extreme departure from the standards of ordinary care" if the SEC has no expert to tell them. *See McLaughlin v. Langrock Sperry & Wool, LLP*, 2020 U.S. Dist. LEXIS 103404, at *24 (D. Vt. June 12, 2020) ("Expert testimony on the standard of care is often required where the issue is a matter of judgment unique to a profession.").

With those global defects as a backdrop, we now address each disputed transaction in turn.

### A.   The SEC cannot establish scienter as to the ASR transaction.

The SEC's theory as to ASR is twofold. First, the SEC claims that Ms. Rosenberger knew or recklessly disregarded that Synchronoss did not have persuasive evidence of an arrangement

---

[5] Taub's opinions that Ms. Rosenberger's accounting judgments were "unreasonable" are inadmissible under Rule 702. *See SEC v. Goldstone*, 2016 WL 3135651, at *43 (D.N.M. May 10, 2016) ("The Court concludes that the experts should not be able to testify that the Defendants' accounting judgment was or was not reasonable."). If any claim survives summary judgment, Ms. Rosenberger will move *in limine* to preclude Taub from offering those impermissible opinions at trial. But for purposes of summary judgment, Taub's opinions—which stop at "reasonableness" and do not describe "egregious" errors or an "extreme departure" from the standards of ordinary care—serve only to further demonstrate that the SEC could never satisfy its burden on the 10(b) claims even when drawing all inferences in the SEC's favor.

for the ASR transaction in Q3 2015 because the appropriate individuals at AT&T (Candy Conway and Steve Peralta) were not copied on the second email confirmation. Compl. ¶¶ 20, 34–37, 77. Second, the SEC asserts that, "by July 2016 at the latest, [Ms.] Rosenberger also knew or recklessly disregarded that [AT&T] had informed the Company that it had decided not to purchase the license" and failed to disclose that fact to EY. *Id*. ¶¶ 20, 84. Both of those theories fail because the SEC has not produced any evidence that Ms. Rosenberger knew (or even should have known) about the issues the SEC identifies—let alone that her conduct was "egregious" or represents an "extreme departure" from a recognized standard of care.

### 1. There is no evidence of fraudulent intent as to the original revenue recognition decision for ASR.

Synchronoss recognized revenue on the ASR transaction after receiving an email from AT&T that included *the exact* language Synchronoss requested: "We agree to move forward with Enterprise Edition of the Gateway Software from Synchronoss." SUF ¶ 105. When that email confirmation was forwarded to Ms. Rosenberger, she responded "Great news!!!" (*id*. ¶ 107)—a contemporaneous reaction indicating that she sincerely believed the Company had secured the approval it needed to record the revenue. Many others, including members of the finance organization, responded similarly, reflecting a consensus that AT&T had agreed to the sale. *Id*.

The SEC claims that Ms. Rosenberger alone should have noticed that the appropriate individual from AT&T was not copied on the second confirmation email with the verbatim approval language the sales team requested. *See, e.g*., Compl ¶ 39. But the SEC ignores that, in an earlier email, and in direct response to an email asking for confirmation "the terms are agreed upon," Conway expressed approval to begin the SOW. SUF ¶¶ 103–04. And even without Conway's email, the SEC offers no evidence that Ms. Rosenberger—the CFO of a large public company—was responsible for scrutinizing emails to determine if appropriate AT&T employees

were copied. Ms. Rosenberger was forwarded the email as part of a group distribution, not as part of a request for accounting advice. She testified that she had no idea who from AT&T was required to approve the agreement and did not know who Candy Conway and Steve Peralta were. *Id*. ¶¶ 110–11. That wasn't her job. Instead, Synchronoss operated in a control environment where the sales team was responsible for securing the appropriate customer authorization. *Id*. ¶¶ 19, 21. And within the finance group, Ms. Rosenberger's support team (including the Controller, Assistant Controller, and Revenue Recognition Manager) were responsible for reviewing the source documents to confirm revenue recognition requirements were met. *Id*. ¶¶ 14–18. Indeed, even the SEC's own expert concedes that Ms. Rosenberger was not responsible for engaging in that level of review. *Id*. ¶ 19; Ex. 9 at 64:3–12.

The facts do not come close to demonstrating an "egregious refusal to see the obvious, or to investigate the doubtful." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000). At least five other Synchronoss employees—including Synchronoss's COO, two salespeople who managed the AT&T account, and two other accountants—reviewed the same email concurrently with Ms. Rosenberger and expressed contemporaneous beliefs that it constituted persuasive evidence of an arrangement. SUF ¶ 107. Prague likewise testified that he believed the email confirmation was a legally binding agreement to purchase the ASR license. *Id*. ¶ 109. And more importantly, Ms. Rosenberger spoke with Yablonowitz to confirm that the email confirmation "would be sufficient" for revenue recognition even though it could take months to finalize the SOW. *Id*. ¶ 115. Indeed, Synchronoss provided the revenue recognition memo, attaching the AT&T confirmation email, to EY and EY expressed no concerns about the accounting decision. *Id*. ¶¶ 117–19.

Shawn Rogers, EY's Coordinating Partner who oversaw the restatement, testified that he is not aware of any information available to Ms. Rosenberger in 2015 that would "call into

31

question" the decision to recognize the ASR revenue in Q3. *Id.* ¶ 121. The SEC's theory that Ms. Rosenberger committed fraud because she failed to spot an issue that a dozen other people who had access to the same information also failed to spot is baseless and should be rejected. *See, e.g.*, *Woolgar*, 477 F. Supp. 3d at 238 ("[The fact that [the defendant]'s independent auditor . . . were unable to identify any material inaccuracies or weaknesses undermines a finding of recklessness on [the d]efendants' part."); *REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1212, 1251, 1258 (S.D. Cal. 2010) (finding that a CFO's "open communication with the independent auditor" about the accounting decision at issue and the fact that the "the outside auditor approved the analysis" undermined an inference of fraudulent intent); *id.* at 1246 ("The level of transparency also serves to negate an inference that [the CEO] had a scheme to defraud investors. . . . [EY] had full access to conduct a thorough, professional, and independent audit while [the defendant] was CEO.").

### 2. There is no evidence that Ms. Rosenberger knew in 2016 that AT&T was contesting the ASR transaction.

The SEC next claims that Ms. Rosenberger committed fraud by failing to tell EY that AT&T disputed the ASR transaction in 2016. *See, e.g.,* Compl. ¶¶ 71, 74–77, 84–85. But there is a problem with that theory: There is no evidence that Ms. Rosenberger ever knew that AT&T disputed the deal. *See* SUF ¶¶ 143–57. The undisputed evidence is that Ms. Rosenberger was told that management turnover was causing temporary delays. *Id.* ¶ 155. As for what was really happening with AT&T, the undisputed evidence is that those communications were restricted to a small group of sales personnel plus the Company's General Counsel, who instructed those in the know not to forward or share the information. *See id.* ¶¶ 143–50. The SEC's theory that Ms. Rosenberger should have told EY that AT&T was disputing the deal cannot survive without admissible evidence that she knew the information that the SEC claims she should have disclosed. That evidence does not exist.

Indeed, the SEC's *only* "evidence" in support of its theory is a single email from Andrew Wilmott to Joel Silverman (neither of whom were deposed) in which Wilmott says he attended a meeting with Garcia (also not deposed), Ms. Rosenberger, and Prague (who joined late) where a decision was made to "kick the can further down the line" on ASR without escalating the issue. *See* Ex. 76, SUF ¶ 152. The email is inadmissible hearsay, and the SEC has not found (and, indeed, has hardly tried to find) a single witness with a personal recollection of the meeting. And even taking the inadmissible email at face value, it does not say that anyone told Ms. Rosenberger that AT&T was disputing the transaction. *See* Ex. 76. At most, it shows that the group discussed that the SOW was delayed but decided to keep working on the issue rather than escalating it. *Id.*

And Ms. Rosenberger did not need to disclose that there was a delay because EY and the Audit Committee already knew about that delay. EY regularly audited the unbilled receivables account, including reviewing the ASR receivable and asking questions about why the ASR SOW was delayed. SUF ¶¶ 161–62. The sales team told EY that the delay was due to management turnovers at AT&T. *Id*. ¶ 164. That is the same thing the sales team told Ms. Rosenberger, and that is what she disclosed to the Audit Committee. *Id*. ¶¶ 155, 166. There is no evidence that Ms. Rosenberger knew anything other than what she reported. Indeed, Ms. Rosenberger's unrebutted testimony is that she did not learn that AT&T challenged the agreement until after she left the Company. *Id*. ¶ 157. Ms. Rosenberger cannot disclose something she did not know about. The Court should grant summary judgment in her favor.

### B.     The SEC cannot show scienter as to the LNP transaction given evidence that Ms. Rosenberger had a reasoned basis for her accounting judgment.

The SEC argues that Ms. Rosenberger fraudulently approved the recognition of revenue for the LNP transaction in Q4 2015 despite knowing that there was not persuasive evidence of an arrangement. Specifically, the SEC claims that Ms. Rosenberger knew that revenue recognition

was based on a confirmation letter signed in January 2016 that was improperly backdated to December 31, 2015 "to provide the false and misleading appearance that it had been signed before the end of the fourth quarter of 2015." Compl. ¶ 52.

But the undisputed evidence shows that Ms. Rosenberger's contemporaneous understanding and subjective belief was that it was appropriate to recognize the LNP revenue once the software was delivered. On December 24, 2015, she was forwarded an email from the salesperson negotiating the deal (Chris Putnam) that said that AT&T would not "allow SNCR to deploy the [LNP] licenses" until AT&T had approved the "funding" for the licenses. SUF ¶ 128. Ms. Rosenberger's contemporaneous view about the revenue recognition requirements is evidenced in her Christmas Eve correspondence with her boss. On December 24, 2015, when Waldis inquired whether the Company could finalize everything in January and still record the revenue in 2015, Ms. Rosenberger pushed back, explaining: "I don't think so – the delivery would have had to occur by 12/31." *Id*. ¶ 130. Rather than tell her boss what he wanted to hear, Ms. Rosenberger explained what she, in good faith, believed was necessary to properly book the revenue prior to year-end and did so not knowing whether Synchronoss could meet those requirements. *Id*. If Ms. Rosenberger wanted to commit a fraud, she could have done it right then, instead of forcing the sales to continue to take steps to close the deal and deliver the software.

After Ms. Rosenberger indicated that the initial communications were insufficient, negotiations continued and Ms. Rosenberger received confirmation, on December 31, 2015, that Synchronoss had delivered the LNP software to AT&T, and that AT&T had confirmed that it downloaded and accepted the software. *Id.* ¶¶ 132–33. Both Yablonowitz and Rogers testified that, in combination with the December 24, 2015 email indicating that AT&T would not accept delivery

34

before securing funding approval, AT&T's acceptance of the license indicated that the license fee had been established so that AT&T could determine the amount of funding it needed. *Id.* ¶ 133.

That brings us to the January 8, 2016 letter agreement, which memorializes the agreement entered into on December 31, 2015. As an initial matter, there is no dispute that written agreements are not required for revenue recognition; even oral agreements are sufficient in certain circumstances. *Id.* ¶ 93. And there is no evidence that Ms. Rosenberger believed that securing a letter memorializing the agreement on January 8, 2016, rather than December 31, 2015, changed the accounting analysis. Indeed, when asked by the SEC's counsel, Yablonowitz (EY's Coordinating Partner at the time) testified that the date the agreement was physically signed might have been a "relevant fact, but I don't – *I'm not sure it would change a revenue recognition conclusion*." *Id.* ¶ 138. Similarly, Ms. Rosenberger explained that she was focused on the actual language in the letter, which expressly states in two places that the agreement was reached and the software was delivered on December 31, 2015. *Id.* ¶¶ 136–37. And as for the SEC's allegation that it was backdated "to provide the false and misleading appearance" that the letter was completed earlier, the SEC has not even attempted to prove that assertion; indeed, and interestingly, the SEC chose not to depose a single person who played any role in the drafting, or execution of, that letter.

Moreover, Ms. Rosenberger did not mislead EY about the date the letter was signed or tell anyone else to do so. *Id.* ¶¶ 141–42. The LNP revenue recognition memo is silent about when the confirmation letter was received, but Yablonowitz testified that a fair reading of the accounting memo suggests that the confirmation letter was received *after* December 31, 2015. *Id.* ¶ 141. There is nothing false in the memo, and there is nothing that suggests EY incorrectly believed the letter was signed on December 31, 2015. The fact that Ms. Rosenberger did not proactively announce that the letter was signed on January 8, 2016 (something that she and Yablonowitz both believed

was immaterial) is not evidence that Ms. Rosenberger acted with scienter. *See Gillis v. QRX Pharma Ltd.,* 197 F. Supp. 3d 557, 579 (S.D.N.Y. 2016) ("[A]n inference of scienter does not follow from the mere fact of non-disclosure of relevant information.") (citation omitted).

The SEC also contends that Ms. Rosenberger should have known the revenue recognition was improper because she was copied on internal emails the first week of January 2016 discussing various negotiations with AT&T regarding related services, including hosting services. *See* Compl. ¶¶ 43–45. The SEC argues that Ms. Rosenberger should have interpreted those communications as demonstrating certain terms of the LNP license sale were not final as of December 31, 2015. *Id.* ¶ 46. But the SEC ignores that the negotiations described in those emails refer to *other* services (like hosting). SUF ¶ 134. There is no evidence that Synchronoss and AT&T continued negotiating the $3 million fee for the LNP license after the year end; on the contrary, the emails refer to the LNP license fee as a fixed amount for "Q4 2015." *Id.* ¶¶ 134, 137. The January 8, 2016 acknowledgment letter from AT&T confirms as much, indicating expressly that additional services (like hosting) could be negotiated as part of a *later* change order but were not part of the license deal. *Id.* ¶ 137. Ms. Rosenberger had a reasoned basis for her view that the Company had what it needed to recognize the LNP revenue.

To be sure, Ms. Rosenberger's expert tends to agree with Taub that December 31 email confirmations for LNP lacked the technical specificity required to recognize the revenue. But even if the accounting was wrong, that is not proof of fraud. *Wyche*, 2017 WL 971805, at *17; *ECA*, 553 F.3d at 200. As Shawn Rogers agreed, "even well-meaning accountants don't always display perfect judgment in a high-speed pressured environment," and flawed judgment does not necessarily equate to intentional deceit. Ex. 7 at 248:9–13. Accounting errors are sufficient to support a 10(b)-fraud claim "[o]nly where such allegations are coupled with evidence of

36

'corresponding fraudulent intent.'" *Novak*, 216 F.3d at 309 (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996)). That corresponding evidence of intent does not exist here.

### C.   The SEC cannot establish that Ms. Rosenberger acted with scienter when approving the accounting treatment for Openwave—a highly complex, "close call" decision that was consistent with previous transactions and that objective, reasonable accountants agree was supportable.

The SEC alleges Ms. Rosenberger committed fraud when she certified financial disclosures that recognized $10 million in revenue for the Openwave IP license instead of accounting for the IP settlement as part of the business combination. *See* Compl. ¶¶ 111–15. But the SEC cannot show the accounting decision was "highly unreasonable" and an "extreme departure from the standards of ordinary care." MTD Op. at 14. Rather, the undisputed evidence confirms the transaction was a "close call" about which reasonable minds can (and did) differ. SUF ¶ 213.

In 2018, Synchronoss restated the revenue for the Openwave transaction (treating the IP settlement as a reduction off the acquisition price). *Id.* ¶¶ 215–16. But that was not an obvious, let alone the only, solution. The Investigative Team (including accountants at BDO) considered the same evidence at the center of the SEC's claim—emails from Synchronoss negotiators indicating that acquiring Openwave was contingent on the IP settlement—and nonetheless concluded that the original accounting decision was supportable and that the IP settlement had an independent basis and valuation separate from the business acquisition. *Id.* ¶¶ 213–15.

New management ultimately opted for a more conservative approach and restated that revenue (along with revenue from 20 other transactions). *Id.* ¶ 217. But that is not proof of fraud. EY opined that BDO was skilled, competent, and objective in its analysis (*id.* ¶ 79) and concluded that BDO's view that the original accounting was appropriate reflected "differences in judgments or interpretations of the applicable guidance." *Id.* ¶ 216. Indeed, Rogers (who oversaw EY's investigation and signed off on the restatement concurrence memo, *id.* ¶ 76) agreed that

"reasonable minds looking at the same set of facts on [the Openwave] transaction could come to differing conclusions about the accounting treatment." Ex. 7 at 369:6–13. EY Senior Manager Lisa Phillips agreed that the decision required "judgment." Ex. 6 at 348:22–349:5. Those are not Ms. Rosenberger's paid experts. That is the testimony of the people that the SEC claims Ms. Rosenberger defrauded.

If reasonable accountants disagree about the accounting treatment then Ms. Rosenberger cannot be liable for fraud. *See SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1241 (S.D.N.Y. 1992) (rejecting fraud claim where the Court was presented with "diametrically opposing views from experts as to the reasonableness of . . . accounting and audit judgments" and the decisions at issue "involved complex issues of accounting as to which reasonable accountants could reach different conclusions"). Indeed, we can find no case where a CFO (or anyone else) was liable for fraud for recognizing revenue when all key stakeholders, including the external auditors, maintain during the litigation that the original judgment was an acceptable way to account for the transaction.

The SEC's theory on Openwave also fails for other, independent reasons. The SEC seeks to establish scienter by observing that Ms. Rosenberger received emails in January 2016 where Synchronoss negotiators (talking among themselves and not to her) indicated that the Openwave acquisition was contingent on the IP settlement. Compl. ¶¶ 118–19, 121–22, 125, 127, 129. But there is no dispute that Ms. Rosenberger did not participate in the negotiations, that those emails were not addressed to her, and that she did not respond to any of them. SUF ¶¶ 191–95. Indeed, there is no evidence that Ms. Rosenberger even read the emails at the time, let alone that she reviewed buried references to a "net" deal that the SEC finds significant. The SEC's own expert concedes that, in his own daily life, he routinely ignores group email chains that don't require his

input, and that "it's certainly possible" Ms. Rosenberger did not actually read the emails. Ex. 9 at 58:7–59:6, 71:20–72:3, 81:8–21, 169:12–170:5.

The SEC contends that Ms. Rosenberger's inclusion as a copied recipient on those group emails is proof that she engaged in fraud because, roughly six months later, she approved an accounting memo stating that the Openwave acquisition and license settlement were not contingent on one another. Compl. ¶¶ 136–39. That theory falls short of the sort of "highly unreasonable," "extreme," and "egregious" conduct necessary to support a securities fraud claim. Moreover, Ms. Rosenberger testified that she relied on guidance from Prague, the Company's General Counsel, about the strength of the patent claims and whether the two transactions were contingent on one another; he told her that the infringement claims were valid and that Synchronoss would bring a patent-infringement lawsuit if the acquisition fell through. SUF ¶¶ 196–97. Even the SEC's expert agrees that it was reasonable for Ms. Rosenberger to rely on representations from counsel. Ex. 9 at 234:18–21, 297:13–18.

There is also no evidence that Ms. Rosenberger tried to conceal information about Openwave from EY. On the contrary, there is only one instance where Ms. Rosenberger even engaged with one of the key emails. On February 1, 2016, Ms. Rosenberger was forwarded a long email chain in which Synchronoss negotiators referenced the deal in "net" terms with the letter of intent "drafted as [$120 million] accounting for the IP," and her only response was to forward the email on to her team with an instruction to "[p]lease forward to EY and KPMG." SUF ¶ 199. Thus, the record shows that Ms. Rosenberger instructed her team to forward to EY the very email exchanges that the SEC claims she withheld from them. Moreover, a few days later, Ms. Rosenberger and Lanni spoke with Rogers and Phillips, who advised Synchronoss to account for Openwave consistent with precedent established in earlier transactions (which also accounted for

39

the IP separate from the business combination). *Id*. ¶ 201. It was, of course, no secret to EY that the two agreements were negotiated simultaneously. *Id*. ¶¶ 207–10.

Openwave was a complex, judgmental transaction that Ms. Rosenberger did her best to resolve in collaboration with EY and consistent with historical practice. No reasonable jury could find that she had a fraudulent intent when she (and many others) approved the Company's accounting treatment. *See, e.g*., *REMEC*, 702 F. Supp. 2d at 1238 (finding there was "no rational basis in the record for concluding that any of the challenged statements was made with the requisite scienter to establish securities fraud" because (among other reasons) the "case involve[d] a complicated accounting analysis that [wa]s infused with the exercise of professional judgment" and did not have "an absolute, black-or-white, definitive result").

## II. The SEC's claims under Section 13(a) and Rule 13a-14 (Claim 3) and Section 13(b)(5) (Claim 4) fail for the same reasons as the Section 10(b) and Rule 10b-5 claims—there is no evidence Ms. Rosenberger "knew" her certifications were incorrect.

The SEC brings Section 13 books-and-records claims against Ms. Rosenberger based on all five transactions. Certain of those claims require a showing that Ms. Rosenberger possessed a mental state that mirrors or exceeds the mental state required to prove a 10(b)-fraud claim. Those claims fail for the same reasons, and would fail even if any 10(b) claim survives.

In Claim 3, the SEC alleges violations of Section 13(a) and Rule 13a-14. As this Court has explained, those provisions, taken together, required Ms. Rosenberger to certify, "based on [her] *knowledge*," that the financial statements "'do[] not contain any' material misstatement or omission and 'fairly presents in all material respects the financial condition and results of operations' of the company." MTD Op. at 18–19 (citing 15 U.S.C. § 78m(a), 17 C.F.R. § 240.13a-14, 15 U.S.C. § 7241(a)) (emphasis added). Accordingly, to survive summary judgment on a claim under those provisions, the SEC must present a genuine issue of material fact about whether Ms. Rosenberger "knew" the financial statements were incorrect.

In Claim 4, the SEC alleges a violation of Section 13(b)(5), which provides that "no person shall *knowingly* circumvent or *knowingly* fail to implement a system of internal accounting controls or *knowingly* falsify any book, record or account." MTD Op. at 20 (quoting 15 U.S.C. § 78m(b)(5)) (emphasis added). "Under the plain language of the provision, to establish a clam under § 13(b)(5) the SEC must show that defendants acted with knowledge." *Id*.

The discovery record does not contain a shred of evidence that Ms. Rosenberger "knowingly" engaged in misconduct. Indeed, the SEC does not even advance a knowledge-based theory for its Section 10(b) claims; instead, the SEC seeks to prove its 10(b) claims under a recklessness standard (*see, e.g.*, ECF 56 at 48–51), which requires proof that Ms. Rosenberger engaged in "highly unreasonable" conduct representing an "extreme departure from the standards of ordinary care." MTD Op. at 14. If the SEC cannot even prove recklessness (see above), it definitely cannot show knowledge. *See SEC v. Stanard*, 2009 U.S. Dist. LEXIS 6068, at *84 (S.D.N.Y. Jan. 27, 2009) (recklessness insufficient to establish violation of Section 13(b)(5)).

**ASR.** For ASR, neither of the SEC's theories satisfy the knowledge requirement. On the contrary, the evidence uniformly suggests that Ms. Rosenberger (along with everyone else who reviewed the transaction at the time) believed that AT&T had agreed to purchase the software and that Synchronoss had the documentation needed to recognize the revenue. And there is no evidence that she ever learned that AT&T disputed the contract before she left the Company.

**LNP.** For LNP, the evidence shows that Ms. Rosenberger believed that the December 31 delivery, made after funding was approved, was sufficient, particularly after AT&T acknowledged the terms in the January 8 letter. But even if she misapplied the accounting guidance, there is no evidence that she *knew* revenue recognition was improper. *See United States v. Reyes*, 577 F.3d

1069, 1080–81 (9th Cir. 2009) ("The 'knowing' requirement protects those who accidentally record incorrect information because, for example, they are confused by accounting rules.").

**Openwave.** For Openwave, not only is there no evidence that Ms. Rosenberger *knew* the accounting treatment was incorrect, objective and independent accountants *agree* with the original decision. As a result, the SEC cannot even show it was wrong to recognize the revenue in the first place, let alone that Ms. Rosenberger *knew* her SOX certification was false.

**Windstream.** The SEC has not even tried to prove that Ms. Rosenberger *knew* the Windstream revenue was improperly recorded. The SEC's entire theory now rests on the existence of a second Windstream contract (Amendment 10) that Ms. Rosenberger did not even know about.

**Sage.** What Ms. Rosenberger *knew* about Sage is that she had expressly instructed the sales team that the reseller contract could not contain contingencies. The sales team said they understood and were following that instruction, and then disclosed to her a contract that contained no contingencies. Ms. Rosenberger did not learn of the side agreement modifying that contract with Sage until after she left the Company, and there is no evidence to the contrary.

## III.   The SEC's Rule 13b2-2 Claim (Claim 2) fails because the SEC cannot show Ms. Rosenberger acted unreasonably or made materially false statements to EY.

Rule 13b2–2 prohibits an officer from "[m]a[king] or caus[ing] to be made a materially false or misleading statement" or "omission" to "an accountant" in connection with an audit. 17 C.F.R. § 240.13b2-2. This is not a strict-liability offense. In addition to showing that a materially false statement was made, the SEC must show that Ms. Rosenberger acted unreasonably in causing the misstatement. *See SEC. v. Kelly*, 765 F. Supp. 2d 301, 324 (S.D.N.Y. 2011).

During discovery, Ms. Rosenberger repeatedly asked the SEC to identify the purported misstatements giving rise to this claim. Avoiding particularity, the SEC responded as broadly as possible, referring to all "management representation letters" signed by Ms. Rosenberger; all

"accounting memoranda" for the five transactions; all "email communications" with EY; and all oral statements "made to [EY] in quarterly meetings, year-end meetings, regular meetings of the Audit Committee," and "other meetings." Ex. 32 at 8–9 (Plaintiff's Responses and Objections to Karen Rosenberger's First Set of Interrogatories, dated April 6, 2023). The SEC should not be permitted to proceed to trial without identifying the false statements. But even if we focus on the items that SEC emphasized in discovery, none supports a claim under Rule 13b2–2.

**ASR.** Ms. Rosenberger made no false statement about the ASR transaction. The SEC contends that Ms. Rosenberger should have observed that the correct person at AT&T did not approve the transaction. But the same email that the SEC says should have tipped off Ms. Rosenberger was provided directly to EY with the revenue recognition memo. SUF ¶¶ 117–19. Moreover, Ms. Rosenberger told Yablonowitz that Synchronoss was relying on that email pending completion of an SOW, which could take months to finalize. *Id*. ¶ 115. Ms. Rosenberger told EY what she knew; EY then reviewed those materials and concurred with the accounting decision.

The SEC has also argued that Ms. Rosenberger made a misstatement when she told the Audit Committee in July 2016 that payment delays were the result of "management changes." Compl. ¶ 92. But there is no evidence that Ms. Rosenberger knew anything to the contrary. A CFO saying what she believes to be true is not unreasonable. And a CFO is not required to conduct a forensic investigation to uncover facts that the sales and legal departments chose to withhold.

**LNP.** In arguing that Ms. Rosenberger's conduct as to LNP was unreasonable, the SEC conveniently ignores evidence that Ms. Rosenberger pushed back, ultimately saying "no" to her boss when he sought to lower the standard for revenue recognition and, instead, insisted on proof that AT&T had accepted the software. SUF ¶ 130. The SEC alleges that the LNP revenue memo was misleading because it did not disclose that AT&T's confirmation letter was signed after the

43

period. But Yablonowitz agreed that a fair reading of the memo and letter (which uses the past tense when referring to December 31, 2015) would inform a reasonable reader that the letter was finalized after the period. *Id*. ¶ 141. And, in any event, Yablonowitz also testified that the letter's timing would not necessarily change the revenue recognition decision. *Id*. ¶ 138.

Ms. Rosenberger did not believe that the communications in early January 2016 changed the accounting analysis because they did not impact the license fee recognized in Q4 2015. *Id*. ¶ 134. Even if that judgment was wrong, it was not unreasonable.

**Openwave.** Every accountant (except for the SEC's paid expert) who has reviewed the Openwave transaction agrees that reasonable minds looking at all the facts could reach different judgments about the correct accounting treatment. *Id*. ¶ 218. That includes the EY witnesses that the SEC claims Ms. Rosenberger defrauded. *Id.*  The SEC nonetheless contends Ms. Rosenberger was unreasonable when she approved an accounting memo stating that the transactions were not negotiated together. Compl. ¶¶ 136–38. That argument fails for several reasons. First, EY indisputably knew that the two transactions were negotiated simultaneously. SUF ¶¶ 206–08. Second, to find Ms. Rosenberger was unreasonable in overlooking statements in earlier emails sent months before the accounting memo was drafted, the Court would need to find that the expected standard of care is for a CFO to read, and perfectly recall, every detail of every email she receives, even if the email was sent months earlier, was part of a group chain not addressed to her, and had nothing to do with the her responsibilities. even the SEC's expert is unwilling to say that; all he is willing to say is that she had emails "in her possession" that contradict the memo.

But not remembering every detail of every email ever received does not automatically make someone unreasonable. Ms. Rosenberger testified that she relied on representations from

Prague about the negotiations. *Id.* ¶¶ 198–99. Even the SEC's expert agrees relying on in-house counsel's representations is reasonable. Ex. 9 at 234:18–21, 297:13–18.

**Windstream.** The SEC cannot show that Ms. Rosenberger unreasonably made a misstatement concerning the Windstream transaction. The SEC's liability theory is based on Synchronoss's purported failure to identify that Amendments 9 and 10 should have been accounted for together as an MEA. Compl. ¶¶ 156, 158–160, 177. But Ms. Rosenberger had no involvement in the Windstream negotiations. Rather, discovery revealed the Company's General Counsel, instructed the sales team on how to handle Amendment 10 and more specifically to push its execution into the following period. SUF ¶ 234. Ms. Rosenberger, in contrast, did not sign the revenue recognition memo for Amendment 10 or even know that the contract was executed. *Id.* ¶¶ 235–36. At her deposition, she testified that she didn't even know what Amendment 10 was. *Id.* ¶ 229. Moreover, if was unreasonable for Ms. Rosenberger not to have realized that Amendment 9 and 10 were an MEA, then every participant in the nearly $30 million restatement was also unreasonable—because no one else identified the issue either. *Id.* ¶ 242.

**Sage.** Ms. Rosenberger did not even make a statement to the auditor concerning the Sage transaction, let alone a misstatement. The only statement the SEC has identified is the revenue recognition memo itself. Compl. ¶¶ 224–26. But Ms. Rosenberger did not author, approve, or sign that memo. SUF ¶ 269. There is no evidence she even saw it. Ms. Rosenberger cannot be liable for statements she did not make. *See, e.g.*, *SEC v. Orr*, 2006 WL 542986, at *18 (E.D. Mich. Mar. 6, 2006) (dismissing Rule 13b2-2 claim where the SEC did not allege that defendant "directed" his subordinate to falsify forms or that "he was even aware" of the subordinate's conduct).

Regardless, there is no evidence that Ms. Rosenberger acted unreasonably on the Sage transaction. Revenue on the Sage transaction was restated because rogue members of

Synchronoss's sales team executed a side letter that made the payment contingent on Sage's ability to resell the product. But Ms. Rosenberger did not know about that side letter and directly instructed the sales team that contingencies were not allowed. SUF ¶¶ 253–54, 278. Sage's CEO testified that Ms. Rosenberger was "making sure that [the sales personnel] were adhering to . . . [accounting] guidelines," and that the finance department was focused on "making sure . . . that the reseller agreement was standalone," and that no side letters existed. *Id.* ¶ 260. When asked if it was his impression that Ms. Rosenberger was willing to "just accept whatever terms the salespeople were suggesting for the reseller agreement," Sage's CEO testified, "of *course not*," and that he never saw any indication Ms. Rosenberger was willing to bend the rules for the deal. *Id.* ¶ 262. As Rogers testified, absent direct information to the contrary, it was reasonable for Ms. Rosenberger to assume the sales team would follow her explicit instructions. *Id.* ¶ 255. The SEC's inference from these facts that Ms. Rosenberger should have guessed that some side agreement was made that contained the forbidden contingencies is unfounded and absurd.

**IV.    The SEC's Rule 13b2-1 Claim (Claim 5) fails because it cannot show that unreasonable conduct by Ms. Rosenberger caused the alleged accounting errors.**

Rule 13b2-1 provides that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A)" of the Exchange Act. 17 C.F.R. § 240.13b2-1. As with the claim under Rule 13b2-2, it is not enough for the SEC to identify accounting errors; it must show that Ms. Rosenberger's unreasonable conduct was the cause of those errors. *See Kelly*, 765 F. Supp. 2d at 322 ("Liability under Rule 13b2–l is predicated on reasonableness. . . . The reasonableness of each defendant's conduct depends, in part, on whether each defendant . . . knew that recognizing revenue on such transactions was improper.").

For all the reasons explained above, the SEC cannot show that unreasonable conduct by Ms. Rosenberger caused the purported accounting errors identified in the Complaint. Ms.

Rosenberger may not have been a perfect CFO—no one is. But she made a good faith effort to apply the facts and information available to her to form reasoned accounting decisions for the transactions at issue in this case. In some instances, things that SEC claims Ms. Rosenberger failed to notice (e.g., that a particular AT&T senior executive was not copied on an email chain) were overlooked by many others, including the well-compensated external auditors at EY who closely scrutinized the transaction. The idea that Ms. Rosenberger—who was not responsible for assessing counterparty authorization—was alone unreasonable and liable for fraud for failing to identify that purported defect is nonsense. In other instances, purported errors in Ms. Rosenberger's judgment were a consequence of the fact that her coworkers in the sales and legal departments consciously withheld information from her (e.g., no one told her AT&T was disputing the ASR transaction or that the sales team had ignored her instruction and entered a secret side letter with Sage).

The SEC may want to hold someone liable for Synchronoss's restatement. But its crusade against Ms. Rosenberger is without merit, and its claims against her should be rejected.

**V.    The SEC's aiding and abetting claims (Claims 6, 7, and 8) fail for many of the same reasons as the primary violations.**

The SEC brings claims against Ms. Rosenberger for aiding and abetting Section 10(b) violations by Synchronoss (Claim 6) and for aiding and abetting various Section 13 books and records violations by Synchronoss (Claims 7 and 8). To prove an aiding and abetting claim (under Section 10(b) or Section 13), the SEC must prove a securities law violation by someone other than Ms. Rosenberger, that Ms. Rosenberger had "knowledge of this violation," and that she provided "substantial assistance . . . in the achievement" of the violation. MTD Op. at 22 (quoting *Gonnella v. SEC*, 954 F.3d 536, 550 (2d Cir. 2020)).

As this Court previously recognized, the SEC's claim for aiding and abetting the purported 10(b) violations uses the "same conduct supporting the primary violation by Rosenberger [to

establish] a primary violation by Synchronoss." MTD Op. at 23. As a result, if the SEC fails to establish that Ms. Rosenberger committed a primary violation of Rule 10(b) (because the SEC cannot show she acted with scienter), then the aiding and abetting claim must be dismissed for the same reason. *Yorkville Advisors*, 305 F. Supp. 3d at 530 n.26 ("The SEC's secondary violation claims, including aiding and abetting liability . . . , are dismissed due to the SEC's failure to establish that [the defendant] was reckless.").

With respect to the Section 13 claims, some (but not all) of the claims for a primary violation are evaluated under a reasonableness standard rather than a heightened knowledge or recklessness standard. As explained above, the SEC has failed to present evidence even sufficient to support the Section 13 claims that apply a reasonableness test. *See* Sections III & IV, above. But even if any Section 13 claim survives summary judgment, aiding and abetting is a specific intent crime that requires knowledge of the primary violation and proof that the defendant knowingly or recklessly provided substantial assistance in the achievement of the primary violation. The SEC cannot meet that standard for ASR, LNP, or Openwave for the reasons discussed in detail throughout this motion. And the SEC has not even attempted to satisfy that heightened standard for Windstream and Sage—the transactions for which the SEC asserts only Section 13 violations. As for Windstream, there is no evidence that Ms. Rosenberger knew that Windstream Amendment 10 was executed, let alone that she knew or was reckless in failing to identify the relationship between Amendments 9 and 10 (something none of the restatement investigators identified). And for Sage, not only did Ms. Rosenberger not know about the side letter, she explicitly instructed the sales team that side agreements with contingencies were impermissible. Ms. Rosenberger is not required assume insubordination or to conduct a forensic investigation to uncover insubordination to avoid aiding and abetting liability.

## VI.    **Ms. Rosenberger is entitled to judgment on the SOX 304 claim (Claim 9).**

The SEC is not entitled to SOX 304 disgorgement. A SOX 304 claim requires a showing that the issuer was required to restate revenue "due to the material noncompliance of the issuer, *as a result of misconduct*, with any financial reporting requirement under the securities laws." MTD Op. at 26 (quoting 15 U.S.C. § 7243(a)). This Court previously held that the "Complaint amply alleges intentional misconduct by Synchronoss management in prematurely recognizing revenue." *Id*. at 27. But the SEC can no longer rest on its complaint. As discussed above, Synchronoss's announcements concerning the restatement made clear that at least four of the five transactions at issue were restated because Synchronoss decided to depart from historical practice as to those transactions. Only one transaction—Sage—arguably resulted from misconduct by a Synchronoss employee. But Sage does not trigger SOX 304 liability because (1) the employees responsible for the side letter were not acting within the scope of their agency (as is required for this claim) given that they did not have the authority to execute an agreement on behalf of Synchronoss (a fact that Sage's CEO understood); (2) the record has unequivocally shown that Ms. Rosenberger specifically instructed those employees *not* to engage in the relevant misconduct (negotiating a side agreement with Sage's CEO); and (3) as a matter of equity, the Court should use its discretion not to hold her liable for this unauthorized conduct. *See* 15 U.S.C. § 7243(a); *SEC v. Jensen*, 835 F.3d 1100, 1122 (9th Cir. 2016) (Bea, J., concurring); *SEC v. ITT Educ. Servs., Inc.*, 303 F. Supp. 3d 746, 790 (S.D. Ind. 2018); *SEC v. Life Partners Holdings, Inc.*, 71 F. Supp. 3d 615, 625 (W.D. Tex. 2014).

## VII.    **The SEC cannot show that it is entitled to disgorgement or injunctive relief.**

The Court should strike the SEC's demand for a permanent director and officer injunction bar because none of the conditions that justify such an extraordinary remedy exist here. *See SEC v. Bankosky*, 716 F.3d 45, 48 (2d Cir. 2013) (explaining that the relevant factors that courts in this Circuit consider are "(1) the egregiousness of the underlying securities law violation; (2) the

defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur"). Ms. Rosenberger is not a "repeat offender." And there is no evidence that similar issues are likely to recur, particularly given the passage of time. *Price Waterhouse*, 797 F. Supp. at 1244 (denying injunction where "it took the Commission approximately five years to file its complaint and another six years for the action to proceed to trial"); *SEC v. Monarch Fund*, 608 F.2d 938, 943 (2d Cir. 1979) (same where "more than seven years" had passed). Moreover, for the reasons discussed above, this case does not involve "egregious" misconduct. The facts present here do not justify the "loss of livelihood and the stigma attached to permanent exclusion from the corporate suite" associated with the permanent injunction sought by the SEC. *SEC v. Patel*, 61 F.3d 137, 142 (2d Cir. 1995).

The Court should likewise strike the SEC's prayer for reimbursement (Compl. at 63)—an "equitable disgorgement remedy," *SEC v. Jasper*, 678 F.3d 1116, 1130 (9th Cir. 2012)—because the SEC has not plausibly alleged that any of Ms. Rosenberger's compensation constituted "ill-gotten gains," *Liu v. SEC*, 140 S. Ct. 1936, 1948 (2020). The SEC has therefore not met its "burden of establishing a reasonable approximation of the profits causally related to the fraud." *SEC v. Gallison*, 2023 WL 3004882, at *5 (S.D.N.Y. Feb. 4, 2023). There is no evidence that Ms. Rosenberger's alleged incentive-based compensation was based on the specific restated revenue at issue in this case (which constitutes less than 14 percent of Synchronoss's total restated revenue, *see* Mot. 1), as opposed to restated revenue that is not at issue in this case or revenue that Synchronoss did not restate at all.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should enter judgment for Ms. Rosenberger on all claims asserted against her.

Date:   August 18, 2023
        New York, New York

**ALSTON & BIRD LLP**

/s/ *Jenny Kramer*
Jenny Kramer
Rachel Finkel
90 Park Avenue
New York, NY 10016
Phone: (212) 210-9420
Jenny.Kramer@alston.com
Rachel.Finkel@alston.com

Andrew Hatchett (Admitted Pro Hac Vice)
1201 West Peachtree Street, NE
Atlanta, GA 30309-3424
Phone: (404) 881-7000
Andrew.Hatchett@alston.com

*Counsel for Karen Rosenberger*