**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

          -against-

KAREN ROSENBERGER and JOANNA LANNI,

                    Defendants.

Case No. 1:22-cv-4736-DLC

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**JOANNA LANNI'S MOTION FOR SUMMARY JUDGMENT**

*Oral Argument Requested*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

SUMMARY OF MATERIAL FACTS ....................................................................................... 2

    I.        BACKGROUND ............................................................................................... 2

           A.     Synchronoss & Ms. Lanni ............................................................. 2

           B.     Synchronoss Acquires Razorsight Corporation ("Razorsight") and Begins Converting Razorsight Customers' Software Subscriptions Into Perpetual License Sales ................................................................................... 3

           C.     2017–2018 Investigation and Restatement ....................................... 9

    II.      THE CLAIMS AGAINST MS. LANNI ......................................................... 10

LEGAL STANDARD ............................................................................................................... 11

ARGUMENT ............................................................................................................................ 12

    I.        SUMMARY JUDGMENT SHOULD BE GRANTED ON THE SEC'S SECTION 13(b)(5) CLAIM FOR AN ABSENCE OF EVIDENTIARY SUPPORT FOR THE REQUIRED SCIENTER (CLAIM IV). ................................. 12

    II.      SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF MS. LANNI ON THE SEC'S 13B2-1 BOOKS AND RECORDS VIOLATION (CLAIM V). ........................................................................................ 22

           A.     There is No Evidence Ms. Lanni Acted Unreasonably in How She Accounted for the Windstream Deals. ............................................. 23

           B.     All Admissible Evidence Supports a Finding that Ms. Lanni Acted Reasonably. ................................................................................. 26

           C.     The SEC's Expert Opinion as to Ms. Lanni's Reasonableness is Inadmissible. ................................................................................ 27

    III.    SUMMARY JUDGMENT SHOULD BE GRANTED IN MS. LANNI'S FAVOR ON THE SEC'S AIDING AND ABETTING CLAIMS (CLAIM VIII). ............................................................................................. 31

           A.     The SEC Cannot Establish that Ms. Lanni Acted With Knowledge or Recklessly. ................................................................................ 31

B.    The SEC Produced No Evidence That Ms. Lanni Substantially Assisted Synchronoss' Primary Violation.......................................................................33

CONCLUSION............................................................................................................................34

# **TABLE OF AUTHORITIES**

**Page(s)**

CASES

*In re Alstom SA*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)...................................................................25

*Alvarado v. United Hospice, Inc.*,
631 F. Supp. 3d 89 (S.D.N.Y. 2022)................................................11, 17, 22, 30

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................12

*In re Blech Sec. Litig.*,
No. 94-7696, 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003).................................29

*In re Carter-Wallance, Inc.*,
220 F.3d 36 (2d Cir. 2000)............................................................................33

*In re Celestica Inc. Sec. Litig.*,
No. 07-0312, 2014 WL 4160216 (S.D.N.Y. Aug. 20, 2014)................................12

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..................................................................................11

*CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*,
735 F.3d 114 (2d Cir. 2013)..........................................................................11

*First Nat'l Bank v. Cities Serv. Co.*,
391 U.S. 253 (1968)..................................................................................12

*Fujitsu Ltd. v. Fed. Express Corp.*,
247 F.3d 423 (2d Cir. 2001)....................................................................11, 26

*Gonnella v. SEC*,
954 F.3d 536 (2d Cir. 2020)..........................................................................32

*Highland Cap. Mgmt., L.P. v. Schneider*,
379 F. Supp. 2d 461 (S.D.N.Y. 2005).........................................................29, 30

*In re Initial Pub. Offering Sec. Litig.*,
174 F. Supp. 2d 61 (S.D.N.Y. 2001)................................................................29

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Grp.*,
14 F. Supp. 2d 391 (S.D.N.Y. 1998).........................................................29, 30

*In re Longtop Fin. Techs. Ltd.*,
    32 F. Supp. 3d 453 (S.D.N.Y. 2014)....................................................................29, 30

*Marx & Co. v. Diners' Club, Inc.*,
    550 F.2d 505 (2d Cir. 1977)......................................................................29, 30, 31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)........................................................................................11, 12

*NEM Re Receivables, LLC v. Fortress Re, Inc.*,
    173 F. Supp. 3d 1 (S.D.N.Y. 2016)....................................................12, 17, 29, 31

*Scott v. Harris*,
    550 U.S. 372 (2007)..............................................................................................12

*Scotto v. Almenas*,
    143 F.3d 105 (2d Cir. 1998)..................................................................................12

*SEC v. Apuzzo*,
    689 F.3d 204 (2d Cir. 2012)............................................................................34, 35

*SEC v. Cedric Kushner Promotions, Inc.*,
    417 F. Supp. 2d 326 (S.D.N.Y. 2006)..............................................................11, 33

*SEC v. Espuelas*,
    579 F. Supp. 2d 461 (S.D.N.Y. 2008)........................................................23, 24, 25

*SEC v. Espuelas*,
    905 F. Supp. 2d 507 (S.D.N.Y. 2012)........................................................23, 24, 25

*SEC v Goldstone*,
    No. 12-0257, 2016 WL 3135651 (D.N.M. May 10, 2016)...............................29, 30

*SEC v. Kelly*,
    765 F. Supp. 2d 301 (S.D.N.Y. 2011)...................................................................13

*SEC v. Lowy.*
    396 F. Supp. 2d 225 (E.D.N.Y. 2003) .............................................................24, 25

*SEC v. Ripple Labs, Inc.*,
    No. 20-10832, 2022 WL 762966 (S.D.N.Y. Mar. 11, 2022)..................................32

*SEC v. Standard*,
    No. 06-7736, 2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ....................................13

*SEC v. Wey*,
    246 F. Supp. 3d 894 (S.D.N.Y. 2017)...................................................................32

*United States v. Lumpkin*,
    192 F.3d 280 (2d Cir. 1999)...........................................................................29

*United States v. Peoni*,
    100 F.2d 401 (2d Cir. 1938)...........................................................................34

*Wrobel v. Cnty. of Erie*,
    692 F.3d 22 (2d Cir. 2012)...........................................................................11

**STATUTES**

15 U.S.C. § 78m(b)(5) ...........................................................................12

15 U.S.C. § 78t(e) (2012)...........................................................................32

Exchange Act Section 13(a)...........................................................................10

Exchange Act Section 13(b)(2)(A) ...........................................................................10

Exchange Act Section 13(b)(5)...........................................................................10, 12, 13, 23

**RULES**

Fed. R. Civ. P. 56...........................................................................1, 11, 17

Fed. R. Evid. 702...........................................................................29

Fed. R. Evid. 704...........................................................................29, 31

Fed. R. Evid. 803...........................................................................18

Rule 10b-5...........................................................................25

Rule 13b2-1...........................................................................passim

Rule 13b2-1...........................................................................25

Rule 12b-20...........................................................................11, 32

Rule 13a-1...........................................................................11, 32

Rule 13a-11...........................................................................11, 32

Rule 13a-13...........................................................................11, 32

**REGULATIONS**

17 C.F.R. § 240.13b2-1 .................................................................................................................23

Defendant Joanna Lanni ("Ms. Lanni") respectfully submits this memorandum of law in support of her Motion for Summary Judgment on Plaintiff Securities and Exchange Commission's ("SEC" or "Commission") claims against her under Federal Rule of Civil Procedure 56.[1]

## PRELIMINARY STATEMENT

With no evidence, the SEC has charged Joanna Lanni, the former corporate controller of Synchronoss Technologies, Inc. ("Synchronoss") with falsifying her former company's books and records.  The Commission does so in relation to a single transaction in which she performed the single act of approving an accounting memorandum provided to her company's outside auditors.  The SEC alleges this accounting memorandum omitted facts concerning the existence of other supposedly related contracts that rendered its revenue-recognition conclusion incorrect.  But it has zero proof of Ms. Lanni's knowledge of those facts, notwithstanding a multi-year investigation, a voluminous evidentiary record, and several months of discovery.  During those years of perfect hindsight and the deployment of massive resources and effort, the Commission discovered three or four vague emails, with draft, redlined contracts attached, on which Ms. Lanni happened to be copied for no discernible reason.  Buried in those attachments was a sparsely scattered handful of potential clues to the existence of the omitted contracts.  And on that foundation rests the entirety of the SEC's case against Ms. Lanni.  As the absence of any competent evidence of Ms. Lanni's liability is manifest, Federal Rule of Civil Procedure 56 and principles of fundamental justice demand that the Court release Ms. Lanni from this misguided litigation.

---

[1] Citations to numbered exhibits ("Ex.") herein refer to exhibits that are attached to the concurrently filed Certification of Scott B. McBride in Support of Ms. Lanni's Motion for Summary Judgment, dated August 18, 2023 ("McBride Cert.").

**SUMMARY OF MATERIAL FACTS[2]**

I.   **BACKGROUND**

A.   **Synchronoss & Ms. Lanni**

Synchronoss is a publicly traded global software and services company based in New Jersey.  (SUMF ¶ 1.)  From September 2015 through at least June 2017 (the "Relevant Time Period"), Synchronoss sold its various software licenses, software-based activation, messaging, analytics, ancillary support, and cloud-based products and services to its customers, which included telecommunication companies such as Verizon; AT&T, Inc.; Vodafone; Sprint; Comcast; and Cablevision.  (*Id.* ¶ 2.)

Ms. Lanni is a certified public accountant ("CPA") licensed in the State of New Jersey, and a former Synchronoss employee.  (*Id.* ¶ 3.)  In 2014, she joined Synchronoss' accounting team as the company's corporate controller, reporting to then-Chief Financial Officer ("CFO") Karen Rosenberger.  (*Id.* ¶ 5.)  Ms. Lanni served as Synchronoss' controller from mid-2014 through early 2017.  (*Id.* ¶ 4.)  During that time, she directly oversaw four or five employees in Synchronoss' accounting department, including Synchronoss' assistant controller, Joshua Shaver.  (*Id.* ¶ 6.)  Shaver, in turn, oversaw Synchronoss' revenue recognition and billing manager, Melissa Chen, and technical accounting manager Dana Moronese.  (*Id.* ¶ 7.)

As controller, Ms. Lanni's responsibilities included, among other things, preparing SEC filings and internal financial reports, analyzing financial data, monitoring internal controls, participating in budgeting processes, and coordinating external audit processes.  (*Id.* ¶ 6.)

During the Relevant Time Period, Synchronoss' internal controls concerning revenue recognition required that its accounting department prepare a "revenue recognition

---

2      Ms. Lanni incorporates by reference, as if fully set forth herein, her entire August 18, 2023 Statement of Undisputed Material Facts ("SUMF") in support of her Motion for Summary Judgment.  Ms. Lanni provides the following summary to avoid repetition and for the sake of brevity.

memorandum" for transactions "in excess of $500,000,"[3] which needed to be reviewed and approved by Ms. Lanni, Rosenberger, and Shaver.  (*Id.* ¶¶ 27, 32–34.)  Each memorandum was to "set[] out the accounting guidelines under [Generally Accepted Accounting Principles ("GAAP")] relevant to the recognition of revenue and providing the purported factual bases for any such recognition."  (*Id.* ¶ 27.)  These revenue recognition memoranda were typically drafted by either Chen or Moronese.  (*Id.* ¶¶ 32–33.)  Ms. Lanni and Shaver were both responsible for then performing second-level reviews of such memoranda.  (*Id.* ¶ 34.)  As second-level reviewers, Ms. Lanni and Shaver would: (1) confirm that the memorandum provided to them accurately reflected the terms set forth in the underlying contract documents, and (2) confirm that the contract documents supported the GAAP accounting analysis described in the revenue recognition memorandum.  (*Id.* ¶ 35.)  After receiving either Ms. Lanni's or Shaver's approval, the revenue recognition memorandum would be forwarded to Rosenberger.  (*Id.* ¶¶ 34, 36.)  Rosenberger was required to review and approve "all such revenue recognition memoranda" of "higher significance."  (*Id.* ¶ 34.)

**B.** **Synchronoss Acquires Razorsight Corporation ("Razorsight") and Begins Converting Razorsight Customers' Software Subscriptions Into Perpetual License Sales**

In August 2015, Synchronoss purchased Razorsight, a company offering "cloud-based analytics solutions for communications service providers," which became one of Synchronoss' subsidiaries.  (*Id.* ¶ 1.)  Razorsight "primarily offered [its] software" through service contracts called Software-as-a-Service ("SaaS") agreements, which allowed customers to use Razorsight's software on a monthly or annual subscription basis.  (*Id.*)

Sometime in or around 2007, well before Razorsight became a Synchronoss subsidiary, Razorsight began providing its software and analytics solutions to Windstream Communications, Inc. ("Windstream"), a provider of voice and data network communications and managed

services.  (*Id.* ¶¶ 57–58, 66–68.)   Razorsight and Windstream entered into a master services agreement governing the scope of the relationship between the two parties, including terms and conditions for current and future activities and responsibilities.  (*Id.* ¶¶ 66–68.)   The agreement was entitled the "Hosted Solution Services Agreement" (the "Razorsight-Windstream MSA") and called for Razorsight to provide a variety of software services to Windstream.  (*Id.*)   These services included processing of Windstream's invoices, automated payments, and "optimization" software geared toward margin improvement and improving costs and revenue.  (*Id.* ¶ 68.)

In or around 2016, Synchronoss' sales team began months-long discussions with Windstream to convert Windstream's SaaS agreement into the sale of a perpetual software license agreement (the "Windstream License Agreement").  (*Id.* ¶ 69.)   These discussions were led by Clayton "Charlie" Thomas, Razorsight's former chief executive officer ("CEO"), along with Razorsight's then-Chief Operating Officer ("COO") Marc Bandini, who was "primarily responsible" for Razorsight's customer relationships.  (*Id.*)   Thomas and Bandini worked with and obtained guidance or input from John Murdock, Synchronoss' senior director of procurement and business operations; Ronald Prague, Synchronoss' general counsel; Noah Ament, Synchronoss' newly installed global deal desk director; and other former Razorsight employees in drafting contract documents and structuring the terms of the transaction.  (*Id.*; *see also, e.g.*, *id.* ¶ 92.)   Ms. Lanni, however, did not take part in any of the contract negotiations with Windstream.  (*Id.* ¶ 71.)   Nor was she copied on or otherwise made aware of any of Synchronoss' communications with Windstream.  (*Id.*)   Nonetheless, on June 15, 2016, Thomas emailed Synchronoss' COO, Robert "Bob" Garcia, updating Garcia on a telephonic meeting that had taken place the prior evening.  (*Id.* ¶ 102.)   In this email, Thomas claimed that he had conferred with Ament, Murdock, and Ms. Lanni and "[was] working on finalizing [the]

structure" of a transaction with Windstream.  (*Id.*)  The email noted that transaction's structure included the "[b]alance of License, Maintenance, Hosting, Settlement, and perhaps Data Center," and that "[s]o far, they say all $13M is recognizable in Q2."  (*Id.*)  However, the record evidence demonstrates Ms. Lanni was not present at that meeting, and, in fact, was attending a meeting with two other Synchronoss employees within the finance department at the same time Thomas's meeting was scheduled to occur.  (*Id.* ¶¶ 99–101, 108.)

Indeed, unlike certain members of Synchronoss' deal desk and legal departments, the accounting department was largely left out of the loop concerning negotiations with Windstream until June 29, 2016—the day before the Windstream License Agreement was executed.  (*See id.* ¶¶ 105, 107, 119.)  In a last-minute flurry of emails on June 29, and June 30, 2016, drafts of the Windstream License Agreement and other Windstream-related "3rd quarter opportunities" were circulated to individuals in Synchronoss' sales, legal, finance, and accounting departments.  (*Id.* ¶¶ 123–126, 129–130, 132–133.)  The record demonstrates that Ms. Lanni received only three emails concerning Windstream on the eve of the second quarter's close.  (*Id.* ¶¶ 123–124, 129– 130, 134.)  None of these, however, asked for Ms. Lanni's input, requested she review or opine as to their contents, or otherwise provided any instruction to or request of Ms. Lanni.  (*See id.*)

First, on June 29, 2016, Ament sent Ms. Lanni an email with the subject line "Windstream."  (*Id.* ¶ 123.)  Ament's email attached a redlined draft of what he characterized as the "latest version of Windstream," stating to Ms. Lanni that he was "sure it will change again but John asked me to socialize w [sic] you."  (*Id.* ¶ 124.)  The record is absent of any further evidence, testimonial or otherwise, suggesting a reason or context for the email.  On page four of the attached draft of the Windstream License Agreement, it indicated that three of five previously included licenses for separate pieces of software had been deleted, leaving two

licenses.  (*Id.* ¶ 125.)  The aggregate sales price for those two remaining software licenses was listed as $6.1 million.  (*Id.* ¶¶ 126–128.)

Later that day, Ament sent Ms. Lanni a second email bearing the subject line "Amendment 10 Widnstream [sic]," and attaching a draft version of the Audit Services Settlement Agreement.  (*Id.* ¶ 129.)  Ament did not include any text in the body of the email.  (*Id.* ¶ 130.)  As with the first June 29 email, the record is bereft of any further evidence, testimonial or otherwise, suggesting a reason or context for this email.

Ament lastly copied Ms. Lanni, Rosenberger, and Synchronoss' general counsel in another June 29 email to Thomas and Deric Vinyard, a vice president of sales at Synchronoss, with the subject line, "Windstream Amendments 9 & 10" (the "June 29 Windstream Amendments 9 & 10 Email").  (*Id.* ¶ 132.)  The June 29 Windstream Amendments 9 & 10 Email ostensibly attached current drafts of the Windstream License Agreement and Audit Services Settlement Agreement contracts, but like the previous June 29 email, contained no text anywhere in the body of the email.  (*Id.* ¶ 133.)  This email from Ament, once again, did not request that anyone—let alone Ms. Lanni or Rosenberger—look over the attachments.  (*Id.* ¶ 134.)  Nor did Ament seek Ms. Lanni's or anyone else's opinion, thoughts, or assent to the documents' terms.  (*Id.*)

On June 30, 2016, Windstream agreed to purchase a perpetual software license, culminating in the execution of the Ninth Amendment to the Razorsight-Windstream MSA, i.e., the Windstream License Agreement.  (*Id.* ¶ 70.)

The Windstream License Agreement provided that Synchronoss would deliver software licenses for two pieces of Razorsight software to Windstream for $6,174,670, along with 12 months of maintenance and support services, for a cost of $127,500 per year.  (*Id.* ¶ 72.)  The

total contract price was approximately $6.3 million. (*Id.*)  Synchronoss thereafter recognized $5,252,476 of the Windstream License Agreement "as license revenue for Q2 2016, while the remaining $922,194 of the purchase" was "deferred and recognized as subscription revenue over the 12-month maintenance term." (*Id.* ¶ 73.)  Moronese authored the revenue recognition memorandum memorializing the accounting treatment for the Windstream License Agreement, which was reviewed, approved, and signed by Moronese, Shaver, Ms. Lanni, and Rosenberger before being transmitted to Ernst & Young ("EY"), Synchronoss' external auditor. (*Id.* ¶¶ 32–34, 36–37.)

While negotiating the Windstream License Agreement, Synchronoss' sales team was simultaneously addressing another issue: Windstream's non-payment of fees for audit-related services rendered under a 2012 statement of work (the "2012 SOW") to the Razorsight-Windstream MSA. (*Id.* ¶ 77.)  The 2012 SOW provided that Razorsight would audit Windstream's service invoices and manage Windstream's disputes with customers. (*Id.*)  Under the agreement, Razorsight would validate Windstream's billed data, file claims against Windstream's delinquent customers, and negotiate settlements directly with those customers. (*Id.*)  In return, Windstream would pay Razorsight a dispute recovery fee ("DRF") of eighteen percent of all claim recoveries resulting from the audit Razorsight used its software to identify. In April 2015, Razorsight entered into an additional agreement with Windstream for optimization services (the "Optimization Agreement").  As part of this work, Razorsight would identify and recommend cost improvements to Windstream's invoicing process.  If Windstream implemented the improvements, it would pay Razorsight an optimization share fee of twenty five percent of the net savings realized over the previous twelve months. (*Id.*)

As of June 2016, Razorsight had recovered up to $55.1 million in claims for Windstream under the 2012 SOW, and had generated net savings for Windstream through its optimization services of $4 million under the Optimization Agreement.  (*Id.* ¶ 78.)  But Windstream had paid no DRFs or optimization fees.  (*Id.*)  Accordingly, Synchronoss sought to resolve the uncertainty surrounding Windstream's prospective payment related to the approximately $55 million in claims Razorsight had identified for Windstream under the SOW, as well as a potential payment due on $4 million in net savings Razorsight had identified or generated for Windstream through its optimization services.  (*Id.*)

Synchronoss and Windstream reached a resolution on this issue on July 1, 2016.  (*Id.* ¶ 79.)  Following negotiations led by Thomas—which, unbeknownst to Ms. Lanni, overlapped with discussions concerning the Windstream License Agreement—the parties executed the Tenth Amendment to the Hosted Solutions Services Agreement (the "Audit Services Settlement Agreement").  (*Id.*)  Under the Audit Services Settlement Agreement's terms, Synchronoss agreed to waive the balance owed by Windstream for audit and optimization services rendered prior to May 31, 2016, in exchange for Windstream making a one-time, non-refundable $600,000 payment to Synchronoss.  (*Id.* ¶¶ 80–81.)

Because the Audit Services Settlement Agreement was executed on July 1, 2016, the settlement fee of $600,000 was recognized as revenue by Synchronoss in Q3 2016.  (*Id.* ¶ 81.)  Chen authored the revenue recognition memorandum memorializing the accounting treatment for the Audit Services Settlement Agreement, which was reviewed, approved, and signed by Chen, Shaver, and Ms. Lanni before being transmitted to EY.  (*Id.* ¶ 82.)

In January 2017, nearly seven months after the execution of the Windstream License Agreement and the Audit Services Settlement Agreement, Synchronoss and Windstream entered

into one additional contract.  (*Id.* ¶ 85.)   This time, Synchronoss and Windstream executed a formal contract for hosting services relating to the Windstream License Agreement (the "Windstream Hosting Agreement").  (*Id.*)   The executed Windstream Hosting Agreement provided that it was retroactively effective, back to and including July 1, 2016.  (*Id.*)   Beforehand, from July 1, 2016, through January 2017, Synchronoss had been hosting the licensed software for Windstream without a contract for doing so.  (*Id.* ¶ 86.)

Ms. Lanni was not aware that Synchronoss had been providing hosting services to Windstream for the licensed software.  (*Id.* ¶ 87.)

### C.    2017–2018 Investigation and Restatement

In January 2017, Synchronoss acquired Intralinks Holdings, Inc., which resulted in the turnover of Synchronoss' C-Suite management.  (*Id.* ¶ 46.)  In May 2017, Synchronoss' Audit Committee engaged the law firm Torys LLP ("Torys") as outside counsel to investigate potential issues related to Synchronoss' historical financials.  (*Id.* ¶ 47.)  Torys, in turn, retained BDO USA, LLP ("BDO" and, together with Torys, the "Investigative Team"), an international accounting firm, to lead the investigation of Synchronoss' prior accounting practices.  (*Id.* ¶ 48.)  Additionally, EY engaged its own team of accountants from its Fraud Investigation & Dispute Services practice ("FIDS"), to perform a parallel "shadow investigation" that, among other things, evaluated the sufficiency of the Audit Committee's and the Investigative Team's investigation and review of Synchronoss' prior accounting practices.  (*Id.* ¶ 49.)

EY and the Investigative Team undertook a thorough, expensive, and extensive investigation.  Shawn Rogers, the 2016 coordinating partner of EY's audit team who oversaw the "shadow investigation," testified that neither EY nor the Investigative Team found that Ms. Lanni had engaged in any fraud or intentional misconduct.  (*Id.* ¶¶ 51–55.)

Following the Investigative Team and EY's meticulous investigations, on July 2, 2018, Synchronoss restated its audited financials and related disclosures for fiscal years 2015 and 2016 and certain financial data for fiscal years 2013 and 2014, restating approximately twenty-one transactions totaling $190 million in cumulative revenue.  (*Id.* ¶ 56.)

One of the transactions subject to restatement was the Q2 2016 Windstream License Agreement.  With respect to the Windstream License Agreement, Synchronoss admitted it violated securities laws by "improperly recogniz[ing] revenue from the sale of licenses and hosting services where the licenses and hosting were purportedly separate transactions, but should have been treated as a single arrangement under GAAP for revenue recognition purposes."  (*Id.* ¶ 61.)  Thus, the Windstream License Agreement revenue was restated on the basis of the presence of hosting services, which Synchronoss had previously failed to recognize and properly account for.  (*Id.* ¶ 63.)  Despite a lengthy and in-depth investigation, there is no evidence in the record that the Investigative Team, EY, FTI,[3] or any other person identified additional reasons or alternative bases for the restatement of the Windstream License Agreement.  (*Id.* ¶ 64.)  Aside from the Windstream License Agreement, no other revenue from any other transactions with Windstream were restated.  (*Id.* ¶ 66.)

## II.    THE CLAIMS AGAINST MS. LANNI

The SEC seeks to hold Ms. Lanni responsible for securities law violations in connection with Synchronoss' recognition in Q2 2016 of nearly $5.3 million in revenue from the Windstream License Agreement transaction.  The Complaint alleges that Ms. Lanni violated Section 13(b)(5) of the Exchange Act and SEC Rule 13b2-1 thereunder by knowingly circumventing Synchronoss' system of internal accounting controls and falsifying the company's

---

3    FTI Consulting ("FTI") is a management consulting company that was retained by Synchronoss to assist with its review.  (SUMF ¶ 50.)

books and records in relation to the transaction.  Ms. Lanni is also charged with aiding and abetting Synchronoss' primary books-and-records violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and SEC Rules 12b-20, 13a-1, 13a-11, and 13a-13 in connection with the same transaction.

## **LEGAL STANDARD**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) and (e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The moving party bears the initial burden of proving that there is no genuine issue of material fact, *Celotex Corp.*, 477 U.S. at 323, using "the record, including depositions, documents, electronically stored information, affidavits or declarations, . . . admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c).  Where, as here, the burden of proof at trial falls on the non-moving party, "it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim."  *Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 107–08 (S.D.N.Y. 2022) (quoting *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013)).

Once the moving party meets her burden, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis removed).  While the evidence and all permissible inferences must be construed "in the light most favorable to the party against whom summary judgment is sought," *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 330 (S.D.N.Y. 2006), the non-movant "need[s] to create more than a 'metaphysical' possibility that [its] allegations were correct," *Alvarado*, 631 F. Supp. 3d at 108 (second alteration in original) (quoting *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012)).

When coming forward with specific facts, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). "Rather, the non-moving party must produce *admissible* evidence that supports its pleadings." *In re Celestica Inc. Sec. Litig.*, No. 07-0312, 2014 WL 4160216, at *4 (S.D.N.Y. Aug. 20, 2014) (emphasis added). "[T]he mere existence of a scintilla of evidence supporting the non-movant's case," however, is "insufficient to defeat summary judgment." *NEM Re Receivables, LLC v. Fortress Re, Inc.*, 173 F. Supp. 3d 1, 5 (S.D.N.Y. 2016) (quoting *In re Celestica*, 2014 WL 4160216, at *4). If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). Likewise, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec.*, 475 U.S. at 587 (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). And "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## <u>ARGUMENT</u>

### I.   SUMMARY JUDGMENT SHOULD BE GRANTED ON THE SEC'S SECTION 13(B)(5) CLAIM FOR AN ABSENCE OF EVIDENTIARY SUPPORT FOR THE REQUIRED SCIENTER (CLAIM IV).

The SEC cannot prove the existence of knowledge required for a violation of Section 13(b)(5) of the Exchange Act. Ms. Lanni is thus entitled to summary judgment on Claim IV.

Section 13(b)(5) of the Exchange Act provides that "[n]o person shall 'knowingly circumvent or knowingly fail to implement a system of internal accounting controls or

knowingly falsify any book, record, or account described in [Section 13(b)](2)." 15 U.S.C. § 78m(b)(5). A claim under the statute thus demands a showing of scienter, requiring the SEC to establish Ms. Lanni "acted with knowledge," *SEC v. Kelly*, 765 F. Supp. 2d 301, 323 (S.D.N.Y. 2011), a greater burden than mere recklessness, *see SEC v. Standard*, No. 06-7736, 2009 WL 196023, at *30 (S.D.N.Y. Jan. 27, 2009).

The SEC alleges that Ms. Lanni violated Section 13(b)(5) through both of the provision's clauses, that is, by knowingly circumventing Synchronoss' internal accounting controls and knowingly falsifying Synchronoss' books and records. But she is alleged to have committed just one act in connection with those violations: approving the Windstream License Agreement Revenue Recognition Memorandum. (*See* Compl. ¶¶ 7, 153, 170–172, 182–190, 194, 261, 264, 282; McBride Cert., Ex. 59, at No. 1.) That is the full extent of the charged conduct.

The Commission asserts two bases for this alleged falsification of the Windstream License Revenue Recognition Memorandum. First, the Commission submits that the memo improperly recognized the lion's share of the license revenue in Q2 2016 because the Windstream License Agreement and the Windstream Audit Services Settlement Agreement should have been deemed part of a single, multi-element arrangement under the GAAP rules. The sales teams at Synchronoss and Windstream negotiated these two contracts together, the SEC maintains. As a result, the agreements should have been evaluated together under GAAP as separate elements of the same contract. Because Synchronoss lacked vendor-specific objective evidence ("VSOE") of the fair value of the Audit Services Settlement Agreement, revenue from the entire multi-element arrangement—from both contracts combined—should have been apportioned, or recognized ratably, over the life of the arrangement. (*See, e.g.*, Compl. ¶¶ 184–185.) This would have resulted in less revenue booked in Q2 2016 than the $5.252 million

recognized that quarter, and more revenue deferred to later quarters.  The memo omitted all this, which according to the SEC rendered it false.

Second, the SEC asserts that the memo improperly recognized the license revenue up front because Synchronoss was providing hosting services to Windstream in connection with the software at issue in the Windstream License Agreement.  (*See, e.g.*, Compl. ¶¶ 178, 190; *see also* McBride Cert., Ex. 5; Ex. 6.)  These hosting services were connected to the license agreement, and the contract for those services (executed months after the license agreement), should have been evaluated with the license agreement as part of a multi-element arrangement.  According to the SEC, Synchronoss had not established VSOE of the fair market value of these hosting services.  The revenue from the licensing fee and hosting services should have been recognized over the duration of the multi-element arrangement as a result.  The Windstream License Agreement Revenue Recognition Memorandum omitted these facts and this analysis.  Consequently, the SEC alleges that the memo's assertions are false.

That the memo was inaccurate is not enough to prove a violation of the statute.  The Commission thus alleges, as it must, that Ms. Lanni was aware of the omitted facts that rendered the memo false.  Specifically, according to the SEC, Ms. Lanni knew about the separate audit services and hosting arrangements because she had learned of their prospects during the June 14 Sales Meeting and when she received the June 29 Emails.  (Compl. ¶¶ 77, 79–80, 161, 168.)  The SEC cannot prove such actual knowledge.

Concerning the SEC's allegations related to the undisclosed hosting services, discovery revealed no evidence that Ms. Lanni knew that Synchronoss was hosting the licensed software when the license agreement was executed.  (SUMF ¶¶ 139–161.)  Witness testimony provided zero support for the SEC's allegation in this respect.  No witness has a personal recollection of

"expressly advis[ing]" Ms. Lanni that Synchronoss "was providing hosting services" to Windstream "without interruption throughout 2016." (*Id.* ¶ 161; McBride Cert., Ex. 52 at No. 37.) The SEC admits that no witness "has a personal recollection of discussing the Windstream hosting agreement with Ms. Lanni." (SUMF ¶ 158; McBride Cert., Ex. 52 at No. 5.)

Sage Management's Scott Johnson testified that he had "no personal knowledge of what information Ms. Lanni was provided about the Windstream hosting agreement," and that he did not recall ever speaking with Ms. Lanni about the Windstream hosting agreement. (McBride Cert., Ex. 51 at 253:9–255:20.) In fact, Johnson "ha[d] no idea who Joanna [was]." (*Id.* at 178:5–14.) Thomas similarly testified that he recalls no conversations with Ms. Lanni about hosting in connection with Windstream. (McBride Cert., Ex. 35 at 167:2–10.) EY's Lisa Phillips testified that she does not recall whether Ms. Lanni "knew that there was a hosting element to the arrangement with Windstream" or whether she was "actually aware of a concomitant hosting arrangement at the time of [EY's] audit." (McBride Cert., Ex. 19 at 167:20–168:3, 364:12–17.) And EY's Shawn Rogers similarly testified that he had no personal knowledge of "whether Joanna Lanni was aware of the existence of that hosting agreement." (McBride Cert., Ex. 13 at 406:22–407:5.)

Tellingly, the SEC's own expert, Scott Taub, conducted no analysis in support of the SEC's allegations related to the undisclosed hosting services. Taub confirmed that he was not "advancing an opinion that Ms. Lanni's conduct was unreasonable here on the basis of a failure to identify a hosting arrangement."[4] (McBride Cert., Ex. 24 at 322:4–11; *see also id.* at 321:12–14 (representing that "[he had] not reached a conclusion with respect to the information in Ms.

---

[4]   Taub's testimony on this point effectively amounted to a recanting of his report's conclusion in that respect. (*See* McBride Cert., Ex. 61 ¶ 175 (identifying, as information in Ms. Lanni's possession sufficient to make her conduct unreasonable, "[a] Company email from mid-June 2016 [that] indicates Lanni was made aware that both hosting and the audit services agreement were being negotiated in connection with the Windstream license agreement").)

Lanni's possession and her conclusions regarding hosting").)    Rather, Taub formed no "conclusion with relation to hosting in the Windstream arrangement."  (*Id.* at 407:22–24.)

Concerning the Audit Services Settlement Agreement, there is likewise no testimonial or documentary evidence that Ms. Lanni knew about the existence of the other elements of the alleged multi-element arrangement that were not actually included in the Windstream License Agreement.  Twelve witnesses (including three proposed experts) were deposed in this matter.  Not one possessed first-hand knowledge of Ms. Lanni's awareness of those extrinsic elements the Commission alleges should have been part of the Windstream License Agreement.

The SEC relies on just two supposed facts in support of its allegations of Ms. Lanni's knowledge: first, the June 14 Sales Meeting, at which Ms. Lanni is alleged to have learned about various components of a multi-element arrangement with Windstream; and second, that she received the June 29 Emails prior to either contract's execution.[5]  Neither supports a finding that Ms. Lanni knew the Windstream License Agreement Revenue Recognition Memorandum omitted or misrepresented information critical to the accounting treatment for the Windstream License Agreement.

With respect to the first alleged fact, there is no evidence that Ms. Lanni attended the June 14 Sales Meeting, let alone that she learned about the Windstream License Agreement and other agreements being simultaneously negotiated at that meeting, or that any supposed hosting services were being contemplated.  (SUMF ¶¶ 95–96, 98, 100, 102–104.)  In fact, the record establishes the opposite; that *Ms. Lanni was not present at the meeting.*[6]  (*Id.* ¶¶ 92–122.)

---

[5]     The June 29 Emails refer to Exhibits 47, 48, and 49 to the McBride Cert.

[6]     The June 14 Sales Meeting was a conference bridge meeting scheduled for 5:30pm on June 14, 2016.  Its participants were Charlie Thomas, Marc Bandini, John Murdock, Deric Vinyard, and Noah Ament.  (SUMF ¶ 95.)  The Commission concedes Ms. Lanni was not invited to the meeting.  (McBride Cert. Ex. 53 at No. 58; SUMF ¶¶ 96, 98; *see also* McBride Cert. Ex. 25 at Nos. 55, 57, 59–60.)  In fact, Ms. Lanni received an invitation for a conference call for an entirely unrelated matter with two other Synchronoss accounting

The sole link between the June 14 Sales Meeting and Ms. Lanni is that the next day, Charlie Thomas emailed Synchronoss' COO, Robert "Bob" Garcia, to report on the status of contract discussions with Windstream, telling Garcia that Thomas supposedly "[m]et with Murdoch [sic], Noah and Joanna [Lanni] last night and [was] working on finalizing structure," which included a "[b]alance of License, Maintenance, Hosting, Settlement, and perhaps Data Center," and that "[s]o far, they say all $13M is recognizable in Q2." (McBride Cert., Ex. 42.)[7]

But Thomas—the only person from whom the SEC sought any testimony on this topic— had no recollection of this or any such meeting, even upon review of his June 15 email. (*See* McBride Cert., Ex. 35 at 94:15–21; 96:8–10; 268:20–269:9.) And after having had an opportunity to review some of the evidence relating to the June 14 Sales Meeting, Thomas conceded that, "from the schedules and calendars" evidencing the meeting's participants, it seemed fair to conclude that Ms. Lanni was not present at that meeting, and that "it's possible" his assertions in the June 15 email to  Garcia were in fact inaccurate.[8]  (*Id.* at 284:12–285:1.) Indeed, neither Noah Ament nor Marc Bandini, two of the other participants in the June 14 Sales Meeting, attested to any recollection of this meeting. (McBride Cert., Ex. 43 ¶¶ 9–10; Ex. 46 ¶¶

---

employees scheduled for the same time as the June 14 Sales Meeting. (*Compare* McBride Cert., Ex. 40, *with* McBride Cert., Ex. 41; SUMF ¶ 101; *see also* McBride Cert., Ex. 35 at 276:20–279:9.)

[7]  This email plainly constitutes inadmissible hearsay and is not competent as evidence for purposes of this motion. *See Alvarado*, 631 F. Supp. 3d at 107–08 (explaining on summary judgment, only "admissible evidence" may be considered); *see also NEM Re Receivables*, 173 F. Supp. 3d at 5 (recognizing same). Moreover, as discovery revealed, Thomas's assertion in the email is objectionable because it "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). As a result, the exhibit itself should not be considered in connection with this motion, because the Commission will not be able to carry its burden "to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment.

[8]  Further reinforcing the overwhelming evidence of Ms. Lanni's absence from the June 14 Sales Meeting is a subsequent email Thomas sent to Vinyard, Bandini, and Sage Management's President, Scott M. Johnson, in which Thomas recounted information concerning revenue recognition as coming from John Murdock, not Ms. Lanni, during the June 14 Sales Meeting. (McBride Cert., Ex. 64.) During his deposition, Thomas acknowledged that, "if somebody in accounting had advised [him] on Tuesday [June 14] that a particular contract structure was insufficient for revenue recognition purposes, [it was] fair to conclude [he] would have identified that person instead of John Murdock as the source of the advice." (McBride Cert. Ex. 35 at 284:4–11.)

7–8.)  Nor did either of them ever recall discussing Windstream with Ms. Lanni.  (McBride Cert., Ex. 43 ¶¶ 9–10; Ex. 46 ¶ 8.)  Nevertheless, according to Ament's contemporaneous notes from the meeting, he "d[oes] not believe anyone from Synchronoss' accounting department was present at the meeting . . . because, in addition to the absence of any accountant's name amongst the participants I noted, my notes reflect the existence of open questions about revenue recognition, strongly suggesting that no one from the accounting department was present to answer those questions," (McBride Cert., Ex. 43 ¶ 14)[9].  In other words, there is no competent evidence that Ms. Lanni attended the June 14 Sales Meeting.

Concerning the June 29 Emails, there is virtually no evidence in the emails themselves, their immediate and surrounding circumstances, or the testimony of percipient witnesses, of the context of these emails.  Ms. Lanni was not asked to do anything in any of the messages.  She was not asked to opine on or approve of a particular contractual clause.  The meaning and import of these emails is purely a matter of speculation.

Perhaps most significantly, the concept of *revenue recognition* is nowhere identified.[10]  In a different setting, where Ms. Lanni was asked to address a sales question related to revenue recognition (which happened frequently at Synchronoss), the emails would perhaps be memorable.  Without that context, however, Ms. Lanni would have had no cause to focus her attention on the potential revenue-recognition implications that could be inferred from redlined

---

[9]   Ament identifies the handwritten notes in Exhibit 45 to the McBride Cert. as his own, and while these notes do not refresh his recollection of the meeting or its substance, he attests that he "documented the events of the meeting as it was occurring and thus fresh in [his] mind," and that the notes are accurate "insofar as [he] always endeavored to record meeting details accurately."  (McBride Cert. Ex. 44 ¶ 7.)  Consequently, Exhibit 45 is excepted from the rule against hearsay as a recorded recollection.  *See* Fed. R. Evid. 803(5).

[10]  Discovery in this case revealed unequivocally that, when Synchronoss sales personnel sought revenue-recognition direction from the accounting department, they did so directly, not ambiguously.  (McBride Cert., Ex. 65 (asking CFO whether the "final ruling" concerning "Licenses with hosting" was that "any License with hosting must be spread for rev rec," and whether, "if we have to spread the revenue, [there is] a reason they are marking down a current deal (GTT) and turning it into a License"); Ex. 66 (asking Revenue Recognition and Billing Manager to "review Deal 3608 and 3699 for rev rec so we can move them to stage 6"); *see also* Ex. 43 ¶ 5.)

edits to discrete terms in draft contracts.  This is especially so given that Ms. Lanni and the accounting department always performed revenue-recognition analyses at one time, following the end of each quarter, and she would not actually be immersed in a revenue-recognition analysis of the final executed Windstream License Agreement until on around July 20, 2016, more than three weeks after she received the June 29 Emails.  (*See, e.g.*, McBride Cert., Ex. 61 (advising that Ms. Lanni had reviewed the Windstream License Agreement Revenue Recognition Memorandum).)    Indeed, the accounting department did not review the Audit Services Settlement Agreement for revenue-recognition purposes until October 2016.  (*See*, *e.g.*, McBride Cert., Ex. 63 (requesting that the Revenue Recognition and Billing Manager "[p]lease upload into the Smartsheet amendment #10 for the Windstream Revenue Recognition Memo").)

Additionally, and more specifically directed to the SEC's particular allegations, the actual text of the June 29 Emails yields only the remotest of clues about the prospective existence of another contract that could potentially end up as part of a multi-element arrangement.[11]   The emails do not request any of the accountants to look over the attachments, and they do not seek Ms. Lanni's or anyone else's opinion, thoughts, or assent to the documents' terms.  (SUMF ¶ 135.)  As to each of the emails, moreover, the record is absent of any further evidence suggesting a reason or context for the particular email.

In addition to the vagueness of the emails themselves, there is no evidence elsewhere in the record suggesting that knowledge of the granular details buried in those emails should be imputed to Ms. Lanni.  For example, nothing suggests Ms. Lanni even read the June 29 Emails,

---

[11]   There are zero clues relating to the "arbitrarily switched" contract prices on which the Commission in part bases its Related Transactions Theory.  (*See* Compl. ¶¶ 193–194; Exs. 47, 48, 49.)  Nothing in the plain text of the June 29 Emails demonstrates how or why the contractual values of the contracts are "false" under federal securities laws.  Nor do they suggest Ms. Lanni was aware of any actual or potential "switch" in prices. (Compl, ¶¶ 171, 193–194; SUMF ¶¶ 124, 128–129, 131, 135, 138–154.)

let alone opened each lengthy attachment and studied its discarded and extant terms on every page.   And nothing about the June 29 Emails, or the redlined iterations of their attached Windstream License Agreement and Audit Services Settlement Agreement drafts, "explicitly linked [those drafts] to each other," as the SEC speculates.  (*Id.* ¶ 138; *see also* Exs. 47, 48, 49.) The SEC cannot point to a single sentence in the June 29 Emails that divulges information on Synchronoss' contract negotiations, simultaneous or otherwise, with Windstream.  (*See, e.g.*, Exs. 47, 48, 49; SUMF ¶¶ 125–126, 128–135, 139.)  All that the June 29 Emails prove is that Ms. Lanni received draft versions of Amendments 9 and 10 in her Outlook inbox.  (*See* Exs. 47, 48, 49; SUMF ¶ 134.)

Also, the inferences the Commission asserts should be drawn from the June 29 Emails are either unsupported or contradicted by the witnesses.   Ms. Lanni testified that she had no understanding that the Windstream transactions were being considered together.  (*See* McBride Cert., Ex. 2 at 88:22–7).  Her testimony stands unrebutted.  While Ms. Lanni likely reviewed the executed Windstream License Agreement and Audit Services Settlement Agreement before signing off on revenue recognition memoranda—in July 2016 and October 2016, respectively— there is no evidence supporting the notion that she had an obligation to screen every draft document for any reason, let alone for revenue recognition implications, which was a very small part of what she did as Corporate Controller.  The SEC's speculation that Ms. Lanni must have opened, read, and understood details not even explicitly mentioned in the June 29 Emails cannot defeat Ms. Lanni's unrebutted testimony and her motion for summary judgment.  *See Alvarado*, 631 F. Supp. 3d at 108 (requiring more than a "'metaphysical' possibility" to survive summary judgment).

While unrebutted, Ms. Lanni's testimony is also corroborated by multiple third-party witnesses.  Charlie Thomas, who was intimately involved in both Windstream transactions, testified that although he recalled Murdock's and Ament's roles in the Windstream transactions, he could not even remember who Ms. Lanni was, let alone "recall Joanna's role in Windstream." (McBride Cert., Ex. 35 at 94:8–14.)  Thomas "did not speak to Joanna about" the amounts "being allocated between Amendments 9 and 10." (*Id.* at 141:2–14.)  Indeed, Ms. Lanni's involvement was so negligible—so borderline nonexistent—that "[i]f she were sitting in [a] room [with Thomas] today, [he] could not identify her." (*Id.* at 26:25–27:7.)

Marc Bandini likewise declared that he does not "have any recollection of speaking to Joanna Lanni about the Windstream transaction." (McBride Cert., Ex. 46 ¶ 8.)  Ronald Prague similarly had no recollection of speaking with Ms. Lanni about the sale of a perpetual license to Windstream. (McBride Cert., Ex. 50 at 256:12–257:7.)  Neither could he remember discussing revenue recognition for the Windstream transaction, or "discussing that Windstream couldn't sign Amendment 10 on the same day as the perpetual license sale" with her. (*Id.*)

Likewise, Scott Johnson, Sage Management's President, "did not provide Ms. Lanni any information concerning the Windstream license agreement." (McBride Cert., Ex. 51 at 253:9–255:20.)  Because he did not speak to her about them, Johnson had no awareness of what information, if any, Ms. Lanni was provided concerning the Windstream license agreement, the Windstream Hosting Agreement, or the Audit Services Agreement. (*Id.*)  Johnson did not "have any personal knowledge of the facts surrounding Ms. Lanni's revenue recognition decisions." (*Id.*)

EY's auditors similarly lacked knowledge as to whether Ms. Lanni knew whether the Windstream License and Audit Services Settlement Agreements were negotiated together or that

they were executed a day apart.  (*See, e.g.*, McBride Cert., Ex. 52 at 431:17–23, 432:6–9; Ex. 19 at 363:19–365:1.)

In sum, there is simply no evidence that Ms. Lanni knowingly falsified Synchronoss' books and records.  She is thus entitled to summary judgment on this claim.

## II.    SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF MS. LANNI ON THE SEC'S 13B2-1 BOOKS AND RECORDS VIOLATION (CLAIM V).

As with its Section 13(b)(5) claim, the SEC cannot prove the required mental state for a violation of SEC Rule 13b2-1.  Ms. Lanni is thus entitled to summary judgment on Claim V.

Rule 13b2-1 provides that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A) of the Securities Exchange Act."  17 C.F.R. § 240.13b2-1.  Rule 13b2-1 "liability is predicated on standards of reasonableness."  *SEC v. Espuelas*, 905 F. Supp. 2d 507, 525–26 (S.D.N.Y. 2012) (citation omitted) ("*Espuelas II*").  Reckless conduct in particular is unreasonable.  *Id.* at 526.  And where the Commission's theory of liability rests, as it does here, not on actual knowledge of the underlying facts rendering the books and records false, but instead on an assertion that the defendant *should have known* those facts, the SEC must demonstrate that the defendant was reckless in relation to those facts.  *See SEC v. Espuelas*, 579 F. Supp. 2d 461, 486–87 (S.D.N.Y. 2008) ("*Espuelas I*").

No genuine issue of material fact remains with regard to whether Ms. Lanni directly or indirectly falsified or caused to be falsified the Windstream License Agreement Revenue Recognition Memorandum, because no evidence in the record supports the Commission's claims.

A.      **There is No Evidence Ms. Lanni Acted Unreasonably in How She Accounted for the Windstream Deals.**

As addressed at length, there is no evidence of Ms. Lanni's knowledge of the facts that allegedly rendered the Windstream Revenue Recognition Memorandum misleading.  Although "Rule 13b2-1 does not impose a scienter requirement," *id.* at 526, New York district courts have been reluctant to find that an individual lacking knowledge acted unreasonably.  Take, for example, the circumstances of Betsy Scolnik in *Espuelas II*.  In that case, Scolnik, StarMedia Network Inc.'s former executive vice president, was accused of aiding and abetting the company's improper recognition of revenue for certain contingent transactions it undertook in 2000 and 2001.  *Id.* at 512–13.  The court found that Scolnik's receipt of revenue information and awareness of StarMedia's revenue recognition policies "d[id] nothing to establish her knowledge of the structure of the particular transactions" at issue.  *Id.* at 521.  Moreover, because she received no information or document indicating the transactions contained contingencies until after the transactions' completion, there was no plausible argument that Scolnik acted unreasonably.  *Id.* at 526; *see also id.* at 518.

John B. Lowy, a securities lawyer and counsel to Latin American Resources, Inc. ("LARI"), was similarly accused of unreasonably disseminating inaccurate statements in *SEC v. Lowy*.  396 F. Supp. 2d 225, 227–28 (E.D.N.Y. 2003).  The inaccurate statements concerned LARI's ownership of properties in Brazil and the valuation of those properties.  *Id.* at 228.  Lowy allegedly ignored several "red flags," such as minor inconsistencies in the properties' deeds, and valued the assets using the costs of the predecessor owner, notwithstanding the seller's failure to provide documentation of his costs.  *Id.* at 229–30, 249.  The court, employing the same analysis in construing Rule 13b2-1's reasonableness standards and Rule 10b-5's recklessness standard, rejected the SEC's arguments.  *Id.* at 242–43, 250–51.  The court determined that the evidence

considered "with the benefit of hindsight, might have alerted a businessman to irregularities in th[at] business transaction." *Id.* at 249.  However, Lowy was not unreasonable or "reckless in failing to recognize any of these 'red flags' at the time they were presented to him." *Id.* at 249–50; *see also In re Alstom SA*, 406 F. Supp. 2d 433, 472 (S.D.N.Y. 2005) (finding no inference of recklessness under Section 10(b) where parent company had no "notice of the degree of cost overruns at [its subsidiary]" indicating fraud).

Ms. Lanni's position mirrors that of the defendants in the above cases, thwarting the SEC's Rule 13b2-1 claim.  There is no evidence that Ms. Lanni met with the sales team or received emails with "critical information" relating to the Windstream transactions.  Without proof that Ms. Lanni had such knowledge, there can be no plausible argument Ms. Lanni acted unreasonably in signing off on the Windstream License Agreement Revenue Recognition Memorandum.  *See Espuelas II*, 905 F. Supp. 2d at 526; *Alstom*, 406 F. Supp. 2d at 472.  As a result, this claim must fail.

The SEC's argument that Ms. Lanni *should have discovered* Synchronoss' accounting improprieties, as already mentioned, requires the Commission to prove that Ms. Lanni ignored or "was reckless in failing to recognize" obvious red flags.  *Espuelas I*, 579 F. Supp. 2d at 486–87; *Lowy*, 396 F. Supp. 2d at 249.  Such proof, however, is absent from the evidentiary record in this case.  Indeed, the only "red flags" the SEC has ever pointed to in support of its claim that Ms. Lanni should have known of the facts that made Synchronoss' SEC filings false are the June 14 Sales Meeting and the June 29 Emails.  (SUMF ¶¶ 95–96, 123–124, 130, 132.)

As discussed above, there is no evidence that Ms. Lanni attended the June 14 Sales Meeting.  (*See* Section I.C.1, *supra*; *Id.* ¶¶ 92–122.)  Further, the evidence is overwhelming that

24

she was not present at the meeting.  (*See id.*)  Any notion that she missed a red flag introduced at that meeting is decidedly disproved.

Concerning the June 29 Emails, there is no evidence Ms. Lanni opened their attachments and digested their contents, or that she even looked at them.  (SUMF ¶ 123–138.)  And even if Ms. Lanni had opened the attachments to those emails and studied their contents carefully (which the Commission does not and cannot prove she did), there are no direct clues in those contracts of a lurking GAAP violation.  (*Id.* ¶¶ 125–128, 130–131, 133–134, 138.)

To the contrary, the SEC's theory rests entirely on remote inferences Ms. Lanni was supposed to have made about the potential, future existence of allegedly related contracts.  That theory also requires Ms. Lanni to have read these vague June 29 Emails through the analytical lens of revenue recognition.  But revenue recognition was not the subject matter of those emails. Moreover, because the accounting department's revenue review occurs during the month following an end of quarter, the SEC necessarily posits that Ms. Lanni should have recalled these unlikely inferences to be drawn from the June 29 Emails weeks later when she was actually attending to the revenue recognition memorandum.  The Commission's theory of liability, then, requires not just an inferential leap, but outright speculation that is plainly insufficient to defeat summary judgment.  *See Fujitsu Ltd.*, 247 F.3d at 428.

Without evidence that the June 29 Emails contained obvious red flags, the SEC's Rule 13b2-1 claim is unsupported.  An assertion that Ms. Lanni was unreasonable by failing to identify and investigate the potential existence of facts divulged at meetings she did not attend and buried within emails she was neither directed to review nor asked to opine on cannot create a genuine issue of material fact for a jury.

**B.**    <u>**All Admissible Evidence Supports a Finding that Ms. Lanni Acted Reasonably.**</u>

The dearth of adverse facts in the record concerning Ms. Lanni's conduct at issue renders it more certain that the SEC cannot carry its burden to prove her actions and omissions unreasonable within the meaning of Rule 13b2-1. In fact, the admissible evidence in this respect overwhelmingly favors Ms. Lanni's reasonableness.

First, that Ms. Lanni's approval of the accounting memo was reasonable within the meaning of Rule 13b2-1 is corroborated by the fact that EY itself took no issue with Synchronoss' accounting treatment of Amendment 10. (SUMF ¶ 84; McBride Cert., Ex. 15 ¶ 67.) Indeed, of these two supposedly "related" transactions—the Windstream License Agreement and the Audit Services Settlement Agreement—only one was restated (SUMF ¶ 65; McBride Cert., Ex. 15 ¶ 67.) The SEC's expert acknowledged that "nobody at Synchronoss or EY or any other accounting firm ever found Amendment 10's accounting treatment improper either at that time or during the restatement process," as both Synchronoss and EY "concluded that all of the revenue that was allocated to the [Windstream] license would need to be recognized over the three-year hosting term and did not appear to change the accounting for the 600,000 that had been allocated to Amendment 10." (McBride Cert., Ex. 24 at 329:10–19.)

EY was paid tens of millions of dollars in connection with the restatement, (SUMF ¶ 51), and the SEC's expert testified that such a figure does not surprise him because "investigations and restatements require a lot of manpower and often take a long time; [and] involve more work than the original audit," (McBride Cert., Ex. 24 at 294:4–15). Yet, even after deploying all of this manpower, EY found no basis to restate the Audit Services Settlement Agreement. (SUMF ¶ 84.) And this notwithstanding that, if EY had determined that the contract's revenue was

improperly recognized and that the error was material, "restatement would be required." (McBride Cert., Ex. 24 at 332:19–25; *accord* Ex. 12 at 137:4–138:5.)

Indeed, only the Windstream License Agreement was restated (for a reason unrelated to its temporal proximity to the Audit Services Settlement Agreement). And to this day, after years of exacting and exhaustive analysis and investigation of Synchronoss' accounting for perpetual license agreements, no accountant has ever identified an error in the accounting for the Audit Services Settlement Agreement other than the SEC's expert.

Second, EY's testing of Synchronoss' internal controls revealed that there was no control exception with respect to EY's review and testing of the Windstream license transaction. (*See* McBride Cert., Ex. 20; Ex. 12 at 53–54, 56–58; 197:197:2–98:1.) EY specifically tested the effectiveness of Synchronoss' revenue-recognition memorandum protocol and explicitly found the control effective in connection with the Windstream transactions. (*See, e.g.*, McBride Cert., Ex. 20.)

And finally, the SEC admitted in discovery that "no Deposition Testimony or Discovery Document demonstrates that [Synchronoss, its Audit Committee, BDO, or FTI] ever concluded that Ms. Lanni engaged in fraud or intentional wrongdoing." (McBride Cert., Ex. 25 at Nos. 45, 47–49.) Additionally, Ms. Lanni's accounting expert, Richard Ostiller, CPA, opined that Ms. Lanni met the standards of the American Institute of Certified Public Accountants ("AICPA")— standards Ms. Lanni had to comply with—and thus "acted appropriately in reaching the conclusion she did about the accounting [for] Amendment 9 at the end of the second quarter of 2016." (McBride Cert., Ex. 12 at 34:5–15.)

### C.   The SEC's Expert Opinion as to Ms. Lanni's Reasonableness is Inadmissible.

The only witness the SEC has proffered to testify about the reasonableness of Ms. Lanni's actions and/or accounting judgment is its own expert, Taub. But his testimony—

27

amounting to nothing more than an opinion that Ms. Lanni's conduct and accounting judgments were "unreasonable"—is inadmissible under Federal Rule of Evidence 702 and should not therefore be considered for purposes of this motion.  *See NEM Re Receivables*, 173 F. Supp. 3d at 5.

An expert witness's testimony is admissible only if it assists the trier of fact in (1) understanding the evidence or (2) determining a fact in issue.  Fed. R. Evid. 702(a).  While experts can give limited testimony on mixed questions of law and fact, *see* Fed. R. Evid. 704(a), their testimony must at all times aim to help the jury "determine a *fact in issue*"; they cannot offer legal conclusions drawn from the facts, *In re Initial Pub. Offering Sec. Litig.*, 174 F. Supp. 2d 61, 64–65 (S.D.N.Y. 2001).  Experts therefore violate Rule 702 when they "usurp[] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it."  *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468 (S.D.N.Y. 2005) (quoting *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)).

In practice, an expert in a securities case may tell a factfinder whether a particular method used by a company was "normal" and detail the customs and practices of an industry or trade.  *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 512 (2d Cir. 1977); *In re Blech Sec. Litig.*, No. 94-7696, 2003 WL 1610775, at *21 (S.D.N.Y. Mar. 26, 2003).  But experts cannot opine on whether a party acted reasonably.  *In re Longtop Fin. Techs. Ltd.*, 32 F. Supp. 3d 453, 463 (S.D.N.Y. 2014); *accord SEC v Goldstone*, No. 12-0257, 2016 WL 3135651, at *43 (D.N.M. May 10, 2016) (disallowing expert to opine on reasonableness of defendants' accounting judgment).  That inquiry "is a quintessential common law jury question."  *Kidder, Peabody &*

*Co. v. IAG Int'l Acceptance Grp.*, 14 F. Supp. 2d 391, 404 (S.D.N.Y. 1998); *accord Longtop Fin. Techs.*, 32 F. Supp. 3d at 463 (describing question as an "ultimate legal conclusion for the jury").

Courts regularly exclude such improper opinions.  *See, e.g.*, *Marx & Co.*, 550 F.2d at 509, 511–12; *Goldstone*, 2016 WL 3135651, at *43.  For example, in *Longtop Financial Technologies*, the trial court allowed securities experts to opine on industry standards, but forbade testimony on whether the defendant CFO's "behavior was 'reasonable' or 'reckless.'" 32 F. Supp. 3d at 463.  The experts were additionally precluded from opining on whether it was "reasonable for [the CFO] to 'rely' on [certain] audits."  *Id.*  *Longtop Financial Technologies* thus restates the broadly recognized rule that the reasonableness of a litigant's conduct is an "ultimate legal conclusion for the jury" to reach, and not the proper subject of an expert's testimony.  *Id.*; *Kidder, Peabody & Co.*, 14 F. Supp. 2d at 404.  Accordingly, none of the SEC's expert testimony on whether Ms. Lanni acted reasonably is admissible, and it cannot be considered for purposes of this motion.[12]  *Alvarado*, 631 F. Supp. 3d at 108.

Opining on Ms. Lanni's objective reasonableness is all that Taub has done here.  Taub's testimony revealed that, in his view, mere "possession" of information—*i.e.*, *the mere receipt of an email*—suffices to impute knowledge of all its contents, the contents of its attachments, and all inferences conceivably drawn therefrom.  (McBride Cert., Ex. 24 at 56:15–57:6, 60:3–25, 65:7–14, 69:2–14; 71:15–19,72:4–74:2, 74:6–23; 76:22–77:6, 80:3–7, 81:22–82:6, 86:3–87:11, 107:2–9, 127:2–11, 163:4–6, 291:8–11, 377:12–378:3.)  Taub opined that, based on nothing

---

[12]  As an important distinction, Ostiller did not opine on the reasonableness of Ms. Lanni's conduct.  Rather, Ostiller based his opinion on whether Ms. Lanni acted appropriately, within the meaning of an articulable, industry standard set forth in the AICPA Code of Conduct (*see* McBride Cert. Ex. 15 at ¶¶ 29–31), and based "on my experience and my knowledge of CPAs and their level of experience and what it means to be an auditor for a firm at one of the big accounting firms for 11 years."  (McBride Cert. Ex. 12 at 139:17–22; *see also id.* at 140:8–20 (stating that, "I have an understanding of what professional competence means and, therefore, I concluded she met that standard.")).  Expert testimony on whether a particular action is normal because of the customs and practices of an industry or trade is permissible.  *Highland Cap. Mgmt.*, 379 F. Supp. 2d 461 at 471–72.

more than Ms. Lanni's receipt of the June 29 Emails, Ms. Lanni "was in possession of information" that indicated the Windstream License Agreement and Audit Services Settlement Agreement were linked.  (McBride Cert., Ex. 61 ¶¶ 182, 233.)  Thus, Taub concluded, Ms. Lanni failed to properly consider all information "in her possession," rendering her conduct "unreasonable."  (*Id*. ¶ 233.)  But as Taub admitted, he did *not* analyze where exactly Ms. Lanni supposedly went wrong, or at what point Ms. Lanni's accounting judgment supposedly became unreasonable.  (McBride Cert., Ex. 24 at 82:16–83:5, 84:5–14, 85:13–15, 123:7–10, 171:7–10, 171:19–25, 219:1–9.)  Thus, Taub's testimony has two deficiencies: first, he seeks to opine on matters outside the scope of permissible expert testimony; and second, Taub's testimony fails to assist the factfinder in determining a fact at issue.  These deficiencies, whether taken together or separately, render Taub's testimony inadmissible at trial and outside the scope of this Court's consideration on this motion.  *See NEM Re Receivables*, 173 F. Supp. 3d at 5.

Perhaps perceiving these fatal deficiencies in his opinion about Ms. Lanni's and Karen Rosenberger's reasonableness, during his deposition, Taub denied that his intended definition of the term "reasonable" was within the meaning of Rule 13b2-1.  (*See* McBride Cert., Ex. 24 341:20–342:3.)  While this *post hoc* denial is belied by the wording of his report—or else is a devious tactic enabling him to testify to the ultimate legal conclusion for the jury and the SEC to circumvent the Rules of Evidence—if true, Taub's opinion is nothing more than an amorphous judgment unmoored to an identifiable and articulable standard.  As such, it is not helpful to the jury in determining whether Ms. Lanni's conduct was "reasonable" under Rule 13b2-1 and is ultimately inadmissible.  *See* Fed. R. Evid. 704 advisory committee's note to 1972 proposed rule ("opinions phrased in terms of inadequately explored legal criteria" are excludable); *accord*

*Marx & Co.*, 550 F.2d at 509, 511 (disallowing expert to opine on whether a defendant's conduct meets a standard necessary to establish liability).

As there is no admissible evidence that Ms. Lanni acted unreasonably in approving the Windstream Accounting Memorandum, she is entitled to summary judgment on this claim.

## III.   SUMMARY JUDGMENT SHOULD BE GRANTED IN MS. LANNI'S FAVOR ON THE SEC'S AIDING AND ABETTING CLAIMS (CLAIM VIII).

To establish its Section 20(e) claim of aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13, the SEC must prove (1) "the existence of a securities law violation" committed by the primary party, as opposed to Ms. Lanni; (2) Ms. Lanni's "knowledge" of or recklessness in relation to the violation; and (3) "substantial assistance by [Ms. Lanni] in the achievement of the primary violation." *Gonnella v. SEC*, 954 F.3d 536, 550 (2d Cir. 2020); 15 U.S.C. § 78t(e) (2012) (expanding scienter standard for aiding and abetting liability to include recklessness).

### A.    The SEC Cannot Establish that Ms. Lanni Acted With Knowledge or Recklessly.

Conceding for purposes of this motion only that Synchronoss committed a primary violation of the securities law,[13] the mere fact of a tangential securities law violation is not enough to satisfy the second element of the SEC's aiding and abetting cause of action. *See SEC v. Wey*, 246 F. Supp. 3d 894, 927–28 (S.D.N.Y. 2017).   Scienter remains to be established. *Gonnella*, 954 F.3d at 550.

In the aiding and abetting context, "knowledge" demands proof that Ms. Lanni had a "general awareness of [her] overall role" in Synchronoss' violative conduct. *SEC v. Ripple Labs,*

---

[13]    Synchronoss acknowledged a specific primary securities law violation, the full extent of which was that the company erred in recognizing revenue upfront for the Windstream License Agreement, because Synchronoss had "converted prior multi-term software as-a-service ('SaaS') agreements into perpetual license agreements." (SUMF ¶ 61.)

*Inc.*, No. 20-10832, 2022 WL 762966, at *7 (S.D.N.Y. Mar. 11, 2022).  Recklessness, on the other hand, is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Cedric Kushner Promotions*, 417 F. Supp. 2d at 335 (quoting *In re Carter-Wallace, Inc.*, 220 F.3d 36, 39 (2d Cir. 2000)).

Here, the record lacks any evidence that Ms. Lanni acted recklessly regarding, let alone knew about, Synchronoss' hosting of software licensed under the Windstream License Agreement—the factual predicate of the sole primary violation to which Synchronoss has admitted.  The SEC procured no evidence on how Ms. Lanni's supposed disregard of the factual nuggets buried in the June 29 Emails, or her failure to recall the conceptual generalities allegedly discussed during a June 14 Sales Meeting—a meeting the evidence demonstrates she did not attend—amounted to "an extreme departure from the standards of ordinary care."  *Id.*  Indeed, the June 29 Emails and the draft contracts they attach do not refer or even allude to the provision of hosting services, further disproving the SEC's theory.  (SUMF ¶¶ 123–138.)  And the SEC's own expert did not reach any conclusion "with respect to the information in Ms. Lanni's possession and her conclusions regarding hosting."  (Taub Dep. Tr. at 321:9–14.)

The SEC also cannot establish that Ms. Lanni knew of or acted recklessly in relation to Synchronoss' accounting treatment of the Windstream License and Audit Services Settlement Agreements.  As discussed above, Synchronoss' auditors *supported* the accounting for the license agreement.  (SUMF ¶ 84.)  And EY did not rubber-stamp Synchronoss' accounting determination, but did so after testing Synchronoss' internal controls by "reperforming" the exact procedures they expected Ms. Lanni, as corporate controller, to perform.  (*Id.* ¶ 145.)  Ms. Lanni

thus had no basis to believe there was a primary violation and could not have acted recklessly, because as far as she was concerned, no risk existed. *See id.*

In short, the SEC has not established that Ms. Lanni was involved in any meaningful way with the Synchronoss-Windstream negotiations, knew of the facts that allegedly made the Windstream License Agreement Revenue Recognition Memorandum inaccurate, or was otherwise aware of Synchronoss' primary violation. It necessarily follows that Ms. Lanni had no consciousness of any risk or danger that Synchronoss would improperly report revenue. *See Cedric Kushner Promotions*, 417 F. Supp. 2d at 335. The SEC's failure to offer any evidence proving scienter requires that Claim VIII be dismissed on summary judgment.

### B.   The SEC Produced No Evidence That Ms. Lanni Substantially Assisted Synchronoss' Primary Violation.

To satisfy the "substantial assistance" element of Section 20(e), the SEC must prove that Ms. Lanni "in some sort associate[d her]self" with Synchronoss' primary violation, "that [s]he participate[d] in it as something that [s]he wishe[d] to bring about, [and] that [s]he [sought] by h[er] action to make it succeed." *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (third, fifth, sixth, and eighth alterations in original) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)). *Apuzzo* is illustrative. In that case, the SEC raised a Section 20(e) claim against Joseph Apuzzo, alleging that Apuzzo helped United Rentals, Inc., and Michael J. Norlan, United Rentals' CFO, carry out two fraudulent "sale-leaseback" transactions. *Id.* at 207. The SEC's complaint alleged that Apuzzo had agreed to participate and retained some measure of control over the deals, in addition to negotiating the key terms of at least one of the transactions. *Id.* at 214. Apuzzo also approved agreements "he knew were designed to hide [United Rentals'] continuing risks and financial obligations relating to the sale-leaseback transactions in furtherance of the fraud." *Id.* The Second Circuit held that these actions, among others, showed

Apuzzo substantially assisted the primary violator's fraud. *Id.* In contrast, the district court in *SEC v. Rio Tinto plc* held that the defendants' *actual knowledge* of a materially false valuation in multiple papers and their decision "not to correct them at [audit committee] meetings" *did not* constitute substantial assistance. No. 17-7994, 2019 WL 1244933, at *18 (S.D.N.Y. Mar. 18, 2019). These cases, taken together, illustrate that something more than the receipt of a misleading filing is required. *See id.*

Here, the SEC characterizes Ms. Lanni's giving the Windstream License Agreement Revenue Recognition Memorandum to EY—again, without knowledge of the facts rendering the memorandum misleading—as "substantial assistance." (Compl. ¶ 200.) But, as discussed at length above, there is no evidence that Ms. Lanni wished to participate in a securities law violation or that she was even aware of the facts that allegedly caused the violation. There is also no proof that Ms. Lanni wished to bring about Synchronoss' improper revenue recognition in general. Thus, she cannot be said to have "substantially assisted" any securities violation. On this additional ground, then, Claim VIII should be dismissed.

## **CONCLUSION**

For the foregoing reasons, Ms. Lanni respectfully requests that her Motion for Summary Judgment be granted in its entirety.


Dated:  August 18, 2023
          New York, New York


                                        **LOWENSTEIN SANDLER LLP**

                                        By: *Scott B. McBride*
                                             Scott B. McBride
                                             Michelle L. Goldman
                                             Amanda K. Cipriano
                                             Cassandra A.  Essert
                                             1251 Avenue of the Americas

New York, New York 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402
smcbride@lowenstein.com
mgoldman@lowenstein.com
acipriano@lowenstein.com
cessert@lowenstein.com

*Counsel for Defendant Joanna Lanni*