**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

Plaintiff,

-against-

**KAREN ROSENBERGER and JOANNA LANNI,**

Defendants.

22 Civ. 04736 (DLC)

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Richard G. Primoff
Lindsay S. Moilanen
Theresa H. Gue
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-0148
*Attorneys for Securities
and Exchange Commission*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... v

PRELIMINARY STATEMENT .............................................................................................. 1

COUNTER STATEMENT OF MATERIAL FACTS ............................................................. 2

I. ROSENBERGER AND THE COMPANY REPORTED INFLATED REVENUE
   AND OVERSTATED RECEIVABLES RELATING TO TWO TRANSACTIONS
   WITH AT&T .................................................................................................................. 2

   A. Rosenberger Inflated Revenue in 2015 by $3 Million for the LNP Transaction .......... 4

      1. Rosenberger Knew the Sole Documentation Supporting the LNP
         Transaction Was a Backdated Letter .................................................................. 4

      2. AT&T and Synchronoss Never Agreed to a $3 Million Price for the LNP
         Transaction, Let Alone in 2015 ......................................................................... 5

      3. Rosenberger Never Disclosed the Backdated Document or That Price
         Negotiations on LNP Continued Throughout 2016 ........................................ 7

   B. Rosenberger Inflated Revenue in 2015 by $4.35 Million for the ASR Transaction ..... 8

      1. Synchronoss's CEO and COO Pressured Rosenberger and the Finance
         Department to Approve the Sale of ASR Software to AT&T ....................... 8

      2. Rosenberger Directed Synchronoss to Recognize Revenue for the ASR
         Transaction, Even After Being Told That AT&T's Emailed Statements
         Were Not Sufficient to Bind AT&T .................................................................. 9

      3. AT&T Never Agreed to Buy the ASR Software, and Rosenberger Never
         Caused Synchronoss to Bill AT&T for It ....................................................... 11

      4. Rosenberger Never Disclosed the Full ASR Emails to EY or That AT&T
         Had Told Synchronoss It Was Not Bound to Buy the ASR Software ........ 12

   C. Rosenberger Inflated the Company's Revenue in Forms 10-Q and a 10-K ............... 12

II. ROSENBERGER AND THE COMPANY FALSELY REPORTED $10 MILLION
    IN REVENUE IN ITS Q1 FORM 10-Q FOR 2016 AND 2016 FORM 10-K ................ 13

   A. Relevant GAAP Principles .................................................................................... 13

   B. Synchronoss and Openwave Began Acquisition Discussions by November 2015 .... 14

i

C. Rosenberger Was Informed That Synchronoss Negotiated the Acquisition on a "Net" Basis with the Openwave IP License.....................................14

D. Rosenberger Inflated Revenue by Improperly Recognizing Revenue from the Openwave IP License .....................................16

E. Rosenberger's Misleading Openwave Revenue Recognition Memorandum...............17

F. Rosenberger's Prior Conduct on the F-Secure Acquisition ...........................20

III. ROSENBERGER AND LANNI OVERSTATED $5.3 MILLION IN REVENUE FROM THE WINDSTREAM TRANSACTION .....................................21

A. EY Discussions with Rosenberger and Lanni Regarding "Hosting" and Accounting for Multiple Element Arrangements.....................................22

B. EY Learned During the Audit Committee Investigation That Lanni Had Advised the Sales Staff Not to Document the Presence of Hosting Services and on How to Respond to Auditor Inquiries.....................................23

C. Rogers Complained to Yablonowitz in January 2017 About Rosenberger's "Aggressive" Accounting on Licenses with Multiple Elements.....................................25

D. Rosenberger Was Informed in November 2016 That the Windstream License Deal Included Hosting.....................................25

IV. ROSENBERGER OVERSTATED [REVENUE] FROM THE SAGE RESELLER TRANSACTION.....................................26

A. After Learning Windstream Would Not Close a $4 Million Deal in Q4 2016, Synchronoss Persuaded Its Subcontractor To sign a "Reseller Agreement" So Synchronoss Could Still Record [Revenue] in Q4 2016 .....................................26

B. Rosenberger Learned the Sales Staff Kept Trying to Put Contingencies on Sage's Obligation to Pay the Company in the Reseller Agreement .....................................28

C. Lanni Told Synchronoss's New CFO in 2017 That the Sage Reseller Agreement Was Always Contingent, and That She Was Not on the "Same Page" with Rosenberger.....................................30

D. Rosenberger Reviewed and Approved the Sage Revenue Recognition Memorandum.....................................31

E. Rosenberger Misrepresented the Sage Reseller Transaction to the Auditors.............32

F. GAAP Precluded Revenue Recognition on the Sage Reseller Transaction.................34

G. Rosenberger Did Not Do Any Analysis to Determine that Collectability Was Probable ..................................................................................................................35

**STANDARD OF REVIEW** ..................................................................................................36

**ARGUMENT** ........................................................................................................................37

I. **THE COMPANY'S AND EY'S INTERNAL INVESTIGATIONS PROVIDE NO BASIS FOR GRANTING DEFENDANTS SUMMARY JUDGMENT** ......................37

    A. Defendants Have Offered Only Inadmissible Hearsay As to the Conclusions of the Company's Internal Investigations ..................................................................37

    B. The "Investigative Team's" Opinions Should Not Usurp the Jury's Role ..................38

    C. EY's Investigation Concluded the Defendants Acted Dishonestly ..............................39

II. **THE SEC IS NOT REQUIRED TO HAVE AN EXPERT TESTIFY THAT ROSENBERGER ACTED WITH THE REQUISITE SCIENTER** ..............................40

III. **SUBSTANTIAL UNDISPUTED EVIDENCE SHOWS THAT ROSENBERGER VIOLATED AND AIDED AND ABETTED VIOLATIONS OF SECTION 10(b) AND RULE 10b-5** ..................................................................................................41

    A. Ample and Often Undisputed Evidence Supports the SEC's Claims that Rosenberger Acted with Scienter with Respect to the Two AT&T Transactions ......43

        1. The LNP Transaction ..........................................................................................43

        2. The ASR Transaction ..........................................................................................48

    B. Ample Evidence Supports the SEC's Claims that Rosenberger Acted with Scienter with Respect to the Openwave IP License ......................................................52

    C. Substantial Evidence Supports the SEC's Claims that Rosenberger Aided and Abetted Synchronoss's Securities fraud ......................................................................55

IV. **SUBSTANTIAL AND OFTEN UNDISPUTED EVIDENCE DEMONSTRATES THAT ROSENBERGER AND LANNI AIDED AND ABETTED VIOLATIONS OF SECTIONS 13(a) AND 13(b)(2)(A) AND RULES 12b-20, 13a-1, 13a-11, 13a-13** ...55

    A. Substantial Evidence Shows That Defendants Aided and Abetted Reporting Violations in Synchronoss's Q2 2016 Form 10-Q and 2016 Form 10-K ....................56

        1. Lanni and Rosenberger Knew or Recklessly Disregarded that Amendments 9 and 10 Compromised a Multiple Element Arrangement, Precluding Revenue Recognition of $4.5 Million ............................................................57

          a.   Lanni ........................................................................................... 58

          b.   Rosenberger ............................................................................... 61

      2.   Rosenberger and Lanni Knew or recklessly Disregarded That Synchronoss Was Hosting the Software for Windstream .................................. 62

   B.  Substantial Evidence Shows That Rosenberger Aided and Abetted Reporting Violations in the 2016 Form 10-K as to the Sage Reseller Transaction ...................... 63

V.     **SUBSTANTIAL AND OFTEN UNDISPUTED EVIDENCE SHOWS THAT ROSENBERGER VIOLATED EXCHANGE ACT SECTION 13(a) AND RULE 13a-14** .......................................................................................................... 66

VI.    **SUBSTANTIAL AND OFTEN UNDISPUTED EVIDENCE SHOWS THAT ROSENBERGER VIOLATED RULE 13b2-2** ........................................................ 66

   A.  LNP ............................................................................................................. 67

   B.  ASR ............................................................................................................. 67

   C.  Openwave ................................................................................................... 68

   D.  Windstream ................................................................................................ 69

   E.  Sage ........................................................................................................... 70

VII.   **SUBSTANTIAL AND OFTEN UNDISPUTED EVIDENCE SHOWS THAT ROSENBERGER AND LANNI VIOLATED EXCHANGE ACT SECTION 13(b)(5)** ................................................................................................................. 70

VIII.  **SUBSTANTIAL EVIDENCE SHOWS THAT ROSENBERGER AND LANNI VIOLATED RULE 13b2-1** ......................................................................... 72

IX.   **SUBSTANTIAL EVIDENCE SHOWS THAT ROSENBERGER AIDED AND ABETTED VIOLATIONS OF SECTION 13(b)(2)(B)** ...................................... 74

X.     **ROSENBERGER IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE SEC'S SOX 304 CLAIM** ............................................................................... 74

XI.    **THE COURT SHOULD NOT DISMISS THE SEC'S REQUEST FOR AN INJUNCION AND AN OFFICER-AND-DIRECTOR BAR** ......................................... 74

**CONCLUSION** ............................................................................................................. 75

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ........................................................................ 36

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................ 36

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.* ("*Chicago Bridge*"),
    No. 17 Civ. 1580 (GBD) 2021 WL 3727095, (S.D.N.Y. Aug. 23, 2021) .......................... 40

*Jeffreys v. City of N.Y.*, 426 F.3d 549 (2d Cir. 2005) .................................................................. 36

*McLaughlin v. Langrock Sperry & Wool, LLP*, 2020 U.S. Dist. LEXIS 103404 (D. Vt. June 12, 2020) . 40

*Nagelberg v. Meli*, No. 17 Civ. 2524 (LLS), 2022 Wl 2078010 (S.D.N.Y. June 9, 2022) .......................... 42

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ............................................................................ 42

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
    652 F. Supp.2d 495 (S.D.N.Y. 2009) .................................................................................. 36

*Rubens v. Mason*, 387 F.3d 183 (2d Cir. 2004) .......................................................................... 38

*SEC v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379 (S.D.N.Y. 2014) ........................... 71

*SEC v. Gallison*, 588 F. Supp.3d 509 (S.D.N.Y. 2022) .............................................................. 42

*SEC v. Gold*, No. 05-CV-4713 (JS), 2006 WL 3462103 (E.D.N.Y. Aug. 18, 2006) .......................... 47

*SEC v. Frohling*, 851 F.3d 132 (2d Cir. 2016) ............................................................................ 42

*SEC v. Jacoby,* No. 17 Civ. 3230, 2021 WL 351176 (D. Md. Feb. 2, 2021) .................................... 43

*SEC v. Jasper,* 883 F. Supp. 2d 915 (N.D. Cal. 2010) ................................................................ 53

*SEC v Jasper*, 678 F.3d 1116 (9th Cir. 2012) ........................................................................ 53, 74

*SEC v. Jensen*, 835 F.3d 1100 (9th Cir. 2016) ............................................................................ 74

*SEC v. Koenig*, 469 F.2d 198 (2d Cir. 1972) .............................................................................. 55

*SEC v. Obus*, 693 F.3 276 (2d Cir. 2012) .................................................................................. 38

*SEC v. Price Waterhouse*, 797 F. Supp. 1217 (S.D.N.Y. 1992) .................................................... 54

*SEC v. Rio Tinto plc*, No. 17 Civ. 7994 (AT), 2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) ........................... 61, 71

*SEC v. Rosenberger*, No. 22 Civ. 4736 (DLC), 2023 WL 1928093 (S.D.N.Y. Feb. 10, 2023) ................ 42

*SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1 (D.D.C. 2017) .................................................... 56

*SEC v. Sayid*, No. 17 Civ. 2630 (JFK), 2019 WL 6307367 (S.D.N.Y. Nov. 25, 2019) ......................... 42

*SEC v. Sequential Brands Grp., Inc.,* No. 20-Civ.-10471 (JPO), 2021 WL 4482215 (S.D.N.Y. Sept. 30, 2021) .... 40

*SEC v. Sourlis*, 851 F.3d 139 (2d Cir. 2016) ......................................................... 42

*SEC v. Stanard*, No. 06 Civ. 7736, 2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ...................... 71

*SEC v. Subaye, Inc.*, No. 13 Civ. 3114 (PKC), 2014 WL 448414 (S.D.N.Y. Feb. 4, 2014) .................... 42

*SEC v. Suman*, 684 F. Supp.2d 378 (S.D.N.Y. 2010) ................................................... 36

*SEC v. Thompson*, 238 F.Supp.3d 575 (S.D.N.Y. 2017) ................................................ 47

*SEC v. Tuzman*, No. 15 Civ. 7057 (AJN), 2017 WL 11606728 (S.D.N.Y. Sept. 29, 2017) ................... 47

*SEC v. Wyly*, 950 F. Supp. 2d 547 (S.D.N.Y. 2013) ..................................................... 74

*Seife v. FDA*, No. 17 Civ. 3960 (JMF), 2019 WL 1382724 (S.D.N.Y. May 27, 2019) ........................ 38

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) .................................................. 40

*United States v. Williams*, 571 F.2d 344 (6th Cir. 1978) ............................................. 62

*In re Worldcom, Inc. Sec. Litig.*, 352 F.Supp.2d 472 (S.D.N.Y. 2005) .................................... 41, 54

**Rules**

Fed. R. Civ. P. 56(a) ..................................................................................... 36

Fed. R. Evid. 404(b) ..................................................................................... 54

Fed. R. Evid. 802 ........................................................................................ 37

Fed. R. Evid. 803(5) ........................................................................... 36, 51, 62

Fed. R. Evid. 803(6) ..................................................................................... 38

Fed. R. Evid. 805 ........................................................................................ 37

**Regulations**

Exchange Act Section 13(b)(2)(A) ................................................................... 55, 56

17 C.F.R. § 240.13a-14 ................................................................................... 66

**Secondary Sources**

ASC 605-25-3 .................................................................................................................73

ASC 605-25-25-3 ...........................................................................................................72

ASC 985-605-25-36 ...................................................................................................31, 64

ASC 985-605-25-36(b) ...................................................................................................34

ASC 985-605 ...................................................................................................................72

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this consolidated memorandum of law, with its Counter-Statement of Material Facts and Statements of Additional Material Facts to Karen Rosenberger's Rule 56.1 Statement ("Counter Ros. 56.1"), its Counter-Statement of Material Facts and Statements of Additional Material Facts to Joanna Lanni's Rule 56.1 Statement ("Counter Lanni 56.1") and the Declaration of Richard G. Primoff dated September 15, 2023 ("Sept. Primoff Decl.") in opposition to the two motions for summary judgment filed by Defendants Karen Rosenberger ("Rosenberger") (Dkt. No. 113) and Joanna Lanni ("Lanni") (Dkt. No. 121). For the reasons below, their motions should be denied.

## PRELIMINARY STATEMENT

Rosenberger, the then-Chief Financial Officer ("CFO") of Synchronoss Technologies, Inc. ("Synchronoss"), and Joanna Lanni, its then-Controller, violated the securities laws by materially inflating the company's revenues on falsified financial statements. Rosenberger did so for five transactions from September 2015 through December 2016 and Lanni for one transaction in 2015. Defendants seek summary judgment on all claims against them, insisting there are no triable issues of fact on any claims. These arguments are meritless, and the motions should be denied.

Ample and often-undisputed evidence supports the SEC's claims. Rosenberger does not dispute, for instance, that she signed Forms 10-Q and 10-K that falsely and materially inflated Synchronoss's revenue. She also gave false and misleading memoranda to the company's auditor to support the improper accounting. Lanni likewise does not dispute that she signed one of those accounting memoranda, which omitted material information about the Windstream transaction. Yet Rosenberger and Lanni argue the SEC cannot prove to a jury that they acted with scienter and, for the non-scienter books-and-records claims, that they acted "unreasonably."

Defendants claim there is no need for a trial because Synchronoss's internal investigation—undertaken while the company was itself under SEC investigation—has already exonerated them.

They also argue the company's external auditor, Ernst & Young ("EY"), never made a "finding" or "conclusion" that they committed fraud. But Defendants cite only inadmissible hearsay, in the form reports and memoranda written by a self-interested company looking to avoid findings of its own fraud. The Second Circuit has held that such internal investigation reports are inherently unreliable and insufficient to grant summary judgment. And EY's auditors testified in depositions that Rosenberger and Lanni had been "not been honest" with them, such that EY concluded it could no longer rely on their representations. This testimony alone is strong proof of scienter.

Defendants also argue that the SEC can't prove they acted recklessly, because the SEC's expert did not explicitly state their conduct constituted an "extreme departure" from acceptable norms. But this Court has found that the absence of the phrase "extreme departure" from an expert report does not merit summary judgment for defendants. Instead, a jury can find fraud because Defendants chose to disregard clear and fundamental guidance under Generally Accepted Accounting Principles ("GAAP") to improperly record revenue, and then falsify the company's books to conceal the truth from the auditors.

Proof of Defendants' scienter is overwhelming. On the LNP transaction, Rosenberger admits she knowingly used a backdated document to recognize $3 million in revenue and never told the auditors about it. Her defense that she thought the deal was consummated in 2015 is belied by every document in the record—except the one she knew was backdated. Her own expert agrees that recognizing revenue on the transaction was a fundamental error and not a "close question." Such knowing deceptive conduct is textbook proof of fraud, and Rosenberger's acts, omissions, and false statements establish her fraudulent intent.

On the Windstream transaction in the second quarter ("Q2") of 2016, Rosenberger and Lanni recognized $5.3 million on the sale of a license that, they knew, was negotiated and executed simultaneously with another agreement with Windstream. They also knew that GAAP required,

based solely on this simultaneous execution and negotiation, that both agreements be accounted for together as one transaction. Rosenberger and Lanni each signed a revenue recognition memorandum violated GAAP, and never mentioned the existence of second agreement, much less contained any of the analysis of the two agreements they knew GAAP required.

On the ASR transaction with AT&T in Q3 2015, Rosenberger approved the recognition of $4.35 million in revenue, relying on a single email that, on its face, lacked the approval of the senior AT&T executives Synchronoss itself had specified was necessary. Her defense that she did not read or understand her emails is inherently implausible. She then failed to tell EY that AT&T had refused to pay for the ASR software, even when she knew that Synchronoss had considered and rejected legal action. Her omissions and false statements to EY caused the auditors to later conclude that she had not been honest with them, which itself renders summary judgment inappropriate.

On the Openwave transaction in Q2 2016, Rosenberger approved recognition of $10 million in revenue in license fees from a company Synchronoss acquired the same day. Rosenberger received multiple emails informing her that the two deals—the license agreement and acquisition—were negotiated as one transaction. Under GAAP guidance, this fact precluded recognition of the license fee as revenue. Yet Rosenberger told EY, in writing, the deals were not negotiated together.

Then in Q4 2016, Rosenberger approved recognition of $3.6 million on a "reseller" transaction to a small Synchronoss subcontractor, Sage Management, Inc. ("Sage") that had never resold software before. She knew this transaction was intended only to engineer revenue recognition for Q4 2016, after Synchronoss's real customer, Windstream, told the company it could not buy the software in Q4. Rosenberger approved another misleading accounting memorandum to assure the auditor there was a probability of collection (a required element for revenue recognition under GAAP), because the company had never had any billing issues with Sage. EY's auditor testified this statement was misleading, because Sage had never been a customer of the company at all.

At best, the record evidence presents triable issues of fact and does not come close to

meeting Defendants' heavy burden on summary judgment. Indeed, undisputed facts warrant

summary judgment in the SEC's favor on certain claims. Defendants' motions should be denied.

## COUNTER-STATEMENT OF MATERIAL FACTS[1]

I.  **ROSENBERGER AND THE COMPANY REPORTED INFLATED
    REVENUE AND OVERSTATED RECEIVABLES RELATING TO TWO
    TRANSACTIONS WITH AT&T.**

   A.  **Rosenberger Inflated Revenue in 2015 by $3 Million for the LNP Transaction.**

       1.  **Rosenberger Knew the Sole Documentation Supporting the LNP
           Transaction Was a Backdated Letter.**

Rosenberger's expert and the EY auditors testified that it is a fundamental rule that

agreements need to be signed in the period in which revenue is recognized. SEC 56.1 ¶¶ 30-31, 150.

At Rosenberger's direction, however, Synchronoss recognized $3 million in revenue from the sale of

the LNP license in the last quarter of 2015, for which her sole support was a purported letter

agreement dated December 31, 2015. SEC 56.1 ¶ 148; Counter Ros. 56.1 ¶ 141.[2]

Rosenberger admits that she knew this letter was signed on January 8, 2016, not December

31, 2015. Counter Ros. 56.1 ¶ 137. She also admits that the letter's signatory cannot be identified

from the letter itself. *See* Counter Ros. 56.1 ¶ 136. There is also no dispute that Rosenberger knew

the company would be requesting a backdated letter from AT&T two days before it received this

letter. SEC 56.1 ¶¶ 58-63. Rosenberger was also told specifically that only AT&T's procurement

---

[1] This section summarizes the facts in the SEC's 56.1 Counter-Statement and, where applicable, in its Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("SEC 56.1"), dated August 18, 2023 (Dkt. No. 12). Citations in this memorandum to the SEC's 56.1 Rosenberger Counter-Statement and 56.1 Lanni Counter-Statement are styled "Counter Ros. 56.1" and "Counter Lanni 56.1," respectively. Where not otherwise defined, this memorandum uses short forms defined in the brief in support of the SEC's summary judgment motion (Dkt. No. 125).

[2] The SEC 56.1 and memorandum of law in support of its summary judgment motion (Dkt. No. 125, "SEC SJ Brief") contain a full discussion of Rosenberger's conduct as to the LNP transaction.

department could physically sign documents, SEC 56.1 ¶ 58, but she admits that the document itself only purports to be signed by a "Senior Tech Director." Counter Ros. 56.1 ¶ 136.

Despite knowing that the letter was backdated, Rosenberger maintains she was "not focused on" the date of the signature, but on the date listed in the body of the document. Counter Ros. 56.1 ¶ 137. She admits, however, that on January 6, 2015, two days before receiving the letter, she wrote it was "unclear yet" as to whether the company could recognize the LNP transaction in 2015, and that the "license piece" had to be approved that night. SEC 56.1 ¶¶ 75-78; Counter Ros. 56.1 ¶ 134. By writing that she was "unclear," she admits "all I wanted to make sure was that there w[ere] no changes in anything that were discussed," and that she "wanted to ensure that nothing had changed with any price." Counter Ros. 56.1 ¶ 134.

As set forth below, however, the price had to have changed, because there is no documentation from 2015 showing a $3 million price was ever communicated to AT&T, let alone agreed upon, in 2015. *See, e.g.*, SEC 56.1 ¶ 123.

### 2. AT&T and Synchronoss Never Agreed to a $3 Million Price for the LNP Transaction, Let Alone in 2015.

AT&T and Synchronoss only agreed on a price for the LNP license in December 2016. *See* Counter Ros. 56.1 ¶ 156; SEC 56.1 ¶¶ 109-116. That price was $2.5 million, not the $3 million listed in the backdated letter. *See* SEC 56.1 ¶ 94; Counter Ros. 56.1 ¶ 137. Other than the backdated letter, which Rosenberger admits she knew was only signed in January 2016, there is no evidence that AT&T and Synchronoss ever communicated about—let alone agreed on—a price of $3 million in 2015. *See* Counter Ros. 56.1 ¶ 137. Indeed, Rosenberger has not cited any evidence showing that a price of $3 million was communicated to AT&T in 2015. *See* Counter Ros. 56.1 ¶¶ 121-133.

By contrast, there is no dispute that, throughout December 2015, AT&T and Synchronoss repeatedly communicated about a potential $6 million price. Counter Ros. 56.1 ¶¶ 128, 131. On December 21, 2015, AT&T executive Richard Batelaan wrote that he was "not sure at what dollar

amount" AT&T could fund a possible LNP license purchase. Counter Ros. 56.1 ¶ 131; Kramer Ex. 63 at 2. Then on December 24, 2015, Verma told Rosenberger and others that Batelaan could not secure "the $6 Mil licenses." Counter Ros. 56.1 ¶ 128. The December 24, 2015 email is the only document from 2015 in the record that Rosenberger saw and that discussed price, but for "$6 Mil licenses," not the $3 million shown in the backdated letter. *See* Counter Ros. 56.1 ¶ 128.

On December 30, 2015, Verma sent another email offering a $6 million price (discounted from $8 million) for the LNP licenses and extending that price until January 4, 2016. Counter Ros. 56.1 ¶ 131; Kramer Ex. 63. Rosenberger did not see this document, although she does not dispute that Verma extended the $6 million price until January 4, 2016, while referencing "a discussion with my CFO today." *Id.* This "discussion" between Verma and Rosenberger thus appears to have taken place on December 30, 2015, when Verma offered the $6 million price. *See id.*

Although Rosenberger testified that AT&T could not allow Synchronoss to deliver the software unless "funding was approved," Counter Ros. 56.1 ¶ 137, emails sent to Rosenberger in the first week of January 2016 show AT&T had not settled on funding for the LNP deal even after the software was downloaded on December 31, 2015, *see* Counter Ros. 56.1 ¶¶ 133-34. The email confirming download contained no pricing information. SEC 56.1 ¶ 123. The first time a $3 million price was documented as being sent to AT&T is in Verma's January 5, 2016 email. Counter Ros. 56.1 ¶ 134. The email only contained a "revised bid on the table," however, and Darren Post acknowledged the price was not agreed upon by noting that Synchronoss's expected revenue in 2015 could be $3 million "(Assuming we get okay)." Counter Ros. 56.1 ¶ 134.

At first, this "new offer [] turned [AT&T's] business case positive," but the next day, Verma explained in an email sent to Rosenberger that "AT&T is looking to find additional $1.5Mil in their business case." Counter Ros. 56.1 ¶ 134. Verma considered and rejected offering "further discounts because we can't deliver the product any cheaper that what[']s on the table. SEC 56.1 ¶ 66. Later that

day, Post wrote, "[i]f AT&T cannot come up with the money to cover that expense … the deal is dead." SEC 56.1 ¶ 69. Instead, Post sought to "offer an increase" to AT&T "to get rid of that additional cost objection" on AT&T's part. SEC 56.1 ¶ 70.

These communications, all of which Rosenberger received, demonstrate that AT&T's funding was not yet secured in January 2016. In fact, in October 2016, Synchronoss was told that AT&T only had a total of $3.4 million for the entire LNP deal. SEC Ex. 39. And AT&T only ever agreed to pay $2.5 million in December 2016. SEC 56.1 ¶ 94.

### 3. Rosenberger Never Disclosed the Backdated Document or That Price Negotiations on LNP Continued Throughout 2016.

Rosenberger signed management representation letters to EY in which she stated that Synchronoss's 2015 and 2016 financial statements complied with GAAP. SEC 56.1 ¶¶ 158-61. She further represented that the company had made available to EY "all significant contracts, communications (either written or oral), and other relevant information pertaining to arrangements with our customers." SEC 56.1 ¶ 159.

But there is no dispute that Rosenberger never told EY that the letter purporting to support the LNP transaction was signed on January 8, 2016, and backdated to December 31, 2015. SEC 56.1 ¶¶ 149-156. This would have been a relevant fact for EY, as would the additional emails in January 2016 showing that a deal was "still being negotiated." Counter Ros. 56.1 ¶ 138. Rosenberger also admits that the LNP revenue recognition memorandum does not disclose that the letter was signed in January 2016. Counter Ros. 56.1 ¶ 141.

EY auditors testified that the LNP transaction was one where they discovered Rosenberger had not been honest. Counter Ros. 56.1 ¶ 82. They also stated that recognizing revenue for the LNP transaction violated GAAP because the company's documentation shows the agreement was not in "final form" by the end of 2015. SEC 56.1 ¶ 119. Rosenberger's expert agreed it was incorrect to recognize revenue from the LNP deal in 2015 and it is not a "close question." SEC 56.1 ¶¶ 121-22.

**B. Rosenberger Inflated Revenue in 2015 by $4.35 Million for the ASR Transaction.**

The LNP transaction was not the only purported license deal with AT&T that Rosenberger improperly included in the company's 2015 Form 10-K. Rosenberger also booked $4.35 million in revenue from the ASR license transaction, which she directed be reported initially in the company's Q3 2015 Form 10-Q. Counter Ros. 56.1 at ¶ 100. The only support cited for this transaction was a single email, sent on September 28, 2015, by an AT&T employee who, as Synchronoss knew, was not authorized to bind AT&T. Counter Ros. 56.1 ¶ 101. Before this transaction, Synchronoss had never recognized revenue from AT&T based solely on an email. Counter Ros. 56.1 ¶ 99.

**1. Synchronoss's CEO and COO Pressured Rosenberger and the Finance Department to Approve the Sale of ASR Software to AT&T.**

Synchronoss's began trying to sell its ASR software to AT&T earlier in 2015, and by May 2015, the company's CEO and COO, Waldis and Garcia, were seeking to recognize this revenue in Q2 2015. Counter Ros. 56.1 at ¶ 112. On May 28, 2015, Rosenberger's finance department became the focus of their attention: Putnam emailed her, copying Waldis, to complain that "[w]e are getting zero help from finance trying to come up with a way to recognize the $2M in revenue from AT&T on the ASR license deal. Can someone more senior please step in at this point and try to help us find creative solution?" *Id.* Waldis forwarded the email to Garcia, who told Rosenberger, "We clearly need the revenue in quarter," and asked her to have Lanni "help drive the process to a workable solution." *Id.* Rosenberger replied to both Waldis and Garcia, agreeing with them. *Id.*

But Synchronoss did not recognize revenue from the ASR transaction in Q2 2015. In August 2015, Synchronoss started work on getting AT&T's approval merely to allow a demonstration, or "proof of concept" of the software. *Id.* On August 10, 2015, the company sent a draft proposal for the trial to AT&T, and it was only signed in October 2015. *Id.* The statement of work expressly left it to AT&T to determine whether to proceed with a full license after the trial. *Id.*

## 2. Rosenberger Directed Synchronoss to Recognize Revenue for the ASR Transaction, Even After Being Told That AT&T's Emailed Statements Were Not Sufficient to Bind AT&T.

By September 2015, the company was still trying to obtain AT&T's agreement on the ASR deal. Counter Ros. 56.1 ¶¶ 101-02. That month, the company's AT&T salesman, Verma, attempted to obtain approval by AT&T to the ASR license using email confirmation only, rather than through a Statement of Work. Counter Ros. 56.1 ¶ 101. At that point, Synchronoss had a custom and practice of requiring a master services agreement and a contract for establishing persuasive evidence of an arrangement, Counter Ros. 56.1 ¶ 93, and it had never recognized revenue from AT&T based only on an email, Counter Ros. 56.1 at ¶ 99.

On September 25, 2015, Verma emailed his AT&T contacts, Mike Shah, Keith Pate, and Steve Peralta, purporting to set offer terms of an ASR license sale and set out Synchronoss's own requirements to confirm approval of the deal. Verma wrote to Shah: "I require your approval and then Candy [Conway]'s/Steve [Peralta]'s on the email confirming the terms are agreed upon and the tier (corporate or Enterprise) of license being approved." Counter Ros. 56.1 ¶ 102. Verma also told AT&T the response language Synchronoss needed: "We are agreeing to move forward with Corporate or Enterprise Edition of Gateway Software from Synchronoss." *Id.*

Shah responded on September 28, 2015, the last day of Q3 2015: "You have approval to start the [Statement of Work] on good faith from ATT." Counter Ros. 56.1 ¶ 101. His email also included a response from Candy Conway, one of the additional approvers Synchronoss required. But her email also said only "Approved to begin the SOW." Counter Ros. 56.1 ¶¶ 101-03.

Synchronoss's senior management quickly recognized Conway and Shah had failed to commit AT&T to purchase the license. Counter Ros. 56.1 ¶ 103. Verma forwarded the email to Putnam, noting "I know this language doesn't help. Trying to get it changed." *Id.* Putnam then

forwarded it to Waldis, Garcia and Rosenberger, saying "Here's what we have so far – not what we need." *Id.* Garcia then forwarded the email to Rosenberger again. Counter Ros. 56.1 ¶ 112.

Later that day, Verma forwarded another email that included no approval from Conway or Peralta, but simply an email from Shah with the language, "We agree to move forward with Enterprise Edition of the Gateway Software from Synchronoss." Counter Ros. 56.1 ¶¶ 101, 105. After Garcia and others replied, Rosenberger wrote back, "Great news!!!" Counter Ros. 56.1 ¶ 107.

EY auditor Alison Yablonowitz testified that Shah's language in the second email was not sufficient to recognize revenue because it did not establish persuasive evidence of an agreement. Counter Ros. 56.1 ¶ 104. The email thread Rosenberger replied to showed that Shah's second email lacked the approval from specific senior AT&T executives, whose approval Synchronoss's own executives in that same email and in the earlier chain, specified was necessary to constitute an agreement binding AT&T. Counter Ros. 56.1 ¶ 102. In addition to receiving multiple emails stating that Conway and Peralta's approval was required, Rosenberger was informed that one of those people, Conway, had refused to provide the requested commitment. Counter Ros. 56.1 ¶ 112.

As CFO, Rosenberger was in possession of information showing that the company could not book the revenue, and she was required to bring to bear her "knowledge of the arrangement" when reviewing the ASR transaction. Counter Ros. 56.1 ¶ 19. Nevertheless, Rosenberger caused Synchronoss to recognize $4.35 million in revenue in Q3 of 2015, based solely on Shah's second email. Counter Ros. 56.1 ¶ 101. The company's revenue recognition memorandum for the ASR transaction did not include the series of emails where multiple executives acknowledged the language sent earlier by AT&T was not sufficient. *Id.* When EY auditor Yablonowitz read this full email thread for the first time in her deposition, she testified that it would have raised a question for her about revenue recognition because "the appropriate people have to authorize [a deal] as part one of the criteria for persuasive evidence of an arrangement." Counter Ros. 56.1 ¶ 104.

### 3. AT&T Never Agreed to Buy the ASR Software, and Rosenberger Never Caused Synchronoss to Bill AT&T for It.

Despite recognizing more than $4 million in revenue for the ASR transaction in September 2015, Rosenberger caused Synchronoss not to bill AT&T for this money for at least nine months. Counter Ros. 56.1 ¶ 159. She initially stated in an email to Synchronoss senior management that she wanted to bill without a statement of work and not have the account remain unpaid for long. *Id.*

At some point in October 2015, Rosenberger spoke with EY auditor Alison Yablonowitz about how Synchronoss did not currently have a statement of work from AT&T for the transaction, but did have an email, which was "a new thing for [Synchronoss]." Counter Ros. 56.1 ¶ 115. Based on the conversation, Yablonowitz understood that the email met the elements of revenue recognition. *Id.* Yablonowitz understood from Rosenberger that either a statement of work or a purchase order would be coming from AT&T by the end of the year. *Id.* As noted above, Rosenberger did not share with Yablonowitz the full email thread, and Yablonowitz had never seen it at the time of her deposition. Counter Ros. 56.1 ¶ 104. Rosenberger also never told Phillips that a Statement of Work was still being negotiated for the ASR transaction. Counter Ros. 56.1 ¶¶ 97, 163.

As months passed, the statement of work was still not finalized, and Rosenberger decided not to bill AT&T for the ASR transaction. Counter Ros. 56.1 ¶ 159. Her claimed explanation was that AT&T's "accounts payables person…may not know what to do with an invoice without an underlying" statement of work. Counter Ros. 56.1 ¶ 159.

In February 2016, AT&T executives wrote to Synchronoss stating that the September email from Shah was not authorized to bind AT&T. Counter Ros. 56.1 ¶¶ 144-47. AT&T maintained this position, and in June 2016, it informed Synchronoss that it had not been selected as a finalist to sell the ASR software to AT&T. Counter Ros. 56.1 ¶ 149.

Rosenberger attended a July 12, 2016 meeting with other senior management to discuss ASR, and she testified she knew the company was considering sending a legal letter to AT&T to

demand payment. Counter Ros. 56.1 ¶¶ 153-54. She recalled the decision at the meeting was not to escalate the dispute with AT&T or send a legal letter. Counter Ros. 56.1 ¶ 154.

### 4. Rosenberger Never Disclosed the Full ASR Emails to EY or That AT&T Had Told Synchronoss It Was Not Bound to Buy the ASR Software.

Rosenberger never shared with EY the contemporaneous emails casting doubt on the transaction's validity. Counter Ros. 56.1 ¶¶ 104, 115, 82. If she had, EY would have wanted to make sure that the appropriate people had authorized the transaction and would have conducted additional audit procedures. Counter Ros. 56.1 ¶ 104.

By July 2016, Rosenberger was aware that AT&T had not paid for the ASR software because she participated in a meeting with other Synchronoss senior management where "we talked about legal escalation" including sending a "legal letter" with a "demand for payment or something like that." Counter Ros. 56.1 ¶ 153-54. Rosenberger never told EY the company was considering legal action against AT&T. Counter Ros. 56.1 ¶¶ 166-67. This information would have been relevant to EY's audit. Counter Ros. 56.1 ¶ 167. Instead, in a July 2016 audit committee meeting, Rosenberger falsely blamed management turnover at AT&T for its issues with AT&T's unbilled receivables. Counter Ros. 56.1 ¶ 166-67. This conduct was among the reasons why EY decided it could no longer rely on Rosenberger's representations. Counter Ros. 56.1 ¶¶ 166-167; SEC 56.1 ¶ at 157.

### C. Rosenberger Inflated the Company's Revenue in Forms 10-Q and a 10-K.

Due to her improper recognition of revenue for ASR in Q3 2015 and LNP in Q4 2015, Rosenberger caused false entries in Synchronoss's Forms 10-Q for those quarters and in its 2015 Form 10-K. SEC 56.1 ¶¶ 116-19; Counter Ros. 56.1 ¶¶ 528. Together, Rosenberger's actions caused the company to restate more than $7 million in revenue. Counter Ros. 56.1 ¶ 100, 527; SEC 56.1 ¶ 117. Without either of these misstatements, the company would have missed meeting consensus revenue estimates or the company's guidance. SEC 56.1 ¶¶ 134-137.

## II.  ROSENBERGER AND THE COMPANY FALSELY REPORTED $10 MILLION IN REVENUE IN ITS Q1 FORM 10-Q FOR 2016 AND 2016 FORM 10-K.

On March 1, 2016, Synchronoss entered into an agreement (the "Openwave purchase agreement") to purchase 100% of the common stock of Openwave Messaging, Inc. ("Openwave") from its parent, Marlin Equity Partners ("Marlin"), for a purported price of $124.5 million. Counter Ros. 56.1 ¶ 182. That same day, Synchronoss signed a license agreement with Openwave, and another entity owned by Marlin, Openwave Mobility ("Mobility"), for a $10 million license fee paid to Synchronoss (the "Openwave IP License"). Counter Ros. 56.1 ¶¶ 296-97, 174, 182.

### A.  Relevant GAAP Principles

ASC 805, *Business Combinations*, provides guidance that addresses whether a transaction (such as the Openwave IP License) entered into between two parties who are simultaneously entering into a business acquisition should account for that transaction separately, or as part of the business combination—in which case the consideration paid for the transaction should be accounted for as an adjustment (up or down) of the acquisition price. Counter Ros. 56.1 ¶¶ 298-299.

If a license agreement and acquisition are "negotiated together, and the acquisition [is] contingent on the license agreement, under ASC 805, you would not be able to separate the two arrangements and so you would have to account for them on a net basis." Counter Ros. 56.1 ¶ 300 (citing testimony of EY Senior Manager Phillips). As EY Coordinating Partner Rogers testified, "if the two transactions were … negotiated together on … a net basis or … if they were contingent, that would lead you to believe that they should be recorded as part of the acquisition price.") (Rogers). Rogers further explained that GAAP guidance focuses "on the … business and economic substance of the transactions. So if … they're … being negotiated net and are contingent, then – then they're really one transaction that you can't separate and record separately." *Id.*

### B. Synchronoss and Openwave Began Acquisition Discussions by November 2015.

The company first received information about Openwave as a potential acquisition target in April 2015 from the investment banking firm Canacord Genuity. By November 23, 2015, the company and Openwave had executed a non-disclosure agreement. Counter Ros. 56.1 ¶¶ 302-304. Rosenberger learned of the acquisition negotiations in late 2015 or early 2016. *Id.*

### C. Rosenberger Was Informed That Synchronoss Negotiated the Acquisition on a "Net" Basis with the Openwave IP License.

On January 8, 2016, Matthias Norweg, Synchronoss's VP of Mergers and Acquisitions, sent Rosenberger and other Synchronoss senior executives—including CEO Waldis, COO Garcia, and General Counsel Prague—an email in which Norweg advised that "Steve and Bob" [Waldis and Garcia] were "onboard that a deal up to $130m is good for SNCR (goal is to try and get something lower—e.g., $100m to $110m)." Counter Ros. 56.1 ¶ 305.

On January 20, 2016, Rosenberger received another email from Norweg (along with Dan Rizer, Synchronoss's EVP of Business Development, Waldis, Garcia, and Prague) and suggested the following talking points to make to Openwave:

> We will enforce our IP against OWM [Openwave] regardless of this transaction (*that's the threat that may impair their ability to sell the company next year*), BUT
> We are looking at this as a *great opportunity for both sides to bridge the valuation gap* - Marlin can show a higher multiple to its limited partners by achieving a higher EV and it will not hurt us from a cash perspective.
> In addition…we are also willing to consider another increase in *net purchase price of $5m to get Marlin to a total of $115m EV*.

Counter Ros. 56.1 ¶ 306 (emphasis added).

This point was repeated in successive emails Rosenberger received during the negotiations. On January 23, 2016, Rizer forwarded a Marlin counterproposal to Rosenberger, Prague, Garcia, and Waldis. Prague responded to everyone, "[t]hink we need to let *them know it's a net 110 deal … If they don't think ip is worth 10 then my understanding is they don't get 120*." Counter 56.1 ¶ 307 (emphasis added).

On January 26, 2016, Rizer again emailed Waldis, Rosenberger, Garcia, Prague and Norweg, this time with a proposed response to Marlin that would state he had taken "a lot of grief getting support from 100 to 110," and noting that the letter of intent "*will be drafted as 120 accounting for the IP.*" Counter Ros. 56.1 ¶ 308 (emphasis added). Rizer added with respect to the "IP" that the "two independent agreements will be executed simultaneously." *Id.* Prague responded, "I think you should add info that says that if they challenge anything regarding our IP then the deals off or your GC will go strong after." Counter Ros. 56.1 ¶ 309.

On January 27, 2016, Rizer reported to Rosenberger and others that he had spoken with Marlin and believed it was trying to "get some movement above 110 (+10)," and that there was no "discussion on the IP." Counter Ros. 56.1 ¶ 310. Rizer stated he had discussed the license agreement with the Marlin representative, "and he said he got it (*10M IP or we don't do*)," and that Rizer had told Marlin both agreements would be signed simultaneously. *Id.* (emphasis added). That same day, Rizer told Marlin the Openwave purchase agreement and Openwave IP License "must be executed simultaneously in order for us to agree to the LOI terms." Counter Ros. 56.1 ¶ 311.

In an email dated February 4, 2016 from Rizer to Prague, Waldis, Garcia and Rosenberger, Rizer said again he had been clear with Marlin that the "IP Settlement [*i.e.*, the Openwave IP License] was required for the PA/LOI [purchase agreement /letter of intent] to be valid," and that "[w]e have been consistent here (and I made clear *without 10M IP Settlement, the 122M PA wasn't happening*)." Counter Ros. 56.1 ¶ 312 (emphasis added). Waldis responded to Rizer, Prague, Garcia and Rosenberger, after a later update that day from Rizer, pointing out the importance of obtaining an agreement on the IP to the acquisition: "We can't have IP go off track." Counter Ros. 56.1 ¶ 313.

### D. Rosenberger Inflated Revenue by Improperly Recognizing Revenue from the Openwave IP License.

At Rosenberger's direction, Synchronoss included the $10 million license fee from the Openwave IP License as revenue in its Form 8-K for Q1 2016 on May 5, 2016; in its Q1 2016 Form

10-Q filed on May 10, 2016; in its Form 8-K announcing its financial results for FY 2016 filed on May 5, 2023; and in its Form 10-K for fiscal year 2016. Counter Ros. 56.1 ¶ 325-326. Rosenberger signed the Form 10-Q and Form 10-K, and the SOX 302 certifications. Counter Ros. 56.1 ¶ 327.

In its July 2, 2018 restatement, the company reversed its recognition of revenue on the Openwave IP License and other licenses it entered into contemporaneously with acquisitions. Counter Ros. 56.1 ¶¶ 174, 333. As the SEC's expert observed, companies do not restate financials when they believe their original accounting was correct—such an elective change would be disclosed as a "change in accounting principle, not a restatement." Counter Ros. 56.1 ¶ 334.[3]

The EY auditors and the SEC's expert agree it was improper for the company to have recognized revenue on the Openwave IP License, based on the underlying facts discussed above, and Rosenberger's expert does not dispute those conclusions. Counter Ros. 56.1 ¶¶ 333-334, 342-344, 349-352, 359-364.

The SEC's expert concluded that, based on the relevant GAAP principles and the information Rosenberger received at the time, Rosenberger had enough information to determine

_____

[3] Rosenberger seeks to rely on memoranda authored by EY that make reference to purported findings of the company's internal "investigative team" that the original accounting for the Openwave transaction was correct, and that the company, in restating, was simply taking a more "conservative" approach. Counter Ros. 56.1 ¶¶ 213-218. Rosenberger has offered no testimony form or even the identity of any accountant (apart from herself) who maintains the original accounting for the Openwave IP License was correct, including from anyone at the company or its investigative team. *Id.* The evidence Rosenberger cites thus constitutes inadmissible hearsay.

Rosenberger also cites conjecture from Rogers at his deposition (in response to a misleading question over the SEC's objection) that "reasonable, fair-minded" accountants could differ about the accounting for the Openwave transaction, but she offers no basis for why that could be the case, nor did counsel for Rosenberger seek to elicit such testimony. Counter Ros. 56.1 ¶ 218. Rogers's opinion is that it was incorrect to have recognized revenue on the Openwave IP License (Counter Ros. 56.1 ¶ 349-352, and his speculative testimony is inadmissible.

her conclusions were incorrect; her accounting decisions were also unreasonable, measured against the clarity of GAAP guidance and the information she had. Counter Ros. 56.1 ¶¶ 361-362.

### E. Rosenberger's Misleading Openwave Revenue Recognition Memorandum

Rosenberger approved and signed a revenue recognition memorandum for the Openwave IP License (Counter Ros. 56.1 ¶ 329), and an accounting memorandum regarding the acquisition agreement (Counter Ros. 56.1 ¶ 204), before providing them to EY for its review of the Q1 Form 10-Q and audit of the 2016 Form 10-K. Counter Ros. 56.1 ¶¶ 58, 204, 329.[4]

Rosenberger purported to justify Synchronoss's recognition of $10 million in revenue from the Openwave IP License, notwithstanding that it was entered into simultaneously with the purchase agreement. Counter Ros. 56.1 ¶ 204, 329-331. Rosenberger identified the following facts in the memoranda's conclusions as relevant to that determination:

> We believe $10.0M should be recognized as revenue for past infringement from OWM on our messaging management patents and should not be reflected as consideration transferred in the business combination. *This settlement was not a negotiating factor in the business combination agreement. None of the two transactional amounts were negotiated together and the acquisition was not contingent on entering into the license agreement.* The purchase consideration for acquiring the business was at a similar markup to other transactions in the market that have occurred, and therefore unrelated to the license agreement settlement.

Counter Ros. 56.1 ¶ 332 (emphasis added).

As Rosenberger's expert admits, the statements in Rosenberger's conclusion above are "inconsistent" with the emails she received, discussed above in Facts Section II.C. The EY auditors

---

[4] Rosenberger contends there is "no evidence" she signed the Openwave revenue recognition memorandum during EY's review of the Q1 Form 10-Q, and she claims she did not do so until six months later. Counter Ros. 56.1 ¶¶ 58, 205. Rosenberger cites only various emails on this point, but none of them establish her point. *Id.* At her deposition, however, Rosenberger testified that she signed the memorandum during the first quarter of 2016. Counter Ros. 56.1 ¶ 58. The EY auditor, Phillips, also testified she received the signed memorandum during EY's review of the Q1 2016 Form 10-Q. *Id.* And the undisputed testimony is that regardless of when Rosenberger signed the memorandum, she *approved* it during the first quarter review. Counter Ros. 56.1 ¶¶ 58, 329.

testified that they learned only during the audit committee investigation that began in 2017 that Rosenberger's statements (1) that the Openwave IP License was not a negotiating factor in the purchase agreement, (2) that the two transactional amounts were not negotiated together, and (3) that the acquisition was not contingent on entering into the Openwave IP License, were directly contradicted by contemporaneous emails Rosenberger had received. Counter Ros. 56.1 ¶ 363.

Phillips testified that, when she saw the emails Rosenberger had received, she "couldn't believe there was email correspondence that suggested that the acquisition was contingent upon executing the license agreement," and realized Rosenberger had not been honest with her. Counter Ros. 56.1 ¶ 344. Rosenberger never disclosed these inconsistent facts to EY. Counter Ros. 56.1 ¶¶ 345. Rogers testified that, when she learned about these emails, he raised with the audit committee his concerns that Rosenberger had not shared with them this evidence showing that the Openwave IP License and acquisition were negotiated on a net basis. Counter Ros. 56.1 ¶ 82. Although it was not the committee's "role to specifically determine…or conclude on fraud," Rogers testified, these omissions and Rosenberger's lack of honesty on other transactions caused EY to conclude it could no longer rely on her representations. Counter Ros. 56.1 ¶¶ 82, 339, 355.[5]

The auditors also testified that these emails showed it was highly improper to recognize the $10 million license fee as revenue, rather than as a reduction in the acquisition price. Counter Ros. 56.1 ¶¶ 341-343, 348-352. These emails indicated that the Openwave IP License had no economic

---

[5] Rosenberger insists the evidence reflects she had no intent to conceal facts from EY. She relies on a long email chain she received on February 1, 2016, at the bottom of which there was a reference to the company's insistence that the Openwave IP License and acquisition agreement be executed simultaneously and that attached an executed copy of the letter of intent for the acquisition. Rosenberger then forwarded that to another finance department employee with the request "Please forward to EY and KPMG." Counter Ros. 56.1 ¶ 199. As Rosenberger and Lanni both admit, however, they understood Rosenberger to be requesting only that the attached letter of intent—which did not reference the fact that the two agreements would be executed simultaneously—be forwarded. Counter 56.1 ¶ 200. There is no evidence that EY ever received this email chain before the audit committee investigation.

substance and, since the two agreements were negotiated on a net basis, any purported "fair value" of the Openwave IP License was irrelevant. Counter Ros. 56.1 ¶¶ 343, 351. The SEC's expert agreed, and Rosenberger's expert does not dispute this conclusion. Counter Ros. 56.1 ¶¶ 359-363.

The Openwave IP License memorandum also justified the purported fair value of the $10 million fee by the royalty payments the company theoretically would have received, absent the infringement. Counter Ros. 56.1 ¶ 372. This depended on determining the appropriate royalty rate, and Rosenberger approved the 10% and 17%, which were figures the company had used in an IP transfer between two of its related entities. Counter Ros. 56.1 ¶ 373. The EY auditors learned during the audit committee investigation that the company's patent counsel had already set a much lower percentage—4%—as a precedent, based on what Rogers testified was a more reliable indicator of "fair value," an arms-length negotiation with an actual third party. Counter Ros. 56.1 ¶¶ 374-376.

As Rosenberger and Lanni acknowledged, they were presented with the $10 million fee before performing any "fair value" analysis, and contemporaneous emails with Rosenberger and Lanni make it clear they saw the task as coming up with a method that supported that pre-determined value. Counter Ros. 56.1 ¶¶ 367-370. In those same emails, they noted prior examples, in which the "fair value" of the license agreements was also $10 million. *Id.* Phillips testified that in 2017, Lanni expressed to her skepticism about these values, noting that it was "an odd coincidence … that they were all—the settlements were always for $10 million." Counter Ros. 56.1 ¶ 371.

### F. Rosenberger's Prior Conduct on the F-Secure Acquisition

Rosenberger's expert noted that a prior revenue recognition memorandum on the F-Secure license transaction from 2015 (another license that the company obtained for a $10 million fee at the same time it made an acquisition) had similar language in its conclusion to the one in Openwave—that is, that the "settlement [*i.e.*, the license agreement] was not a negotiating factor in the asset purchase agreement." Counter Ros. 56.1 ¶¶ 378-380. Rosenberger's expert opined that the F-Secure

transaction was relevant as "context" for judging Rosenberger's actions on Openwave and noted that accountants sometimes use prior memoranda as templates. Counter Ros. 56.1 ¶¶ 380-381.

Rosenberger and Prague testified that the F-Secure and Newbay transactions were prior examples of license agreements where the company obtained $10 million license fees in settlement of purported infringement claims, while the company was acquiring the licensee or its assets. Counter Ros. 56.1 ¶ 382. Phillips testified the 2015 F-Secure transaction was one of the transactions the company restated in 2018, because (as with Openwave) it determined there "was not enough evidence to support the transactions being accounted for separately and so [] they were netted together." Counter Ros. 56.1 ¶ 383.

As with Openwave, Rosenberger and Lanni reviewed and approved the recognition of $10 million in revenue from a license agreement fee from F-Secure, in settlement of a patent infringement suit, at the same time a Synchronoss-related business acquired assets of F-Secure under an asset purchase agreement. Counter Ros. 56.1 ¶ 384. Like in Openwave, Rosenberger received repeated emails informing her the two deals were negotiated together on a net basis. Counter Ros. 56.1 ¶¶ 385-387. As she did for Openwave, Rosenberger falsely represented that the license agreement "was not a negotiating factor in the asset purchase agreement." Counter Ros. 56.1 ¶ 396.

In an email thread dated February 13, 2015, involving Prague, Rosenberger, Lanni and Veronica Speck, another member of the Synchronoss finance department, Rosenberger discussed with Prague and Lanni how to describe the acquisition and license agreement for public disclosure. Counter Ros. 56.1 ¶ 388. Speck had emailed Prague that EY suggested that the disclosure say that the two agreements were entered into contemporaneously. Counter Ros. 56.1 ¶ 389. When Prague

sought Rosenberger's advice on the point, Rosenberger responded that she wanted them described as "separate." Counter Ros. 56.1 ¶¶ 390-391.

Rosenberger maintained that position, even after Lanni pointed out that "*they are related and will be considered as negotiated at the same time. The fair value of the license will be an adjustment to the purchase price from the accounting perspective.*" Counter 56.1 ¶ 394 (emphasis added). Rosenberger responded, without disagreeing with Lanni's observation, that "I do not want to use the word simultaneously. We signed the agreement ahead of any signatures on the IP agreement. *I don't want it to be implied it was to be combined with the purchase. Leave it as two separate sentences.*" Counter Ros. 56.1 ¶ 395 (emphasis added). Lanni responded: "Ok, we will present it as two separate sentences." *Id.* Rosenberger and Lanni both then approved the accounting memorandum stating that the license agreement "was not a negotiating factor in the asset purchase agreement." *Id.*

## III.  ROSENBERGER AND LANNI OVERSTATED $5.3 MILLION IN REVENUE FROM THE WINDSTREAM TRANSACTION.

The SEC's papers in support of its motion for partial summary judgment contain a thorough discussion of Rosenberger's and Lanni's conduct with respect to the Windstream transaction. *See* SEC SJ Br. at 15-25, 39-42, 56.1 ¶¶ 163-336. In sum, Synchronoss and Windstream negotiated Amendments 9 (the Windstream license) and Amendment 10 (the audit services agreement) together and executed the agreements almost simultaneously as a single transaction. Rosenberger and Lanni knew the agreements were executed at the same time. This simultaneous execution, under GAAP and the company's policies, required Rosenberger and Lanni to account for them as one arrangement—thus precluding recognition of at least the vast majority of the $5.3 million Rosenberger and Lanni directed that the company recognize—unless they identified sufficient facts to overcome that presumption. Rosenberger and Lanni nevertheless approved and signed a revenue recognition memorandum that authorized recognizing $5.3 million of revenue on Amendment 9, yet made no mention of Amendment 10 or the fact that this was a multiple element arrangement.

The discussion below addresses additional evidence that presenting triable issues of fact about Rosenberger's and Lanni's scienter. They had knowledge, or acted in reckless disregard, of the fact that Synchronoss provided hosting services in conjunction with its sale of the perpetual licenses in general and with respect to Windstream in the second quarter of 2016, which alone would have precluded the recognition of any revenue from the Windstream license in Q2 2016.

A.    **EY Discussions with Rosenberger and Lanni Regarding "Hosting" and Accounting for Multiple Element Arrangements.**

In Q2 2016, Phillips and other members of the EY audit team discussed hosting, "primarily with Joanna [Lanni]," and "[p]robably Karen [Rosenberger] as well." SEC 56.1 ¶ 280. Among the topics they discussed were that "when they enter into a license and a hosting arrangement, that there is — there's multiple elements. There's the license element. There's a maintenance element, whether it's implicit or defined in the arrangement. And there would be a hosting element if they were also … offering hosting services." *Id.* Phillips and other members of EY had these discussions with Rosenberger and Lanni, because the company did not have "vendor specific objective evidence" of fair value for hosting, and under the software revenue recognition guidelines, the company could not recognize hosting as an independent deliverable, and thus any revenue from a license sale would have to be spread over the period of the hosting arrangement. Counter Lanni 56.1 ¶ 172.

In particular, Phillips testified that she had a discussion with Lanni, in which Phillips was focused on a transaction in which Synchronoss had represented that there was a "formal bid process" for hosting that would have independently supported an assertion that there was fair value for that element. Counter Lanni 56.1 ¶ 173.

B.    **EY Learned During the Audit Committee Investigation That Lanni Had Advised the Sales Staff Not to Document the Presence of Hosting Services and on How to Respond to Auditor Inquiries.**

Lanni testified that she received feedback from EY that there was a "rare" exception to GAAP guidance that would allow a company to recognize revenue on a license with hosting where

there was no "vendor specific objective evidence" of fair value, if there was a "bona fide bidding process." Counter Lanni 56.1 ¶ 174. If there were no bona fide bidding process that could support the value of hosting, Lanni testified that the company would have to recognize revenue ratably over the life of the license. *Id.*

Lanni testified that the first time she came across hosting being provided with a license at the company was with a transaction with Frontier, which she brought to Rosenberger's attention. Counter Lanni 56.1 ¶ 175. Lanni concluded there was a bidding process that allowed for revenue recognition upfront and that EY must not have had an issue with it. *Id.*

EY came to a different conclusion during the audit committee investigation. It learned, for example, that Lanni had emailed a company sales executive, Chris Putnam, on October 27, 2016, regarding the Frontier deal, as follows:

> EY, our external auditors, are looking to talk to you about the hosting deal negotiation process. In order to be able to recognize the license revenue upon its delivery we took an approach that the hosting was awarded to Synchronoss via a competitive bid process. Our support was not sufficient as a [*sic*] persuasive evidence of a bona fide bid process and they would like to speak to a business person in order to walk them through the negotiations.…
>
> Main key points to remember during your conversation with EY are:
> - We have sold the software w/o hosting before
> - We market the software to customers with or w/o hosting
> - There is no benefit to the customer if the software is hosted by Synchronoss.

Counter Lanni 56.1 ¶ 54.

Rogers testified that EY discovered this email during the audit committee investigation, and it raised a concern for EY as to Lanni's conduct, because EY learned that the points Lanni was telling the sales staff to "remember" were not true and were things the finance department had told EY, including that hosting was a "plain vanilla" add-on that anybody could do. Counter Lanni 56.1 ¶ 54. He was also concerned that Lanni (a former auditor from EY) was interfering with EY's efforts

to corroborate what they were told by the finance department, because Lanni was giving Putnam a "preview of the questions we would ask." *Id.*

Of similar concern to EY was an email discovered during the audit committee investigation, which Lanni had sent to Post and Andrew Wilmott on the LNP transaction (while it was still being negotiated) on October 20, 2016. Counter Lanni 56.1 ¶ 54. In the email thread, Post had alerted Lanni that hosting would be part of the license transaction, and she responded with a "heads up":

> The total contract value for the license and maintenance cannot be less than what we have been recognizing and the license price has to stay at $3M. There is really not much flexibility there on what we have recognized through Sep. 30. *Our signed SOW shouldn't mention anything about hosting it. Hosting element would revert us to a SaaS model and disallow recognition of the license upon delivery.* Let's talk through on our call.

*Id.* (emphasis added).

Rogers testified that EY's concern was that, if Lanni knew of the hosting component of the transaction, it "should have been brought to our attention." Counter Lanni 56.1 ¶ 54. When asked if he was concerned that Lanni had not told Wilmott not to host the software, but rather that it should not be mentioned in the statement of work, Rogers responded, "Yes, that was the concern." *Id.*

Based on emails such as these, EY became concerned that Lanni had not been honest with EY about the presence of hosting on a number of the company's transactions. They raised these concerns with the audit committee, and EY concluded (as it had with Rosenberger) that it could no longer rely on Lanni's representations. Counter Lanni 56.1 ¶ 87.

### C.    Rogers Complained to Yablonowitz in January 2017 about Rosenberger's "Aggressive" Accounting on Licenses with Multiple Elements.

Rogers also complained about Rosenberger to EY auditor Yablonowitz on January 14, 2017, stating Rosenberger "wasn't happy in Q2 and Q3," because EY "made them reverse certain revenue that they had recorded up front that should have been deferred," which (to give them the benefit of the doubt), he did not put in EY's Summary of Audit Differences "as recorded differences or call out control differences." Counter Ros. 56.1 ¶ 49. In particular, Rogers complained that "[t]hey have

been aggressive in trying to front load revenue." *Id.* Yablonowitz responded to Rogers that she "completely understand[s] your position," and that "Karen [Rosenberger] pushes the guidance and I guess this year just totally got it wrong." *Id.* Yablonowitz added that it "would be helpful if she had a controller that kept her straight but Joanna [Lanni] covers for herself and doesn't push back instead of being upfront with us early on and asking for help." *Id.*

### D. Rosenberger Was Informed in November 2016 That the Windstream License Deal Included Hosting.

On June 17, 2016, Rosenberger received a forwarded email regarding the status of negotiations on Amendments 9 and 10, SEC 56.1 ¶ 207, in which Murdock explained that among the outstanding items were "Hosting SOW [Statement of Work]—may come later, but they may ask." A few months later, on November 11, 2016, Ament emailed Rosenberger that "[w]e have 2 deals being presented to us by Analytics that are *Licenses with hosting.* Please correct me if I am wrong but is the final ruling—any License with hosting must be spread for rev rec? They are trying to get us to recognize the entire License in Q. *These deals are not much different than what we did in Q2 for Earthlink and Windstream.*" SEC Counter Ros. 56.1 ¶ 238 (emphasis added). Rosenberger responded that she agreed that revenue recognition must be spread if there is hosting provided with a license. *Id.* at SEC-ROSENBERGER-LIT-000727351.

## IV. ROSENBERGER OVERSTATED REVENUE FROM THE SAGE RESELLER TRANSACTION.

### A. After Learning Windstream Would Not Close a $4 Million Deal in Q4 2016, Synchronoss Persuaded Its Subcontractor to Sign a "Reseller Agreement" So Synchronoss Could Still Record Revenue in Q4 2016.

Sage was a subcontractor engaged by Razorsight (and then Synchronoss, after it acquired Razorsight), to perform audit services for Synchronoss's customers, including Windstream. Counter Ros. 56.1 ¶ 397. Sage was never a customer of Synchronoss, only a vendor, and had never been billed

by the company for any goods or services. Counter 56.1 ¶¶ 399, 464. Before Q4 2016, Sage had never

served as a software reseller. Counter 56.1 ¶ 406.

Sage's annual revenues for 2016 and 2017 ranged between only $4 million and $7 million, and

eighty percent of that revenue came from Synchronoss. Counter Ros. 56.1 ¶ 401. Johnson, Sage's

then-CEO, testified that he had disclose Sage's revenue to Charlie Thomas, the senior company

salesman on the Windstream relationship, and that Synchronoss's executives knew it was a small

company. Counter 56.1 ¶ 403. Without an increase in the amount of work they were hired to do,

Johnson testified, Sage would have to lay off employees. *Id.*

On December 26, 2016, a Windstream employee informed Thomas, the former head of

Razorsight and senior Synchronoss executive on the Windstream relationship, that "a year-end deal"

for $4 million Synchronoss had been counting on was "just not possible. We need to more fully

evaluate the integration of these products into Windstream." Counter Ros. 56.1 ¶ 408. Thomas

forwarded this email to COO Garcia, Daniel Ives, and other members of the sales team. Ives

responded, "So Sage is the best path. Let's drive it my man!" Counter Ros. 56.1 ¶ 409. Garcia likewise

replied, "Full court press on Sage." *Id.*

Two days later, on December 28, 2016, Rosenberger emailed Lanni, Shaver and Murdock to

ask for an update on "[t]his Sage deal I just heard about." Counter Ros. 56.1 ¶ 410. Murdock

responded that "Windstream was unable to sign for q4 but indicated they still intend to buy in Q1,"

and explained in response that the sales department sought to have Sage "buy a license as a

resale/distributor and buy from us to sell to customers such as Windstream." Counter Ros. 56.1 ¶ 411.

Murdock added that "I can see Sage having significant reservations on a deal of the structure needed

but Sales thinks they will consider this and do have some level of funds." *Id.*

A few hours later, Murdock forwarded Rosenberger an email from Bandini, a Synchronoss

salesman, to Johnson, Sage's CEO, copying Thomas, about the "Sage-Synchronoss Reseller

Agreement." Counter Ros. 56.1 ¶ 413. Prague, who also received the same email, asked how the company would make money on any deal, since the agreement did not provide for any compensation. Ives responded, copying Rosenberger and others, "We need this deal first off. *Second they are only gonna sell it to windstream but the wording need to be more general so mcfly proof and not focused just on windstream.*" Counter Ros. 56.1 ¶ 416 (emphasis added). "Mcfly" was a derisive reference to Shawn Rogers that senior management, including Rosenberger, used with one another. Counter Ros. 56.1 ¶ 417.

Prague then responded to Ives' email: "Lawyers don't trust 'understandings' like this." Counter Ros. 56.1 ¶ 418. Ives then forwarded this email chain to Rosenberger and others with Ives' response: "Hear ya. Red line what u guys want. Just want to give broad structure of deal." *Id.*

As Johnson testified, the rationale for the reseller agreement was (consistent with Ives's "Mcfly proof" email) that Synchronoss was "trying to sell their software before the end of the year to Windstream. Windstream was slow, slower than they wanted. So our understanding was they . . . wanted [Sage] to purchase a license and then resell it to Windstream and make sure that they had the contract before the end of 2016." Counter Ros. 56.1 ¶ 419. Johnson further explained that one purpose behind the reseller agreement "was to make sure [Synchronoss] hit their number for Wall Street so their stock didn't dip." Counter Ros. 56.1 ¶ 420.

Johnson testified that Sage "didn't want to do the deal, period." Counter Ros. 56.1 ¶ 422. Johnson had significant concerns about Sage's ability to pay the $4 million due to Synchronoss because Sage "didn't have $4 million" in cash, which he had told the company's sales staff. *Id.*

Lanni testified that she understood that a contract of millions of dollars was a large contract for a company of Sage's size. Counter Ros. 56.1 ¶ 423. As a company that performed audit services, Sage did not have the capability to host or provide support services. Counter Ros. 56.1 ¶ 424.

**B. Rosenberger Learned the Sales Staff Kept Trying to Put Contingencies on Sage's Obligation to Pay the Company in the Reseller Agreement.**

Johnson testified that between Christmas and New Year's Day, Rosenberger participated in two telephone calls with Johnson and several Synchronoss employees discussing the reseller agreement. Counter Ros. 56.1 ¶ 429. During the first call, Johnson recalled that various Synchronoss employees discussed how to make sure the reseller agreement would count towards 2016 revenue. *Id.* Johnson testified that during both of the calls, Rosenberger was objecting to the contract because it was not "tight enough for revenue recognition." Counter Ros. 56.1 ¶ 431. Specifically, Rosenberger "wanted to make sure that *in that contract, at least*, that—that we were—that we were signing it and we were going to pay $4 million." *Id.* (emphasis added).

At 2:37 p.m. on December 30, 2016, Murdock sent a revised draft of the Sage reseller agreement to Rosenberger, Prague, Assistant Controller Joshua Shaver, and other members of the Finance and Sales Departments. Counter Ros. 56.1 ¶ 432. Murdock noted the redlined draft included "potential changes and edits to the draft we provided Sage to address some concerns noted." *Id.*

The redline indicated that one of the additions made to "address some concerns noted" was a new paragraph providing that Synchronoss would assist Sage in selling the software to end users and negotiating the subsequent contracts. It stated: "Licensor shall provide reasonable support to Customer in sales and marketing of the Software," which "shall include assistance in responding to technical questions of prospective Carriers" among others. Counter Ros. 56.1 ¶ 433.

Shaver replied with a list of points, identifying items that would "imply contingencies on any distributions/reselling" which "we cannot have" because they would mean "no rev rec." Counter Ros. 56.1 ¶ 434. He added, "None of this can exist in another agreement. If we can't meet this criteria, we will lose rev rec and it will be deferred until licenses are sold to end user." *Id.* Rosenberger agreed, noting she had given comments on the draft as well. Counter Ros. 56.1 ¶ 435.

Later on December 30, 2016, Rosenberger received and accepted an invitation to an

"Internal discussion on Sage reseller agreement" call scheduled for 5:30 p.m. that evening. Counter Ros. 56.1 ¶ 436. At 10:30 p.m., Rosenberger received an email from Murdock proposing and attaching a "February executed amendment" to Sage's Auditing and Consulting Services Agreement ("Auditing Agreement") with Synchronoss, dated January 17, 2012. Counter Ros. 56.1 ¶ 437. The attached draft amendment again attempted to add contingencies on Sage's payment obligations. *See* Counter Ros. 56.1 ¶¶ 437-39. Shaver responded the next day:

> Why are we putting a contingency in here tying to the reseller agreement. We can't have that, otherwise rev rec is contingent on ensuring sage has recovered 4m on the reseller agreement. This was the point I was making on my previous email. We can't expect any future concession or this make whole provision because then we aren't transferring risk.

Counter Ros. 56.1 ¶ 440. Rosenberger responded, "Agreed." *Id.*

After seeing two attempts by the sales staff to add contingencies benefiting Sage, Rosenberger thereafter never questioned how Sage planned to pay for the license in the reseller agreement, nor did she question why the draft amendment was scheduled to be a "February executed amendment," when the Reseller Agreement was to be signed by the end of the year. Counter Ros. 56.1 ¶ 441.

By the morning of December 31, 2016, Sage had not yet agreed to sign the Reseller Agreement. Counter Ros. 56.1 ¶ 442. At 8:40 a.m., Ament emailed Thomas with the update that Murdock had "made some edits [to the contract] and is trying to work on the internal approvals from Karen [Rosenberger] and Josh right now so we can be sure to get rev rec." *Id.*

That same morning, at Thomas's request, Ives called Johnson and promised that Synchronoss would pre-pay fees to Sage to finance Sage's obligation to Synchronoss under the Reseller Agreement and therefore eliminate any financial risk that Sage might face from the deal. Counter Ros. 56.1 ¶ 444. Synchronoss drafted such a document, entitled "Amendment No. 3 to Auditing and Consulting Services Agreement" ("Amendment 3"). Counter Ros. 56.1 ¶ 447. In the meantime, on the afternoon of December 31, 2016, Synchronoss and Sage signed the Reseller Agreement, which ostensibly

provided that Sage would pay Synchronoss $3.6 million for a license for three types of Synchronoss software that it could then resell to other companies. The Reseller Agreement on its face did not contain any contingencies and made no mention of any side agreement. Counter Ros. 56.1 ¶ 448.

### C.   Lanni Told Synchronoss's New CFO in 2017 That the Sage Reseller Agreement Was Always Contingent, and That She Was Not On the "Same Page" With Rosenberger.

On March 9, 2017, Synchronoss's new CFO John Frederick asked Lanni, "Do you know when the Sage $4 million Q4 receivable is due? Has anyone followed up on payment?" Counter Ros. 56.1 ¶ 450. Lanni wrote, "Sage was due March 1, 2017. Sage's payment to us has always been contingent on selling the license to Windstream (never stated in writing). I know this revenue should have been accounted on cash basis, but the Company did not share that position." Counter Ros. 56.1 ¶ 451.

By "accounted on a cash basis," Lanni meant that "the revenue is recognized on a time when the cash comes in as opposed to when a product or service is sold or provided"—*i.e.*, once Sage actually paid the $4 million to Synchronoss. Counter Ros. 56.1 ¶ 452.

Later in the same email chain, Lanni wrote to Frederick, "Btw, I wish you were the cfo when I was the controller. I think we would be on the same page. Unfortunately, life does not work that way." Counter Ros. 56.1 ¶ 453. Lanni testified that by writing this, she was contrasting her experience working with Frederick as CFO with her experience working with Rosenberger as CFO. *Id.*

### D.   Rosenberger Reviewed and Approved the Sage Revenue Recognition Memorandum.

The finance department prepared a memorandum for the Sage reseller transaction, which Lanni signed, but, contrary to company policy, Rosenberger did not. Counter Ros. 56.1 ¶ 455. Rosenberger testified, however, that she was required by company policy to review and approve the memorandum and stated that she had no "reason to believe that that policy was not followed in connection with the Sage transaction." *Id.* Rosenberger's expert, Hines, testified that, if her signature

was required, the lack of her signature on the memorandum "could be a defect in Synchronoss's internal controls." Counter Ros. 56.1 ¶ 457.

The memorandum recognized $3,598,880 in revenue from three licenses sold to Sage pursuant to the Reseller Agreement. Counter Ros. 56.1 ¶ 458. The memorandum concluded that the fee due to Synchronoss under the Reseller Agreement was fixed or determinable, noting the relevant provisions of ASC 985-605-25-36, which identifies the factors a vendor must consider when determining whether an arrangement fee with a reseller is fixed or determinable, and thus whether revenue from the fee can be recognized. Counter Ros. 56.1 ¶ 459. These factors include whether (1) business practices, the reseller's operating history, competitive pressures, informal communications, or other factors indicate that payment is substantially contingent on the reseller's success in distributing individual units of the product; and (2) resellers are new, undercapitalized, or in financial difficulty and may not demonstrate an ability to honor a commitment to make fixed or determinable payments until they collect cash from their customers. *Id.*

This ASC guidance, the SEC's expert explained, requires accountants to consider factors beyond the four corners of the contract itself for reseller agreements, such as "business practices," "informal communications," or the fact that the reseller "may not demonstrate an ability to honor a commitment." Counter Ros. 56.1 ¶ 459.

The revenue recognition memorandum did not disclose that Synchronoss initiated the reseller arrangement with Sage. Counter Ros. 56.1 ¶ 461. Nor did it disclose that the reason for Synchronoss initiating the arrangement was to close the deal and recognize revenue before the end of the year, and that, as Ives had pointed out in his email to Prague and Rosenberger, that Sage had never been a reseller, was just going to be selling to Windstream, and there was no further upside to Synchronoss, because Synchronoss needed the revenue in Q4 2016. *Id.* Although the memorandum

represented that "Synchronoss is not committed to helping Sage in selling to carriers," the Reseller Agreement specifically provided the contrary. Counter Ros. 56.1 ¶ 462.

With respect to the required element of probability of collection, the memorandum stated, "Razorsight Corporation, which was acquired by Synchronoss in 2015, has been engaged in business with Sage since 2010 and has not had any billing issues. As such, we find that collectibility of the fees is probable." Counter Ros. 56.1 ¶ 463. The memorandum did not disclose that Sage had never been a customer of Synchronoss, had never been invoiced by Synchronoss, and therefore had no billing history at all. Counter Ros. 56.1 ¶ 464.

On February 27, 2017, Rosenberger signed a management representation letter and provided it to EY in connection with Synchronoss's financial statements for the year ended December 31, 2016. Counter Ros. 56.1 ¶ 477. The letter stated, among other things:

> We have disclosed to you all sales terms (both expressed and implied), including all rights of return or price adjustments and warranty provisions. We have made available to you all significant contracts, communications (either written or oral), and other relevant information pertaining to arrangements with our customers, including distributors and resellers.

*Id.*

### E. Rosenberger Misrepresented the Sage Reseller Transaction to the Auditors.

As Rosenberger knew, the revenue recognition memorandum for the Sage reseller transaction was sent to Synchronoss's auditors. Counter Ros. 56.1 ¶ 466.

EY had requested information from Rosenberger and Lanni in February 2017 about any collectability analyses performed for Sage. Counter Ros. 56.1 ¶ 468. Neither Rosenberger nor Lanni could recall providing any answers to EY's questions, and Rosenberger testified she did not remember preparing any collectability analyses on Sage or, if one was prepared, sending it to EY. Counter Ros. 56.1 ¶ 470. Rogers testified that he could not recall Rosenberger ever disclosing to him during the 2016 audit that Sage had not previously been a customer of Synchronoss. Counter Ros. 56.1 ¶ 471.

After the 2016 audit, the EY auditors learned that Sage was previously a vendor and not a customer, and Rogers was "surprised" that such a fact "wasn't brought to our attention." Counter Ros. 56.1 ¶ 472. Rogers testified that the revenue recognition memorandum's statement that collectability was probable because Synchronoss "has been engaged in business with Sage since 2010 and has not had any billing issues" was "misleading," given that Sage had never been a customer. Counter Ros. 56.1 ¶ 467. Rogers explained that the statement implied that Sage had received bills from Synchronoss and was credit-worthy, when in fact it had not and when Synchronoss had no credit history from which to draw any conclusions about Sage. *Id.*

Rogers testified that such information would have been relevant to him for understanding the "the business purpose and substance [of] a transaction," *i.e.*, whether the transaction was performed primarily for purposes of revenue recognition and did not have economic substance. Counter Ros. 56.1 ¶ 473. He also testified that at no point during the 2016 audit was he told that the reseller transaction was executed as a way for the company to recognize revenue in the fourth quarter of 2016 because the intended customer, Windstream, was not going to purchase the license in the fourth quarter of 2016. Counter Ros. 56.1 ¶ 474. According to Rogers, such facts would have been "key information in evaluating the accounting for the transaction" because "the reseller accounting guidance is fairly specific that to recognize a sale to a reseller, that there can't be any contingencies with respect to that software being resold." Counter Ros. 56.1 ¶ 475.

Rosenberger testified that "I think [Sage] were both a customer and a vendor from my recollection," but could not recall from whom she learned that Sage was a customer, did not know what products or services Sage purchased from Synchronoss, and did not know how much revenue Synchronoss (purportedly) obtained from Sage as Synchronoss's customer. Counter Ros. 56.1 ¶ 502.

## F.     GAAP Precluded Revenue Recognition on the Sage Reseller Transaction.

The SEC's expert, Taub, concluded that, even disregarding the side letter to Sage, Synchronoss's collectability assessment was flawed. First, Taub concluded (as had the EY auditors) that the representation about there being no billing issues did not establish probability of collection, because Sage was not a customer, and had no relevant billing history. Counter Ros. 56.1 ¶ 487-90.

Second, Taub pointed out that ASC 985-605-25-36(b) required consideration of whether resellers are "new, undercapitalized or in financial difficulty and may not demonstrate an ability to honor a commitment to make fixed or determinable payments until they collect cash from their customers." Counter Ros. 56.1 ¶ 491. Sage was a brand-new reseller without the ability to pay the $4 million due under the Reseller Agreement, as Johnson repeatedly told Synchronoss. *Id.* Because Synchronoss did not consider these factors—and instead relied on "a non-existent history of collections"—Synchronoss "did not fully consider Sage's ability to pay in the absence of resale." *Id.*

Third, SEC Staff Accounting Bulletin No. 104 states that, if "the seller has significant obligations for future performance to directly bring about resale of the product by the buyer," this precludes revenue recognition even if title to the product has passed to the buyer. Counter Ros. 56.1 ¶ 481.  EY's own revenue recognition guide and Synchronoss's corporate accounting policy were consistent with this guidance in SAB 104. Counter Ros. 56.1 ¶ 482-83.

The executed Reseller Agreement contained such a provision, requiring Synchronoss to provide "reasonable support to Customer in sales and marketing of the Software to Carriers and in the negotiation of Carrier Agreements," including "assistance in responding to technical questions of prospective Carriers, review of proposal requests, demonstrations and providing available collateral materials." Counter 56.1 ¶ 493. This provision, Taub concluded, rendered Synchronoss's recognition of revenue on the Sage Reseller Agreement inappropriate. Counter Ros. 56.1 ¶ 496.

This exact provision was highlighted as an addition to the Reseller Agreement in a redline sent to Rosenberger on December 30, 2016, Counter Ros. 56.1 ¶ 495. Rosenberger testified that it was her practice to review transaction documents such as the Reseller Agreement in connection with her review of revenue recognition memoranda. Counter Ros. 56.1 ¶ 494.

### G. Rosenberger Did Not Do Any Analysis to Determine that Collectability Was Probable.

Rosenberger failed to conduct any collectability analysis on the transaction. Counter Ros. 56.1 ¶ 497. Rosenberger admits that she did not recall specifics of Sage's financial condition in 2016 and did not have any understanding in 2016 about Sage's assets and liabilities or what its annual income was. Counter Ros. 56.1 ¶ 498. Johnson testified Rosenberger never questioned him about Sage's ability to pay the $4 million due under the Reseller Agreement. Counter Ros. 56.1 ¶ 499. Nor did Lanni recall any discussions with Rosenberger about collectibility from Sage on the reseller agreement. *Id.*

When asked whether she ever made "any inquiry into Sage's assets, liabilities, or income," Rosenberger responded that she only asked Prague whether there was a legal right of offset against Sage, *i.e.*, "if we could withhold payment to Sage if we did not get paid." Counter Ros. 56.1 ¶ 500. Rosenberger did not describe any other inquiries she made into Sage's assets, income, or ability to pay. *Id.* The company's accounting policy did not vision allow for a "legal right of offset" to constitute a valid means of assessing collectability. Counter Ros. 56.1 ¶ 483-84. In any event, Prague did not recall Rosenberger raising the issue of the legal right of offset with him. Counter Ros. 56.1 ¶ 501. Nor did he recall any discussions with Rosenberger or anyone else in the finance department regarding collectability with respect to Sage. *Id.*

Synchronoss policy required each "new customer to go through an initial credit review process, which evaluates the customer's financial positions, historical payment history and ultimately their ability to pay." Counter Ros. 56.1 ¶ 505. Rosenberger did not recall if she or anyone else in the

Finance Department conducted an initial credit review on Sage. Counter Ros. 56.1 ¶ 506. Johnson testified he did not believe Synchronoss did an initial credit review or ran a credit check on Sage. *Id.*

Taub concluded that during the Relevant Period, Rosenberger possessed sufficient information "(1) to have concluded that the original accounting used by SNCR and its recognition of $3.6 million in revenue on the Sage reseller transaction was improper; and (2) to make it clear that her analyses and conclusions regarding the accounting treatment, and the recognition of revenue from the Sage reseller agreement, was unreasonable." Taub Report ¶ 212.

## STANDARD OF REVIEW

To win summary judgment, Defendants must demonstrate that there is insufficient evidence to support an essential element of the SEC's claim, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and that therefore there is no "genuine issue as to any material fact" for a jury to try. Fed. R. Civ. P. 56(a). A fact is material for summary judgment if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). "In deciding a summary judgment motion, a court resolves all factual ambiguities and draws all … inferences in favor of the non-moving party." *SEC v. Suman*, 684 F. Supp.2d 378, 385 (S.D.N.Y. 2010) (citing *Anderson*, 477 U.S. at 255; *Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A party cannot win summary judgment simply by ignoring relevant evidence. *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 652 F. Supp.2d 495, 503-04 (S.D.N.Y. 2009).

## ARGUMENT

## I.  THE COMPANY'S AND EY'S INTERNAL INVESTIGATIONS PROVIDE NO BASIS FOR GRANTING DEFENDANTS SUMMARY JUDGMENT.

Defendants argue the SEC's case suffers from the "global" defect that Synchronoss's internal "investigative team" already exculpated them and that EY did not find any intentional fraud on Defendants' part, during EY's "shadow investigation." Rosenberger Mem. at 5-7, 16-17, 19-20,

24; Lanni Mem. at 9, 26. These arguments have no merit for three reasons: (1) Defendants have submitted no admissible evidence to establish that the internal investigation exonerated them; (2) the company's opinions after its self-serving internal investigation are disputed; and (3) EY auditors testified here that Defendants had not been honest with them and could not be relied upon.

### A. Defendants Have Offered Only Inadmissible Hearsay As to the Conclusions of the Company's Internal Investigation.

Defendants have submitted no admissible evidence to support their assertions about what the company's "investigative team" concluded. The record contains no declaration on personal knowledge; no deposition testimony; and not even the name(s) of any of the members of this team, none of whom Defendants sought to depose.

Instead, Defendants rehash in their Rule 56.1 Statements (1) portions of second-hand memoranda written by EY, not by any member of the company's "Investigative Team," that in turn reference the company's purported findings; or (2) after-the-fact, internal memoranda written by the company's new management at the time of its restated financials. *See, e.g.*, Counter Ros. 56.1 ¶¶ 76, 91, 96; Rosenberger Mem. 5-7, 16-17, 19-20, 24; Counter Lanni 56.1 ¶¶ 47-51.

These materials are inadmissible under Federal Rule of Evidence ("FRE") 602, because they were not offered on the basis of any personal knowledge by any witness. They are also inadmissible hearsay under FRE 802, because both Defendants offer these reports for the truth of the matters asserted in them, and hearsay within hearsay barred by FRE 805. The documents are also particularly unreliable hearsay, given the highly unusual circumstances in which they were written, and thus cannot qualify as records of regularly conducted activity under FRE 803(6). Pursuant to Fed. R. Civ. P. 56(c)(4), citations to Synchronoss's internal investigation documents and EY's reports about them are therefore not properly considered on this motion for summary judgment, and arguments based on these documents should be stricken or disregarded by the Court on this motion for that reason alone. *See, e.g., Seife v. FDA*, No. 17 Civ. 3960 (JMF), 2019 WL 1382724, at *1

(S.D.N.Y. May 27, 2019) (quoting *Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir. 2004)).

**B.     The "Investigative Team's" Opinions Should Not Usurp the Jury's Role.**

But even if Rosenberger had admissible evidence, the company's and EY's self-serving opinions cannot usurp the role of the Court and the jury in this proceeding. *SEC v. Obus*, 693 F.3 276, 291 (2d Cir. 2012) (reversing grant of summary judgment to defendant because it was in part grounded in an internal company investigation). Allowing such opinions to do so would enable corporate officers to escape liability for their misconduct once a company's management conducts a whitewashing internal investigation.

Here, Synchronoss's internal investigation took place while the SEC was *also* investigating the company's conduct. Counter Ros. 56.1 ¶ 76. Synchronoss thus had an obvious self-serving motive to avoid findings that could constitute corporate admissions of fraud. In such situations, the Second Circuit has held that conclusions of corporate internal investigations purporting to exculpate its officers are not dispositive on summary judgment. For example, the Second Circuit in *Obus* found it was error to grant summary judgment for a defendant based on an internal investigation by his former employer, GE Capital, reasoning:

> [T]he internal investigation was not indisputably reliable, and … its conclusions were contradicted by other evidence. … More broadly, the GE investigation was motivated by corporate interests that may or may not coincide with the public interest in unearthing wrongdoing and affording a remedy. And finally, the conclusion of such an internal investigation cannot bind a jury, which will make its own independent assessment of the evidence.

693 F.3 at 291. The Court should likewise refuse Defendants' invitation to grant them summary judgment based on the company's and EY's internal investigations.

**C.     EY's Auditors Testified the Defendants Were Not Honest or Reliable.**

Defendants claim that EY made no finding or conclusion of intentional fraud on their part, but the testimony of EY's coordinating partner, Shawn Rogers, and its senior manager, Lisa Phillips, and documentary evidence show otherwise. *See* Sections I.C, I.B.4, II.E, and III.B, above. With

38

respect to Rosenberger, Rogers and Phillips testified that they concluded she had "not been honest" with them on the three fraudulent transactions at issue here (among others). Counter Ros. 56.1 ¶ 82. They also reacted with surprise, disbelief, and disappointment when learning of the information Rosenberger had that she did not share with them, which caused them to conclude they could no longer rely on her representations and to report their concerns to the company's audit committee. *Id.*

As for Lanni, after discovering documents, including an email from Lanni advising the sales team on the ATT-LNP transaction to conceal the presence of hosting arrangements in transactional documents so as not to defeat revenue recognition, EY concluded it could no longer rely on Lanni's representations. Counter Lanni 56.1 ¶ 87.

That EY did not make a "finding" or conclusion of "fraud," as Defendants contend, Rosenberger Mem. at 5-6 and Lanni Mem. at 9, 26, is irrelevant. EY is not an enforcement agency, and it remains Synchronoss's external auditor. As Rogers testified, making findings of fraud was not EY's role in the audit committee investigation. Counter Ros. 56.1 ¶ 82. Nor is it relevant to this proceeding that EY's audit engagement letter required it to bring to the company's attention evidence of fraud. Counter Ros 56.1 ¶¶ 62, 82. EY's contractual obligations and its compliance is immaterial to Rosenberger's liability for violating the anti-fraud provisions of the securities laws.

Even if EY had concluded that Defendants did not engage in misconduct, such a conclusion would not constitute grounds to grant summary judgment in Defendants' favor. *See In re Chicago Bridge & Iron Co. N.V. Sec. Litig.* ("*Chicago Bridge*"), No. 17 Civ. 1580 (GBD), 2021 WL 3727095, at *6 (S.D.N.Y. Aug. 23, 2021) (denying defendant's motion for summary judgment, which was based on claim not only that the "external auditors reviewed its disclosures and deemed them reasonable," but also that the SEC "closed an investigation into [defendant's] accounting practices.").

Courts in the Second Circuit have rejected attempts by defendants to escape liability based on prior findings (or non-findings) of a company's auditor. *See Chicago Bridge*, 2021 WL 3727095, at

*6 (an external auditor's findings "at most show[s] that a material issue of fact exists as to whether…[there] were in fact misstatements"); *SEC v. Sequential Brands Grp., Inc.,* No. 20-Civ.-10471 (JPO), 2021 WL 4482215, at *8 (S.D.N.Y. Sept. 30, 2021) (citing cases).

## II. THE SEC IS NOT REQUIRED TO HAVE AN EXPERT TESTIFY THAT ROSENBERGER ACTED WITH THE REQUISITE SCIENTER.

In her next "global defect" argument, Rosenberger contends that the SEC's expert, Taub, did not include in his report a conclusion that Rosenberger's conduct was an "extreme departure from acceptable norms," and that she is entitled to summary judgment because the SEC therefore cannot prove recklessness. Rosenberger Mem. at 29. The SEC, however, is not required to present expert testimony to establish that Rosenberger acted recklessly in committing fraud, *see, e.g., United States v. Rigas,* 490 F.3d 208, 219-220 (2d Cir. 2007), and Rosenberger cites no case to the contrary.[6] Moreover, as this Court has recognized, the absence of phrases such as "extreme departure" in a plaintiff's expert report does not entitle a defendant to summary judgment, particularly where, as here, an expert's report is "replete with examples of failures to comply with critical requirements under" GAAP. *In re Worldcom, Inc. Sec. Litig.,* 352 F.Supp.2d 472, 500, n. 34 (S.D.N.Y. 2005).

Taub's report analyzes the GAAP provisions at issue and how the information Defendants had at the time they reached their accounting conclusions was sufficient to make it clear that their conclusions were inconsistent with GAAP. *See* Taub Decl. (Dkt. No. 123) Ex. 1 ("Taub Report") ¶¶ 67-72, 95-106, 135-37, 174-86, 212-23. Taub's testimony will be helpful to a lay jury, without usurping its role in assessing how far Rosenberger's conduct departed from acceptable norms.

---

[6] Rosenberger cites only *McLaughlin v. Langrock Sperry & Wool, LLP,* 2020 U.S. Dist. LEXIS 103404, at *24 (D. Vt. June 12, 2020), Rosenberger Mem.at 29, which is inapposite. It involved an escrow agent's alleged breach of fiduciary duty, not knowledge or recklessness under the securities law.

### III. SUBSTANTIAL UNDISPUTED EVIDENCE SHOWS THAT ROSENBERGER VIOLATED AND AIDED AND ABETTED VIOLATIONS OF SECTION 10(b) AND RULE 10b-5.

The Complaint alleges that Rosenberger violated Exchange Act Section 10(b) and Rule 10b-5(b) through multiple SEC filings that inflated Synchronoss's financial results based on three transactions. First, it alleges violations of these provisions because she signed and certified the company's Q3 2015 Form 10-Q and the 2015 Form 10-K. These filings inflated the company's results by improperly including revenue of $4.35 million and $3 million from two purported transactions with AT&T—ASR and LNP—in the third and fourth quarter of 2015, respectively, and from both transactions, for a total of $7 million, in the 2015 Form 10-K. Counter Ros. 56.1 ¶ 100, 527; SEC 56.1 ¶ 117. Rosenberger also endorsed similarly misleading Forms 8-K for each of those periods that announced inflated financial results. Counter Ros. 56.1 ¶¶ 325-28, 509-10, 528-29; SEC 56.1 ¶¶ 118.

Second, Rosenberger violated the same anti-fraud provisions because she signed and certified the company's false and misleading Q1 2016 Form 10-Q and the 2016 Form 10-K. These filings inflated financial results by improperly including as revenue a $10 million license fee Synchronoss extracted from Openwave during its negotiations over the acquisition price. Rosenberger also endorsed similarly misleading Forms 8-K that announced the same inflated financial results for each of those periods. Counter Ros. 56.1 ¶¶ 325-28.

With respect to all three of these transactions, Rosenberger violated Rule 10b-5(a) and (c), by actively concealing material facts about them from EY. Rosenberger does not challenge on the instant motion the SEC's claims that she made materially false statements by publicly filing the company's inflated financial results for the periods in question by recognizing revenue in violation of GAAP, but argues she is entitled to summary judgment on the SEC's fraud claims because the SEC cannot establish scienter. Rosenberger's arguments are meritless, and her motion should be denied.

Scienter can be established by showing "reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *SEC v. Rosenberger*, No. 22 Civ. 4736 (DLC), 2023 WL 1928093, at *5 (S.D.N.Y. Feb. 10, 2023) (citing *SEC v. Sourlis*, 851 F.3d 139, 144) (2d Cir. 2026). And recklessness can be shown by a defendant's failure to "review or check information that [she] had a duty to monitor," or where a defendant "ignored obvious signs of fraud." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)*; see also Subaye, Inc.*, No. 13 Civ. 3114 (PKC), 2014 WL 448414, at *6 (S.D.N.Y. Feb. 4, 2014).

Scienter can alternatively be established where a defendant makes a false statement while knowing the facts that make that statement false. *See SEC v. Frohling*, 851 F.3d 132, 138 (2d Cir. 2016); *SEC v. Gallison*, 588 F. Supp.3d 509, 524-25 (S.D.N.Y. 2022) (granting summary judgment to SEC where defendant knew the statement was "false when made"); *SEC v. Sayid*, No. 17 Civ. 2630 (JFK), 2019 WL 6307367, at *8 (S.D.N.Y. Nov. 25, 2019), *aff'd*, 860 F. App'x 18, 20 (2d Cir. 2021).

To defeat Rosenberger's summary judgment motion, the SEC need only offer evidence from which a jury could infer scienter, because it is the rare defendant who admits to having had fraudulent intent. *Nagelberg v. Meli*, No. 17 Civ. 2524 (LLS), 2022 Wl 2078010, at *1 (S.D.N.Y. June 9, 2022 (denying motion for summary judgment in favor of defendant as to defendant's scienter).

With respect to each of the three transactions at issue—the LNP and ASR ones involving AT&T and the Openwave transaction—ample evidence would allow a jury to infer that Rosenberger acted knowingly or recklessly when inflating Synchronoss's public financial statements. And in the case of the LNP transaction, no rational factfinder could find in favor of Rosenberger.

## A. Ample and Often Undisputed Evidence Supports the SEC's Claims that Rosenberger Acted with Scienter with Respect to the Two AT&T Transactions.

### 1. The LNP Transaction

Rosenberger admits she knew the supposed letter agreement for the LNP license transaction

was signed on January 8, 2016 and backdated to December 31, 2015. Rosenberger Mem. at 14-15.

She had been told to expect as much earlier that week. SEC 56.1 ¶¶ 56-63. As shown in the SEC's

motion papers, she caused this document to be sent to EY. SEC SJ Br. at 12-13. Courts have

recognized that providing backdated agreements to auditors, as Rosenberger knowingly did,

constitutes "plainly deceptive" conduct. *See, e.g.*, *SEC v. Jacoby,* No. 17 Civ. 3230, 2021 WL 351176,

at *10 (D. Md. Feb. 2, 2021) (granting summary judgment to SEC, where CFO provided to auditor

an agreement backdated from January 2015 to December 2014, inflating revenue in violation of

GAAP), *motion for reconsideration granted on other grounds*, 2021 WL 4478722 (D. Md. Sept. 30, 2021).

Rosenberger approved a revenue recognition memorandum that she knew would be

provided to EY to support the company's 2015 Form 10-K. SEC 56.1 ¶¶ 117-18. She understood

that "persuasive evidence of an arrangement" was one of four fundamental elements required for

the recognition of revenue, because the memorandum specifically noted as much. SEC 56.1 ¶ 141.

There is no dispute that the memorandum stated only that the LNP letter agreement had been

entered into, and delivery made, by December 31, 2015, but failed to disclose it had been physically

signed on January 8, 2016 and backdated. SEC 56.1 ¶¶ 142-45; Counter Ros. ¶¶ 141-42.

The memorandum omitted other material facts that are also not in dispute: (1) that

Rosenberger received and responded to emails during the first week of January 2016 alerting her that

the entire LNP deal was still under negotiation, including its price. SEC 56.1 ¶ 144; (2) that after a

January 6 email update from Verma, Rosenberger forwarded the email to the company's COO,

Garcia, who pressed her about what that meant for revenue recognition in the fourth quarter of

2015. SEC 56.1 ¶¶ 144, 75; and (3) that in response, Rosenberger wrote: "*Unclear yet. They need to get*

*the license piece approved tonight.*" SEC 56.1 ¶¶ 144, 150, 76 (emphasis added).

But the LNP "license piece" was not approved that night, as Rosenberger knew from later

emails. SEC 56.1 ¶ 80-81. Even if it had been, recognizing revenue on this transaction for the fourth

quarter of 2015, as the EY auditors and Rosenberger's own expert testified, violated "fundamental" accounting principles, because there can be no "persuasive evidence of an arrangement" when a deal is still being negotiated and the final agreement remains to be signed. *See* SEC 56.1 ¶¶ 31, 120, 150. As the EY auditors confirmed and Rosenberger does not dispute, Rosenberger never told EY that (1) Synchronoss and AT&T were still changing terms on LNP in January 2016; (2) the letter was not signed or received until January 8, 2023; or (3) even as late as September 2016 terms like price and the delivery date of December 31, 2015 were in question. SEC 56.1 ¶¶ 149, 151-53, 109-11.

Rosenberger advances several arguments to suggest she lacked scienter. None suffices to raise a genuine factual dispute as to her liability, much less warrant summary judgment in her favor.

*First*, Rosenberger argues it was her "subjective belief" that she could recognize the LNP revenue once the software was downloaded on December 31, 2015, because she had seen an email from Verma on December 24, 2015, reporting that AT&T had told him that since the "funding letter" had not been approved, AT&T could not "authorize the email and allow SNCR to deploy licenses," and that approval would therefore have to occur in January. Rosenberger Mem. at 34; Counter 56.1 ¶ 137. Rosenberger argues that, when she saw confirmation that AT&T had downloaded the software on December 31, 2015, she inferred that there must have been agreement on the license deal. Rosenberger Mem. at 34-35. She contends this subjective belief is evidenced by her response to Waldis that same day, when he asked her if the company could recognize revenue if the terms with AT&T were "agreed" in December, and she replied that delivery would also have had to occur by December 31, 2015. *Id.*

The argument is baseless. The documentary evidence, including this email, shows that Rosenberger knew no agreement with AT&T had been reached by December 31, 2015. Her email to Waldis on December 24 responded to his hypothetical question that assumed an agreement had been reached, SEC 56.1 ¶¶ 42-44, and nothing in Verma's December 24 email suggested that AT&T

would not download the software until an agreement had been finalized, *see* SEC 56.1 ¶ 39. Nor has Rosenberger ever produced any documentation of any agreement at all before January 2016.

In any event, Rosenberger's knowledges that there was no "persuasive evidence of an arrangement" in December 2015 is established by her own email response to Garcia on January 6— after Verma had yet again reported to Rosenberger that the LNP deal was still not done—where she stated that revenue recognition for the fourth quarter was "Unclear yet. They need to get the license piece approved tonight." SEC 56.1 ¶¶ 75-76. That she in fact knew the deal was not finalized in December is further confirmed by her own deposition testimony, in which she admitted that her "unclear yet" email meant she was seeking confirmation that there was a final agreement on the price. SEC 56.1 ¶ 78. If Rosenberger genuinely thought the software download in December was "persuasive evidence" of an arrangement in December, she would not have been seeking that confirmation, would not have been "unclear," (the opposite of "persuasive evidence") and would not have told Garcia the license still needed to be approved.

Similarly unfounded is Rosenberger's suggestion that her response to Waldis on December 24 demonstrates her good faith because she insisted that delivery had to occur by December 31. Rosenberger Mem. at 34. The email establishes no such point. Delivery is a separate required element under GAAP, and the lack of such delivery would have been difficult to conceal from EY. It was much easier to use a backdated letter agreement, as Rosenberger admits she knowingly did, and conceal that fact from EY for more than a year.

*Second*, Rosenberger contends the evidence does not establish that she misled EY. Rosenberger Mem. at 35-36. She argues that her revenue recognition memorandum did not affirmatively state the letter was signed on December 31, 2015, and claims, wrongly, that EY auditors acknowledged the possibility at their depositions that, reading between the memorandum's

lines, it could be interpreted to mean the letter agreement *might* have been signed after December 31, 2015. *See id.* at 35; Counter Ros. ¶ 141.

This argument should be rejected. The memorandum reads, "During December 2015, [AT&T] entered into an agreement with [Synchronoss]…." SEC 56.1 ¶ 138. This claim was false, and Rosenberger's own expert admits as much. SEC 56.1 ¶ 122. Nowhere in the memorandum did it disclose that the agreement was still being negotiated in January 2016. SEC 56.1 ¶ 144. Nor did the memorandum disclose to EY that the LNP letter agreement was backdated. SEC 56.1 ¶ 145.

Neither were Rosenberger's only deceptive statements in the misleading memorandum. Rosenberger ignores that, in connection with the company's 2015 Form 10-K, she signed and provided EY with a management representation letter in February 2016, falsely stating she had made available to EY "all significant contracts, communications (either written or oral), and other relevant information pertaining to arrangements" with Synchronoss's customers. SEC 56.1 ¶ 158. She repeated those misrepresentations in later management representation letters. SEC 56.1 ¶ 161.

These affirmative misrepresentations, combined with Rosenberger's representation in the memorandum that the agreement was "entered into" in December 2015, made her omissions misleading and required her to disclose the truth about the transaction to EY. "As a general matter, Section 10(b), Rule 10b–5 and Section 17(a) require that when a company (or individual) 'speaks' it must disclose all information necessary to make its statement(s) not materially misleading—even where there is otherwise no independent duty to disclose." *SEC v. Thompson*, 238 F.Supp.3d 575, 597 (S.D.N.Y. 2017) (citation omitted). "So-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud." *Id.* (quotation marks and citation omitted).

Rosenberger's deception of EY throughout 2016 regarding LNP is independent evidence of her scienter that belies her claims of good faith. *See, e.g., SEC v. Tuzman*, No. 15 Civ. 7057 (AJN),

2017 WL 11606728, at \*13 (S.D.N.Y. Sept. 29, 2017) ("The subsequent lies—the cover up—if

hproven, would be strong circumstantial evidence of a bank's state of mind and intentions at the

time of entry into the two sets of agreements.") (quotation marks and citation omitted); *SEC v. Gold*,

No. 05-CV-4713 (JS), 2006 WL 3462103, at \*5 (E.D.N.Y. Aug. 18, 2006).

Rosenberger argues that EY auditor Yablonowitz's testimony supports her claims about the

memorandum. *See* Rosenberger Mem. at 35-36. But she selectively quotes and mischaracterizes

Yablonowitz's testimony. Counter Ros. 56.1 ¶ 104, 138, 141. Until her deposition, Yablonowitz had

not seen the email threads Rosenberger had received in January. Counter Ros. 56.1 ¶ 104, 138. Once

she read the full emails, she testified consistently with Rogers, Phillips, and Rosenberger's own

expert, that revenue recognition on LNP was inconsistent with GAAP here because negotiations

continued after 2015. *Id.* She also testified that nothing in the memorandum actually disclosed when

the backdated letter was sent to Synchronoss. Counter Ros. 56.1 ¶ 141.

Phillips and Rogers, the two EY auditors who discovered Rosenberger's January 2016 emails

from their participation in the audit committee investigation, both testified about their surprise and

disappointment at Rosenberger had not been honest. Counter Ros. 56.1 ¶ 82. Both also testified, as

did Rosenberger's own expert, that her conduct violated "fundamental"—not "technical,"

Rosenberger Mem. at 36—accounting principles, and they could conceive of no justification for her

to have recognized revenue under the circumstances. SEC 56.1 ¶¶ 31, 120, 150, 155-56.

Rosenberger has presented no grounds sufficient to grant her motion on the SEC's fraud

claims on the LNP transaction, and as set forth in the SEC's moving papers, its motion for partial

summary judgment on those claims should be granted.

## 2. The ASR Transaction

Yablonowitz, EY's coordinating partner on the 2015 audit, testified that ensuring the

"appropriate people" have authorized an agreement is "part one of the criteria for persuasive

evidence of an arrangement." Counter Ros. 56.1 ¶ 104. There is no dispute that Rosenberger recognized revenue for the ASR transaction in the Q3 2015 Form 10-Q and then again in the 2015 Form 10-K, despite receiving direct notification that the Synchronoss lacked approval from the appropriate AT&T senior executives. Counter Ros. 56.1 ¶¶ 101, 528.

Rosenberger was informed twice (and the second time by direct email from COO Garcia) that one of those senior executives, Candy Conway, had refused to provide the requested language to commit AT&T, and instead offered only her approval to "begin the [statement of work]" in the first, deficient September 28, 2015 email, which even the business people reported to Rosenberger was insufficient. Counter Ros. 56.1 ¶¶ 101. Rosenberger never disclosed that email from Conway to Yablonowitz, who testified that, had she seen it, it would have called into question the appropriateness of recognizing revenue on the transaction. Counter Ros. 56.1 ¶ 104.

Rosenberger insists nonetheless that there is insufficient evidence to establish her scienter under Rule 10b-5 with respect to the ASR transaction. Her argument ignores key evidence that creates factual disputes only a jury can resolve.

*First*, Rosenberger contends that (1) no one else at the company noticed that Shah's second September 28, 2015 email did not "copy" the appropriate AT&T individuals, and (2) it was other people's jobs, not Rosenberger's, to ensure that the ASR transaction was properly authorized. Rosenberger Mem. at 30-31. Rosenberger ignores that the ASR transaction was not a routine transaction, but was to be the company's first license sale to AT&T, Counter Ros. 56.1 ¶ 99. It therefore drew the close scrutiny of Synchronoss's CEO and COO, who pressured Rosenberger as to whether the company would be able to report revenue from it. Counter Ros. 56.1 ¶ 112. It was also the first transaction with AT&T in which the company sought to use an email confirmation to base "persuasive evidence of an arrangement" on. Counter Ros. 56.1 ¶ 99. Rosenberger thus had

every reason to ensure that the email on which she was basing revenue recognition had the required AT&T authorization.

In addition, Rosenberger mischaracterizes the SEC's claims about Shah's second September 28 email. It was not insufficient because Candy Conway was not "copied" on it; rather, it was insufficient because it did not include her express approval, which Synchronoss had insisted—in the same email Rosenberger used to recognize revenue—was required for a binding agreement. Counter 56.1 ¶ 101. This was neither a trivial nor easily overlooked omission. As Rosenberger and rest of senior management had been informed that same day, Conway had not approved the transaction on the first email. Counter Ros. 56.1 ¶ 101. Rosenberger characterizes this as a "group distribution" she could easily have ignored. It was not: Synchronoss's senior management were all on it, and the COO made sure to send this email to Rosenberger specifically, a second time. Counter 56.1 ¶ 112.

Furthermore, the record evidence contradicts Rosenberger's insistence that it was not her job to "scrutinize[e]" emails to ensure they were appropriately authorized. Rosenberger Mem. at 30. Rosenberger cites only EY workpapers summarizing the roles of those involved in the preparation and review of the company's revenue recognition memoranda, Rosenberger Mem. at 31; Counter Ros. 56.1 ¶¶ 19, 21. None of the workpapers states that Rosenberger was neither obligated to, or did not, review source or transactions documents as part of her review. In any event, her argument is flatly contradicted by her own admissions that it was her regular practice to review such documents:

> Q.  Would you review transaction documents in connection with your review of
>     the accounting memoranda?
> A.  Yes.  Yes, I would.
> Q.  That was a regular part of your review process?
> A.  Correct.  And if I had questions, most of the time I would go directly to the
>     general counsel with those questions.

Counter Ros. 56.1 ¶ 6 (citing Kramer Ex. 1 [Rosenberger Tr.] at. 42:20-43:3).[7]

_____

[7] Nor did the SEC's expert testify to the contrary, as Rosenberger suggests. Rosenberger Mem. at 31. Taub testified Rosenberger was in possession of information showing that the

*Second*, substantial additional evidence establishes that, or at least creates factual disputes whether, Rosenberger knew by July 2016 that AT&T denied any commitment to purchase the license. Rosenberger admitted she knew about a legal escalation in a July 2016 meeting. Counter Ros. 56.1 ¶ 154. As Synchronoss executive Andrew Wilmott explained in his declaration, by July 2016, Synchronoss was well aware that AT&T was not going to pay Synchronoss for the license, and, as confirmed by an email he wrote on July 13, 2016, he, Rosenberger, Prague, and Garcia met on July 12 to discuss "our position on ASR." Counter Ros. 56.1 ¶¶ 152-53.

Wilmott's email stated that "[d]ecision is to kick the can further down the line with no escalation anywhere. We will focus on getting paper on LNP and … then see where we are in late q3/q4 to react. Karen [Rosenberger] is working on options in line with other corporate activities. No GL escalation at all/ at this time."

Although Wilmott had no present recollection of the meeting, he acknowledged that he wrote the email when the meeting was fresh in his mind and accurately recorded his recollection of the meeting in his email. Counter Ros. 56.1 ¶ 153. For that reason—contrary to Rosenberger's conclusory argument, Rosenberger Mem. at 33—his email is admissible under FRE 803(5).

As Wilmott further explains in his declaration, he had no reason to believe, given the purpose of the meeting, that AT&T's refusal to purchase the ASR license was not discussed at the meeting, and that he or anyone else at the meeting had any reason for or intention of withholding AT&T's communications in February or June from Rosenberger. Counter Ros. 56.1 ¶ 153.

---

appropriate individual at AT&T had not approved the ASR transaction and that it therefore *was* Rosenberger's job to determine if the appropriate employees at AT&T had approved the transaction. Counter Ros. 56.1 ¶ 19. Further, Taub testified that Rosenberger, in reviewing revenue recognition for significant transactions, "would be expected to bring to bear information that she's aware of." *Id.* Indeed, Taub testified that "in most companies a CFO would be reviewing [a revenue recognition memorandum] … with perhaps a different focus than others. And the reason you would have a CFO review memos for material transactions is because the CFO might have information or insight that others might not have." *Id.*

Rosenberger, moreover, ignores that she corroborated Wilmott's declaration and email in her deposition. She admits that she attended the July meeting, and that a "legal escalation" was discussed, as well as a "legal letter" to demand payment from AT&T (notwithstanding that the company had not yet even billed AT&T). Counter Ros. 56.1 ¶ 154.

*Third*, Rosenberger's deception of EY provides further evidence sufficient for a jury to find that she had the requisite scienter as to the ASR transaction. As Phillips testified, Rosenberger did not inform EY in 2016 that AT&T had disputed the transaction, or rejected the sale outright, or that Synchronoss had discussed a legal escalation, a legal letter to demand payment, or "kick[ing] the can" down the road on collecting this aged receivable to the third or fourth quarter. Counter Ros. 56.1 ¶¶ 166-67. Any one of these facts would have been relevant to EY's review of the company's Q3 and Q4 financials and called into question revenue recognition. *Id.*

Instead, at audit committee meetings attended by EY for Q2 and Q3 of 2016 in July and October 2016, and in other meetings with EY, Rosenberger offered EY bland assurances as to the collectability of the ASR (and LNP) transactions and blamed the delays on the AT&T receivables on vague "management" turnover issues. Counter Ros. 56.1 ¶¶ 155, 166-67. Her conduct led to Phillips's conclusion through the audit committee investigation that, as with the LNP transaction and the Openwave transaction, Rosenberger had not been honest with EY. Counter Ros. 56.1 ¶¶ 166-167. EY thus concluded it could no longer rely on her representations. Counter Ros. 56.1 ¶ 82.

More than sufficient evidence in the record presents a triable issue of fact as to Rosenberger's scienter with respect to the ASR transaction, and the Court should deny her motion.

**B.**    **Ample Evidence Supports the SEC's Claims that Rosenberger Acted with Scienter with Respect to the Openwave IP License.**

Rosenberger does not dispute that she received emails in January and February 2016, during the negotiations for the $124 million acquisition of Openwave, in which the negotiators, Synchronoss's CEO and General Counsel, made it clear that Synchronoss (1) was using the threat of

a patent infringement claim to extract a $10 million license fee from Openwave to reduce the company's "net" cost of acquiring Openwave; and (2) insisted to Openwave's parent, Marlin, that it agree to enter into the $10 million Openwave IP License as a condition of the acquisition.

As Rosenberger does not now dispute, she then told EY precisely the opposite. In the revenue recognition memorandum she signed for the Q1 2016, she justified recognizing the $10 million license fee as revenue (rather than as a reduction in the purchase price of Openwave), because, she said, the Openwave IP License was not a negotiating factor in the acquisition, and the acquisition was not contingent on the Openwave IP License. Counter Ros. 56.1 ¶ 332. Rosenberger admitted at her deposition that these false statements were relevant to recognizing revenue. Counter Ros. 56.1 ¶ 342. EY's auditors and the SEC's expert further testified that the emails Rosenberger received made it improper to have treated the acquisition and Openwave IP License as separate transactions and therefore to recognize revenue. Counter Ros. 56.1 ¶¶ 344, 353, 360.

Phillips in particular reacted with disbelief upon seeing these emails during the investigation. Counter Ros. 56.1 ¶ 344. Phillips concluded Rosenberger had been dishonest about this transaction (as with the LNP and ASR transactions), and EY concluded on this basis that it could no longer rely on her representation. Counter Ros. 56.1 ¶ 82. Even Rosenberger's expert does not dispute that the original accounting for this transaction was incorrect. Counter Ros. 56.1 ¶¶ 363-64.

Rosenberger advances several thin factual arguments that she claims warrant summary judgment in her favor. First, Rosenberger argues the accounting for the transaction was complicated, and that it required "judgment" over which "reasonable minds" could differ at to the appropriate accounting treatment. Rosenberger Mem. at 38. Second, she argues she did not sign the false revenue recognition memorandum until six months after the transaction, and as merely a passive recipient of the emails discussed above, she did not have them in mind when she wrote her false memorandum. Rosenberger Mem. at 39-40. Both of these arguments are meritless.

First, Rosenberger's "reasonable minds" argument fails because it is unsupported factually. No accountant who has testified in this case (not even Rosenberger's expert) has opined that the original accounting on this transaction was correct. Rosenberger cites only speculative testimony extracted from Rogers through a misleading question (over the SEC's objection), about some other, hypothetical "reasonable mind." Rosenberger Mem. at 38.[8] But Rogers, like Phillips and the SEC's expert, was unequivocal that the emails Rosenberger received required that she treat the Openwave IP License as part of the acquisition. Counter Ros. 56.1 ¶ 353.

Moreover, the company itself restated the transaction. Counter Ros. 56.1 ¶ 334. As both the SEC's expert and courts have recognized, issuers do not restate prior financial statements when they believe the original accounting was correct; they do so only because the original accounting is incorrect. *Id.* ; *SEC v. Jasper,* 883 F. Supp. 2d 915, 933–34 (N.D. Cal. 2010), *amended,* No. 07 Civ. 06122 (JW), 2010 WL 8898216 (N.D. Cal. Nov. 5, 2010), *aff'd,* 678 F.3d 1116 (9th Cir. 2012) (for purposes of SOX 304, company was "required" to file restatements, because issuer would not have issued the restatements unless the original accounting was in material non-compliance).

Rosenberger relies on *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1241 (S.D.N.Y. 1992), for the proposition that, based on Rogers's speculation about a "reasonable, fair-minded accountant," testimony the SEC cannot prove Rosenberger's scienter at trial. Rosenberger Mem at 38. This argument is unavailing for at least two reasons. First, in *Price Waterhouse*, the court was presented with sharply differing testimony from accounting experts as to the correctness of the accounting at issue. Here, there is none. Second, even if Rosenberger had presented such testimony, *Price Waterhouse* was a decision rendered after a bench trial, and for that reason, as this Court recognized

---

[8] Rosenberger also relies on inadmissible hearsay (including double hearsay) for this point (Rosenberger Mem. at 37) that the Court should not consider on this motion, including references in EY memoranda to purported conclusions by Synchronoss or its investigative team in various internal memoranda. Counter Ros. 56.1 ¶ 213.

in *Worldcom,* the *Price Waterhouse* decision provides no support for the "unusual contention that a battle of experts entitles it to summary judgment." 352 F. Supp. at 500. Rather, the Court held, such issues are determined by the factfinder based on conclusions about credibility that are not appropriately resolved on summary judgment. *Id.* at 500-501.

Second, Rosenberger's argument, Rosenberger Mem. at 38-39, that she signed the false memorandum six months after the transaction and simply forgot about the emails on a $124 million acquisition fails because the record, including her own deposition admission, shows she reviewed and signed the memorandum during the Q1 2016 review, not six months later. Counter 56.1 ¶ 58.[9]

At best, Rosenberger's argument that she forgot presents a factual issue that can only be resolved at trial, especially given what her expert acknowledged was the "relevant context" of her conduct a year earlier on the F-Secure transaction. *See* Section II.F, above; FRE 404(b) (knowledge, absence of mistake). There, Rosenberger made similar misrepresentations in a formal accounting memorandum after receiving similar emails about a simultaneous acquisition/license agreement and disregarded an explicit warning from Lanni that the license fee could not be recognized as revenue (before Lanni capitulated to Rosenberger). Counter Ros. 56.1 ¶¶ 393-96. Substantial evidence shows that Rosenberger knew precisely what she was doing when she falsely represented material facts to EY in Openwave, which enabled Synchronoss to overstate its revenue for Q1 2016, and the fiscal year 2016, by $10 million. Her motion for summary judgment on this transaction should be denied.

## C. Substantial Evidence Supports the SEC's Claims that Rosenberger Aided and Abetted Synchronoss's Securities Fraud.

Rosenberger seeks summary judgment on the SEC's claims that she aided and abetted the

---

[9] Nor, for the reasons discussed above, is there any evidence to support her contention, Rosenberger Mem. at 38, that she had any intention to forward to EY email evidence that the two agreements were negotiated together on a net basis. *See* Section II.E, above. Indeed, had she had such an intention, she would have brought it to EY's attention in the revenue recognition memorandum, rather than telling EY the opposite.

company's violations of Exchange Act Section 10(b) and Rule 10b-5, based on her same scienter arguments as to primary liability. Rosenberger Mem. at 47-48. For the reasons discussed above, the substantial and undisputed evidence of Rosenberger's scienter warrants denial of her motion.

## IV. SUBSTANTIAL AND OFTEN UNDISPUTED EVIDENCE DEMONSTRATES THAT ROSENBERGER AND LANNI AIDED AND ABETTED VIOLATIONS OF SECTIONS 13(a) AND 13(b)(2)(A) AND RULES 12b-20, 13a-1, 13a-11, 13a-13.

Exchange Act Section 13(a) and Rules 13a-1, 13a-11 and 13a-13 thereunder require issuers with securities registered under Exchange Act Section 12, such as Synchronoss, to file annual, current and quarterly reports with the SEC containing such information as the SEC's rules prescribe. Rule 12b-20 requires that an issuer's statement or report contain such further material information as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading. An issuer violates these provisions by filing materially false or misleading reports or omitting material information necessary to render statements in the reports not misleading. *See SEC v. Koenig*, 469 F.2d 198, 200 (2d Cir. 1972). Exchange Act Section 13(b)(2)(A) requires issuers with securities registered under Exchange Act Section 12 to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the issuer. Allegations of inaccuracies in SEC filings "are sufficient to state a claim under Section 13(b)(2)(A)." *SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 33 (D.D.C. 2017).

As discussed above in Arg. Section III, substantial and undisputed evidence establishes that Rosenberger aided and abetted Synchronoss's violations of these provisions, by signing and certifying materially false and misleading Forms 10-Q for Q3 2015 and Q1 2016 and 2015 and 2016 Forms 10-K with respect to the ASR, LNP and Openwave transactions, with scienter.

As discussed below, Rosenberger and Lanni aided and abetted Synchronoss's violations of these provisions with respect to the company's Form 10-Q for Q2 2016 and 2016 Form 10-K and the related Forms 8-K announcing its earnings and revenue for those periods based on the

Windstream transaction in Q2 2016. Defendants rendered substantial assistance by signing false and misleading revenue recognition memoranda that enabled the company to overstate its revenue and income for the quarter and year. And Defendants did so knowingly or recklessly disregarding (1) that Synchronoss was providing hosting services to Windstream in conjunction with its sale of the perpetual license (Amendment 9) and that GAAP therefore precluded their recognition of $5.3 million in revenue from the sale of the license; and (2) Amendment 9 and Amendment 10 (the audit services agreement), independently of the hosting arrangement, comprised a multiple element arrangement thus precluding the recognition of $5.3 million in revenue.

As further discussed below, Rosenberger aided and abetted Synchronoss's violations with respect to the 2016 Form 10-K based on the Sage reseller transaction in Q4 2016.

### A.     Substantial Evidence Shows That Defendants Aided and Abetted Reporting Violations in Synchronoss's Q2 2016 Form 10-Q and 2016 Form 10-K.

Defendants' summary judgment motions do not dispute that there is a triable issue as to whether the revenue recognition memorandum they signed for the company's Q2 2016 financial statements—the memorandum justifying the recognition of $5.3 million in revenue on the sale of the perpetual license to Windstream (Amendment 9)—was false or misleading. Indeed, the memorandum failed to disclose that (1) Amendments 9 and 10 comprised a multiple element arrangement that precluded the recognition of at least $4.5 million of the $5.3 million the company recognized under GAAP; and (2) Synchronoss was providing hosting services to Windstream, a separate basis for concluding the arrangement was a multiple element arrangement that precluded such revenue recognition under GAAP. Nor do Defendants dispute that there is a triable issue as to whether their August 4, 2016 management representation letter to EY was false or misleading, or whether, by including $5.3 million in revenue from the Windstream transaction, Synchronoss's Q2 2016 Form 10-Q and 2016 Form 10-K were materially inflated.

Instead, Defendants both argue there is insufficient evidence for a jury to conclude they had

the requisite scienter in signing the false and misleading revenue recognition memorandum. Their arguments minimize the significant evidence of their scienter and their motion should be denied.

**1.** **Lanni and Rosenberger Knew or Recklessly Disregarded that Amendments 9 and 10 Comprised a Multiple Element Arrangement, Precluding Revenue Recognition of $4.5 Million.**

The SEC's papers in support of its motion for partial summary judgment set forth the undisputed facts establishing that Rosenberger and Lanni were both aware through multiple emails that Amendments 9 and 10 were negotiated and executed one day apart on June 30, 2016, and July 1, 2016, respectively. SEC SJ Br. at 22-24; SEC 56.1 ¶¶ 185-248.

Each was also aware of the additional red flag that the values assigned in Amendments 9 and 10 were irrational when considered separately from one another. Rosenberger was informed that Synchronoss would receive only $600,000 from Windstream for Amendment 10, while Synchronoss was obligated to pay its subcontractor, Sage, $4 million to do the work, and both Rosenberger and Lanni knew the maintenance figure assigned in Amendment 9, $127,500, was far too low for the purported license fee. SEC SJ Br. at 40.

Defendants' knowledge that Amendments 9 and 10 had been negotiated and executed together required them to presume under settled GAAP guidance (undisputed by their experts) that the two agreements should be accounted for together, unless sufficient evidence to the contrary existed to overcome that presumption. SEC SJ Br. at 22-25, 39-41.

**a.** **Lanni**

Lanni now argues that summary judgment is appropriate in her favor because there is insufficient evidence that she knew about the simultaneous negotiation and execution of Amendments 9 and 10 at the time she reviewed and signed the false revenue recognition memorandum. Lanni Mem. at 18-20. She claims her review of the memorandum may have happened "weeks" after she received the emails informing her of the agreements' simultaneous

negotiation and that she had "no cause to focus her attention" on revenue recognition issues until then and may not even have opened or read her emails. *Id.* at 18. Further, she argues that her "unrebutted" testimony was that she had no understanding the two agreements were being negotiated together. *Id.* at 20. Finally, she argues that the SEC cannot establish that she acted recklessly, because EY "supported" the accounting determination, and Lanni was not meaningfully involved in the negotiations. *Id.* at 32-33. Each of these arguments is meritless.

*First*, ample evidence supports a finding that Lanni knew about the simultaneous negotiation of Amendments 9 and 10. Among other things, she admitted at her deposition that she understood Amendment 10 was being "worked on" for the third quarter, and the company's written accounting policy—which Lanni acknowledged was in effect at the time—required her to presume that contracts entered into within 90 days of one another triggered the requirement to conduct a multiple element arrangement analysis. Counter Lanni 56.1 ¶ 18.

*Second*, ample evidence also supports a finding that Lanni knew of the simultaneous negotiation of the agreements when she signed the revenue recognition memorandum. As she now admits, Counter Lanni 56.1 ¶¶ 74, 82, she approved journal entries for both Amendments 9 and 10 within only a few weeks of each other—at the latest by August 1, 2016. That was *before* she signed the August 4, 2016 management representation letter and before the Q2 2016 Form 10-Q was filed. SEC 56.1 ¶¶ 186, 287, 330.

Lanni ignores in her papers the implications of this knowledge under GAAP and company policy. GAAP required that, with that knowledge alone, she had to presume the two transactions were part of a multiple element arrangement, unless she found sufficient evidence to the contrary—an analysis she admitted she did not perform and that is not mentioned in either of the two memoranda she signed. SEC SJ Br. at 39-41.

*Third,* Lanni asks the Court to accept as mere "speculation," Lanni Mem. at 20, that she

58

opened, read or reviewed the multiple emails she received at the close of the second quarter on a significant revenue transaction that she would shortly be called upon to account for in her capacity as the second-most senior member of the finance department. She admitted at her deposition, however, that it was her general practice to try to open "all e-mails" she received. Counter Lanni 56.1 ¶ 144. And she received these emails during a period when, as the EY auditors testified, when Lanni and Phillips were discussing the implications of that for GAAP guidance on "multiple element arrangements." Counter Lanni ¶ 171-74

Further evidence that Lanni read the emails includes that, by the third quarter of 2016, when she signed the memorandum for Amendment 10, she was coaching the sales staff on how to prevent EY's inquiries into Synchronoss's multiple element arrangements from defeating the company's aggressive revenue recognition agenda. *See* Fact Section III.B above. Lanni testified, for example, that EY had told her there was a "rare" exception to GAAP guidance that would allow a company to recognize revenue upfront on a license sold with hosting services, even where there was no "vendor specific objective evidence" of fair value, if there was instead a "bona fide bidding process" for those hosting services. *See* Fact Section III.B above. Lanni testified that, for the Frontier licensing deal—a Q3 2016 multiple element arrangement for which Synchronoss later reversed its accounting—she concluded that there was a bidding process that allowed for revenue recognition upfront and that EY must have not had an issue with it. Counter Lanni 56.1 ¶ 54.

But as EY discovered during the audit committee investigation, Lanni had emailed Chris Putnam, a Synchronoss sales executive, on October 27, 2016, to let him know that EY was challenging the finance department's support for the existence of a competitive bid process and would be contacting him directly with questions. Lanni let him know the "main key points" to "remember" when he spoke with them, including:

- We have sold the software w/o hosting before[;]

- We market the software to customers with or w/o hosting[;]
- There is no benefit to the customer if the software is hosted by Synchronoss.

Counter Lanni 56.1 ¶ 54.

Rogers testified that EY sought to speak to salespeople to verify the accounting, so that when EY saw this email, EY "had a concern why they would be getting a preview of the questions we would ask." Counter Lanni 56.1 ¶ 54. Rogers further testified that Lanni's email was inconsistent with EY's efforts to corroborate what they were told by the finance department. *Id.* Of particular concern to Rogers was that what Lanni was telling the sales team to "remember" was not true. *Id.*

In that same quarter, on October 20, 2016, Lanni was on an email thread with company executives Post and Wilmott regarding the LNP transaction. After Post alerted Lanni in the email that the LNP license deal involved hosting services, she responded with the following "heads up":

> Our signed SOW [Statement of Work] shouldn't mention anything about hosting it. Hosting element would revert us to a SaaS model and disallow recognition of the license upon delivery. Let's talk through on our call.

Counter Lanni 56.1 ¶ 54. Rogers testified that, when he saw this email, he was concerned in particular that Lanni was not telling Post and Willmott not to host the software, but rather that the hosting should not be mentioned in the statement of work. *Id.*

In sum, Lanni's self-serving argument that she may not have read her emails might raise a triable issue of fact as to her scienter, but her argument does not warrant summary judgment in her favor, given the significant evidence weighing the other way.[10]

*Fourth,* Lanni's arguments that EY "supported" the original accounting and that she was not

---

[10] Lanni's reliance on *SEC v. Rio Tinto plc*, No. 17 Civ. 7994 (AT), 2019 WL 1244933, at *18 (S.D.N.Y. Mar. 18, 2019), Lanni Mem. at 34, as support for her argument that she did not render substantial assistance to Synchronoss's reporting and books-and-records violations is misplaced. In *Rio Tinto*, Judge Torres based her conclusion on the defendant's inaction. By contrast, Lanni took the affirmative and *essential* step for the company to overstate its financial performance: signing the revenue recognition memorandum company policy required.

meaningfully part of the negotiations are irrelevant. EY was not aware of the simultaneous execution of Amendments 9 and 10, because Lanni's memorandum made no mention of Amendment 10 (which had been pushed off to the next quarter and thus escaped review). SEC 56.1 ¶ 317. And whether Lanni participated in the negotiations is irrelevant given what she actually knew.

### b. Rosenberger

There is also no dispute that Rosenberger received successive emails, beginning as early as June 17 and to which she responded, informing her that Amendments 9 and 10 were being negotiated, and the June 17 email she received and replied to reflected that hosting was being considered. SEC 56.1 ¶ 205-27. Furthermore, even if she had disregarded the emails attaching the drafts of Amendments 9 and 10—each of which explicitly made clear they were intended for simultaneous execution—she was directly and specifically informed by July 28, 2016, of the amendments' execution and of the fact that the $600,000 fee was irrational in light of the $4 million subcontract issued to Sage. SEC 56.1 ¶¶ 246-48.

Rosenberger simply ignores this evidence. Her only argument on this transaction falsely insists that there is no evidence she was aware of Amendment 10 and that she did not sign the revenue recognition memorandum for it. Rosenberger Mem. at 42. The latter is at best an admission that she violated the company's internal controls, and the former is contradicted by the clear record. Neither contention provides a basis for granting her summary judgment.

### 2. Rosenberger and Lanni Knew or Recklessly Disregarded That Synchronoss Was Hosting the Software for Windstream.

Lanni and Rosenberger both acknowledge that GAAP precluded revenue recognition on the Windstream license, because the company was providing hosting services and had not established "vendor specific objective evidence" of its value. Counter Lanni 56.1 ¶ 20; Rosenberger Mem. at 21. Yet Lanni argues there is no admissible evidence that she was aware the company was providing hosting services together with the sale of the perpetual license to Windstream. Lanni Mem. at 14.

However, in an email dated June 15, 2016, Thomas, the senior company salesman on the

Windstream relationship, told Synchronoss COO Garcia that Thomas had met with "Murdoch,

Noah and Joanna [Lanni] last night and working on finalizing structure. Balance of License,

Maintenance, *Hosting*, Settlement, and perhaps Data Center. So far, they say all of $13M is

recognizable in Q2." Counter Lanni 56.1 ¶ 71, 102.

Lanni argues his email is inadmissible hearsay and that Thomas testified he had no

recollection of the meeting. Lanni Mem. at 17. But Thomas testified that he sent the email when the

events were fresh in his mind and that it is generally his practice to be accurate in his emails. Counter

Lanni 56.1 ¶¶ 71, 103, 104, 108. The email (or at least its contents) are therefore admissible under

FRE 803(5), as past recollection recorded. *See United States v. Williams*, 571 F.2d 344, 349 (6th Cir.

1978) (witness's testimony that memorandum was accurate "in general" sufficient for admissibility

under FRE 803(5)). To be sure, Lanni has produced documents casting doubt on her attendance at a

particular meeting on June 14 with Murdock and Ament. Counter Lanni 56.1 ¶¶ 96-99. But those

documents at most present a triable issue of fact. Thomas testified he had no reason to say he met

with Lanni if he had not, and these documents do not preclude another conversation or meeting

with Lanni on or around the same date. Counter Lanni 56.1 ¶ 153.

As for Rosenberger, she was aware as least by June 17, 2016, that hosting was anticipated as

part of the Windstream deal (Amendments 9 and 10), as discussed above. That day, she received and

responded to an email that advised that and the two deals presented "Licenses with hosting," and

"they are trying to get us to recognize the entire License in Q." SEC Counter Ros. 56.1 ¶ 238.

These deals, Ament said, *"are not much different than what we did in Q2 for Earthlink and Windstream." Id.*

(emphasis added). Rosenberger responded that she agreed that revenue recognition must be

recognized ratably over time if there is hosting provided with a license. *Id.* In short, summary

judgment in Rosenberger's favor is not appropriate on this issue when she was advised in two

separate emails that the Windstream deal involved hosting.[11]

**B.    Substantial Evidence Shows That Rosenberger Aided and Abetted Reporting Violations in the 2016 Form 10-K as to the Sage Reseller Transaction.**

Rosenberger seeks summary judgment on the SEC's claim that she aided and abetted Synchronoss's false reporting of $3.6 million in revenue from the Sage reseller transaction in Q4 2016. She bases her argument primarily on her contention that she was not aware of the "side letter" making Sage's payment to Synchronoss contingent on Sage's successful resale to the intended real customer, Windstream. Rosenberger Mem. at 42, 45-46.

But the "side letter" is irrelevant to Rosenberger's scienter. The evidence shows that Rosenberger was aware from the start of the Sage reseller transaction—regardless of whether she saw the side letter—that the deal was a sham.

Synchronoss never intended for Sage, an undercapitalized company that had little cash and was almost entirely dependent on Synchronoss, to be a reseller of software. Counter Ros. 56.1 ¶¶ 401-403. Synchronoss intended to sell its software to Windstream and was using its leverage over Sage to make it an intermediary solely so that Synchronoss could recognize revenue in Q4 2016, rather than wait until the next year. Counter Ros. 56.1 ¶ 419-22.

Rosenberger was made aware of this plan in two separate emails. The first, on December 28, 2016, was from Murdock. He responded to Rosenberger's request for an update on "[t]his Sage deal I just heard about," by telling her that it came about because Windstream "was unable to sign for q4 but indicated they still intend to buy in Q1." Counter Ros. 56.1 ¶ 248. Murdock also let Rosenberger know that Synchronoss sought to have Sage act as a reseller, not Sage—which had "significant

---

[11] Rosenberger argues without any basis that the SEC "abandoned" its theory that she knew or recklessly disregarded the presence of hosting in the deal with Windstream. Rosenberger Mem. at 21. The SEC has not done so, and the SEC's expert testified he expressed no opinion on the point, because there was no need for him to do so, given the clarity of the evidence on Amendments 9 and 10. Counter Ros. 56.1 ¶ 239.

reservations" about doing so, he explained to her. *Id.*

The second was the "Mcfly proof"—that is, auditor proof—email thread Murdock forwarded to Rosenberger on December 28, 2016, after a draft Sage reseller agreement had been circulated. Prague asked how Synchronoss was supposed to make money on the deal after the Windstream deal, as the agreement provided for no further compensation. Counter Ros. 56.1 ¶ 416-17. Ives responded, copying Rosenberger: "We need this deal first off. Second they are only gonna sell it to windstream but the wording need to be more general so mcfly proof and not focused just on windstream." Counter Ros. 56.1 ¶ 416. As noted above, "Mcfly" was a derisive nickname for Rogers, the EY coordinating partner. Counter Ros. 56.1¶ 417. Prague assented but noted that lawyers "don't trust 'understandings' like this." Counter Ros. 56.1 ¶ 418.

As the SEC's expert explains, GAAP guidance, including ASC 985-605-25-36, provides clear direction to accountants to be wary of reseller transactions entered into with new or undercapitalized resellers and where "informal communications" may comprise a complete understanding of the parties' arrangements. Counter Ros. 56.1 ¶ 479. GAAP guidance requires accountants to look beyond the four corners of the agreement in such situations. Counter Ros. 56.1 ¶ 480.

Here, Rosenberger received notice of every conceivable red flag about this purported reseller transaction: an obvious intention by the sales staff to pretend that Sage was the company's end customer and to make the documentation "mcfly [auditor] proof" to get away with revenue recognition and a "reseller" who did not want and could not afford to be a reseller. *See* Fact Section IV.A, above. Yet Rosenberger approved (but did not sign) a revenue recognition memorandum that concluded "collectability of the fees is probable" (a required element of revenue recognition) Counter Ros. 56.1 ¶ 455. This was based on a misleading representation: that Synchronoss had "not had any billing issues" for ten years with Sage, when Sage had never been a customer, and thus, had no billing history. Counter Ros. 56.1 ¶ 463-64. Indeed, Rogers, the EY auditor, testified that this

statement was "misleading" under those circumstances. Counter Ros. 56.1 ¶ 467.

Rosenberger also argues that, since she did not sign the memorandum, she made no false statements to the auditor. Rosenberger Mem. at 45-46. But her argument ignores her own testimony that she had no reason to believe she did not approve the memorandum, as required by company policy. Counter Ros. 56.1 ¶ 455 In any event, she ignores that she signed and sent EY a management representation letter that falsely stated, among other things, that "[w]e have disclosed to you all sales terms (both expressed and implied), including all rights of return or price adjustments and warranty provisions. We have made available to you all significant contracts, communications (either written or oral), and other relevant information pertaining to arrangements with our customers, including distributors and resellers." Counter Ros. 56.1 ¶ 477.

Nor does Rosenberger's testimony that "I think [Sage] were both a customer and a vendor from my recollection" warrant summary judgment in her favor. As Johnson testified, Sage was never a customer, and Rosenberger's testimony is not credible, especially given that she could not recall from whom she learned that Sage was a customer, did not know what products or services Sage purchased from Synchronoss, and did not know how much revenue Synchronoss (purportedly) obtained from Sage in its capacity as Synchronoss's customer. Counter Ros. 56.1 ¶ 502.

Similarly, summary judgment is not appropriate in Rosenberger's favor on the grounds that she repeatedly advised the sales staff that there could be no guarantees in the contract that Sage would sign. Rosenberger Mem. at 42. She knew from the December 28 email thread with Ives and Prague that (1) the intention was to make the transaction documents "mcfly [auditor] proof," (2) and that the transaction was driven not by a business purpose but by a "revenue recognition" purpose. *See* Fact Section IV.A, above; Counter Ros. 56.1 ¶ 419-22. This is more than sufficient to draw the reasonable inference that Rosenberger's instructions were designed to make sure the documents did not reveal the true, but wrongful purpose of the transaction. Rosenberger knowingly or recklessly

participated in that purpose by approving and signing a false and misleading revenue recognition memorandum and management representation letter.

## V. SUBSTANTIAL AND OFTEN UNDISPUTED EVIDENCE SHOWS ROSENBERGER VIOLATED EXCHANGE ACT SECTION 13(a) AND RULE 13a-14.

Exchange Act Rule 13a-14 mandates that an issuer's principal financial officer certify to the best of her knowledge that there are no untrue statements of material fact or omissions of material fact as to the period covered by the periodic reports. 17 C.F.R. § 240.13a-14. Rosenberger seeks summary judgment on this claim because, she claims, the SEC cannot establish she acted knowingly. For the reasons discussed above in Arg. Sections III, her motion should be denied.

## VI. SUBSTANTIAL AND OFTEN UNDISPUTED EVIDENCE SHOWS THAT ROSENBERGER VIOLATED RULE 13b2-2.

Rosenberger, in violation of Rule 13b2-2, made materially false or misleading statements, and/or omissions, to EY with respect to each of the five transactions at issue.[12]

### A. LNP

As set forth in more detail in the SEC's summary judgment papers, Rosenberger violated Rule 13b2-2 based on the false and misleading revenue recognition memorandum she approved and provided to EY; her failure to disclose that she received the backdated letter agreement in January 2016; her February 26, 2016 management representation letter and subsequent statements in 2016; and her misleading oral statements to EY throughout 2016. SEC SJ Br. at 44. Rosenberger now argues for summary judgment on this claim because Yablonowitz purportedly testified that a "fair reading" of the memorandum "would inform a reasonable reader that the" backdated letter was finalized after 2015 closed. Rosenberger Mem. at 44. This is incorrect. When shown the

---

[12] Rosenberger complains that the SEC's responses to her interrogatories were insufficient to apprise her of the misstatements that form the basis of this claim. Rosenberger Mem. at 42-43. They are not, and had Rosenberger truly believed that to be the case, she should have timely sought the Court's intervention.

memorandum at her deposition, Yablonowitz was only asked if that language "could suggest" the letter was received by Synchronoss after December 31, 2015. Counter 56.1 ¶ 141. As Rosenberger ignores, Yablonowitz later clarified that the memorandum did not specifically disclose when it was sent or received.. Yablonowitz also testified that the continuing negotiations on LNP 2016 (which Rosenberger omitted in the memorandum and in every other communication with EY) would be inconsistent with revenue recognition for December 2015. Counter 56.1 ¶ 140.

### B.  ASR

Rosenberger omitted from her revenue recognition memorandum the fact that the company had received an email from Conway, the AT&T official from whom Synchronoss required approval on the agreement, that did not comply with the company's requirement for evidencing an agreement. Counter Ros. 56.1 ¶ 101. Rosenberger did not otherwise disclose this fact to EY. Counter Ros. 56.1 ¶¶ 101, 104. Yablonowitz testified that Conway's email would have called into question the appropriateness of recognizing revenue on the transaction—thus clearly a material omission. Counter Ros. 56.1 ¶ 104. Rosenberger, at the same time, sent EY a management representation letter in connection with its Q3 Form 10-Q and 2015 Form 10-K that falsely represented that the filings were "prepared and presented in conformity with US [GAAP]," and that the company had "made available to you all significant contracts, communications (either written or oral), and other relevant information pertaining to arrangements with our customers, including distributors and resellers." SEC 56.1 ¶ 15, SEC Exs. 11, 14. These representations, especially in light of the omissions described above, were materially false.

Rosenberger also argues that, because there is no evidence she was informed of AT&T's dispute and rejection of the ASR transaction, it was not unreasonable for her not to have disclosed to EY in the audit committee meetings in 2016 (and otherwise) that AT&T had disputed and rejected the ASR transaction. Rosenberger Mem. at 43. In fact, as described above in Facts Section

I.B, there is more than sufficient evidence to establish Rosenberger knew these facts.

### C.    Openwave

Rosenberger violated Rule 13b2-2 as to Openwave because she misrepresented the material facts about the Openwave transaction in (1) the revenue recognition memorandum she signed, Counter Ros. 56.1 ¶ 348-49, 352-53; (2) the false and misleading management representation letters she sent to EY, in connection with the Q1 2016 Form 10-Q and 2016 Form 10-K, Counter Ros. 56.1 ¶¶ 337-40; and (3) in oral statements discussing the Openwave transaction with EY in 2016, in which she did not disclose the material facts about the "net" negotiation of the Openwave IP License and the overall acquisition. Counter Ros. 56.1 ¶¶ 345-46.

Rosenberger repeats her meritless argument that she could not have violated Rule 13b2-2, because "objective and independent accountants agree with the original decision." Rosenberger Mem. at 42. First, the premise of her argument is wrong, as there is no evidence any accountant disputes the accounting was wrong. *See* Arg. Section III.B above. Second, regardless of the accounting decision, there is no dispute that Rosenberger misrepresented material facts about the Openwave transaction. Rosenberger admits (and the EY auditor confirmed) that the false facts Rosenberger represented in her revenue recognition memorandum were material to the determination of the accounting issue. Counter Ros. 56.1 ¶¶ 341-43.

### D.    Windstream

As discussed in the SEC brief for partial summary judgment motion, SEC SJ Br. at 24-25, 39-41, Rosenberger misrepresented and omitted material facts about the Windstream license transaction (Amendment 9) in the revenue recognition memorandum she signed and sent on to EY in connection with the Q2 2016 Form 10-Q and in the management representation letters she signed and sent to EY. SEC 56.1 ¶¶ 15, 22, 158-161, 260, 320-326, 330-331. These same false statements to EY constitute violations of Rule 13b2-2. *See* SEC SJ Br. at 15-27, 39-42.

Rosenberger seeks summary judgment in her favor on the Rule 13b2-2 claim as to these misrepresentations and omissions, because she states she "didn't even know what Amendment 10 was." Rosenberger Mem. at 45. In fact, Rosenberger testified only that she could not *recall* Amendment 10. Counter Ros. 56.1 ¶ 229. Given the contemporaneous emails, Counter Ros. 56.1 ¶¶ 305-313, her claimed lack of recollection is insufficient to warrant summary judgment in her favor.

Nor is her contention that she did not sign Amendment 10 (as she was required to) a basis to grant her motion. She signed Amendment 9 after being made aware that Amendments 9 and 10 were executed within one day of each other. SEC SJ Br. at 40. It is also not relevant whether it was Prague who directed that Amendment 10 be pushed off one day, to July 1. Rosenberger Mem. at 45. Whether Amendment 10 was signed the same day as Amendment 9 or one day after, the required accounting treatment was the same.

### E.    Sage

Rosenberger was required by company policy to review, approve and sign revenue recognition memoranda for transactions of $500,000 or more. Counter 56.1 ¶ 454. Despite the absence of her signature on the Sage memorandum, Rosenberger testified she had no reason to believe she did not follow company policy in reviewing and approving the revenue recognition memorandum for Sage. Counter 56.1 ¶ 455. That memorandum, as Rogers confirmed in testimony, was misleading, because, among other reasons, it claimed that the requirement of probability of collection was met based on Synchronoss having a ten-year history with Sage without any billing issues—omitting to disclose that Sage was never a customer, only a vendor. Counter 56.1 ¶ 467. Rosenberger also sent a false and misleading management representation letter to EY in connection with the 2016 Form 10-K, and her letter falsely represented that the company's financial statements had been prepared in conformity with GAAP. SEC 56.1 ¶¶ 158-59.

Rosenberger ignores company policy and her own deposition testimony to argue that there is no evidence she saw or approved the revenue recognition memorandum. This evidence alone creates genuine triable issues of fact. But Rosenberger nevertheless seeks summary because the Sage reseller transaction was reversed on the basis of the side letter she had no knowledge of. Rosenberger Mem. at 45-46. Even if the company's stated reason for the reversal on this transaction were true (and Rosenberger presents no admissible evidence for that), that is irrelevant here. Her "misleading" representations, based on the information she indisputably possessed, were materially false and independently violated GAAP. Counter Ros. 56.1 ¶¶ 467, 470-77.

## VII. SUBSTANTIAL AND OFTEN UNDISPUTED EVIDENCE SHOWS THAT ROSENBERGER AND LANNI VIOLATED EXCHANGE ACT SECTION 13(b)(5).

Section 13(b)(5) of the Exchange Act prohibits any person from "knowingly circumvent[ing] or knowingly fail[ing] to implement a system of internal accounting controls or knowingly falsify[ing] any book, record, or account." The statute requires a showing of knowledge; recklessness does not suffice. *See SEC v. Stanard*, No. 06 Civ. 7736, 2009 WL 196023, at *30 (S.D.N.Y. Jan. 27, 2009). This knowledge requirement is met by alleging that the person charged "knew of facts that contradicted the substance of the reported accounting." *SEC* v. *China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 394 (S.D.N.Y. 2014); *Rio Tinto*, 2019 WL 1244933, at *20.

As discussed above and in the SEC's affirmative motion papers, Rosenberger knowingly falsified Synchronoss's books and records as to the five transactions and circumvented the company's internal controls by approving and/or signing materially misleading revenue recognition memoranda. Arg. Section III, above. At a minimum, she knew of the facts that contradicted the substance of the reported accounting. Arg. Sections III, above. Rosenberger merely repeats her meritless arguments addressed above regarding her scienter, and they should be rejected for the same reasons as discussed above in Arg. Section III.

Lanni repeats her argument that the evidence is insufficient to establish she knew about the hosting agreement between Windstream and Synchronoss, which is incorrect for the reasons stated above in Arg. Section IV.A.2. As to Amendments 9 and 10, she does not dispute she signed a false and misleading revenue recognition memorandum for Amendment 9. Lanni Mem. at 13-14. But she claims the SEC cannot establish her "knowing" violation, because the repeated emails she received offered only the "remotest" clues the Amendments were a multiple element arrangement. Her argument is baseless. The emails made clear both agreements were both being negotiated at the same time and were intended to be executed at the same time. SEC 56.1 ¶¶ 228-45. And, as Lanni learned a short while later, they *were* executed at the same time. SEC 56.1 ¶ 288. These facts required Lanni, under GAAP guidance she knew well, to presume the agreements were a multiple element arrangement. SEC 56.1 ¶¶ 276-78. There is thus ample evidence that Lanni knew the facts that contradicted her signed misrepresentations.

## VIII. SUBSTANTIAL EVIDENCE SHOWS THAT ROSENBERGER AND LANNI VIOLATED RULE 13b2-1.

Rosenberger bases her motion for summary judgment as to the SEC's claim that she violated Rule 13b2-1 on the same grounds she advanced as to its Rule 13b2-2 claim. They should be rejected for the same reasons discussed above in Arg. Sections VI.A-E as to all five transactions at issue.

As for Lanni, the SEC's motion for summary judgment details the undisputed facts that establish Lanni's liability under Rule 13b2-1 as to Windstream. SEC SJ Br. at 15-27. These same facts warrant denial of Lanni's motion for summary judgment on this claim.

Yet Lanni argues that summary judgment is warranted on the Rule 13b2-1 claim because she discerns no "red flags" that would have alerted her that she should have had the multiple emails regarding Amendments 9 and 10 she received, or the journal entries she approved for them, at hand when she reviewed the revenue recognition memoranda for those two agreements. Lanni Mem. at 23-24. She further complains that the SEC "necessarily posits that [she] should have recalled" the

emails and journal entries when she was "attending to the revenue recognition memoranda." *Id.* at 25. Lanni refers to this as requiring "not just an inferential leap, but outright speculation." *Id.* at 25.

Her argument is without merit. Taking as true Lanni's contention that she was not part of the business negotiations on these transactions, the only reason she was sent the draft emails was because a finance department member required by company policy to approve revenue recognition. The emails showed Amendments 9 and 10 were to be executed at the same time with the same customer. SEC 56.1 ¶ 266-68. The emails thus triggered a mandatory GAAP provision, ASC 605-25-25-3, requiring Lanni to presume that Amendments 9 and 10 were "negotiated as a single package"; to evaluate them as a single arrangement, absent sufficient evidence to the contrary; and to conduct a multi-factor analysis under ASC 985-605 heavily weighted toward simultaneous negotiations. SEC 56.1 ¶ 250-55. That was the "critical information" and context for the emails Lanni received, and it is a reasonable inference, not a leap, to conclude she acted knowingly.

Lanni finally argues that the SEC's expert's testimony is inadmissible to establish that she acted unreasonably. Lanni Mem. at 27-31. Lanni argues that the SEC's expert, Taub, did nothing more than conclusorily assert Lanni acted "unreasonably" and did not "analyze where exactly [she] supposedly went wrong." *Id.* at 30. Lanni's arguments are unavailing.

First, she mischaracterizes Taub's analysis, report, and opinions. Taub offered three opinions regarding each of the transactions at issue: (1) whether the company's accounting decisions were correct under GAAP (*e.g.*, Taub Report ¶¶ 157-173); (2) whether the information in Defendants' possession was sufficient, when measured by GAAP guidance, for them to have concluded they were incorrect (*e.g.*, *id.* at ¶ 174); and (3) whether their conclusions were reasonable, *id.*

Lanni next ignores Taub's detailed analysis of her conduct in the second of these three opinions. He explained the principal GAAP pronouncements on multiple element arrangements, ASC 605-25-3 and 985-605; discussed the information that the company had received; and analyzed

where Rosenberger and Lanni fell short on the Windstream transaction. Taub Report ¶¶ 174-186.

Taub pointed out, for example, not only the emails reflecting the simultaneous negotiation of

Amendments 9 and 10 (Taub Report ¶¶ 176-178), but also inconsistencies in the two agreements (in

particular, the low maintenance figure, when measured against the inflated value of the license) that

should have led Rosenberger and Lanni to question whether the agreements were appropriately

accounted for separately. Taub Report ¶ 181. Taub pointed out that if had Lanni or Rosenberger

followed up on the indications that Amendments 9 and 10 were a multiple element arrangement,

they would determined their revenue recognition decisions were wrong. Taub Report ¶ 186.

## IX.  SUBSTANTIAL EVIDENCE SHOWS THAT ROSENBERGER AIDED AND ABETTED VIOLATIONS OF SECTION 13(b)(2)(B).

Exchange Act Section 13(b)(2)(B) required Synchronoss to devise and maintain a system of

internal accounting controls sufficient to provide reasonable assurances that the company's

transactions were executed in a manner, among other things, permit the preparation of financial

statements in conformity with GAAP. Rosenberger makes no new argument here, but instead refers

to the arguments she advanced with respect to the SEC's primary liability fraud claims. Rosenberger

Mem. at 47. Her arguments should be rejected for the reasons discussed above in Arg. Section III.

## X.  ROSENBERGER IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE SEC'S SOX 304 CLAIM.

Rosenberger first argues that only the Sage transaction is subject to a SOX 304 claim seeking

to have her reimburse Synchronoss for certain bonus and incentive payments and stock profits. She

contends that "Synchronoss's announcements concerning the restatement made clear that at least

four of the five transactions at issue were restated because Synchronoss decided to depart from

historical practice as to those transactions." Rosenberger Mem. at 49. She therefore contends that

only the Sage transaction arose from misconduct and thus qualifies for reimbursement under SOX

304. Rosenberger does not identify this "announcement," but it is irrelevant. SOX 304 claims do not

require corporate admissions of misconduct; misconduct found by the factfinder suffices. The overwhelming evidence of misconduct in this case—Rosenberger's, Lanni's, and others—is sufficient to grant the SEC summary judgment as to certain SOX 304 reimbursement and to create a genuine factual dispute as to whether misconduct occurred as to the rest. *See* SEC SJ Br. at 48-50.

There is also no merit to Rosenberger's argument under *SEC v Jasper*, 678 F.3d 1116, 1130 (9th Cir. 2012), that, because SOX 304's statutory reimbursement provision constitutes an equitable, not legal, remedy, the SEC's claim should be limited to reimbursement of Rosenberger's profits relating to her wrongdoing. Rosenberger Mem. at 50. *Jasper* held only that there was no right to a jury trial on SOX 304 claims. 678 F.3d at 1130. Even if the Second Circuit were to adopt that approach, it would provide no support for the proposition that courts may limit the mandatory scope of SOX 304, which requires reimbursement of all covered compensation and profits. *See also SEC v. Jensen*, 835 F.3d 1100, 1116 (9th Cir. 2016) (holding that the "equitable" remedy of SOX 304 allowed for reimbursement from CFO, even if the misconduct at issue was of other employees).

## XI. THE COURT SHOULD NOT DISMISS THE SEC'S REQUEST FOR AN INJUNCTION AND AN OFFICER-AND-DIRECTOR BAR.

Rosenberger asks the Court to dismiss the SEC's claims for injunctive relief and an officer-director bar. That request is premature, as a determination on injunctive relief should await a finding of liability. *See, e.g., SEC v. Wyly*, 950 F. Supp. 2d 547, 559 (S.D.N.Y. 2013) ("[I]t would be premature to find that injunctive relief is not warranted prior to determining the merits of the SEC's claims."). Nonetheless, should the Court reach that issue at this stage, the injunction and officer-and-director bar are more than justified by the ample evidence of Rosenberger's repeated and egregious fraud, consisting of falsifying business records to inflate corporate earnings and intentional misrepresentations to the company's external auditor.

74

**CONCLUSION**

For the foregoing reasons, the Commission respectfully requests that the Court deny

Defendants' motions for summary judgment in their entirety.

Dated: September 15, 2023
New York, New York

Respectfully submitted,

/s/ Richard G. Primoff
Richard G. Primoff
Lindsay S. Moilanen
Theresa H. Gue
SECURITIES AND EXCHANGE COMMISSION
New York 100 Pearl Street, Ste.  20-100
New York, NY 10004