UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                         :
SECURITIES AND EXCHANGE COMMISSION,      :
                                         :
                          Plaintiff,     :      22cv4736 (DLC)
                                         :
              -v-                        :      OPINION AND ORDER
                                         :
KAREN ROSENBERGER and JOANNA LANNI,      :
                                         :
                          Defendants.    :
                                         :
--------------------------------------- X

APPEARANCES:

For plaintiff Securities and Exchange Commission:
Richard G. Primoff
Lindsay Senechal Moilanen
U.S. Securities and Exchange Commission
100 Pearl Street, Suite 20-100
New York, NY 10004

Theresa Hsin-Yi Gue
Lara Shalov Mehraban
U.S. Securities and Exchange Commission
200 Vesey Street, Suite 400
New York, NY 10281

For defendant Karen Rosenberger:
Jenny Rebecca Kramer
Rachel Finkel
Steven Campbell
Alston & Bird, LLP
90 Park Avenue
New York, NY 10016

Paul Monnin
David Andrew Hachett
Alston & Bird, LLP
1201 West Peachtree Street
Atlanta, GA 30309

For defendant Joanna Lanni:
Scott Bonner McBride
Michelle Lea Goldman
Amanda Kate Cipriano
Cassandra Annemarie Essert
Lowenstein Sandler
One Lowenstein Drive
Roseland, NJ 07068

DENISE COTE, District Judge:

The U.S. Securities and Exchange Commission (the "SEC") has brought claims against Karen Rosenberger and Joanna Lanni, former officers of Synchronoss Technologies, Inc. ("Synchronoss" or the "Company"), in connection with the Company's overstatement of revenue from five transactions. The SEC has moved for summary judgment on the claims relating to two of the five transactions and for Rosenberger to reimburse the Company for certain bonus compensation she received. Rosenberger and Lanni have each filed motions for summary judgment on all claims brought against them. For the following reasons, the SEC's motion is granted and the defendants' motions are denied.

## Background

The following facts are undisputed or taken in the light most favorable to the defendants, unless otherwise indicated. After a description of Synchronoss and the two defendants' employment at the Company, the two transactions for which the SEC seeks summary judgment will be described. They are Synchronoss's sale of its Local Network Portability ("LNP")

software[1] to AT&T, Inc. ("AT&T") and its sale of perpetual

software licenses to Windstream Communications, Inc.

("Windstream").

I.   Overview of Synchronoss and the Defendants' Positions in
     the Company

Synchronoss is a software and services company whose

customers are generally telecommunications companies.  Ernst and

Young ("EY") audited the Company's financial statements.

Rosenberger, who is a C.P.A., joined Synchronoss in 2000

and served as its Chief Financial Officer ("CFO") from April

2014 to February 2017.  Rosenberger resigned in February 2017,

when the Company's new CEO hired a new CFO.

In her capacity as CFO, Rosenberger reviewed accounting

memoranda and supporting documents for every non-recurring

Synchronoss transaction valued over $500,000 and approved

Synchronoss's financial disclosure forms.  These memoranda were

provided to EY for their review and audit.  Rosenberger worked

with EY to conduct due diligence on various transactions and to

prepare Synchronoss's financial disclosure forms.  Rosenberger

signed each of the Company's Forms 10-K and 10-Q.

Lanni, who is also a C.P.A., served as the Controller of

Synchronoss from January 2014 to mid-2017.  In that capacity,

---

[1] The LNP software allows retail customers to keep their personal
cell phone numbers when switching carriers.

Lanni was responsible for day-to-day accounting operations, maintaining a relationship with auditors, implementing proper internal controls, and preparing and filing Synchronoss's financial disclosure forms.  These responsibilities included reviewing supporting documents for every non-recurring Synchronoss transaction valued over $500,000.  With Rosenberger, Lanni reviewed the accounting memoranda provided to EY for its audit and review.  She reported directly to Rosenberger.  Lanni left the Company in 2017.

On July 2, 2018, following an internal investigation, Synchronoss filed a Form 10-K.  In that filing, it restated its financial statements for FY 2015 and 2016, including in connection with the revenue from the LNP transaction and the sale of licenses to Windstream.

II.  LNP Transaction

The first set of claims on which the SEC is seeking summary judgment arises from the Company's recognition of revenue in its 2015 Form 10-K and February 2016 Form 8-K from a transaction with AT&T.  The transaction involved a set of licenses for the LNP software, along with accompanying maintenance fees.  The SEC contends that $3 million in revenue from the LNP sale should not have been recognized in 2015 since the amount of revenue for that sale was not finalized until 2016.

The generally accepted accounting principles ("GAAP")[2] that apply to this transaction are contained in ASC 985-605-25-3.[3] They are also contained in the SEC's Staff Accounting Bulletins ("SAB").[4]  Under GAAP, revenue from the sale of software "shall be recognized" when all of the following criteria are met:

> (1) persuasive evidence of an arrangement exists; (2) delivery has occurred; (3) the vendor's price is fixed or determinable; and (4) collectability is reasonably assured.

ASC 985-605-25-3.  See SAB No. 104.

The Company's negotiations with AT&T for this transaction took place in 2015 and in 2016.  On December 24, 2015, John Murdock ("Murdock"), Synchronoss's Senior Director of Procurement and Business Operations, forwarded an email to Rosenberger from Charlie Verma ("Verma"), the Vice President and

---

[2] GAAP is a set of generally accepted accounting principles that U.S. companies must follow in preparing their financial statements.  Indiana Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 93 (2d Cir. 2016) (citing 17 C.F.R. § 210.4-01(a)(1)).

[3] The Accounting Standards Codification ("ASC") is the "source of authoritative generally accepted accounting principles" published by the Financial Accounting Standards Board ("FASB").  FASB, Accounting Standards Codification: About the Codification 4 (Dec. 2014), https://asc.fasb.org/imageRoot/71/58741171.pdf.

[4] Pursuant to 17 C.F.R. 211, the SEC issues Staff Accounting Bulletins ("SAB"), which provide "interpretive guidance consistent with current authoritative accounting and auditing guidance and SEC rules and regulations."  SAB No. 104, 68 Fed. Reg. 74436 (Dec. 23, 2003).  Synchronoss relies on the SAB as authoritative guidance for proper revenue recognition.  See Id. at 74437.

Executive of Strategic Sales at Synchronoss.  In an email with
the subject matter identified as "LNP Update", Verma wrote that
AT&T had not yet approved the funding that would allow
Synchronoss to "deploy" software licenses to AT&T and that
AT&T's approval would likely occur in January, following "AT&T's
regular process."  Rosenberger forwarded this email to Steve
Waldis, Synchronoss's CEO.  Waldis asked Rosenberger, "What if
they accept software in Dec[ember], and send an email saying due
to holidays, we will get formal OK after Monday AM fist [sic]
day back[?]"  Rosenberger responded, "I would say we could work
that one."  She indicated that she would call Verma.  On
December 31, Bob Garcia, the Company's Chief Operating Officer,
informed Rosenberger that AT&T had downloaded the LNP software
and "accepted all licenses."

      Rosenberger, knowing that AT&T had not yet formally
approved the contract for the LNP software, emailed Verma on
January 6, 2016, asking for an "update on the license deal."
Verma responded that Murdock wanted to have "AT&T physically
sign and backdate the license agreement."  Rosenberger responded
that she was aware of Murdock's request.  In other emails from
that same day and the next, Verma informed Rosenberger that AT&T
was looking for $1 million in savings in 2016, that AT&T had
been told that the Company had "no further discounts to offer",
and that they were at a "stalemate."  Verma's emails included

                              6

timestamped updates, indicating that he was in touch with AT&T every few hours in his attempt to secure the LNP sale.

On January 8, Verma sent Rosenberger a backdated AT&T contract, in an email titled, Signed Agreement LNP.  The attached agreement is dated December 31, 2015 ("LNP Agreement"). The LNP Agreement provided that AT&T would pay $3 million for the LNP software as a perpetual license fee, as well as 20% (i.e., $600,000) for "standard maintenance and support".  The Agreement also stated that "[f]ees and scope for . . . hosting support services . . . may be available pursuant to a change order negotiated between the parties."  The signature is illegible and there is no printed name.  The signer's title is handwritten and may be "Senior Tech. Director."  Rosenberger forwarded these documents to Lanni, who instructed her staff to "book this now for December."

The Company's Accounting Memorandum ("LNP Memorandum") for this transaction, which required Rosenberger's approval, reported that "[d]uring December 2015" AT&T "entered into an agreement with Synchronoss" to purchase a perpetual license and maintenance support services for a total of $3.6 million.  It explains that a written contract is not required by SAB No. 104 if a written contract is not part of a company's "customary business practice."  It reports that the Company "received a letter from AT&T <u>confirming</u>" the software "had been delivered <u>as

of December 31, 2015" and confirming "the pricing for the licenses and maintenance support." (Emphasis supplied.)  It concluded that "[b]ased on the above factors, we find that the contract between the parties constitutes persuasive evidence that an arrangement exists."  The LNP Memorandum did not indicate that the LNP Agreement was backdated.

On February 4, the Company filed its February 2016 Form 8-K, which included $3 million in revenue from the LNP AT&T transaction.  On February 26, the Company sent a management representation letter to EY in connection with Synchronoss's financial statements for the year ended December 31, 2015.  This letter was signed by Rosenberger, as well as Waldis and Lanni. It represented to EY that Synchronoss had disclosed to EY "all sales terms (both expressed and implied)" as well as "all significant contracts, communications (either written or oral), and other relevant information pertaining to arrangements with our customers, including distributors and resellers."  The Company sent three more management representation letters to EY, each containing the language quoted above.  These letters were dated May 10, August 4, and November 8, 2016.  Each of these letters was also signed by Rosenberger, Waldis, and Lanni. Despite the representations in these letters, it is undisputed that none of the signatories revealed to EY in 2016 that the LNP

Agreement was backdated and that the price for the LNP license remained under negotiation.

On February 26, Rosenberger signed Synchronoss's 2015 Form 10-K, which recognized $3 million in revenue from the LNP transaction.  With this revenue, the Company exceeded analyst expectations; without it, it would not have done so.  The recognition of this revenue in 2015 led to an increase in the Company's pre-tax income of the fourth quarter of 2015 by about 23%.

Synchronoss did not send an invoice to AT&T for the sale of the LNP software license until December 5, 2016.  That invoice, which was dated November 30, 2016, listed $2.5 million as the LNP license fee and 20% of that amount, i.e. $500,000, as the maintenance fee, for a total of $3 million, rather than the total of $3.6 million stated in the backdated LNP Agreement. The Company's accounting department noted that there was a $500,000 difference between what was listed on the Company's books as "unbilled" versus what was being invoiced.

In the interim, EY inquired as to why no invoices had been sent or payment received on the LNP Agreement, whose revenue had been included in the 2015 Form 10-K.  Rosenberger responded with explanations that did not reveal the full sequence of events set forth above.  For instance, on July 27, Rosenberger reported to Synchronoss's Audit Committee, which included EY auditors, that

management changes at AT&T were delaying the billing process and had led to "unbilled receivables".

In 2018, after the departure of Rosenberger and Lanni from the Company, Synchronoss concluded that the LNP software revenue, recognized in 2015, should not have been recognized until 2017.  On July 2, 2018, the Company filed a Form 10-K in which it restated its financial statements for fiscal years 2015 and 2016.  In this Form 10-K, Synchronoss explained that, in conformity with GAAP, it had determined "to revise the timing of revenue recognition to when [the Company] received final formal contract documentation, which occurred in a future period."

In an internal memorandum explaining the restatement, dated June 29, 2018, the Company found that the LNP software license and the maintenance agreement should be treated as part of one overall multiple-element arrangement with a hosting arrangement and a professional services agreement.  As a result, their combined fees should have been recognized over the term of the hosting services, which began in January 2017.

III. Windstream Transaction

The second set of claims on which the SEC is seeking summary judgment relates to the Company's treatment of a single software-as-a-service arrangement ("SaaS") with Windstream.  The Company recognized $5.3 million in revenue from one component of that arrangement in its Q2 2016 Form 10-Q, separating that

component from the rest of the arrangement.  The SEC contends
that this premature recognition of revenue in Q2 2016 violated
GAAP, specifically its rules concerning a single multiple-
element arrangement ("MEA").

Several GAAP principles apply to the Windstream software
sale.  ASC 985-605-55-4, which requires software vendors to
consider whether multiple agreements are part of a single MEA,
provides that:

> Software vendors may execute more than one contract or
> agreement with a single customer.  However, a group of
> contracts or agreements may be so closely related that they
> are, in effect, parts of a single arrangement and should be
> viewed as one multiple-element arrangement when determining
> the appropriate amount of revenue to be recognized in
> accordance with this Subtopic.  The form of an arrangement
> is not necessarily the only indicator of the substance of
> an arrangement.  The existence of any of the following
> factors (which are not all-inclusive) may indicate that a
> group of contracts should be accounted for as a single
> multiple-element arrangement:
> (a) The contracts or agreements are negotiated or executed
> within a short timeframe of each other.
> (b) The different elements are closely interrelated or
> interdependent in terms of design, technology, or function.
> (c) The fee for one or more contracts or agreements is
> subject to refund, forfeiture, or other concession if
> another contract is not completed satisfactorily.
> (d) One or more elements in one contract or agreement are
> essential to the functionality of an element in another
> contract or agreement.
> (e) Payment terms under one contract or agreement coincide
> with performance criteria of another contract or agreement.
> (f) The negotiations are conducted jointly with two or more
> parties (for example, from different divisions of the same
> entity) to do what in essence is a single project.

ASC 985-605-55-4 (emphasis supplied).

11

There is a presumption that contracts entered closely in time were negotiated as a package.  ASC 605-25-25-3 provides:

> "[S]eparate contracts with the same entity or related parties that are entered into at or near the same time are presumed to have been negotiated as a single package and shall, therefore, be evaluated as a single arrangement in considering whether there are one or more units of accounting."

ASC 605-25-25-3 (emphasis supplied).

Pursuant to GAAP, revenue for a single MEA is to be recognized when vendor-specific objective evidence ("VSOE") is obtained.  VSOE is obtained when the fair value of all undelivered elements is known.  "If an arrangement includes multiple elements, the fee shall be allocated to the various elements based on [VSOE] of fair value, regardless of any separate prices stated in the contract for each element."  ASC 985-605-25-6.  But,

> if sufficient [VSOE] does not exist for the allocation of revenue to the various elements of the arrangement, all revenue from the arrangement shall be deferred until the earlier of the point at which: (a) [s]uch sufficient [VSOE] does exist; and (b) [a]ll elements of the arrangement have been delivered.

ASC 985-605-25-9 (emphasis supplied).  Where an MEA involves a hosting element, "[t]he portion of the fee allocated to the hosting element should be recognized as the service is provided."  ASC 908-605-55-124.

The Company acquired the Windstream business when the Company acquired Razorsight Corporation ("Razorsight") in August

of 2015.  Razorsight had a long-standing relationship with Windstream, which had been codified in a master services agreement ("MSA").

After Synchronoss's acquisition of Razorsight, Windstream and Synchronoss broke the existing Windstream SaaS into several components.  Three of these components, which were reflected in amendments to the MSA, were a perpetual license for Synchronoss software ("Amendment 9"), an audit services agreement ("Amendment 10"), and a hosting services agreement for that software ("Hosting Agreement").  The statement of work ("SOW") for the hosting agreement ran for three years, from July 1, 2016 to June 30, 2019.

During the June 2016 negotiations between Windstream and the Company, drafts of Amendments 9 and 10 were circulated within the Company, including to Rosenberger and Lanni.  Several of these email chains discussed both amendments.  For example, on June 17, Murdock provided colleagues at Synchronoss with updates on the Windstream negotiations on both amendments. Under the heading "Amend 9", Murdock wrote, "7M in license with 10% support; 12 month term on support . . ."  Under the heading "Amend 10", Murdock wrote, "6M in settlement; Expected 6.5 in cogs that may be lowered."  Under the heading "Outstanding", Murdock wrote "Hosting SOW – may come later . . . Sage

settlement docs."[5]  In the last email in this chain, Rosenberger responded "All, thanks for all of your efforts!"  Rosenberger and Lanni also received iterations of the drafts of Amendments 9 and 10 on June 29 and 30.

On June 30, 2016, Synchronoss executed the perpetual software license at the cost of over $6.1 million as Amendment 9 to the MSA.  The next day, July 1, Windstream executed Amendment 10, in which it agreed to pay a $600,000 one-time fee in exchange for Synchronoss providing audit and advising services. Specifically, Synchronoss agreed to audit Windstream's invoices from other telecommunications carriers and advise Windstream on strategies to lower costs.  This $600,000 figure was far below the value of this work.  Synchronoss outsourced these services to another company, Sage Management Inc. ("Sage"), at a cost of $3.9 million to Synchronoss.  Thus, unless Amendments 9 and 10 are viewed together, Synchronoss would have sustained a loss on the transaction.  Executed copies of Amendments 9 and 10 were sent together to the Company's Accounts Receivable department on July 7, 2016.

Rosenberger and Lanni signed an Accounting Memorandum for Amendment 9 in which they approved the recognition of

---

[5] As described below, the Company contracted with Sage Management, Inc. to perform some of the work it provided to Windstream.

approximately $5.3 million in revenue in Q2 2016, with the deferral of slightly over $922,000, described as subscription revenue, over a 12-month maintenance term.  The Memorandum does not discuss either Amendment 10 or the Hosting Agreement.

Lanni signed an Accounting Memorandum approving the recognition of $600,000 in revenue from Amendment 10 in the Company's Q3 2016 Form 10-Q.  That Memorandum does not discuss either Amendment 9 or the Hosting Agreement.  In addition, Lanni approved two entries into Synchronoss's books and records, reflecting the effective date and revenue of Amendments 9 and 10, as just described.  Lanni approved these entries on July 11 and August 1, respectively.

Roughly six months later, on January 18, 2017, Synchronoss entered into the Hosting Agreement with Windstream.  The Hosting Agreement was made retroactive to July 1, 2016, for a term of three years, expiring on June 30, 2019.  During this three-year term, Synchronoss provided Windstream with products and services required for the operation of the software licensed through Amendment 9, including network connectivity and software update installation.  Synchronoss provided these hosting services at the price of $5,000 per month.  Synchronoss did not treat the hosting services as part of an MEA.

After Amendment 9 was signed on June 30, 2016, Synchronoss recorded approximately $5.3 million in revenue for Q2 2016 from

the sale of the perpetual license agreement to Windstream in its
August 2016 Form 8-K, its Q2 2016 Form 10-Q, its February 2017
Form 8-K announcing financial results for FY 2016, and its 2016
Form 10-K.  Because of its recognition of $5.3 million in
revenue from Amendment 9, the Company reported revenue that
surpassed consensus analyst estimates for Q2 2016 by $4.53
million.  The Company also reported $3.9 million in pre-tax
income loss in its August 2016 Form 8-K, rather than $8.3
million.

On August 3, Rosenberger endorsed an earnings release that
accompanied the Company's August 2016 Form 8-K, which reported
the Q2 revenue from Amendment 9.  In this release, Rosenberger
stated, "[w]e are pleased with another quarter that exceeded our
expectations, particularly our ability to deliver strong top-
line growth."

On July 2, 2018, new management at Synchronoss restated the
revenue from this Windstream transaction.  Synchronoss's
restatement reflects that revenue recognized in Q2 2016 should
have been recorded instead over the life of the Hosting
Agreement.  In a June 6, 2018 Accounting Memorandum discussing
the restatement, the Company reviewed several transactions in
which the Company had an explicit or implied hosting agreement
that had not been identified at the time of the original
accounting assessment.  Applying ASC 985-605, the Company

determined that the license agreement in Amendment 9 and the Hosting Amendment were negotiated together and that the bundled revenue should be "recognized over the period that the hosting services were to be performed."

IV.  Additional Transactions: ASR Software Sale, Openwave Acquisition, and Sage Reseller Agreement

Apart from the aforementioned, Synchronoss also revised its reported earnings from three other transactions described in the SEC's complaint in this action: AT&T's agreement to purchase Synchronoss's ASR Software[6], Synchronoss's acquisition of Openwave Messaging, Inc. ("Openwave"), and Synchronoss's sale of software to Sage.  Each is briefly discussed below.

a. ASR Software Sale

In an email dated September 28, 2015, AT&T agreed to purchase the ASR software for $4.5 million and pay a $900 thousand maintenance fee.  Synchronoss reported the total amount as recognized revenue in its financial disclosures for 2015 and 2016.  On February 5, 2016, Charlie Putnam, Executive Vice President of Sales at Synchronoss, notified AT&T that Synchronoss had not yet received an executed contract for the sale of the ASR Software.  On June 23, 2016, AT&T notified Synchronoss that the Company "was not selected as a finalist in

---

[6] The ASR Software was designed to help Synchronoss's customers respond to access service requests by or to other phone carriers.

connection with the Project Renovation ASR Enterprise Gateway project."  AT&T never paid Synchronoss for the ASR software.

On July 27, at an EY audit committee meeting, Rosenberger explained that "management changes at AT&T" had led to issues securing the amount that AT&T had agreed to pay for the ASR software.  She did not advise EY that AT&T had notified the Company that it would not move forward with the purchase.  Synchronoss later reversed its recognition of revenue from this transaction.

b. Openwave Acquisition

On January 8, 2016, Rosenberger was informed of Synchronoss's ongoing negotiations to acquire Openwave Messaging, Inc. ("Openwave") and simultaneously settle its patent infringement claims against Openwave.  Executives at Synchronoss proposed to lower the purchase price for the acquisition in order to account for the settlement.

On March 1, Synchronoss reached an agreement to acquire Openwave for $124.5 million.  On the same day, Synchronoss entered into a licensing agreement with Openwave and Openwave Mobility, Inc., valued at $10 million, to settle its patent infringement claims against Openwave.

Prior to the filing of Synchronoss's financial statements for the Q1 2016, Lanni wrote an accounting memorandum in which she stated that Synchronoss should recognize the $10 million

from the Openwave license agreement as revenue separate from the acquisition agreement.  The memorandum also stated that the licensing agreement "was not a negotiating factor in the [acquisition agreement].  None of the two transactional amounts were negotiated together and the acquisition was not contingent on entering into the license agreement."  Lanni and Rosenberger both signed this memorandum and provided it to EY before EY's regular audit.  Synchronoss included the $10 million license fee as revenue in its Forms 8-K and 10-K for fiscal year 2016.  In 2018, Synchronoss restated this revenue, no longer listing it as a separate transaction from the purchase of Openwave.

      c. Sage Reseller Agreement

In late December 2016, Synchronoss negotiated and executed an agreement with Sage, a company that had previously worked with Razorsight.  Sage had provided audit services to Razorsight's customers, including Windstream, and became a Synchronoss subcontractor after Synchronoss acquired Razorsight. In its negotiations with Synchronoss, Sage agreed to purchase software from Synchronoss that it would then re-sell to its own clients.  On December 31, Synchronoss and Sage executed the final software resale agreement.  Synchronoss recognized approximately $3.6 million in revenue from this reseller agreement in Q4 2016.

Sage did not make payments pursuant to the resale agreement in 2016 or 2017.  On July 2, 2018, Synchronoss restated its revenue to reflect Sage's withdrawal from the reseller agreement.

V.   Procedural History

On May 1, 2017, prior to the filing of this action, a class action was brought against Synchronoss in the District of New Jersey.  Robinson v. Synchronoss Technologies, et al., No 3:17-cv-02978-ZNQ-LHG (D.N.J.).  The lead plaintiff in that case alleged that the Company and its corporate officers, including Rosenberger, had fraudulently inflated the price of the Company's stock by knowingly falsifying the Company's publicly reported revenue.  That action was settled on December 8, 2021.

On June 7, 2022, the SEC initiated administrative proceedings against the Company and six of its officers, including its CEO.  In these proceedings, the SEC charged the Company with claims brought in this action, including violations of securities laws in connection with the LNP transaction and the Windstream transaction.  The Company agreed to pay $12.5 million to settle the SEC's claims, and the Company's former CEO agreed to reimburse the company in the amount of $1.3 million.[7]

---

[7] Press Release, SEC Charges New Jersey Software Company and Senior Employees with Accounting-Related Misconduct, Synchronoss Technologies to Pay $12.5 Million to Settle Charges, Former CEO to Reimburse Company, U.S. Securities and Exchange

The SEC also filed this action against Rosenberger and Lanni on June 7, 2022.  It was reassigned to this Court on August 17.  In its complaint, the SEC brought nine claims against Rosenberger and three claims against Lanni.  On February 10, 2023, Rosenberger's motion to dismiss was denied.  <u>SEC v. Rosenberger</u>, No. 22cv4736 (DLC), 2023 WL 1928093 (S.D.N.Y. Feb. 10, 2023).  Following the completion of discovery, on August 18, the SEC filed a motion for partial summary judgment.  The SEC has moved for summary judgment on all nine claims against Rosenberger and on one claim against Lanni.  On the same day, both defendants cross-moved for summary judgment on all claims. The SEC's motion became fully submitted on November 14.[8]

## **Discussion**

The SEC has moved for summary judgment against Rosenberger and Lanni.  The claims at issue principally assert violations of the Securities Exchange Act of 1934 ("Exchange Act") and its rules, as well as the Sarbanes-Oxley Act.

Summary judgment may be granted only when "the movant shows that there is no genuine dispute as to any material fact and the

---

Commission (June 7, 2022), https://sec.gov/news/press-release/2022-101.

[8] The Court permitted the SEC to supplement its motion with late produced discovery materials.  The defendants' objections to this evidence were received on November 14.

movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a). "To present a genuine issue of material fact
sufficient to defeat a motion for summary judgment, the record
must contain contradictory evidence such that a reasonable jury
could return a verdict for the nonmoving party." Horror Inc. v.
Miller, 15 F.4th 232, 241 (2d Cir. 2021) (citation omitted).
Material facts are facts that "might affect the outcome of the
suit under the governing law." Choi v. Tower Rsch. Cap. LLC, 2
F.4th 10, 16 (2d Cir. 2021) (citation omitted). In considering
a motion for summary judgment, a court "construe[s] the facts in
the light most favorable to the non-moving party and must
resolve all ambiguities and draw all reasonable inferences
against the movant." Kee v. City of New York, 12 F.4th 150, 158
(2d Cir. 2021) (citation omitted).

The SEC's claim against Rosenberger for securities fraud in
connection with the LNP sale of software to AT&T will be
addressed first. The claims against Rosenberger and Lanni for
books and records violations will be addressed next, followed by
the claims that Rosenberger aided and abetted the Company's
violations. Finally, the SEC's claim against Rosenberger for
reimbursement of the Company will be addressed.

I.   Securities Fraud Claim

The SEC argues that Rosenberger engaged in a scheme to
defraud by making material misrepresentations about

Synchronoss's revenue in its 2015 Form 10-K and February 2016

Form 8-K, in violation of § 10(b) of the Exchange Act and Rule

10b-5.  Section 10(b) makes it unlawful to "use or employ, in

connection with the purchase or sale of any security . . . any

manipulative or deceptive device or contrivance in contravention

of" SEC rules.  15 U.S.C. § 78j(b).

>Rule 10b-5, in turn, provides:
>
>It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
>(a) To employ any device, scheme, or artifice to defraud,
>
>(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
>(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.  17

C.F.R. § 240.10b-5.

>Section 10(b) of the Exchange Act and Rule 10b-5, which prohibit fraud in the purchase or sale of a security, are violated if a person has (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.

SEC v. Sourlis, 851 F.3d 139, 144 (2d Cir. 2016) (citation

omitted).

A material misrepresentation or material omission is made "with the requisite scienter if it was made with the intent to deceive, manipulate, or defraud." Id. (citation omitted). "Scienter may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." Id. (citation omitted). "Recklessness may be established where a defendant failed to review or check information that it had a duty to monitor, or ignored obvious signs of fraud." Gould v. Winstar Comm., Inc., 692 F.3d 148, 159 (2d Cir. 2012) (citation omitted).

A misstatement is material if, "in the view of a reasonable investor," it "significantly alter[s] the total mix of information made available." Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 100–01 (2d Cir. 2021) (citation omitted). Similarly, an omission is material if the omitted fact would have been viewed by the reasonable investor "as having significantly altered the total mix of information made available." Altimeo Asset Mgmt. v. Qihoo 260 Tech. Co. Ltd., 19 F.4th 145, 151 (2d Cir. 2021) (citation omitted).

Courts may rely on SAB No. 99 as "persuasive guidance for evaluating the materiality of an alleged misrepresentation." Ganino v. Citizens Util. Co., 228 F.3d 154, 163 (2d Cir. 2000).

24

SAB No. 99 provides that a "quantitively small misstatement of a financial statement item" may be material if it "hides a failure to meet analysts' consensus expectations for the enterprise" or "masks a change in earnings or other trends." SAB No. 99, 64 Fed. Reg. 45150, 45152 (Aug. 19, 1999).

In the context of federal securities laws, a statement of fact "expresses certainty about a thing," and an opinion "in ordinary usage does not imply definiteness or certainty." New England Carpenters Guaranteed Annuity and Pension Funds v. DeCarlo, 80 F.4th 158, 169-70 (2d Cir. 2023). A statement of opinion may nonetheless be actionable if it "omits information whose omission conveys false facts about the speaker's basis for holding that view and makes the opinion statement misleading." Id. at 171.

The SEC has provided sufficient evidence to demonstrate that Rosenberger knowingly and intentionally made a material misrepresentation about Synchronoss's revenue in connection with the reporting of $3 million in revenue from the LNP software sale to AT&T in the Company's 2015 Form 10-K and February 2016 Form 8-K, and in doing so acted with intent to deceive. It is undisputed that Rosenberger signed the Form 10-K and Form 8-K. It is undisputed that AT&T did not provide the Company with any written agreement or other document executed in 2015 to reflect a purchase of the LNP software for $3 million, and that the

document on which the Company and Rosenberger relied to
recognize the $3 million in revenue in 2015 was a document
created in 2016.  That document was backdated to bear a 2015
date, as Rosenberger concedes she knew.  It is also undisputed
that Rosenberger did not reveal to EY that the document on which
she and the Company were relying to recognize this revenue in Q4
2015 was a backdated document, created and received in 2016.

The SEC has also shown that the recording of this revenue
in 2015 was material.  It is undisputed that the Company
reported revenue of $157.78 million for Q4 2015 by including $3
million in revenue from the LNP sale.  It is also undisputed
that the Company would not have met consensus analyst
expectations for Q4 2015 if it had not included the revenue from
the LNP sale.  An investor, who was deposed about his investment
in Synchronoss, relied on the Company's Forms 10-K and 10-Q, its
net revenue as verified under GAAP, consensus analyst
expectations, and year-over-year comparisons of the Company's
revenue growth from March 31, 2014 to December 31, 2016 when
deciding whether to invest in Synchronoss.  He testified that it
would have been important for him to know that the Company's
revenue was lower than that reported in 2015, as the Company's
growth was a factor in his decision to invest.

Rosenberger has not provided an affidavit in opposing this
motion for summary judgment.  Instead, in resisting summary

judgment, Rosenberger makes several arguments based on the evidentiary record.  None of these arguments succeeds in identifying evidence to raise a question of fact and thereby defeat the SEC's motion for summary judgment.

First, she argues that the SEC has failed to show that she knowingly or recklessly made a false statement since SAB No. 104 does not require a written contract in the year in which the income is recognized if a company's customary business practice was to rely on other evidence of the agreement.  She asserts that the Company customarily relied, in the case of AT&T, on "an email or purchase order" authorizing work to begin.  Rosenberger has not provided evidentiary support for this assertion.  She points to neither an email nor a purchase order from 2015 in which AT&T agreed to pay $3 million for this sale of software. Instead, for this transaction, Rosenberger relied solely on the backdated document from 2016.  That is the only evidence cited in the LNP Memorandum, which was written to support the recording of this revenue.  Nor has Rosenberger provided evidence that the Company had a practice in recognizing revenue of relying on emails or purchase orders from AT&T or indeed any customer, instead of executed contracts.  The EY auditors have testified that it was the Company's practice to rely on written contracts from AT&T and that the contract had to be signed in the period in which the revenue is recognized.  Even

Rosenberger's expert agrees that it is a "fundamental rule" that the agreement on which one is relying to recognize revenue must be "signed in the period in which you're recognizing revenue."

Moreover, the LNP Memorandum acknowledged that the Company did not recognize revenue "until such point as the prices [sic] is fixed or determinable." Rosenberger has not pointed to any evidence that the price of the LNP transaction was fixed in 2015. The parties had only agreed in 2015 on the delivery of the LNP Software to AT&T. The other elements of SAB No. 104 -- persuasive evidence of an arrangement, a fixed or determinable price, and reasonable assurance of collectability -- were not met until 2016. Yet, despite her awareness that negotiations with AT&T over price were ongoing, Rosenberger approved recognition of the LNP revenue in 2015.

Rosenberger next argues that summary judgment is not warranted since she understood that AT&T had agreed to the $3 million purchase price for the LNP software when she received confirmation on December 31, 2015 that AT&T had downloaded and accepted the software. The evidence to which she points to support this argument does not raise a question of fact. None of the documents to which she points reflect AT&T's agreement in 2015 on the $3 million price. Nor does her deposition testimony. While Rosenberger testified that she "believed" the deal had closed, she acknowledged her uncertainty about the

existence of an agreement on the sale price.  She repeatedly explained during the deposition that she wanted to make sure there was no change in the $3 million asking price for the LNP software license as negotiations on the sale continued in January 2016.  Rosenberger's conclusory assertion of a belief about the deal closing does not raise a question of fact when read in context.

Rosenberger argues next that any reasonable person, including the EY auditors, should have understood that the document reflecting the parties' agreement was received by the Company after December 31, 2015.  As support for this argument, Rosenberger points out that the LNP Memorandum disclosed that the Company had received a letter from AT&T "confirming" that the software "had been delivered as of" December 31, 2015, and that the same letter "confirms" the pricing.  The letter, i.e. the LNP Agreement, bears the date December 31, 2015.  But there is nothing in the wording of the LNP Agreement or the LNP Memorandum to suggest that December 31 is not the date on which the Agreement was written and received.  There is no reason why an agreement of December 31 cannot confirm the delivery and sales price agreed upon earlier that same day.  A reasonable person would not have assumed from the LNP Memorandum that the Company received the LNP Agreement after December 31, 2015.

Rosenberger objects that the SEC has relied on the
Company's emails to support its motion.  She contends that the
emails contain hearsay and have not been properly authenticated.
Rosenberger's objections are overruled.  The SEC has satisfied
the requirements of authentication by producing evidence
sufficient to support a finding that the emails are what the SEC
claims.  Fed. Evid. Rule 901.  See Crawford v. Tribeca Lending
Corp., 815 F.3d 121, 126 (2d Cir. 2016).  Rosenberger has not
made any showing that the Company's emails, provided in
discovery, are not authentic.  Indeed, many of the Company
emails and memoranda on which the SEC has relied, are documents
on which Rosenberger has also relied in bringing her own motion
for summary judgment.

As for the hearsay objection, that objection fares no
better.  Many of the documents are admissible business records.
Fed. Evid. Rule 803(6).  See Picard Tr. for SIPA Liquidation of
Bernard L. Madoff Inv. Sec. LLC v. JABA Assocs. LP, 49 F.4th
170, 182 (2d Cir. 2022).  Some of the statements within the
documents are not being offered for the truth, but merely for
the fact that these statements were made during the course of
the transaction.  To that extent, they do not constitute
hearsay.  Fed. Evid. Rule 801(c)(2).  See Crawford, 815 F.3d at
126.  Also, the defendant's own statements are not hearsay; they
are statements by a party opponent.  Fed. Evid. Rule

801(d)(2)(A).  Finally, Rosenberger has failed to identify any
particular document to which she is making these objections.
Without a more specific identification of the inadmissible
hearsay, it is not possible to address her complaint.

Rosenberger makes several arguments that do not bear
directly on the sufficiency of the SEC's evidence or that do not
raise a question of fact.  For example, she argues that EY could
have contacted AT&T directly to learn that there was no
agreement as to price for the purchase of the LNP software in
2015 and that Rosenberger did not prevent it from doing so.  She
admits that she reviewed and approved the Accounting Memorandum
for the transaction but argues that she did not sign it.  She
argues that she actually believed that management turnover at
AT&T was delaying issuance by AT&T of a statement of work.  She
adds that the emails from the Fall of 2016, which show that AT&T
and the Company were still negotiating the price for the sale of
the LNP software license, corroborate her position that she
understood in 2015 that AT&T had agreed to purchase the
software.  She argues that the SEC failed to take depositions of
many individuals at EY and the Company who were familiar with
these issues.  Since none of these arguments prevents entry of
summary judgment, they need not be further addressed.

Rosenberger also points to EY's 2017 review of the
transaction for the Company as evidence that she engaged in an

31

error of judgment, and not a violation of law.  This review does
not absolve Rosenberger of the fraud claims brought by the SEC.
The review found she had "failed to identify that all the
criteria for recognizing revenue had not been met."  It also
found that she "failed to take appropriate steps" to reverse the
recognition of the revenue from the LNP sale when "she became
aware that certain revenue recognition criteria had not been
met."  In any event, to the extent the 2017 review contains an
assessment of the defendant's state of mind, that assessment is
not admissible evidence of the defendant's mental state in 2016.

       In opposing this motion, Rosenberger appears to suggest
that EY employees who reviewed the Company's financial
statements agreed in their depositions that it was appropriate
to recognize the revenue from the LNP software in 2015 even
though they now understood that the LNP Agreement was created in
2016.  Not so.  None of the three EY employees deposed by the
SEC opined that the backdated LNP Agreement constitutes
persuasive evidence of an agreement, as required by SAB No. 104.
EY Audit Partner Shawn Rogers testified that it was not
appropriate to recognize the LNP revenue in 2015 because the
"transaction was still being negotiated, . . . the fee was not
fixed and determinable and collectability was not probable, nor
was there persuasive evidence of an arrangement if the price
[wasn't] final."  Former EY Partner Alison Yablonowitz testified

that "[t]he key terms of . . . persuasive evidence of an
arrangement means the key terms of the customer arrangement
[are] known by both parties and authorized by both parties."
Finally, Lisa Phillips, who was a Senior Manager at EY at the
time of the LNP sale and the Company's restatement, testified
that delivery of software is only one element of revenue
recognition criteria and that it is "a fundamental rule that the
agreements need to be signed in the period in which you're
recognizing revenue."

Finally, Rosenberger argues that the Company's misstatement
of $3 million in revenue from the LNP sale is not material
because it was of "minimal significance."  She states that the
Company's Q4 2015 revenue would have only been $550,000 below
consensus analyst estimates without the LNP revenue.  She also
argues that there is no evidence that the difference in revenue
"would have made a difference to anyone."  But, as the SEC
points out, Rosenberger was aware that Synchronoss itself
monitored consensus analyst expectations.  Furthermore, even a
"quantitively small" misstatement of revenue may support a
finding of materiality when compared to analyst expectations.
The $550,000 difference in revenue was the difference between
Synchronoss falling below or above consensus analyst estimates.
This difference was important to the Company and to the investor
who testified that he relied on these estimates when deciding

whether to invest in the Company.  Rosenberger has offered no
evidence to raise a question of fact regarding materiality.  The
SEC has shown, therefore, that the misstatement of revenue was
material.

II.  Books and Records Violations

The SEC seeks summary judgment on four claims described as
books and records violations.  The SEC asserts that Lanni
violated one Exchange Act regulation -- Rule 13b2-1 -- in
connection with the Windstream transaction, and that Rosenberger
violated the Exchange Act or its regulations in connection with
the Windstream transaction and the sale of LNP software to AT&T.
The Rule 13b2-1 claim will be addressed first.  After that
discussion, the remaining "books and records" claims addressed
to Rosenberger will be discussed.  The SEC has shown that it is
entitled to summary judgment on each of these claims.

a. Rule 13b2-1

The SEC argues that Rosenberger and Lanni violated Rule
13b2-1, issued pursuant to § 13(b)(2)(A) of the Exchange Act, by
falsifying Synchronoss's books and records with respect to the
Windstream transaction.  The SEC also argues that Rosenberger
violated Rule 13b2-1 by falsifying Synchronoss's books and
records with respect to the LNP software sale.

Before addressing this claim, it is helpful to describe the
context in which Rule 13b2-1 was issued.  In response to the

Watergate Scandal and subsequent SEC investigations into suspect corporate practices, the SEC recommended in the 1970s that Congress enact legislation to enhance "the accuracy of corporate books and records and the reliability of the audit process, which together constitute foundations of the system of corporate disclosure."  44 Fed. Reg. 10964, 10965 (Feb. 23, 1979).

In response, Congress enacted in 1977, among other provisions, § 13(b)(2) of the Exchange Act.  Section 13(b)(2) requires every issuer subject to §§ 12 and 15(d) of the Exchange Act to keep books in "reasonable detail" that accurately and fairly reflect the transactions of the issuers.  It also requires the issuer to devise a system of internal accounting controls to provide "reasonable" assurance that transactions are properly recorded.

Section 13(b)(2), in relevant part, requires companies to:

(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer [and]
(B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that ... transactions are recorded as necessary ... to permit preparation of financial statements in accordance with generally accepted accounting principles or any other criteria applicable to such statements, and ... to maintain accountability for assets.

15 U.S.C. § 78(m)(b) (emphasis supplied).

The Senate Report for the Committee on Banking, Housing, and Urban Affairs that accompanied § 13(b)(2) explains that an

35

issuer's "establishment and maintenance of a system of internal control and accurate books and records are fundamental responsibilities of management" and of "basic importance to investors and the maintenance of the integrity of our capital market system." S. Rep. No. 95-114, at 8 (1977). The Committee recognized, however, that "management must exercise judgment in determining the steps to be taken and the cost incurred, in giving assurance that the objectives expressed will be achieved." Id. It noted that "standards of reasonableness must apply." Id. The Report adds, "[i]n this regard, the term accurately" as used in § 13(b)(2)(A) "does not mean exact precision as measured by some contract principle." Id. "Rather it means that an issuer's records should reflect transactions in conformity with generally accepted accounting principles or other applicable criteria." Id.

The SEC promulgated Rule 13b2-1 to "promote compliance with" § 13(b)(2)(A). 44 Fed. Reg. at 10967. Rule 13b2-1 provides that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to section 13(b)(2)(A)" of the Exchange Act. 17 C.F.R. § 240.13b2-1. To prove a violation of Rule 13b2-1, the SEC must show that a record of the issuer contained false information, and that the defendant either falsified the information or

caused it to be falsified.  See SEC v. Stanard, No. 06 Civ. 7736 (GEL), 2009 WL 196023, at *29 (S.D.N.Y. Jan. 27, 2009).

In its development of Rule 13b2-1, the SEC determined that rule would not require proof of scienter.  44 Fed. Reg. at 10968.  As the SEC observed, including a requirement of scienter for the Rule "would be inconsistent" with the language of § 13(b)(2)(A), which contains no scienter requirement.  Id. Therefore, scienter is not an element for a cause of action under§ 13(b)(2)(A) or Rule 13b2-1.  SEC v. McNulty, 137 F.3d 732, 740-41 (2d Cir. 1998).  Nor is proof of materiality. Stanard, 2009 WL 196023, at *29.

In discussing Rule 13b2-1, the SEC also explained that § 13(b)(2)(A) "does not require perfection but only that books, records and accounts 'in reasonable detail, accurately and fairly reflect the transactions.'"  44 Fed. Reg. at 10966 (emphasis supplied).  As a consequence, in assessing liability for a violation of § 13(b)(2)(A) and Rule 13b2-1, an issuer's books must be kept in "reasonable" detail and an internal system of controls must provide "reasonable" assurances that entries in those books comply with GAAP.  These are the only circumstances in which actions of an issuer or other defendant are subject to an analysis of whether those actions were reasonable.

i.   Windstream Transaction

The SEC seeks summary judgment for the falsification of several records created in connection with the Windstream transaction.  It seeks summary judgment against both Rosenberger and Lanni for the falsification of six documents:  the Accounting Memorandum addressed to Amendment 9; the August 4, 2016 management representation letter to EY; the Q2 2016 Form 10-Q; the August 2016 Form 8-K; the February 2017 Form 8-K; and the 2016 Form 10-K.  It seeks summary judgment as to Lanni alone in connection with the Accounting Memorandum for the Q3 2016 revenue recognition addressed to Amendment 10.

The SEC has shown that each of these Company records were falsified.  The Q2 2016 Form 10-Q recognized $5.3 million in revenue for the sale of a perpetual software license to Windstream pursuant to Amendment 9, when it should not have done so.  The SEC has shown that a properly applied GAAP analysis, treating Amendments 9 and 10 as part of a single MEA, would have permitted the Company to report less than $750,000 in revenue in that quarter.  The SEC has shown that Amendments 9 and 10 were negotiated together and executed essentially simultaneously, and that they were closely related and necessary to each other. There is no basis in the record, based on a proper application of GAAP, to treat revenue generated from Amendment 9 independently.  Consequently, the two Accounting Memoranda, one

38

created for Amendment 9 and the other addressed to Amendment 10, contained false information when they reported the revenue to be recognized from a single Amendment and failed to discuss the relevant GAAP provisions for an MEA or to mention the other Amendment.  Similarly, the August 4 management representation letter to EY for Amendment 9 contained false information when it described the revenue to be recognized in Q2 2016 for Amendment 9 and failed to discuss the relevant GAAP provisions or Amendment 10.  Finally, the August 2016 Form 8-K filed by the Company, which was endorsed by Rosenberger, falsely reported revenue from Amendment 9 and thereby understated the Company's pre-tax income loss by about 53%.

The June 2016 emails associated with Amendments 9 and 10 show that Lanni and Rosenberger were advised repeatedly of the intertwined nature of the two Amendments.  Their actions caused the creation of the falsified records identified by the SEC, including the improper recognition of the Amendment 9 revenue in Q2 2016.

Neither Rosenberger nor Lanni has offered evidence to dispute that GAAP required the revenue of Amendments 9 and 10 to be treated as part of a single MEA or that the Q2 2016 Form 10-Q improperly reported revenue from Amendment 9.  Both resist summary judgment, however, with other arguments.

Rosenberger first contends that the SEC cannot rely on its expert's opinion as to whether her actions were reasonable. The finding of summary judgment, as recited above, has not relied on such a characterization by the SEC's expert. Therefore, this argument fails. In any event, as already explained, Rule 13b2-1 does not import a requirement that a defendant act reasonably other than through its requirement that transactions be recorded in reasonable detail. That requirement is not at issue here.

Rosenberger next contends that she was not unreasonable in "failing to detect" that Amendments 9 and 10 should have been accounted for as an MEA since the restatement investigation conducted by the Company's new management did not reach that conclusion. Again, if the SEC has shown that Rosenberger caused a false entry into the Company's books, it has no burden to show as well that she acted unreasonably in doing so. In any event, the restatement does not excuse Rosenberger's actions. The restatement concluded that Amendment 9 and the Hosting Agreement should have been treated as part of a single MEA and the revenue from both should have been spread over the term of the Hosting Agreement. Nothing in that restatement suggests that Amendment 9 could be treated independently, as opposed to treating it as a component of a single Windstream MEA. As of June 30, 2016, that required consideration of Amendments 9 and 10 together. As of the time of the restatement in 2018, that also required

40

consideration of the Hosting Agreement, which had been executed in January 2017.

Finally, Rosenberger argues that there is no evidence that she knew that Amendment 10 was ever executed.  This argument misses the point.  Through a stream of emails that she received in June 2016, she was given notice repeatedly that Amendments 9 and 10 were being negotiated together.  She was given notice as well through those emails that the fees the Company was paid on Amendment 9 only made sense in the context of the fees being negotiated for Amendment 10.  The fact that there is no email record that she was sent a copy of the executed Amendment 10 does not raise a question of fact regarding the falsity of the entries she caused to be made in Company records.

The sole claim against Lanni on which the SEC has moved for summary judgment is its Rule 13b2-1 claim that Lanni caused false entries regarding the Windstream transaction to be made in corporate records.  Lanni does not dispute that she caused these entries to be made.  She does argue, however, that she has no recollection of the transaction and that the SEC has failed to show, based on her receipt of just three emails in June of 2016 that she had the requisite knowledge that Amendments 9 and 10 were components of a single MEA, and therefore that she should have considered ASC 985-605-55-4 in determining the appropriate accounting treatment for the Amendments.  This argument fails.

41

First of all, Lanni's argument ignores much of the SEC's evidence. She received roughly sixteen separate emails demonstrating that Amendments 9 and 10 were being negotiated at the same time. She was summoned to two meetings or conference calls on the subject. The journal entries she approved on or before August 1, 2016, one for Amendment 9 and another for Amendment 10, reflect that the two Amendments were executed just one day apart. And, at various points in her deposition, she admitted knowing that Amendments 9 and 10 were being worked on together. In any event, Lanni misstates the SEC's legal burden. There is no scienter requirement for Rule 13b2-1.

Lanni also contends that the SEC has not shown that she acted unreasonably by failing to draw the inference that the two Amendments were related to each other. She argues that the dramatic increase of $3.15 million in the price paid by Windstream pursuant to Amendment 9 has an explanation. This argument, again, seeks to import a scienter requirement into the analysis of Rule 13b2-1. If the entry in the books and records is false and Lanni caused that entry, then she is liable for the violation.

Finally, Lanni argues that there is an issue of fact because EY did not discover the accounting error in 2016 and the Company's restatement in 2018 focused on whether Amendment 9 and the hosting agreement were part of a single MEA, as opposed to

42

whether Amendments 9 and 10 were.  Neither EY's failure to detect the error[9] nor the restatement's focus on the 2017 hosting agreement raises a question of fact regarding the falsity of the 2016 record entries.  Therefore, the SEC has shown that it is entitled to summary judgment against Lanni as well as Rosenberger for the entries related to the Windstream transaction.

> ii.   LNP Software Sale

The SEC also seeks summary judgment against Rosenberger for the falsification of three documents in relation to the LNP sale: the Company's 2015 Form 10-K; the LNP Memorandum; and the February 26 management representation letter to EY.  The SEC has shown that each of these three Company records was falsified, and that Rosenberger caused the falsification.

The Company's 2015 Form 10-K falsely included $3 million in revenue from the LNP sale.  Three of the four elements required by GAAP to recognize revenue from the sale of software were not met in 2015 because the LNP sale continued to be negotiated in

---

[9] EY reviewed Synchronoss's two Accounting Memoranda and found each of them effective with respect to the Windstream transaction.  Because the Amendments and their memoranda were evaluated by EY in different quarters, however, EY's failure detect the accounting irregularity does not raise a question of fact as to the Company's compliance with GAAP.  Neither of the Memoranda mentioned the companion Amendment nor otherwise included the facts relevant to consideration of whether they were part of a single MEA.

2016 and the price was not fixed until 2016.  Accordingly, the
LNP Memorandum falsely claimed that the GAAP requirements were
met.  Furthermore, Rosenberger's representation to EY that all
sales terms and all significant contracts and communications had
been disclosed to EY was also false.  The management
representation letter did not explain that the LNP Agreement had
been backdated to December 31, 2015, nor did it disclose that
negotiations regarding price extended beyond that date.

The emails that Rosenberger sent and received in December
2015 and January 2016 indicate that she was aware that the LNP
sale was not finalized until after December 31, 2015.  She
authorized revenue recognition for the LNP sale in Q4 2015,
despite knowing that the negotiations over the sale price
continued well into 2016, the LNP Agreement was not signed until
January 8, and that AT&T could not be billed for the sale.  Her
actions caused the creation of the falsified records identified
by the SEC, including the improper recognition of the LNP
revenue in 2015.

Rosenberger opposes summary judgment on this claim by
arguing that she reasonably believed revenue recognition in Q4
2015 was proper.  This argument relies on an erroneous
understanding of the SEC's burden in showing a violation of Rule
13b2-1.  The SEC has shown that Rosenberger caused a false entry
in the Company's books and records.  It has no burden to show

that Rosenberger acted with scienter or unreasonably.  In any event, as discussed in connection with the § 10(b) and Rule 10b-5 claim, it has already shown that Rosenberger engaged in securities fraud in connection with the sale of the LNP software to AT&T.

> b. Rule 13b2-2

The SEC also asserts that Rosenberger violated Rule 13b2-2 by making materially misleading statements about the LNP sale to EY auditors.  Rule 13b2-2 provides in pertinent part:

> No director or officer of an issuer shall, directly or indirectly (1)[m]ake or cause to be made <u>a materially false or misleading statement to an accountant</u> in connection with; <u>or (2)[o]mit</u> to state, or cause another person to omit to state, <u>any material</u> <u>fact</u> necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with: (i)[a]ny audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or (ii)[t]he preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.

17 C.F.R. § 240.13b2-2 (emphasis supplied).

Rule 13b2-2 was issued at the same time as Rule 13b2-1, to assure than an issuer's books and records "accurately and fairly reflect transactions and dispositions of assets."  44 Fed. Reg. at 10964.  As is true for Rule 13b2-1, there is no requirement to show scienter under Rule 13b2-2.  <u>Id.</u> at 10969.  <u>See</u> <u>Stanard</u>, 2009 WL 196023, at *29.

The SEC seeks summary judgment under Rule 13b2-2 on five of Rosenberger's statements or omissions to EY auditors. The SEC seeks summary judgment for the falsification of the LNP Memorandum and the February 26, 2016 management representation letter. It also seeks summary judgment for Rosenberger's failure to disclose to EY that the Company did not receive the signed LNP agreement until January 2016, her failure to disclose ongoing negotiations with AT&T over the price of the LNP software in the May 10, August 4 and November 8 management representation letters, and her misleading oral statements to EY during audit committee meetings about the status of the LNP transaction. The SEC has shown that Rosenberger failed to disclose the true circumstances of the LNP sale to EY in the LNP Memorandum and the February 26 management representation letter. It has also shown that Rosenberger failed to disclose the ongoing negotiations with AT&T to EY, both in writing and orally, throughout 2016.

Rosenberger argues that she did not mislead EY auditors because she believed her statements about the LNP software sale to be true. This argument fails. Because scienter is not an element of a Rule 13b2-2 claim, Rosenberger's beliefs about the LNP transaction are immaterial. Rosenberger provided misleading information to EY auditors about the LNP transaction throughout 2016 because she did not disclose relevant details about the

46

sale, including the execution date of the Agreement and ongoing negotiations over price.

      c. Section 13(b)(5) of the Exchange Act

The SEC argues that Rosenberger violated § 13(b)(5) of the Exchange Act by knowingly misrepresenting facts about the LNP sale to EY, including by omitting facts about the backdated LNP Agreement in the LNP Memorandum. In 1988, Congress enacted § 13(b)(5) of the Exchange Act, which provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" required by other provisions of the Exchange Act. 15 U.S.C. § 78m(b)(5). Section 13(b)(5) requires proof that a defendant acted "knowingly." It does not require a showing of materiality. Stanard, 2009 WL 196023, at *30.

The SEC prevails on this claim. As described in connection with the SEC's § 10(b) and Rule 10b-5 claim, it has provided sufficient evidence to show that Rosenberger failed to inform EY that the LNP Agreement was signed on January 8, 2016 and backdated to December 31, 2015. In addition, she failed to inform EY that while AT&T had agreed to accept delivery of the software on December 31, the parties had yet to agree in 2015 on the price that AT&T would pay for that software.

Rosenberger opposes summary judgment by arguing that she sincerely believed revenue recognition was proper based on the

delivery of the LNP software to AT&T on December 31, 2015.  She
asserts, therefore, that she did not knowingly misstate revenue.
But, again, as already described, this argument fails.
Rosenberger knew that the LNP Agreement had been backdated, that
the price negotiations were ongoing throughout 2016, and that
AT&T had not been invoiced for the sale.  She did not include
these facts in the LNP Memorandum that she approved, which was
then provided to EY for its regular audit of Synchronoss.

Rosenberger has not provided evidence to raise a question
of fact that her actions were done knowingly.  Rosenberger has
not submitted an affidavit in opposition to this motion for
summary judgment.  The passages of her deposition to which she
points do not, in fact, raise a question of fact as to her
"knowing" conduct.  While she testified that AT&T's acceptance
of the LNP software in December 2015 was evidence that the "deal
was closed," Rosenberger acknowledges in that same deposition
that she did not know if there was an agreement on the price of
that software and took steps in January 2016 "to ensure that
nothing changed on the price."

d. Section 13(a) of the Exchange Act and Rule 13a-14

The SEC argues that Rosenberger violated § 13(a) of the
Exchange Act and Rule 13a-14 by falsely certifying Synchronoss's
2015 Form 10-K, which contained improperly recognized revenue
from the LNP transaction.  Section 13(a) was enacted as part of

the Exchange Act in 1934.  It provides, in relevant part, that

issuers of securities

> shall file with the Commission, in accordance with such
> rules and regulations as the Commission may prescribe ...
> such annual reports ..., certified if required by the rules
> and regulations of the Commission by independent public
> accountants, and such quarterly reports ... as the
> Commission may prescribe.

15 U.S.C. § 78m(a).  Rule 13a-14, promulgated by the SEC in

2002, states in relevant part that

> [e]ach report, including transition reports, filed on Form
> 10-Q, Form 10-K, Form 20-F or Form 40-F ... under Section
> 13(a) ... must include certifications in the form
> specified in the applicable exhibit filing requirements of
> such report and such certifications must be filed as an
> exhibit to such report.  Each principal executive and
> principal financial officer of the issuer, or persons
> performing similar functions, at the time of the filing of
> the report must sign a certification.

17 C.F.R. § 240.13a-14 (emphasis supplied).  These

certifications require an officer to certify, inter alia, that

the officer has reviewed the report, and that "based on the

officer's knowledge," the report "does not contain any" material

misstatement or omission and "fairly present[s] in all material

respects the financial conditions and results of operations" of

the company.  15 U.S.C. § 7241(a).

The SEC is entitled to summary judgment on this claim

because it has shown that Rosenberger knowingly executed a false

certification regarding the accuracy of the 2015 Form 10-K,

knowing as she did that it improperly reported $3 million in

49

revenue from the LNP sale, which materially misrepresented the Company's financial condition.  Rosenberger's argument that she sincerely believed recognition of the revenue was proper fails for the reasons previously stated.

### III. Aiding and Abetting Synchronoss's Violations

The SEC also argues that Rosenberger aided and abetted Synchronoss's violations of §§ 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, as well as Rules 10b-5, 12b-20, 13a-1, and 13a-11, in relation to the LNP sale.  The standards that govern these claims are well established.

Section 20(e) of the Exchange Act establishes liability for those who aid and abet others in securities violations.  15 U.S.C. § 78t(e).  Section 20(e) provides:

> any person that <u>knowingly or recklessly provides</u> <u>substantial assistance</u> to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

<u>Id.</u> (emphasis supplied).  To support a claim for aiding and abetting liability, the SEC must show:

> (1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation.

<u>Gonnella v. SEC</u>, 954 F.3d 536, 550 (2d Cir. 2020) (citation omitted).

50

To determine whether a person provided substantial assistance, it is appropriate to consider "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." Honickman v. BLOM Bank SAL, 6 F.4th 487, 500 (2d Cir. 2021) (citation omitted). None of these factors is dispositive. Id. A person does not act "knowingly" if she acts inadvertently. Id. at 499-500.

The SEC asserts that Rosenberger provided substantial assistance to Synchronoss in its violation of § 10(b) and Rule 10b-5 by directing improper accounting, certifying misleading Forms 10-K and 8-K, and misleading EY auditors. Section 10(b) of the Exchange Act and Rule 10b-5 require proof of scienter to substantiate a claim. "[T]he most straightforward way" to show corporate scienter is to "impute it from an individual defendant who made the challenged misstatement." Jackson v. Abernathy, 960 F.3d 94, 98 (2d Cir. 2020) (citation omitted).

The SEC also asserts that Rosenberger approved the improper recognition of revenue in Synchronoss's 2015 Form 10-K and February 2016 Form 8-K, thus providing substantial assistance to Synchronoss in filing false reports about the LNP sale. Section 13(a) of the Exchange Act requires issuers to file annual and

51

quarterly reports conforming to SEC regulations.  15 U.S.C. §

78m(a).  Rules 13a-1 and 13a-11 thereunder require companies to

file annual and current reports.  17 C.F.R. § 240.13a-1; 17

C.F.R. § 240.13a-11.  Rule 12b-20 requires that

> [i]n addition to the information expressly required to be
> included in a statement or report, there shall be added
> such further material information, if any, as may be
> necessary to make the required statements, in the light of
> the circumstances under which they are made, not
> misleading.

17 C.F.R. 240.12b-20.  Finally, as explained above, §

13(b)(2)(A) requires companies to maintain recordkeeping and

internal accounting controls "accurately and fairly".  15 U.S.C.

§ 78m(b)(2)(A).

Finally, the SEC asserts that Rosenberger's approval of the

improper recognition of revenue caused Synchronoss to fail in

its duty to maintain a system of appropriate accounting

controls, in violation of § 13(b)(2)(B).  As explained above, §

13(b)(2)(B) requires companies to "devise and maintain a system

of internal accounting controls sufficient to provide reasonable

assurances" that necessary transactions are recorded for the

preparation of financial reports in accordance with GAAP and to

"maintain accountability for assets."  15 U.S.C. § 78m(b)(2)(B).

"Reasonable assurance[ ]" means "such level of detail and degree

of assurance as would satisfy prudent officials in the conduct

of their own affairs."  15 U.S.C. § 78m(b)(7).

As already described, the SEC has succeeded in showing that Rosenberger engaged in fraud in connection with the recognition of LNP revenue in Q4 2015 in the Company's records.  That fraudulent conduct caused and substantially assisted the Company in violating the laws identified here.

Rosenberger has failed, for the reasons already described, to raise a question of fact regarding these issues and claims. Thus, the SEC is entitled to summary judgment on its aiding and abetting claims brought against Rosenberger.

IV.  Reimbursement for Material Noncompliance

The SEC asserts that, pursuant to § 304 of the Sarbanes-Oxley Act, Rosenberger must reimburse Synchronoss for the bonuses, incentive-based compensation, and profits she received in the twelve months after the filing of Synchronoss's 2015 Form 10-K because of the Company's material noncompliance with securities laws.  In 2002, Congress passed the Sarbanes-Oxley Act in response to significant accounting scandals at public companies, including the Enron Corp.  S. Rep. No. 107-205, passim (2002).  The purpose of the Act is to "protect investors by improving the accuracy and reliability of corporate disclosures." Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat 745 (2002).  The Senate Report for the Committee on Banking, Housing, and Urban Affairs that accompanied the Sarbanes-Oxley Act explains that § 304 was developed due to

concerns of "management benefitting from unsound financial

statements, many of which ultimately result in corporate

restatements."  S. Rep. No. 107-205, at 26.  It noted President

George W. Bush's recommendation that "CEOs or other officers

should not be allowed to profit from erroneous financial

statements."  Id.

>     Section 304 provides:
>
>     If an issuer is required to prepare an accounting
>     restatement due to the material noncompliance of the
>     issuer, as a result of misconduct, with any financial
>     reporting requirement under the securities laws, the chief
>     executive officer and chief financial officer of the issuer
>     shall reimburse the issuer for --
>     (1) any bonus or other incentive-based or equity-based
>     compensation received by that person from the issuer during
>     the 12-month period following the first public issuance or
>     filing with the Commission (whichever first occurs) of the
>     financial document embodying such financial reporting
>     requirement; and
>     (2) any profits realized from the sale of securities of the
>     issuer during that 12-month period.

15 U.S.C. § 7243(a) (emphasis supplied).  See Cohen v. Viray,

622 F.3d 188, 193 (2d Cir. 2010).

The ordinary meaning of the term misconduct, as defined in

Black's Law Dictionary is "dereliction of duty; unlawful,

dishonest, or improper behavior, especially by someone in a

position of authority or trust."  Black's Law Dictionary (11th

ed. 2019).  The term "misconduct" appears as well in another

section of the Exchange Act, which addresses the registration

and regulation of brokers and dealers, see 15 U.S.C. §§

78o(6)(A), and courts have found that it is appropriate to use the definition appearing in Black's Law Dictionary in construing the word "misconduct" in that provision of the Exchange Act. See Kornman v. SEC, 592 F.3d 173, 183-84 (D.C. Cir. 2010). Therefore, this Opinion relies as well on that definition.

To prevail on its § 304 claim and obtain reimbursement by Rosenberger, who was CFO at the time of the improper filing, the SEC must show that (1) the Company prepared an accounting restatement; (2) the restatement was due to material noncompliance by the Company with the financial reporting requirements of securities laws; and (3) that the material noncompliance was due to the Company's misconduct.

While the SEC was not required to show that Rosenberger was the one who engaged in the misconduct that caused the noncompliance, here it has identified the relevant misconduct as the activity underlying her violation of § 10(b) and Rule 10b-5, which led to the false reporting in Q4 2015 of $3 million in revenue from the sale of LNP software to AT&T.[10]

There is no dispute that Synchronoss was required to prepare the July 2, 2018 accounting restatement due to material

---

[10] The SEC also relies on the misconduct of three Synchronoss employees whose employment was terminated in connection with the Sage transaction.  Because the SEC has shown that Rosenberger engaged in misconduct, it is unnecessary to discuss the three others.

noncompliance with financial reporting requirements.  That restatement was required by Rosenberger's misconduct in connection with the reporting in Q4 2015 of $3 million in revenue from the LNP transaction.

Rosenberger argues that she should not be ordered to reimburse Synchronoss because the SEC has not proved that she engaged in an intentional violation of law.  This argument fails.  The SEC has shown that Rosenberger engaged in improper and dishonest activity in connection with the Q4 2015 recognition of the LNP revenue.  Indeed, it has shown she engaged in securities fraud.

Finally, the parties dispute the amount of reimbursement owed by Rosenberger to Synchronoss.  The SEC asserts that there is no dispute that Rosenberger received $430,741 in bonuses, incentive-based compensation, and profits from the sale of stock within twelve months of the filing of the Company's 2015 Form 10-K.  Rosenberger asserts that the value of the shares she received from Synchronoss should not be calculated based on their value on the day they were issued to her, but their value today.  Using this measure, Rosenberger contends she need only reimburse approximately $280,000.

The only reasonable way to measure the value of compensation is to measure its value on the date it is received.

Accordingly, the SEC has shown that Rosenberger must reimburse Synchronoss $430,741.

## Conclusion

The SEC's August 18, 2023 motion for partial summary judgment is granted.  The defendants' motions for summary judgment are denied.  An Order accompanying this Opinion sets forth a schedule for further proceedings in this litigation.

Dated:    New York, New York
          January 26, 2024

                                   _____
                                   DENISE COTE
                                   United States District Judge